Roger H. Hoole (5089)
**HOOLE & KING, L.C.**
4276 S. Highland Drive
Salt Lake City, UT 84124
Telephone: (801) 272-7556
Facsimile: (801) 272-7557
rogerh@hooleking.com

Jaclyn J. Robertson (11951)
**JR LAW GROUP, PLLC**
244 West 4860 South
Salt Lake City, UT 84107
Telephone: (801) 297-8545
jrobertson@jrlawgroup.com

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| Amanda Rae Grant; Jenny Kingston; Jana Nicole Johnson; Julie Ruth Green; Michelle Ruth Michaels; Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson, <br><br> Plaintiffs, <br><br> vs. <br><br> Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young, John Paul Johnson, Jacob Daniel Kingston, Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Jr., Daniel Charles Kingston, Patricia Kingston, Paul Elden Kingston, Jr., Michelle Afton Michaels, Deborah Williams, Jolene Andrews, , April McKay, Valarie Martin, Kent William Johnson, Individual Does 1 through 50, Davis County Cooperative Society, Inc. dba Redwood Grocery & Health Foods and John's Market Place, Latter Day Church of Christ, dba, ZMPC and LDCC, A-1 Disposal, Management Business Systems, Inc., Advanced Copy, Ensign Learning Center, Inc., Vanguard Academy, Advanced Vending, A&W Restaurants, The Food Group, LLC, United Fuel Supply, Washakie Farm, Order Bank aka the "Office" aka the "Century | **COMPLAINT AND JURY DEMAND** <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Case No._____ <br><br> Judge |

| Office," Family Stores True Value, Standard Restaurant Supply, AAA Communications, Washakie Renewable Energy, LLC, Fidelity Lending, Property Compliance, aka Arrow Real Estate, Attco Trucking aka CTC Trucking, American Digital Systems, Garco Property Management, American Wellness & Rehab Clinic, A-Action Express, Mitchell & Associates, A-Fab Engineering, Sierra Wholesale, and Corporate Does 50 through 500, Defendants. | |

Plaintiffs complain and allege against Defendants as follows:

## SUMMARY

This lawsuit seeks justice for ten victims[1] of a criminal organization that has operated for decades under the pretense of a religious community, but is, in reality, largely a racketeering enterprise, hate group, and polygamous cult called the Order. Plaintiffs ask this Court to hold accountable the men and organizations[2] who trafficked them and other women and children for free or discounted labor for decades; perpetrated a relentless cycle of extreme physical, sexual, and emotional abuse; and forced underage and/or teenage girls into unwanted "Order Marriages"

---

[1] Plaintiffs include Amanda Rae Grant; Jenny Kingston; Jana Nicole Johnson; Julie Ruth Green; Michelle Ruth Michaels; Allison Eames; Priscilla Tucker; Brenda Collins; Katie Martin, and Mary Ann Robinson.

[2] Paul Elden Kingston,  John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young, John Paul Johnson, Jacob Daniel Kingston, Jr., Jacob Ortell Kingston, Sr., Sally John Daniel Kingston, Jr., Daniel Charles Kingston, Patricia Kingston, Paul Elden Kingston, Jr., Michelle Afton Michaels, Debra Williams, Jolene Andrews, April McKay, Valarie Martin, Kent William Johnson, Individual Does 1 through 50, and Davis County Cooperative Society, Inc. dba, Redwood Grocery & Health Foods and John's Market Place, and Latter Day Church of Christ, dba, ZMPC and LDCC, A-1 Disposal, Management Business Systems, Inc., Advanced Copy, Bountiful Baby, Ensign Learning Center, Inc., Vanguard Academy, Advanced Vending, A&W Restaurants, The Food Group, United Fuel Supply, Coal Trucking Company, Washakie Farm, the Order Bank (aka the "Office" aka the "Century Office"), Family Stores True Value, Standard Restaurant Supply, AAA Communications, Washakie Renewable Energy, LLC, Fidelity Lending, Property Compliance aka Arrow Real Estate, Attco Trucking also known as CTC Trucking, American Digital Systems, Garco Property Management, American Wellness and Rehab Clinic, A-Action Express, Mitchell & Associates, and Corporate Does 50 through 500.  Defendant Paul Elden Kingston should be distinguished from his son who is also a defendant and is referred to herein as "Paul Elden Kingston, Jr."

with close relatives, some of which were incestuous and therefore illegal under Utah's and other states' laws.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................... 8

PLAINTIFFS ................................................................................................................... 9

INDIVIDUAL DEFENDANTS.................................................................................... 10

CORPORATE DEFENDANTS.................................................................................... 12

THE ORDER AND ITS MODUS OPERANDI .......................................................... 18

    I.      The Origins of the Order.......................................................................... 18

    II.     Paul Elden Kingston's Greed and Exploitation of Women and Children .......... 19

GENERAL ALLEGATIONS ....................................................................................... 22

    I.      The Order's Structure and Hierarchy.................................................... 22

    II.     The Order's Fraudulent "Banking" System ......................................... 29

    III.    The Order's Illicit Use of Child Labor ................................................. 33

        A.     The Order's Child Workforce Practices ................................... 33

        B.     Plaintiffs Were Forced to Work Against Their Will................ 34

        C.     The Order Deprived Plaintiffs of Due Compensation ............ 41

        D.     The Order Intentionally and Willfully Deprived Plaintiffs of Their Earnings ........................................................................ 44

        E.     The Order Misappropriated and Converted Plaintiffs' Assets................ 46

        F.     The Order Trafficked Plaintiffs Across State Lines For Labor Purposes and Forced Them To Engage in Interstate Commerce ............ 48

        G.     The Order Engages in Rampant Criminal Activity................. 49

    IV.    The Indoctrination and Education of Order Children ......................... 52

        A.     Young Girls Were Forced to Attend Marriage and Child-Bearing Courses................................................................ 52

    V.     Polygamy and Marriage Within the Order............................................. 54

    VI.    The Order Commits, Condones, and Encourages Sex Trafficking, Sexual Battery, Battery, and Sexual Abuse of Minors ................................... 57

    VII.   Individual Plaintiffs ................................................................................ 59

        A.     Amanda Grant ............................................................................ 59

        B.     Jenny Kingston........................................................................... 66

C.      Jana Nicole Johnson.................................................................. 73

D.      Julie Ruth Green ....................................................................... 80

E.      Michelle Ruth Michaels............................................................ 83

F.      Allison Eames ........................................................................... 86

G.      Priscilla Tucker ........................................................................ 90

H.      Brenda Collins ......................................................................... 95

I.      Alex Martin............................................................................. 100

J.      Mary Ann Robinson............................................................... 103

VIII.   The Order Inflicted Substantial, Intentional Emotional Distress...................... 106

IX.     The Order's Core Conspiracies...................................................................... 108

FIRST CAUSE OF ACTION LABOR TRAFFICKING IN VIOLATION OF FEDERAL
        LAW ............................................................................................. 109

SECOND CAUSE OF ACTION  SEX TRAFFICKING IN VIOLATION OF FEDERAL
        LAW ............................................................................................. 113

THIRD CAUSE OF ACTION  VIOLATION OF THE FEDERAL FAIR LABOR
        STANDARDS ACT....................................................................... 115

FOURTH CAUSE OF ACTION VIOLATION OF RICO 18 U.S.C. § 1962(C) .................... 117

FIFTH CAUSE OF ACTION VIOLATION OF RICO 18 U.S.C. § 1962(D) .......................... 120

SIXTH CAUSE OF ACTION  LABOR TRAFFICKING IN VIOLATION OF UTAH
        LAW ............................................................................................. 121

SEVENTH CAUSE OF ACTION SEX TRAFFICKING IN VIOLATION OF UTAH
        LAW ............................................................................................. 124

EIGHTH CAUSE OF ACTION  SEXUAL BATTERY AND ABUSE OF CHILDREN ........ 127

NINTH CAUSE OF ACTION  SEXUAL BATTERY AND RAPE OF ADULTS.................. 128

TENTH CAUSE OF ACTION  NEGLIGENT SEXUAL BATTERY AND ABUSE OF
        A CHILD ...................................................................................... 130

ELEVENTH CAUSE OF ACTION  CONVERSION............................................................ 132

TWELFTH CAUSE OF ACTION  INFLICTION OF EMOTIONAL DISTRESS.................. 133

PUNITIVE DAMAGES ...................................................................................... 134

PRAYER FOR RELIEF ...................................................................................... 135

## INTRODUCTION

1.      Plaintiffs are 10 young women who, from their earliest memories until their eventual

escapes, were victims of economic and sexual crimes perpetrated by "the Order," a criminal

enterprise and polygamous religious sect. Some Plaintiffs were forced to "marry" close relatives, who then beat and raped them. Others fled before the Order could lock them into similar "Order Marriages." Almost all were denied an ordinary education, physically abused (or threatened with abuse), taught to fear outsiders, and forced to work for years of their childhoods, often in grueling jobs, with little or no pay. Plaintiffs escaped the Order after enduring years of this physical, sexual, and economic abuse, which is designed to swell the Order's ranks and line the pockets of its leaders.

2.      Plaintiffs recognize that many people in the Order, including the family members and friends they love, hold sincere religious beliefs, and will be offended by this legal action, but they are compelled to bring this action, not to disparage a religion, but to address illegal conduct, benefit their family members and friends, and especially to help protect children and to show them a way to protect themselves.

3.      Defendants are members of the Order, which outsiders typically refer to as "the Kingstons."

4.      The Order is a fundamentalist religious organization comprised of several families. It is also a sophisticated criminal enterprise led by a small group of privileged white men, that feeds off the trafficking, systemic abuse, and economic exploitation of women and children.

5.      The human trafficking, emotional and physical abuse, and labor offenses described in this pleading are not the only instances of illegal behavior by the Order. Law enforcement has taken some action as to the Order's crimes but has yet to fully uncover the depth and breadth of criminal activity underlying the Order, its leaders, and the businesses under its control.

6.      Plaintiffs recognize that the Order has both religious and business functions. In filing this Complaint, Plaintiffs do not seek or intend to disparage the lawful religious aspects or beliefs of the Order. Rather, Plaintiffs' allegations are directed at the Order's unlawful religious and business

practices, which include fraud, child abuse, kidnapping, child endangerment, and wage theft, among a host of others. To the extent Plaintiffs reference religious practices in this Complaint, they do so only when those practices are illegal or supply context for Plaintiffs' allegations.

7.      The Order engages in a systemic and systematic pattern of unlawful activity designed to enrich certain Order members at the expense of others and to grow the Order's ranks by pushing girls and young women to have as many children as possible. Plaintiffs allege that Defendants and the Order engaged in unlawful patterns and practices that harmed Plaintiffs, including, without limitation, the following:

8.      The Order forces minor children to work for Order-controlled businesses before they are legally permitted to do so. Some Plaintiffs started working for Order-controlled businesses when they were just 4 years old.

9.      Though the Order forces children to work, it does not pay them wages, instead depositing their pay into the "Order Bank," which does not accurately account for children's wages, prevents children from accessing those wages, and ultimately diverts those wages to children's parents, others in the Order leadership, or back to Order-controlled businesses.

10.     The Order punishes its child workers for even minor workplace violations, sometimes beating or starving children who violate the rules at Order-controlled businesses.

11.     The Order demands that its child laborers commit or aid in committing various crimes, ordering them to falsify federal income tax returns, to destroy evidence in criminal investigations, and to not report child abuse and other crimes to "outsiders." It also involves children in various business activities designed to "Bleed the Beast"—that is, in the words of the Order, to defraud federal, state, and municipal government entities.

12.     The Order often forces underage girls, including some Plaintiffs, to marry close relatives and men who already have wives. The Order hides these illegal marriages by falsifying marriage and birth certificates, as well as by conducting "happy divorces" used to facilitate additional plural child marriages. For instance, the Order commonly and intentionally does not list fathers on children's birth certificates, a practice designed to make it difficult to prosecute Order members for fathering children in underage, plural, and incestuous marriages. The Order uses similar methods to avoid paying taxes and to hide its labor violations.

13.     Order leaders direct and arrange marriages between young, often underage girls and older Order members, subject to approval by the leader of the Order, Paul Elden Kingston.

14.     The Order, through its religious practices and educational curriculum, teaches young girls that they must bear as many children as possible, that they have a responsibility to increase the size of the Order by bearing children, and that they must submit sexually, even against their will, to their husbands in order to produce children.

15.     By forcing girls into underage marriages and young pregnancies, the Order makes it difficult for girls to leave. The Order does not allow girls to divorce their husbands, and it threatens to prevent mothers from seeing their children if they try to leave the Order. Pressuring girls to have as many children as possible also gives the Order a steady supply of unlawful and easily exploitable child labor for its various business interests.

16.     The Order teaches its members that the laws of God, not society, govern them. This sows seeds of anarchy and contempt for the rule of law, which ultimately justifies any action deemed necessary to advance the needs of the Order—regardless of legality.

17.     Some of the Order's practices are lawful and constitutionally protected, but some are unlawful and have no constitutional protection, particularly when they involve children.

18.     Children in the Order are involved in these practices and typically do not recognize that they are part of, and are advancing, the unlawful aspects of the Order's enterprise. When they are disobedient, fail to comply, or challenge these practices, they are punished.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, including under the Federal Trafficking Victims Protection Reauthorization Act ("TVPRA") and the federal Fair Labor Standards Act ("FLSA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

20.     This Court has personal jurisdiction over each of the named defendants (i) because the defendants purposefully availed themselves of the privilege of conducting various business, professional, and/or personal activities in Utah, including, *inter alia*, by residing in Utah, by owning, managing, and/or operating businesses in Utah, by doing business in Utah and/or by transacting business through banks in Utah; and (ii) because the defendants' contacts within this forum give rise to, or are related to, the plaintiffs' claims.  Furthermore, the defendants' activities in Utah—including their ownership, management, and/or operation of businesses, their trafficking of minors, and their conversion of plaintiffs' funds—are substantial. Finally, with respect to entity defendants, each entity is incorporated in, and/or maintains a principal place of business, in this forum, such that each such defendant is considered "at home" in Utah.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to plaintiffs' claims occurred in the District of Utah.

## PLAINTIFFS

22.     Plaintiff Amanda Rae Grant is a young woman and former member of the Order. Amanda Rae Grant was born into the Order on August 31, 1995. Amanda's mother is Lorie Peterson, and her father is Verl Johnson, a Numbered Man, assigned number 36.

23.     Plaintiff Jenny Kingston is a young woman and former member of the Order. Jenny Kingston was born into the Order on May 10, 1997, in a home in the Salt Lake area. Jenny's mother is Benny Kingston, and her father is Jeremy Kingston, Sr., a Numbered Man, assigned number 68.

24.     Plaintiff Jana Nicole Johnson is a young woman and former member of the Order. Jana Nicole Johnson was born into the Order on January 9, 2003. Jana's mother is Nataleen Johnson, and her father is Kent William Johnson. Kent William Johnson is one of the sons of John Ortell Kingston, a half-brother of the Seven Kingston Brothers, and a Numbered Man 26.

25.     Plaintiff Julie Ruth Green is a young woman and former member of the Order. Julie Ruth Green was born into the Order on December 6, 1998. Julie's mother is Martha Nichols, and her father is Jason Ortell Kingston, one of the Seven Kingston Brothers and a Numbered Man, assigned number 49.

26.     Plaintiff Michelle Ruth Michaels is a young woman and former member of the Order. Michelle Ruth Michaels was born into the Order on May 2, 2000. Michelle's mother is Michelle Afton Michaels, also known as Michelle Afton Brown. Michelle Ruth Michaels' father is Jesse Orvil Kingston, one of the Seven Kingston Brothers and a Numbered Man, assigned number 48.

27.     Plaintiff Allison Eames is a young woman and former member of the Order. Allison Eames was born into the Order on November 6, 1999. Allison's mother is Kelli Collins, also known as Kelli Mattingly. Allison's father is John Daniel Kingston Sr., one of the Seven Kingston Brothers and a Numbered Man, assigned number 15.

28.   Plaintiff Priscilla Tucker is a young woman and former member of the Order. Priscilla Tucker was born into the Order on April 18, 1997. Priscilla's mother is Hannah Tucker, and her father, Alma Tucker, is deceased.

29.   Plaintiff Brenda Collins is a young woman and former member of the Order. Brenda Collins was born into the Order on March 23, 2001. Brenda's mother is Kelli Collins, also known as Kelli Mattingly. Brenda's father is John Daniel Kingston, Sr., a Numbered Man, assigned number 15.

30.   Plaintiff Katie Martin (herein referred to as "Alex" or "Alex Martin") is a young woman and former member of the Order. Alex Martin was born into the Order on January 23, 2002. Alex's mother is Valarie Martin. Alex's father is John Daniel Kingston, Sr., a Numbered Man, assigned number 15.

31.   Mary Ann Robinson is a young woman and former member of the Order. Mary Ann was born on November 13, 1992. Mary Ann's mother is Mary Keaton. Mary Ann's father is Jeremy Kingston, a Numbered Man, assigned number 68.

### INDIVIDUAL DEFENDANTS

32.   Defendant Paul Elden Kingston is an individual believed to be residing in, among other counties, in Salt Lake County, State of Utah, and a member of the Order.  He is the Order's leader. He directs the activities of the Order and meticulously controls Order members' conduct, going so far as to mandate medical procedures (or abstinence therefrom), restrict or compel the employment of certain individuals at specific jobs and organizations, and approving marriages between and among Order members.

33.   Defendant John Daniel Kingston Sr. is an individual believed to be residing in, among other counties, in Salt Lake County, State of Utah, and a member of the Order.

34.     Defendant Hyrum Dalton Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

35.     Defendant, David Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

36.     Defendant Jesse Orvil Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

37.     Defendant Jason Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

38.     Defendant Rachel Orlean Kingston Young is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

39.     Defendant John Paul Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

40.     Defendant Jacob Daniel Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

41.     Defendant Jacob Ortell Kingston, Sr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

42.     Defendant Sally Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

43.     Defendant John Daniel Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

44.     Defendant Daniel Charles Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

45.     Defendant Patricia Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

46.     Defendant Paul Elden Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

47.     Defendant Michelle Afton Michaels is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

48.     Defendant Deborah Williams is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

49.     Defendant Jolene Andrews is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

50.     Defendant April McKay is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

51.     Defendant Valarie Martin is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

52.     Defendant Kent William Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

53.     Individual Defendant Does 1 through 50 are members and agents of the Order, not yet identified, who hold property and conduct business for the benefit of the Order.

**CORPORATE DEFENDANTS**

54.     Defendant Davis County Cooperative Society, Inc., established in 1941, is a corporation registered as a nonprofit entity organized under the laws of Utah, with a principal place of business at 1798 South 900 East, Salt Lake City, UT 84106.

55.     Defendant Davis County Cooperative Society also has registered two additional names with the State of Utah under which it conducts business:  Redwood Grocery & Health Foods and John's Market Place.

56.     Defendant Redwood Grocery & Health Foods is a for-profit grocery store organized under the laws of Utah, with a principal place of business at 4141 South Redwood Road, Salt Lake City, Utah, 84123.

57.     Defendant John's Market Place is a for-profit grocery store organized under the laws of Utah, with a principal place of business at 4141 South Redwood Road, Salt Lake City, Utah, 84123.

58.     Defendant Latter Day Church of Christ is a corporation registered as a nonprofit entity with the State of Utah and has been since December 27, 1977. However, it has only been active since December 28, 2001.

59.     Defendant Latter Day Church of Christ is organized under the laws of Utah, with a principal place of business at 1860 West Parkway Blvd, Salt Lake City, Utah 84119.

60.     Defendant Latter Day Church of Christ registered with the State of Utah two names under which it conducts business:  ZMPC9 and LDCC.

61.     Defendant Order Bank (aka the "Office" aka the "Century Office") is not a real banking organization, but rather a set of offices with the main office located at 53 West Angelo Ave, Salt Lake City, Utah and a larger office at 10 Century Park Way, Salt Lake City, Utah. Paul Elden Kingston and the Order require all Order members to have an "account" at the Order Bank, into which each Order business purports to deposit all of each member's wages and income and from which the Order Bank, at the order and direction of Order leaders like Paul Elden Kingston, unilaterally controls each member's access to money.

62.     On information and belief, Paul Elden Kingston exercises direct oversight and ultimate authority and control over all of the funds deposited into the Order Bank and the Order Bank's activities.

63.     Defendant A-1 Disposal is a waste management and recycling solutions center organized under the laws of Utah, with a principal place of business at 610 West 3410 South, Salt Lake City, Utah 84119.

64.     Defendant Advanced Copy is a for-profit copying and duplicating service organized under the laws of Utah, with a principal place of business at 4850 South Redwood Road, Taylorsville, Utah 84123.

65.     Defendant Ensign Learning Center, Inc. is an educational center organized under the laws of Utah, with a principal place of business at 2755 Decker Lake Lane, Salt Lake City, Utah 84119.

66.     Defendant Vanguard Academy is a charter school organized under the laws of Utah, with a principal place of business at 2650 South Decker Lake Lane, Salt Lake City, Utah 84119.

67.     Defendant Advance Vending is a vending management company organized under the laws of Utah, with a principal place of business at 3994 South 300 West, Unit 32, Murray, Utah 84107.

68.     Defendant A&W Restaurant is a franchise organized under the laws of Utah, with a principal place of business at 6765 UT-36, Stansbury Park, Utah 84074. The franchise is part of a chain of for-profit A&W Restaurants that serve fast food.

69.     Defendant United Fuel Supply is a for-profit commodity trading company organized under the laws of Utah, with a principal place of business at 7950 West 2400 North, Plymouth, Utah 84330.

70.    Defendant Family Stores True Value is a for-profit hardware store organized under the laws of Utah, with a principal place of business at 4860 South Redwood Rd, Taylorsville, Utah 84123.

71.    20.  Defendant Standard Restaurant Supply is a for-profit restaurant supply company organized under the laws of Utah, with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115.

72.    Defendant AAA Communications is a for-profit answering service organized under the laws of Utah, with a principal place of business at 2971 South Richards Street, Salt Lake City, Utah 84115.

73.    Defendant Washakie Renewable Energy, LLC is a for-profit biofuel company organized under the laws of Utah, with a principal place of business at 3950 South 700 East Ste #100, Salt Lake City, Utah 84107.

74.    Defendant Fidelity Lending is a for-profit finance and credit company organized under the laws of Utah, with a principal place of business at 10 West Century Parkway, Salt Lake City, Utah 84115.

75.    Defendant Property Compliance, aka Arrow Real Estate, is a for-profit real estate company organized under the laws of Utah, with a principal place of business at 635 West 5300 South Ste 202, Murray, Utah 84123.

76.    Defendant Attco Trucking Company, Inc. (also known as CTC Trucking) is a for-profit freight and transportation company organized under the laws of Utah, with a principal place of business at 2750 West 900 South, Salt Lake City, Utah 84104.

77.    Defendant American Digital Systems is a for-profit software company organized under the laws of Utah, with a principal place of business at 2971 South Richard Street, Salt Lake City, Utah 84115.

78.    Defendant Garco Property Management is a for-profit business with a principal place of business at 3994 South 300 West, Millcreek, Utah 84107.

79.    Defendant American Wellness & Rehab Clinic is a for-profit family medicine clinic organized under the laws of Utah, with a principal place of business at 677 West 5300 South, Murray, Utah 84123.

80.    Defendant The Food Group, LLC is a for-profit entity organized under the laws of Utah, with a registered address listed as 670 East 3900 South Ste 300 Salt Lake City, UT 84107 and doing business as A&W Taylorsville, A&W Plymouth, and A&W Stansbury.

81.    Defendant Washakie Farm is located in or around the town of Washakie, Utah in Box Elder County. It is a for profit farm owned by the Order.

82.    Defendant Coal Trucking Company which may also be known as CTC Trucking, LLC and/or Coal Valley, LLC is a for-profit entity owned and operated by the Order.

83.    Defendant A-Action Express is a for-profit transportation company that provides school and employee bus services for Order children, organized under the laws of Utah, with a principal place of business at 624 North 300 West, Salt Lake City, Utah 84103.

84.    Defendant Mitchell & Associates is a for-profit accounting company that provides Order members tax and accounting services for the benefit of the Order, organized under the laws of Utah, with a principal place of business at 670 East 3900 South, Suite 301, Salt Lake City, Utah 84117.

85.     F-Fab Engineering is a for-profit engineering company, organized under the laws of Utah, with a principal place of business at 83 Navajo Street, Salt Lake City, Utah 84104.

86.     Sierra Wholesale is a for-profit flooring company and a dba of the Order operating within Standard Restaurant Supply, with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115.

87.     The Order owns and manages numerous other entities and businesses throughout the State of Utah, as well as in other states, including but not limited to, the entities and businesses listed in **Exhibit A** hereto.

88.     The named corporate Order businesses include Davis County Cooperative Society, Inc. dba Redwood Grocery & Health Foods and John's Market Place, A-1 Disposal, Management Business Systems, Inc., Advanced Copy,  Ensign Learning Center, Inc., Vanguard Academy, Advanced Vending, A&W Restaurants, The Food Group, United Fuel Supply, Coal Trucking Company, Washakie Farm, the Order "Bank" aka the Office aka the Century Office, Family Stores True Value, Standard Restaurant Supply, AAA Communications, Washakie Renewable Energy, LLC, Fidelity Lending, Property Compliance aka Arrow Real Estate, Attco Trucking aka CTC Trucking, American Digital Systems, Garco Property Management, American Wellness and Rehab Clinic, Mitchell & Associates, A-Fab Engineering, and Sierra Wholesale (the "Order Businesses").

89.     Corporate Defendants Does 50 through 500 are also Order Businesses, not yet identified, which are controlled by the Order and part of its enterprise, and which conduct business and hold property for the benefit of the Order.

90.     The Individual Defendants, the Order Businesses, including those listed on Exhibit A, Davis County Cooperative Society, Inc., and Latter Day Church of Christ are sometimes collectively referred to herein as the "Order."

## THE ORDER AND ITS MODUS OPERANDI

### I.      The Origins of the Order

91.     The Order is a Utah-based organization that was created on January 1, 1935, by Charles Elden Kingston, a third-generation member of the Church of Jesus Christ of Latter-Day Saints (LDS Church).

92.     Charles Elden Kingston determined that the LDS Church had erred in abandoning certain FLDS practices, such as plural marriage and the Law of Consecration. As a result, Charles Elden Kingston ultimately decided to establish the Davis County Cooperative Society ("DCCS" also known as the "Order"), as an alternative to the LDS Church.

93.     The Order holds itself out publicly as a religious organization that accepts the "time and properties from individuals who wished to live by the same principles" that Charles Kingston and his family espoused.[3]

94.     A primary underpinning of the Order was economic consolidation, whereby all members contribute money to a single pool controlled by the Society. As such, after the Order was officially organized under the laws of Utah, the Order set up a system whereby money loaned to or deposited by "any individual member was recorded in their account, paying interest on money owed, or receiving interest on the balance of savings."  This system of using internal Order "accounts" to record members' monetary assets, rather than using traditional banking institutions, is still the system used today.

---

[3] *See* Davis County Cooperative Society, available at: https://www.dccsociety.org/dccs-history/establishment.

95.     The Davis County Cooperative Society and "the Order" are one and the same.

96.     While the Order is not affiliated with the LDS Church, which abandoned the practice of polygamy nearly 120 years ago, its members practice a fundamentalist version of Mormonism that involves polygamy. Members are, almost without exception, born into the organization.

97.     On information and belief, the Order's current leader, Paul Elden Kingston, is also the Trustee-in-Trust of the Order.

## II.     Paul Elden Kingston's Greed and Exploitation of Women and Children

98.     The Order, as it exists today, consists of a large group of families that own an extensive network of businesses in Utah. It is a massive financial enterprise where all members work to contribute to the needs, wants, and objectives of Paul Elden Kingston and his family, to the detriment of the individual members.

99.     Worse still, the Order has become a criminal enterprise engaged in rampant illegal conduct. The Order secretly engages in, endorses, encourages, and approves of forced labor, sex trafficking, sexual battery, abuse of children and other vulnerable individuals, as described throughout this Complaint.

100.    Furthermore, the Order practices willful fraud against the government and encourages—and sometimes requires—its members, including children, to be complicit in its crimes. The Order withholds paychecks from working Order members and controls members' wages while avoiding liability for labor law violations. It falsifies and files fraudulent tax documents to maximize tax benefits and minimize tax liability. It fraudulently has members' medical bills paid by Medicaid. And it conceals its widespread child abuse from state officials at the Utah Division of Child and Family Services ("DCFS").

101.    The tactics designed to illegally extract money from the government are part of the Order's mantra of "Bleeding the Beast."

102.    "Bleeding the Beast" is how the Order refers to the concept of exploiting and defrauding governments and taxpayers for the benefit of the Order.

103.    For example, through a now-defunct biofuel company, Washakie Renewable Energy, the Order conspired to steal and launder over $1 billion in federal tax credits.[4]  It was caught, and four Kingston family members were prosecuted.[5]

104.    Another example of the Order leaders' efforts to "Bleed the Beast" arises from the federal and state tax documentation that the Order files each year.  At the direction of Paul Elden Kingston and the Order's leadership, teenagers, on their tax returns, are often required to claim several of their siblings as their own dependents, so as to maximize tax deductions to Order families, which are in turn intercepted by or passed along to the Order leadership through the Order Bank (and not retained by each member).

105.    Similarly, at Paul Elden Kingston's instruction, parents of minor children claim that their minor children are not working and not receiving money, so that they may qualify for Medicaid and food stamps. But, in reality, minor children in the Order are forced to work, which the Order and the children's parents benefit from but fail to disclose to federal and state authorities.

106.    Through its consistent, concerted, and willful acts of "Bleeding the Beast," the Order operates as a modern crime syndicate.

107.    Various other tactics that the Order uses can only be described as corrupt, illegal, immoral, and, indeed, evil.

---

[4] *See, e.g.*, United States Department of Justice, Office of Public Affairs, Press Release, *Jury Finds Los Angeles Businessman Guilty in $1 Billion Biodiesel Tax Fraud Scheme*, available at: https://www.justice.gov/opa/pr/jury-finds-los-angeles-businessman-guilty-1-billion-biodiesel-tax-fraud-scheme (noting that "Four Members of Kingston Family, including the CEO and CFO of Washakie Renewable Energy, Previously Pleaded Guilty").

[5] In April 2023, these individuals were sentenced to the following prison terms: Jacob Ortell Kingston, Jr. 18 years; Isaiah Kingston 12 years; Rachel Orlean Kingston Young 7 years; and Sally Kingston 6 years. Two of these individuals, Jacob Ortell Kingston, Jr. and Sally Kingston, are defendants in this civil action.

108.     In 2017, the FBI executed a search warrant on some of the Order Businesses, as well as on the home of Jacob Ortell Kingston, Sr. in connection with the Washakie Renewable Energy tax fraud scheme.

109.     Because, on information and belief, the Order had been tipped off prior to the raid and knew that the FBI planned on executing search warrants, the Order forced its members—including minor children—to assist in destroying evidence, hiding evidence, and lying to the government.

110.     Prior to the raid, the Order systematically removed damning information from its computers and replaced hard drives, so that the FBI would only see the falsified information that the Order was willing to share with the FBI.

111.     Children were instructed to take the hard drives with incriminating evidence, along with other evidence, and shoot them with guns. In other words, the children were ordered to be complicit in the crime of interfering with a federal investigation and destroying evidence.

112.     Despite the Order's destruction of literal tons of evidence of fraud, the evidence that the FBI did seize pursuant to the search warrants still resulted in the criminal convictions and imprisonment of several Order Members and a criminal judgment in favor of the United States in excess of $500 million for fraud related to Washakie Renewable Energy's illegal activities on behalf of the Order.

113.     The Order also takes great pains to hide the plural, underage, and incestuous marriages into which it forces young girls. It is a common and intentional practice in the Order not to list fathers on their children's birth certificates to cause confusion, avoid criminal prosecution for fathering children in underage, plural or incestuous marriages, and/or for illicit tax and child labor reasons.

114.     The criminal exploitation and abuse of children does not stop there. The Order warns children against speaking to police officers or officials from the DCFS. Children are forcibly

trained to not speak to non-Order members, and they are taught to say they do not know their fathers if asked—so that the Order can prevent disclosure of plural, incestuous, and underage marriages.

115.    One Order member, Laura Fuller, who is unlawfully married to John Daniel Kingston, Sr. coached Order children, including certain of the Plaintiffs, to withhold from authorities evidence of self-harm and/or the abuse that they suffered in the Order.

116.    Occasionally, DCFS would find out about abuse that was taking place in the Order, and they would send an authority to investigate. When this would happen, Order leaders, including Hyrum Dalton Kingston, the Principal of the Order's school, Ensign Learning Center, Inc., would pressure and intimidate children to prevent them from disclosing evidence against the Order. Hyrum Dalton Kingston falsely told the children that the Order was entitled to have a witness in the room for any interviews—namely, a trusted member of the Order. The purpose of having an Order member in the room during DCFS interviews was to ensure that the child would honor their mother and father and protect both their family and the Order by concealing the abuse the child had experienced or witnessed firsthand. When DCFS would not allow an adult Order member to sit in on the interview, an adult Order member would leave a recording device in the room to intimidate the child and prevent the child from telling the truth about the Order's rampant child abuse.

## GENERAL ALLEGATIONS

### I.    The Order's Structure and Hierarchy

117.    The Order's power and authority is centralized in the Kingston family, also known as the "Kingston clan."

118.    To become a member of the Order, you have to be born into it or, on rare occasions, be admitted by unanimous vote of all members during a New Year's Church Meeting.

119.     The Order is structured in a patriarchal and hierarchical manner with Paul Elden Kingston the leader of the enterprise. Senior men within the Order are assigned numbers—becoming "Numbered Men." The living man with the lowest number is the leader of the Order.

120.     John Ortell Kingston's seven sons are all Numbered Men in the Order, and listed in age order are: Joseph Ortell Kingston (deceased), assigned number 14; John Daniel Kingston, Sr., assigned 15; Hyrum Dalton Kingston, assigned number 25; Paul Elden Kingston, assigned number 9; David Ortell Kingston, assigned number 33; Jesse Orvil Kingston, assigned number 48; and Jason Ortell Kingston, assigned number 49 (collectively herein, the "Seven Kingston Brothers").

121.     The Seven Kingston Brothers are considered royalty in the Order and have authority over members of the Order and the Kingston Church. Among the Seven Kingston Brothers there is a hierarchy, in which all of the living brothers report to Paul Elden Kingston, sometimes referred to as "The Man on the Watch Tower."

122.     Paul Elden Kingston is one of the seven sons of John Ortell Kingston, who died after assigning number nine to Paul Elden Kingston and appointing him to lead the Order. As a leader in the Order, Paul Elden Kingston is the "Numbered Man" with the lowest number.

123.     All the Numbered Men in the Order with numbers lower than Paul Elden Kingston have died.

124.     Paul Elden Kingston exercises direct oversight over all of the funds "deposited" by or for Order members into the Order Bank. The Order Bank, however, is not a real bank at all, but an Order Business used by Paul Elden Kingston to siphon the Order members' money into Order Businesses and real banking institutions' accounts controlled by him. At Paul Elden Kingston's discretion, he also distributes Order members' money to himself, John Daniel Kingston, Sr.,

Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, and Rachel Orlean Kingston Young, among others.

125.    While the official ownership of Order Businesses changes frequently, the profits of those businesses accrue directly to Paul Elden Kingston and his siblings. Paul Elden Kingston and his siblings have accrued tremendous wealth from their oversight of the Order and use that wealth to enrich themselves.

126.    Each Order Business falls within the jurisdiction of one of Paul Elden Kingston's brothers. The brothers each obtain the profits from the businesses they oversee and then divide those profits between themselves and their sister, Rachel Orlean Kingston Young.

127.    If an Order member starts a business, one of Paul Elden Kingston's brothers will ultimately claim ownership of that business if it demonstrates any measure of success. In this way, Order members are prevented from passing on wealth to their descendants, and all wealth in the Order is ultimately aggregated into the control of Paul Elden Kingston and his siblings.

128.    Paul Elden Kingston, his brothers, and many other Numbered Men have separate homes for each of their numerous wives. For example, Paul Elden Kingston has at least 27 homes—one for each of his wives—including at least one home with an indoor swimming pool. Paul Elden Kingston and his family also have numerous luxury cars, as do other powerful men within the Order.

129.    Another example is Jacob Ortell Kingston, Sr., who managed Washakie Renewable Energy, owned a silver Lamborghini and gave a business partner a gold Bugatti.

130.    By contrast, most non-elite Order members—especially the women—live in relative poverty, with entire families—including multiple wives and potentially dozens of children—often living in single, poorly-maintained homes.

131.    Public news reports[6] have stated that Paul Elden Kingston and some of his wives maintain vast stockpiles of gold and silver bullion that he has accrued from the profits of Order Businesses derived from the Order's illegal exploitation of women and children.

132.    Even though it is difficult and, in some cases, impossible, for Order members to withdraw their money from the Order Bank, Paul Elden Kingston is able to access as much cash as he would like.

133.    Paul Elden Kingston and his siblings use the ill-gotten profits of the Order to purchase numerous items for their personal use. For example, they have used Order proceeds to purchase luxury vehicles and lavish vacations, including international trips. Jason Ortell Kingston used Order profits to install bulletproof glass on the windows of at least one of his homes. Jesse Orvil Kingston has used thousands of dollars of Order profits to purchase collectible Star Wars toys.

134.    On information and belief, Paul Elden Kingston collects and keeps for himself at least 10% of all earnings and property held by all Order members. Each year, a certain amount from each Order Bank account is transferred to Paul Elden Kingston's account, and each member of the Order who owns real property must give 10% of the value of that property to Paul Elden Kingston.

135.    Paul Elden Kingston and his siblings draw on their combined wealth, power, and authority over the Order to control Order members and administer Order business and affairs.

136.    There is also an entity, sometimes called the "Governing Board" or "Order Board," consisting of the Seven Kingston Brothers and other powerful Numbered Men in the Order, all of whom report to Paul Elden Kingston.

---

[6] *See e.g.,* Jesse Hyde, *Inside 'The Order,' One Mormon Cult's Secret Empire*, Rolling Stone (June 15, 2011) https://www.rollingstone.com/culture/culture-news/inside-the-order-one-mormon-cults-secret-empire-244969/ (describing "America's most twisted crime family").

137.    Upon information and belief, the following individuals serve on the Order Board:  James Charles Young, assigned number 107; John Alden Gustafson, assigned number 27; John Daniel Kingston Sr., assigned number 15; Hyrum Dalton Kingston, assigned number 25; David Ortell Kingston, assigned number 33; Jesse Orvil Kingston, assigned number 48; Jason Ortell Kingston, assigned number 49; Robert John Kingston, assigned number 59; Joshua Paul Kingston, assigned number 56; Matthew Ortell Kingston, assigned number 60; John Daniel Kingston Jr., assigned number 69; Kent William Johnson, assigned number 26; Verl James Johnson, assigned number 36; Steven Elden Miller, assigned number 89; Ellery Merlin Kingston, assigned number 32; and Paul Elden Kingston, assigned number 9.

138.    All Order members are required to submit to Paul Elden Kingston's authority and direction.

139.    To facilitate Paul Elden Kingston's control, Order members are required to follow "The Law of One Above Another."

140.    Numbered Men in the Order report to the One Above (typically Paul Elden Kingston), one of the Seven Kingston Brothers, or to a man on the Order Board.

141.    The Seven Kingston Brothers and the men on the Order Board report to their "One Above," who is Paul Elden Kingston.

142.    As set forth below, The Law of One Above Another was used in this fashion to make Plaintiffs and other children born into the Order provide labor as religious martyrs for their parents, the Order, and its leaders. A husband is the "One Above" all his wives and all their unwed children. When a girl or woman is married, her "One Above" changes from her father to her husband. Any married but unnumbered man reports to his assigned "One Above," a Numbered Man who is either his father or a Numbered Man that is closely related.

143.   Young girls in the Order are specifically taught to ensure they are "... fitting in with the ones over [them] and pleasing [the One Above] in every way [they] know how."

144.   Order members as a whole are taught to "... [abide] by the order standards [and] make sure the ones around you are doing the same" by following the Law of One Above.

145.   In order to have children for labor, The Law of One Above Another is essential for coercing arranged Order marriages and the production of as many children as possible.

146.   A general diagram of the Law of One Above Another structure is attached as **Exhibit B**.

147.   Failure to abide by the Law of One Above Another is considered to be a sin in the Order, punishable not only by God, but also by members of the Order.

148.   Punishments include a rigorous repentance process that varies in extremes from members being physically restrained or held against their will, to being denied basic human necessities under the guise of a 42-day fast, to physical beatings, to children being taken away from parents, among other things.

149.   The repentance process often includes packets of paperwork to be completed by the supposedly "sinful" member. This paperwork is evaluated by numbered men in the Order as well as Paul Elden Kingston to determine if the member has "repented of their sins."

150.   The Order utilizes a wide range of methods to control members—including involuntary members, like children born into the Order—and to make them dependent on the Order, including:

   a.   Requiring members to live in a closed, insular society;

   b.   Teaching children to fear, distrust, and not associate with outsiders;

   c.   Controlling the education and indoctrination of children;

   d.   Teaching children to disobey the laws of society;

   e.   Operating an array of Order Businesses;

   f.   Requiring most members to work Order jobs;

g.  Operating the Order Bank to restrict or prevent access to earnings;

h.  Using the Order Bank to misappropriate member earnings;

i.  Stressing the need to function within the Order's economy;

j.  Arranging and directing all Order marriages;

k.  Insisting that girls and women give birth to large numbers of Children;

l.  False imprisonment or restraint to coerce compliance;

m.  Forced institutionalization to coerce compliance;

n.  Threatening girls and women with the loss of their children if they leave;

o.  Threatening the loss of family and friends for leaving; and

p.  Cutting those who do leave off from their families and friends.

151.   Once dependent on the Order, members are often compelled to submit to and perpetuate these practices on others against their will.

152.   In addition to a patriarchal and numerical hierarchy, the Seven Kingston Brothers govern the Order with a belief in the "Pure Kingston Blood," which causes them to arrange marriages for Kingstons within the Kingston blood line to maintain Pure Kingston Blood.

153.   The greater the quantity of "Kingston Blood" in your line, the more worthy you are as an individual, thus the more "freedom" you have.

154.   Members of the Order who have Kingston blood are favored over those from families whose blood is impure. The Order teaches members that only those with pure Kingston blood will survive the apocalypse. The Order deems individuals' blood impure if they have any blood in their line stemming from a minority race, if they enter into an interracial relationship, or if they exhibit LGBTQ+ "tendencies."

155.   Women in the Order are favored to the extent they are obedient, pure of blood, married to a Numbered Man, a first wife, and the mother of numerous children.

156.    Men in the Order are favored and given authority and power to the extent they are obedient, pure of blood, have large families, and can produce a lot of money and workers for the Order.

157.    Favored men in the Order are often "gifted" additional wives to exemplify the status of their favor and worthiness.

158.    The Southern Poverty Law Center has designated the Order as a hate group since at least 2017.[7]

**II.     The Order's Fraudulent "Banking" System**

159.    Central to the Order's enterprise is the "Order Bank," which is not a real bank.

160.    Members do not receive wages for working at Order Businesses, rather their wages are paid by Order Businesses directly to the Order Bank. Members, particularly children, do not have any choice in this matter.

161.    The Order Bank receives the wages of Order members, reserves small amounts for use by Order members and filters the rest of the funds through "back accounts" at the Order Bank to pay expenses—typically "owed" to itself or Order Businesses, and for other Order purposes—while funneling the balance of the member earnings into accounts at various real banks controlled and owned by the Order. The funds sent to real banks are only accessible to Order leaders like Paul Elden Kingston. Essentially, the Order bank is a ledger system that buffers members from their money while it is siphoned away.

162.    The Order tells members that their earnings are tracked with "statements," and that any wages earned are accounted for in each member's statement. That is false.

---

[7]   *See* Stephen Lemons, *Blood Cult*, Southern Poverty Law Center (August 8, 2017), https://www.splcenter.org/fighting-hate/intelligence-report/2017/blood-cult.

163.    Each month, the statements and accounts are manipulated by the Order, and they do not accurately show how much money should be reflected on the statement, or how much new money should have been added for work performed.

164.    Statements at the Order Bank do not show hours worked, hourly wage, or anything to show why a certain amount of money has been deposited in an account. Instead, the statements simply show a balance. Order Bank statements are distributed at church once a month, and all of the statements for the children are given to their parents. It is up to the parents to decide whether or not to show the statements to the children.

165.    On information and belief, Order Businesses do not maintain accurate formal payroll records because, among other reasons, the Order businesses do not want to create records of their illegal activities, including forced child labor. Children working in the Order Businesses prepare these payroll documents to send to the Order Bank. They are given numbers by the managers of the businesses for each employee. Sometimes, managers will dock pay for employees who displease them, or they will take money out of a child's wages when a piece of equipment breaks and needs to be replaced, even if the child was not responsible for the break.

166.    Children working in the payroll department at the Order Bank receive some of these payroll records from Order Businesses. These records ostensibly show the wages earned by Order members who work at Order Businesses, but there is simply a number next to each person's name. There is no explanation of how many hours were worked or the hourly wage.

167.    In addition to statements showing money that goes into member accounts each month from Order Businesses, the statements may also reflect money removed from the accounts. The Order claims that these deductions are based on each member's expenses for that month. Statements may show deductions made each month for rent (which children are informed they must pay to their

parents, starting at a young age), groceries, clothes, and other basic necessaries of life purchased at Order stores.

168.     Children regularly see deductions on their statements for purchases they have not made but are told that they are contributing to their parents' household expenses, or simply that their parents needed the money.  Occasionally, children, including the plaintiffs, were informed that they had to help pay for improvements made to their mothers' homes, and large sums of money were deducted for those repairs. Other deductions have no explanation.

169.     In addition to controlling access to the statements, parents and Order leaders control when and how much money the children can access, even though children begin working as young as age 4.

170.     In order to purchase anything from Order stores, children must be authorized to charge items to their own Order statements. To receive authorization, children must first get permission from their One Above to spend a certain amount of money. This authorization is reported to the Order Bank, and it is noted on the child's statement. When the child asks to purchase something from an Order store, that store must ensure that the child has authorization, which is done by calling the Order Bank. If the child is authorized to spend that much money, the transaction is completed and the child's statement is debited; if the child is not authorized, they cannot complete their purchase. Authorization is granted arbitrarily based on coercion of blind obedience and standing in the Order. Further, women and children who are granted authorization must purchase products from Order stores at greatly inflated prices.

171.     If a child wants to withdraw actual cash from the Order Bank, the Order Bank must call the child's "One Above" for permission. Children rarely are permitted to withdraw cash, and when

it is permitted, withdrawals are typically only for absolutely necessary expenses that cannot be satisfied by Order stores.

172.    All money that is spent from Order Bank accounts at Order stores is simply transferred from one account to another.

173.    Order members, most of them children, working at the Order Bank keep track of these transactions, sometimes receiving receipts and records from Order Businesses and logging them in the Order Bank computers. Some transfers are entirely unexplained and simply done at the arbitrary direction of Order leaders like Paul Elden Kingston.

174.    The Order Businesses do not function separately but are integrated in the Order economy as a single enterprise or common concern and operate to achieve common purposes, including the patterns and practices identified in the Introduction to this Complaint and as otherwise set forth herein.

175.    Adults supervising the children working at the Order Bank oversee the accounts for Order Businesses, and the adults teach and instruct the children to ensure that the accounts are adequately funded in an effort to avoid responsibility themselves. The Order Businesses have accounts outside of the Order with bills that need to be paid, and the children employed in the financials department of the Order Bank ensure that those bills can be paid, under the supervision and instruction of the Order adults who also work at the Order Bank.

176.    Any Order adult who has a bank account at a bank outside of the Order is required to provide the Order with their banking information, including online banking log-in information. When the children see that some Order accounts need additional funds which must come from outside the Order Bank, the children log in to those outside accounts held by Order members

without the members' permission, and transfer money from those accounts to Order business accounts.

177.    At the end of each year, all or substantially all of the money that the children build up in their Order Bank accounts is moved into a "back account," which is simply an account owned and managed by that child's father. The children do not have access to that money, and they start each year with basically nothing in their Order Bank accounts. They then spend the entire year working so that they have money to pay rent, buy food and other necessities, and contribute to the family however their parents see fit.

178.    In this manner, the Order systematically and systemically uses, *inter alia*, the Law of One Above Another to make Order children religious martyrs in violation of the United States Constitution.

### III.    The Order's Illicit Use of Child Labor

#### A.    The Order's Child Workforce Practices

179.    On information and belief, the Order owns, operates, and manages hundreds of businesses within the State of Utah and other states, including the named defendant Order Businesses, with annual profits numbering in the millions.

180.    Rather than relying on an adult workforce, Paul Elden Kingston and his family, along with the rest of the Order's leadership, force the children in its community to work at various Order Businesses, often starting when they are in elementary school.

181.    Child labor within the Order is punctuated by long hours, harsh working conditions, and the threat of—and actual—retribution if the children fail to comply with the compulsory work orders.

182.    The type of retribution children face for refusing to work runs the gamut—from ostracization to starvation, from threats of violence to actual violence and abuse, and, at a

minimum, such retribution includes serious harm in the form of nonphysical, psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel children in the Order to perform or to continue performing labor or services in order to avoid incurring such retribution.

183.     The Order is set up so that, after the school day ends, many Order children are transported on yellow school buses owned by the Order from their Order-owned-and-controlled elementary or middle schools straight to their jobs at various Order Businesses.

184.     In addition, the Order forces underage girls into plural, incestuous, and abusive marriages so that those girls can produce as many children as possible, starting as early as possible. The ultimate goal is to increase the pool of child laborers and child wives within the Order.

185.     Put another way, most, if not all, of the Order's structure, teachings, principles, and practices are designed to promote, protect, and enhance the Order's economic bottom line: through child labor and trafficking.

## B.     Plaintiffs Were Forced to Work Against Their Will

186.     The Order Businesses—which are run by Paul Elden Kingston and his family, Davis County Cooperative Society, Inc., and Latter Day Church of Christ—cover all aspects of the Order's society and the lives of its members.

187.     Among other businesses, the Order operates purported banking facilities, education and daycare facilities, digital and communications services, coal mines and energy companies, merchandise companies, trucking and sanitation services, food industry businesses, finance and real estate companies, accounting services, and medical facilities, including as follows.

188.     Standard Restaurant Supply is an Order-owned company that operates in Utah, Idaho, Arizona, Colorado, New Mexico, and Nevada, sells restaurant supplies, and engages in illicit child

labor.[8]  On its website, Standard Restaurant Supply boasts that it is "extremely proud of it's [sic] well-deserved reputation as one of the finest food service suppliers in the nation."[9]

189.    Family Stores True Value is an Order-owned-and-operated franchise that sells home improvement products and engages in illicit child labor. True Value falls under the global umbrella of True Value Hardware companies ("True Value Hardware"). True Value Hardware "serves more than 4,500 stores worldwide with retail sales in their communities, totaling about $10 billion, with 13 regional distribution centers and approximately 2,500 True Value Associates."[10]

190.    A-1 Disposal is a waste disposal company owned by the Order that provides dumpster rentals and collection services.[11]  On information and belief, Management Business Systems, Inc. is the parent company of A-1 Disposal. Management Business Systems, Inc. is a Nevada corporation doing business in Utah, including through A-1 Disposal. A-1 Disposal's customers included numerous large commercial clients, including restaurants, malls, shopping centers, and office buildings. On information and belief, at least some of these clients conducted business outside of Utah and/or engaged with customers from outside of Utah. In her role at A-1 Disposal Plaintiff Jenny Kingston, for example, would directly interface with these customers. On information and belief, A-1 disposal and Management Business Services have gross annual revenues of at least $500,000 and likely more.

---

[8] According to news reports, in March 2023, Standard Restaurant Supply was cited and fined by the United States Department of Labor for violating child labor laws. *See* Logan Stefanich, *Utah Restaurant Supply Company with Ties to Polygamous Group Cited for Violating Child Labor Laws*, KSL (Mar. 29, 2023). https://www.ksl.com/article/50610695/utah-restaurant-supply-company-with-ties-to-polygamous-group-cited-for-violating-child-labor-laws.

[9] *See* Standard Restaurant Supply (last visited Jun. 8, 2023) https://standardrestaurant.com/about-us.

[10] *See* True Value website, True Value History (last visited Jun. 8, 2023) https://truevaluecompany.com/our-history.

[11] Based on the work experience of at least one Plaintiff, A-1 Disposal offered its customers recycling services and charged them for recycling services but did not actually recycle anything. Rather, all A-1 Disposal's recycle trucks dumped of their loads as if they contained unrecyclable trash.

191.    Attco Trucking aka CTC Trucking is an Order Business that coordinates long-hauling trucking shipments across the United States. Attco is owned and operated by the Order, but all of the truckers who haul shipments with Attco are non-Order members. Attco finds loads that need to be hauled, and they find a trucker with room and availability to make the trip. Once that trucker reaches their destination, Attco finds a load in that area for the trucker to haul back. Shipments coordinated by Attco stretch across the entire United States, going as far as New York and Florida. Attco employs both Order and non-Order members in its home office in Utah. Dispatchers who are non-Order members receive a paycheck with salary and commission on the loads they schedule, while Order members employed in the same role do not receive commission and only receive payments via additions to their Order statements.

192.    Advanced Vending is a vending machine supply company owned by the Order. It operates numerous vending machines, supplying them with products and collecting the proceeds from each vending machine. The vending machines stock a number of products, such as sodas and candies. On information and belief, the products sold in these vending machines originate and are purchased from outside of Utah.

193.    Washakie Farm or Ranch was an Order Business operated by Valarie Martin and John Daniel Kingston, Sr. The ranch along with another Order Business, Ralphs Milk Farm, are primary sources of food for Order members. Every week employees of the Washakie Ranch and Ralph's Milk Farm bring food, eggs, ground beef and other food products, to be distributed after church to Order members. Some of the Plaintiffs also made and brought their own baked goods. The members' statements are docked for the food they obtain. In addition, A-1 Disposal often brings expired and thrown away food and produce to the church which the members can take home free.

194.    The Washakie Ranch is also used as a means to discipline Order members, particularly children, who misbehave. Order members who misbehave or resist the Order are sent to the ranch to perform manual labor. Employees are required to live in the basement of Valarie Martin's home. As punishments employees of the ranch were often beaten, forced to sleep outside, or denied meals.

195.    Ensign Learning Center, Inc. is a private school owned by the Order. Order members pay as much as $100 dollars a day to send their children to Ensign Learning Center, Inc.. The funds from which Order members pay for their children to attend Ensign Learning Center, Inc. are earned largely, if not entirely, from work for other Order Businesses, including businesses that conduct business internationally and in states outside of Utah or with customers from foreign countries or other states. At Ensign Learning Center, Inc., in addition to religious indoctrination, students are taught part of a curriculum provided by Penn Foster High School, a for-profit online high school program operated out of Pennsylvania and available in all fifty states. Hyrum Dalton Kingston, Sr. oversees and serves as the principal of Ensign Learning Center, Inc.

196.    On information and belief, the Order also does business with numerous non-Order owned companies, including but not limited to Wells Fargo, True Value Hardware, A&W Restaurants, and Brighton Bank.

197.    As underage children and as adults, the Order forced Plaintiffs to work at Standard Restaurant Supply, Family Stores True Value, A-1 Disposal, Attco Trucking, Advanced Vending, Washakie Ranch, and various other Order Businesses across multiple sectors.

198.    Plaintiffs had no choice about working for these Order Businesses. As with all Order children, Plaintiffs were born into a culture whereby, as children, Paul Elden Kingston assigned them to a job that purportedly pays wages. The purpose of that job is to advance the economic interest of Paul Elden Kingston, his family, other Numbered Men, and those the Order believes

should be compensated. Paul Elden Kingston and the Order leadership disseminated this message to Order children at home, in church, at school, and through all channels of life within the Order.

199.    Once Paul Elden Kingston determined the work assignments of Plaintiffs, he deputized various members of the Order—including the corporate defendants, managers and supervisors—to ensure that Plaintiffs complied with their work assignments at all times.

200.    If any Plaintiff had refused to work, they would have been punished into submission, suffering, at a minimum, serious harm including nonphysical, psychological, financial, or reputational harm, that was sufficiently serious to compel them to perform or to continue performing labor or services to avoid incurring that serious harm.

201.    For example, at every Order Business where Plaintiff Amanda Grant was required to work, her supervisors would threaten to call her parents if she did not attend work, was late, or failed to perform her work as expected. Throughout her life, Amanda's parents regularly used physical violence to punish her. By the time Amanda began working for Order Businesses it had been firmly ingrained in her that physical violence was an acceptable and expected punishment from her parents for any acts of disobedience. By threatening to call her parents, Amanda's supervisors at Order Businesses were threatening to have her parents inflict physical violence upon her as a means of keeping her in line at work. Amanda also suffered physical abuse at the hands of Hyrum Dalton Kingston, purportedly as a result of her failure to comply with the work dress code at Ensign Learning Center.

202.    Likewise, Plaintiff Allison Eames' work history is punctuated by threats, including threats of violence, from John Daniel Kingston, Sr., John Daniel Kingston, Jr., and Kelli Collins, among others in the Order. On one occasion, John Daniel Kingston, Sr. had delegated authority over Allison to John Daniel Kingston, Jr., and Allison indicated that she needed a break from working.

John Daniel Kingston, Jr. told her she had no choice but to work and forced her into continuing work against her will.

203.    On another occasion, John Daniel Kingston, Sr.,[12] in front of Allison, expressed rage and anger about why Allison and his other children were not all working at a particular time.  On information and belief, on that day he assaulted one of Allison's sisters, yelled that all the children needed to work, and Allison was made to work, by her parents, without any days off from that day forward.  In addition, if Allison expressed hesitation with going to work, her mother, Kelli Collins, would tell her that, if she did not work, her father would come—and it was readily apparent that this was a threat of violence, given Allison's father's demonstrated history of physical assault, battery, and abuse of his children, which Allison had regularly witnessed.

204.    The other Plaintiffs experienced similar threats of, and actual, punishment for failing to fulfill any work obligations mandated by Paul Elden Kingston and the Order.

205.    Plaintiffs' inability to escape work was compounded by the grueling hours, harsh work conditions, and contemptuous supervisors.

206.    As for hours, the Order had no restrictions on the number of hours an Order child might work in a day. If work so required, the Order forced Plaintiffs to work after school, into the evenings, and sometimes all night until they went back to school the next day. Plaintiff Michelle Ruth Michaels, for example, worked long, overtime hours at the Order Bank, including overnight shifts, while also attending school during the day.

207.    Furthermore, Allison Eames, starting at approximately the age of 10, was forced by Valarie Martin to work excruciating, long hours on the Washakie Farm.

208.    Not only were the work hours troubling—so were the work conditions on the farm.

---

[12] John Daniel Kingston, Sr. had previously gone to prison for beating one of his other children nearly to death.

209.     Allison was regularly prevented from going into the house at the end of the day until she had completed all of her farm-hand chores—which often required her to work late into the night. At only ten years old, she was often working more than twelve hours per day.

210.     Furthermore, Allison—who was forcibly taken from her parents' home and transported to the farm to work—was required to sleep in the basement of the home with approximately 8 other underage girls and was often deprived of meals. As an elementary school child, Valarie Martin forced Allison to slaughter and skin chickens with a dull kitchen knife, and if she refused to do so, she would not be allowed back into the house after work.

211.     In addition, certain Plaintiffs, including Allison and Alex Martin, had their birth certificates and/or government-issued identification taken from them—to prevent them from leaving their grueling, laborious jobs and the Order lifestyle.

212.     The Order's exertion of control over Plaintiffs took other forms as well.

213.     They were prohibited from speaking to outsiders, including at work, who might have helped them escape from the Order or might have blown the whistle on the Order's myriad labor violations.

214.     To reinforce the children's silence, the Order subjected Plaintiffs to threats under the guise of religion. One plaintiff, Alex Martin, for example, was told by her father, John Daniel Kingston, Sr. a senior member of the Order that God would kill her if she revealed the Order's secrets.

215.     Furthermore, a number of Plaintiffs, including but not limited to Brenda Collins, Allison Eames, and Alex Martin, suffered physical abuse for even the slightest act of purported disobedience, including for mistakes made at work or hesitation about continuing to work.

216.     Through these and other means, the Order made work nearly intolerable for Plaintiffs, but also went to great lengths to prevent Plaintiffs from ever escaping the Order.

217.    Additionally, the Order prioritized the use of child labor over the education of Plaintiffs. Therefore, in the existence of a conflict, work would prevail. Alex Martin's father, for example, forced Alex and her sisters to skip school for weeks at a time so that they could work on their father's secret marijuana farm in Oregon for over 10-12 hours per day.

### C.       The Order Deprived Plaintiffs of Due Compensation

218.    Under federal and state law, the Order was required to pay their employees a minimum wage and, as applicable, overtime wages.

219.    The Order fails to comply with these requirements in the operation of all of its businesses.

220.    Plaintiffs never received paychecks, let alone regular paychecks, for their many years of work. There are three narrow exceptions. First, Michelle Ruth Michaels once received a paycheck by mistake. Second, Priscilla Tucker demanded, and ultimately received, two paychecks while working at Washakie Renewable Energy. Third, Jenny Kingston received paychecks while working at A-1 Disposal and Management Business Systems in 2020, but those paychecks reflected underpayment of her due wages.

221.    And, while Order Businesses purported to pay Plaintiffs via direct deposit into their Order Bank statements, the actual amounts listed reveal that the Order was not adequately paying its Order employees minimum and overtime wages. Indeed, in most cases, it pays Order employees no wages at all.

222.    Worse still, in large part, the Order does not even attempt to accurately record the number of hours worked by Order employees—because the Order never has any intention of paying them due compensation. Order children working at Order Businesses typically have no time sheets, timecards, or clock-in/clock-out systems to reflect their hours worked per day. The Order children's supervisors and managers are not otherwise keeping accurate track of Order employees'

hours. And the Order children in charge of payroll have witnessed arbitrary reductions being made to Order employees' hours and pay for no justifiable reason.

223.    At Family Stores True Value, Priscilla Tucker's managers and supervisors required her to handwrite the hours she worked at Family Stores and place it in a box at the end of every day. However, Priscilla never saw an Order Bank statement that led her to believe that she was being paid correctly for all of the hours she worked and was aware that the Order would reduce an employee's hours that the employee had worked after the fact.

224.    Priscilla and every other Plaintiff had the same experience: the number of hours they worked never accurately matched the amount of money their Order employers recorded into their Order statements for work performed.

225.    Similarly, at A-1 Disposal, a 12-year-old female Order child was responsible for employee payroll at one point in time, under the supervision of John Daniel Kingston, Sr.

226.    John Daniel Kingston, Sr. directed the 12-year-old female Order child to make arbitrary, unjustified reductions to the payroll amounts before the funds were distributed. For example, if a tool broke at A-1 Disposal, John Daniel Kingston, Sr. would dock the pay of all employees working that day to pay for a replacement tool, without their knowledge or consent. Or, if John Daniel Kingston, Sr. did not like particular employees' behaviors or attitudes on a given day, he would dock their pay, without their knowledge or consent. John Daniel Kingston, Sr. would deny employees, including Brenda Collins, their legal entitlement to wages based on his arbitrary and capricious whims, without any legal justification.

227.    The Order has systematically deprived Order children, including Plaintiffs, of due compensation for work performed for decades. And the practice has endured into recent years—which is evident from the Order's treatment of Jenny Kingston, Jana Johnson, and Alex Martin

from 2020 onward by defendants A-1 Disposal, Property Compliance/Arrow Real Estate, and Standard Restaurant Supply.

228.    For example, in 2020, Jenny Kingston worked for Defendants A-1 Disposal in the accounts receivable department. She worked for A-1 Disposal the first time from approximately January 1, 2016, through May 31, 2016, for approximately 40 hours per week, and the second time from approximately June 1, 2020 through December 30, 2020, for approximately 30 hours per week. Throughout her employment with A-1 Disposal, her statements[13] consistently reflected payment for fewer hours than Jenny actually worked. Thus, for numerous hours that Jenny worked for A-1 Disposal she was not fairly compensated.

229.    The same held true for Jana Johnson in 2020 and 2021. From approximately March 2020 and continuing through June 2020, Jana worked at defendant Property Compliance/Arrow Real Estate, and from June 2020 through June 2021, Jana worked part-time at Defendant Standard Restaurant Supply. Jana never received paychecks for her work at Property Compliance/Arrow Real Estate or at Standard Restaurant Supply prior to June 2021.[14]  Instead, her employers sent her purported wages directly to the Order Bank to be inaccurately recorded on her Order statement. However, the deposited wages consistently reflected payment for fewer hours than Jana actually worked in a given pay period. Thus, for numerous hours that Jana worked for Property Compliance/Arrow Real Estate she received no wages.

---

[13] During the second time Jenny worked at A-1 disposal her paychecks went into a real checking account after being processed by the Order Bank.

[14] After Jana left the Order in June 2021, Jana continued to work at Standard Restaurant Supply. After leaving the Order Jana began to receive paychecks from Standard Restaurant Supply.

230.    The experiences of Priscilla, Jenny, and Jana are no different than the experience of every other Plaintiff in this action. Each Plaintiff was systematically deprived of wages that accurately reflected the hard work they endured as children and as adults.

231.    Further still, to quash any protest from Plaintiffs about being deprived of earnings to which they were entitled, Paul Elden Kingston, Plaintiffs' parents, and the Order leadership, particularly the managers and supervisors working at the Order Bank, limited the Plaintiffs' access to their vague and incorrect Order Statements. The parents of certain Plaintiffs (e.g., those of Julie Ruth Green) never once let her see her bank statements until she was 17 years old—many years after she started working. None of the Plaintiffs had regular and guaranteed access to their own bank statements, which—even if they had been accurate, which they were not—significantly limited transparency into the Order's deprivation of their earnings.

**D.**    **The Order Intentionally and Willfully Deprived Plaintiffs of Their Earnings**

232.    The Order's failure to pay Plaintiffs and its failure to comply with labor laws was not inadvertent.

233.    To the contrary, the Order is well aware of its obligations under federal and state laws—for at least two reasons.

234.    First, the Order Businesses, including the corporate defendants in this action, do not provide all employees with an explicit wage rate upon the start of their employment.

235.    Second, some Order Businesses employ numerous non-Order employees. On information and belief, the Order pays these non-Order employees pursuant to federal and state minimum and overtime wage laws.

236.    Despite the Order's apparent awareness of its legal obligations under the law, the Order systematically fails to comply with minimum wage and overtime wage laws as compensation for Order members' work.

237.    This is no accident. The Order's economic system was purposefully designed to deprive Order members, including children, of earnings to which they are rightfully entitled, for the benefit of Paul Elden Kingston, high ranking Order men, the corporate defendants, managers, and, on information and belief, some of the Plaintiffs' supervisors. This system allows the Order to benefit from unpaid child labor and to prevent discovery of the Order's myriad labor violations. As previously noted, Standard Restaurant Supply was recently cited and fined by the United States Department of Labor for violating child labor laws.

238.    Standard Restaurant Supply is but one example of an Order Business that treats Order employees and non-Order employees differently. While Order members were not paid for the work they performed, Standard Restaurant Supply paid non-Order employees minimum wage, via regular paychecks, and provided them with periodic raises the longer they worked for the company. Non-Order employees also received commissions on their sales. Paul Elden Kingston, together with Standard Restaurant Supply maintained that differential treatment throughout Plaintiffs' tenure working for the company.

239.    Plaintiff Jana Johnson worked for Standard Restaurant Supply from approximately June 2020 through June 2022, but the company never provided her with a paycheck and sent her wages directly to the Order Bank.

240.    As is typical of the Order, Jana's Order statements did not accurately reflect wages for the number of hours she worked, her funds were immediately restricted by the Order, and those funds were subject to unjustified withdrawals by defendants John Daniel Kingston, Sr., Hyrum Dalton Kingston, Paul Elden Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young , and the Order.

241.    However, after Jana left the Order in June 2021, her employer, Standard Restaurant Supply, provided her with bi-monthly paychecks and sent correct amounts of wages to her personal bank account by direct deposit.

242.    Put another way, while in the Order, the Order converted and misappropriated her wages.

243.    Other Order Businesses, including but not limited to Attco Trucking, Family Stores True Value Hardware, and A-1 Disposal, together with its parent company, Management Business Systems, Inc., engaged in the same type of differential treatment of Order and non-Order members.

### E.      The Order Misappropriated and Converted Plaintiffs' Assets

244.    The Order not only deprived Plaintiffs of wages to which they were entitled, but it regularly siphoned money owed to Plaintiffs.

245.    At the end of every year, Plaintiffs' Order statement balances would be transferred—in their entirety—to a member of the Order leadership. Therefore, at the beginning of each year, Plaintiffs' statement balances would cycle back down to zero, despite the fact that they had not spent their own personal money and had not authorized any use of owed funds from their statements. For example, without her prior knowledge or consent, funds listed as belonging to Amanda Grant's statement were removed from her statement every December and placed into the Order statement and record account of her father, Verl Johnson—an account titled "Back Account CO36." The same was true for Michelle Ruth Michaels, Allison Eames, and every other Plaintiff in this action.

246.    The Order also took funds owed to Plaintiffs as reflected on their statements and used them on assets that Plaintiffs did not want, were not given to them, and did not benefit them. For example, when Michelle was 15 years old, her father, Jesse Orvil Kingston, took Michelle's earnings from her account to buy a car from another family member.

247.    The scale and breadth of the Order's conversion of Plaintiffs' assets were not insignificant.

248.    Indeed, Defendants John Daniel Kingston, Sr., Hyrum Dalton Kingston, Paul Elden Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, and Rachel Orlean Kingston Young unlawfully converted money, included wages, from the Plaintiffs in this action.

249.    Plaintiffs were legally entitled to those funds, and these individual defendants' interference with Plaintiffs' property was willful, it was done without lawful justification, and it wrongfully deprived Plaintiffs of the use and possession of those funds.

250.    For example, Jenny Kingston worked for businesses owned by the Order from the time she was approximately six or seven years old until she left the Order in January 2021. All wages Jenny earned from her work at Order Businesses until approximately January 1, 2020, were submitted directly to her statement in the Order Bank. Jenny also set up what she understood to be savings accounts at the Order Bank for her children with initial deposits of $500 each and subsequent deposits while Jenny was in the Order. When she tried to withdraw the money for them, she discovered much of the money had been taken.

251.    Jenny estimates that she earned at least $160,000 in wages working for Order Business, almost all of which was withheld by the Order. When Jenny left the Order, she attempted to withdraw the entirety of the funds listed as belonging to her on her Order statement. The Order informed her that not only was her statement empty, but that she owed them a debt of $1200. Jenny had never consented to the removal of funds from her statement and did not agree to borrow funds from the Order or otherwise incur debt.

252.    Similarly, Jana Johnson worked for businesses owned by the Order from approximately August 2018, when she was 15 years old, until she left the Order on June 6, 2021, when she was 18 years old.

253.   All wages Jana earned from August 2018 through June 2021 from working at Order Businesses were represented to be recorded on her statement in the Order Bank.

254.   Jana estimates that she earned at least $27,000 in wages working for Order businesses, all of which, she was informed, was submitted to her Order statement.

255.   Despite working for years as a minor, her Order Bank statement never showed more than $2,000 in earnings.

256.   Furthermore, throughout Jana's time in the Order, her statements regularly showed withdrawals of funds from her account without her consent, without any explanation and for no discernible reason.

257.   Defendants Jacob Daniel Kingston, Jr., Jacob Kingston, Sr., John, Daniel Kingston, Sr., Paul Elden Kingston, Sally Kingston, Patricia Kingston, John Daniel Kingston, Jr., Daniel Charles Kingston, Hyrum Dalton Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young , Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order misappropriated and converted the funds of the other Plaintiffs in a similar manner:  through one-off purchases, unauthorized withdrawals, and withholding of Plaintiffs' assets upon their departure from the Order.

## F.      The Order Trafficked Plaintiffs Across State Lines For Labor Purposes and Forced Them To Engage in Interstate Commerce

258.   On numerous occasions, Plaintiffs were forced to travel outside of Utah to assist Order Businesses with various work endeavors.

259.   For example, while working at Family Stores True Value, Priscilla Tucker was forced to travel to Nevada to identify new merchandise that could be sold at the company's Utah store; Alex Martin was regularly taken from Utah to Oregon, where her father forced her and her sisters to engage in tedious work for long hours on  the covert Pot Farm he controlled or owned for the

Order; and Jenny Kingston was forced to travel on an international business trip to Turkey, where she met with Turkish business partners of the Order's Washakie Renewable Energy business.

260.    In addition, Plaintiffs were required to engage in interstate commerce of various kinds for the benefit of the Order. For example, while working at Attco Trucking, Priscilla was required to coordinate long-haul trucking shipments across the United States.

261.    More broadly, the Order and its many businesses, including the businesses at which the Order forced Plaintiffs to work, operate within and in relation to interstate commerce. Numerous Order Businesses are open to the general public and, on information and belief, sell products and services to individuals residing outside of Utah. The Order also uses the proceeds of its businesses to purchase supplies and other goods necessary to operate its businesses and to provide food, clothing, and shelter to its members. On information and belief, many of these goods and supplies are purchased and/or originate outside of Utah.

### G.    The Order Engages in Rampant Criminal Activity

262.    The Order not only engages in rampant fraud against the federal, state, and local governments under the direction of Paul Elden Kingston, it forces young children to unwittingly participate in the fraud by Bleeding the Beast.

263.    To facilitate its various frauds, the Order has members, including Allison Eames, Michelle Ruth Michaels, Jenny Kingston, Mary Ann Robinson, and Alex Martin when they were children, forge and fabricate documents, often against their will to further the Order's leaders' self-interests.

264.    The fraudulent conduct includes filing false tax returns and destroying evidence of crimes ahead of government raids, among other conduct.

265.    Plaintiffs are among the children that Paul Elden Kingston and the Order forced to assist with those and other crimes.

1.      Tax Fraud

266.    The Order falsifies personal income tax returns, on behalf of individual Order members, and Plaintiffs were among the Order children called upon to assist with those tax filings. For example, April McKay directed Allison Eames when she was 14 to forge signatures and move dependents around on Order members' tax filings—to minimize each tax filer's tax liability and increase the filer's deductions.

267.    Each year, the Order prepares and files with federal and state governments fraudulent tax documentation. For example, on their tax returns, teenagers and single adults with no children are often required to claim several of their siblings as their own dependents despite not living with or providing for these siblings, so as to maximize tax deductions. This is done because each parent can only claim a certain number of dependents before they stop seeing a tax benefit from it. Thus, to Bleed the Beast, children names are allocated to non-parent tax returns to maximize various earned income tax credits. In the end, the Order steps in and collects the fraudulently acquired tax refunds.

268.    The Order also falsifies tax documentation on behalf of individual Order businesses, and likewise uses child labor for those illicit purposes.

269.    For example, while working at Washakie Renewable Energy, Jacob Ortell Kingston, Sr. directed Priscilla Tucker, at age 17, to fill out state tax forms, reporting no activity in certain states, even though Washakie Renewable Energy had operated in these states. Jacob Kingston told Priscilla that there was no way to prove that they had operated there, so there was no need to pay taxes. To avoid being embroiled is such frauds and to avoid an Order marriage, Priscilla had to flee.

2.     Destruction of Fraud Evidence

270.     In addition, in February 2016, the Order feared that the FBI was about to serve a search warrant on American Digital Systems, and as a result, Paul Elden Kingston and the Order assigned Michelle Ruth Michaels to temporarily work there to help destroy evidence ahead of the FBI search.

271.     The Order had received a tip about the FBI's plan to execute search warrants and, prepared an A, B, and C list with the Order Business most likely to be raided on the A list. Examples of Order Business on the A list were the Order Bank and the Order's law firm at 3212 South State Street in Salt Lake City. American Digital Systems was on the B list.

272.     In response to the tip, Order members at American Digital Systems, including Michelle, took payroll and other records and hid them so that evidence of the Order's unlawful activities—including its child labor law violations—would not be discovered. Jenny similarly assisted with gathering and destroying records at Jacob Ortell Kingston, Sr.'s house for his various businesses during this time.

273.     Other Order members also shredded documents, wiped, or manipulated electronic data so it would not be available to law enforcement. Paul Elden Kingston and the Order also ordered children to refrain from going to work ahead of the raid, so that law enforcement would not detect the Order's illicit use of child labor.

274.     Order children, including Alex Martin, Michelle Ruth Michaels and several of Michelle's siblings (one only 4-years old), were forced to help with the American Digital Systems cover-up. They shredded papers and prepared truckloads of materials which were taken to, the home of Michelle's father's third wife, to an Order-owned storage facility on Redwood Road in Salt Lake City, Utah and to other locations for hiding.

275.    The children were ultimately driven to a rural, empty area, where those 9 and older were instructed to shoot bullets through loaded hard drives, computers, and other materials.

276.    After the FBI raid, certain other Order children, including Jenny Kingston, were assigned to assist Laura Fuller, an attorney for the Order, with cleaning, re-filing, and re-organizing evidence that the Order had hidden from the FBI.

## IV.    The Indoctrination and Education of Order Children

277.    The Order did not educate its children for the sake of expanding their minds and preparing them for a life of self-determination. Instead, a central goal of the Order's education system was to train young girls to be obedient wives and mothers.

278.    Furthermore, once Order children reached high school age, the Order funneled many of them into Penn Foster, an online high school, which they were expected to finish within approximately one year—so that the Order could either make them work full-time for Order businesses from age 14 onward or make them attend college (typically Salt Lake Community College) to study and receive a degree in an academic discipline of Paul Elden Kingston's choosing, for the benefit of Paul Elden Kingston, the Numbered Men, and the Order leadership.

### A.    Young Girls Were Forced to Attend Marriage and Child-Bearing Courses

279.    When Plaintiffs were not being forced to labor under harsh work conditions for no pay, they were being constantly taught the Order's various rules, requirements, and strictures.

280.    Within the Order, the children's education—both in school and at home, in church, and throughout the Davis County Cooperative Society—focused heavily on indoctrinating them with lessons of obedience, subservience, and acquiescence to the will of the Order. For example, Order children, including Plaintiffs, learned that if they question the Order's absolute power, control, and authority, they would suffer.  A young child who made noise during a prayer, for example, was at risk of being beaten and/or physically restrained.

281.    In addition, the Order placed particular emphasis on educating young Order girls, including Amanda, Jenny, Jana, Julie, Michelle, Allison, Brenda, Priscilla, Alex, and Mary Ann about their primary roles and responsibilities within the Order: getting married and having children.

282.    This type of education came in different forms. For example, beginning at approximately age 10, there were formal instructional courses, such as a "Preparation for Marriage" course, that were taught to Order girls by John Daniel Kingston, Sr., his older sons, his wives, and others in the Order. Each of the female Plaintiffs—namely Amanda, Jenny, Jana, Julie, Michelle, Allison, Brenda, Priscilla, Alex, and Mary Ann—were forced to endure such courses and complete assignments ensuring full indoctrination and retention.

283.    The marriage preparation curriculum included lessons on being an obedient wife, submitting to your husband without objection, utilizing your fertility period, budgeting and cooking for a large family, as well as learning memory gems.

284.    The curriculum also required most young girls in the Order, including the female Plaintiffs, to complete a child-bearing worksheet. The girls had to calculate how many children they could bear between the ages of 16 and 40, assuming they were only pregnant for nine months.

285.    When plaintiff Allison Eames filled out the worksheet, she scheduled herself to have a child every 18 months, rather than every 9 months. Allison's schoolteacher told her she was missing kids from her worksheet—an 18-month gap between childbirths was too long of a break.

286.    The Order girls were taught that there are many children waiting up in heaven to be born, and the only way those children can come down to Earth is if the Order girls find their husbands as soon as possible, so the girls can get pregnant and give birth to those children waiting in heaven. The marriage preparation teachers would tell them that those children in heaven are "rooting" for these girls to get pregnant and facilitate their births.

287.    Aside from Order classes, Order girls also learned about their marriage and child-bearing responsibilities at home, at their Order jobs, and at Order functions.

288.    Because of the Order's indoctrination of young girls, it was normal to hear elementary school-aged girls discuss their dreams of becoming a first wife, theorize about who they will marry, and deliberate over how many children they will have.

289.    All of this so-called education is designed to make preparing for marriage a girl's top priority, which is lawful until put into practice with minor girls and grown men and placed in the context of the Order's patterns and practices of illicit and illegal conduct, including incest, trafficking and other forms of sexual abuse.

## V.    <u>Polygamy and Marriage Within the Order</u>

290.    Women in the Order are favored to the extent they are obedient, pure of blood, married to a Numbered Man, a first wife, and the mother of numerous children.

291.    Men in the Order are favored and given authority and power to the extent they are obedient, pure of blood, have large families, and can produce a lot of money and workers for the Order. Favored men in the Order are often "gifted" additional wives to exemplify the status of their favor and worthiness.

292.    In the Order, Numbered Men following The Law of One Above Another have proposed arranged and/or directed marriages waiting for each proposal to be ultimately approved by the leader of the Order. This is typically done through meetings with Paul Elden Kingston and finalized as a formal engagement in an engagement meeting with Paul Elden Kingston at which the arranged couple are present with their parents.

293.    To satisfy its self-imposed objectives and needs, marriage practices in the Order commonly and intentionally involve underage girls, polygamy and/or incest.

294.    The Order attempts unsuccessfully to mitigate these illegalities and biological realities in various ways. For example, by having first wives become "Happily Divorced" so that a subsequent wife can "legally" marry. Being "Happily Divorced" means individuals obtain a legal divorce in the eyes of the law, while maintaining their marriage in the eyes of the Order. This tactic is frequently used to trap minor girls in unlawful and fraudulent marriages, require illegal sexual relations with the minor girls, and get them pregnant. Only once the minor girl has given birth to children and cannot leave the Order, will the Order authorize a "happy divorce" allowing the man to obtain another child bride. Additional methods to mitigate include (but are not limited to) taking blood samples from girls to check genetic compatibility and to maintain Pure Kingston Blood, but mostly by locking girls into the Order through marriages, pregnancies and children so they cannot leave and can be controlled to keep the Order's secrets.

295.    Order girls are taught from birth that their primary purposes in life are to be obedient, a submissive wife, and to bear as many children as possible. Girls are instructed that they cannot deny their husbands sexual intercourse.

296.    When they are married, men are also directed to engage in sexual intercourse with their wives to multiply and increase the Order and to accomplish its objectives of producing workers for Order Businesses.

297.    Once married, wives who fail to give birth frequently are often shunned, considered unworthy, or ostracized. Even worse are women who experience miscarriages. In the Order, a woman who has a miscarriage may be labeled a sinner and murderer and often left without support or medical care during an incredible difficult time in their life. For example, Julie Ruth Green became pregnant as a result of a violent rape. Subsequently, and likely a result of the emotionally and physically abusive environment Julie was trapped in, Julie suffered a miscarriage. Julie was

blamed for the miscarriage and, ostracized as a baby killer for failing to fulfill her duties as an obedient and compliant wife.

298.    Order members are required to obey any instructions given to them by the male individual that is "above them," even if they are instructed to do something immoral, wrong, or illegal. The belief is that by obeying and following The Law of One Above Another you are being obedient to God and will not be punished for any actions you have been instructed to take, instead, the individual ordering the action will be punished, if necessary, in the eyes of God.

299.    In the Order, "betrothed" refers to the process of becoming engaged to be married and all engagements and marriages in the Order must be approved by Paul Elden Kingston.

300.    The Order begins teaching young girls how to receive "direction" for the purpose of marriage when they are in elementary school. The concept is reiterated constantly throughout the girl's childhood. The concept of direction is a ploy used to manipulate children into thinking they are choosing their arranged Order marriages.

301.    Girls are taught that they may have to "fulfill the law of sacrifice in order to get [themselves] in the condition [that will enable them] to receive the Lord's direction" and by receiving direction to pursue marriage they are "promising to give [themselves] to the man such that he can guide [them] to [their] salvation."

302.    Girls may experience teenage infatuation, but if it is not for the one they are arranged to marry, that infatuation, according to the Order, is a trick from Satan disguised as direction.

303.    To ensure that direction is received from God and not Satan, all direction must be approved by the One Above, and ultimately by Paul Elden Kingston.

304.    The One Above the girl "helps" the girl find her direction, particularly in regard to their "Number One Choice" by "removing things in [their] life that do not contribute to success" and

that parents cannot "stand by and do nothing while [their] child considers marrying someone that is less."[15]

305.    Throughout this process, the Ones Above both the girl and the man will ask the Man on the Watch Tower whether a match may potentially be made. When "receiving" direction, the One Above the girl will often present a man's name or a short list of approved men. The One Above will then continue to guide the girl to which man she is to marry. Once there is what may be considered direction, the man will "Come Forward" on the girls by informing their One Above and the One Above the girl that they wish to be considered for marriage. Sometimes, after the "Come Forward," a betrothal is made when approved by Paul Elden Kingston.

306.    Next, the families of the girl and the man will meet with the Man on the Watch Tower, Paul Elden Kingston, who will ultimately decide if a match is to be made.

307.    During this meeting, the Man on the Watch Tower typically announces his approval by declaring the girl and the man engaged and instructing them to hold hands in order to solidify the engagement. Once engaged, the girl and the man are expected to marry quickly.

## VI.   The Order Commits, Condones, and Encourages Sex Trafficking, Sexual Battery, Battery, and Sexual Abuse of Minors

308.    The Order's economic success and survival depends on the silence, subservience, and obedience of its members.

309.    Women and girls in the Order, are essentially viewed as property of the Order. They represent value to the Order as wives for male Order members, sources of cheap (and often free) labor, , and sources of additional labor by way of the children they bear. Unless they are able to escape from the Order, women in the Order are expected to continue working at Order Businesses

---

[15] Packets are distributed to Order girls and members entitled *How to Get Direction from the Lord (with emphasis on marriage)*.

for the remainder of their lives, produce as many children as biologically possible, and provide unlimited and unconstrained sexual services to their Order husbands.

310.     The children of Order women are likewise viewed as property by the Order. All of their children will be expected to work for Order Businesses and any female children will be expected to marry Order men and give birth to as many children as biologically possible, thus continuing the cycle of producing additional labor for the Order to exploit.

311.     Because the Order needs girls to marry young and procreate early and frequently to increase the Order's work force, the Order devotes substantial time and resources to apply pressure and ensure that underage marriages to adult men, and resulting procreation, occurs.

312.     Young girls and women, as well as adult women, are taught and required to submit to powerful men in the Order, and the failure to comply will result in physical, sexual, and/or psychological abuse.

313.     In addition, while the Order takes a number of steps to limit interactions between young girls and young boys—to preserve the illegal tradition of young girls being married to older, adult men—the Order also turns a blind eye to the pre-marital, and sometimes incestuous, sexual battery and abuse of young girls and young boys at the hands of adult Order men.

314.     The Order, including its leader Paul Elden Kingston, takes steps to hide the abuse, such as interfering with DCFS investigations and prohibiting divorces. Indeed, the Order punishes young children for reporting sexual battery and abuse. Through these methods, the Order teaches girls and women to be subservient and that their role is to simply submit to the advances of Order men.

315.     Further, after the Order forces underage marriage between young Order girls and adult Order men, the Order condones and encourages sexual abuse of illegally married, non-consenting girls. Again, the Order, including its leader Paul Elden Kingston, takes no steps, and indeed

punishes, young girls for reporting sexual battery and abuse that occurs within an Order marriage to adult men.

316.    The Order similarly condones abuses of young men in the Order. Some senior Order members have molested young boys, often in vulnerable settings such as at the Washakie Farm, Pioneer Day events, or at church. Like the abuse of girls and women in the Order, these abuses are intended to instill a culture of subservience and the Order may even promise young men privileged positions within the Order leadership in exchange for submitting to the sexual advances of senior leadership.

## VII.   Individual Plaintiffs

### A.    Amanda Grant

317.    Amanda was born in an Order apartment in the Salt Lake City area, and on information and belief, was delivered by Paul Elden Kingston. When Amanda was born, she began her life as a member of the Order.

318.    Amanda's father is Verl Johnson, and her mother is Lorie Peterson. Lorie Peterson and Verl Johnson entered into an unlawful polygamous marriage when Lorie Peterson was a 17-yearold minor. Lorie Peterson was the second wife of the three wives of Verl Johnson.

319.    Lorie Peterson gave birth to 10 children, all of whom were, on information and belief, fathered by Verl Johnson.

320.    Upon information and belief, Verl Johnson has fathered at least 33 children with these wives.

321.    Verl Johnson is a numbered man in the Order and has been assigned number 36, but he is not listed on Amanda's birth certificate. A fictitious father, named "Kyle Grant," is listed instead. "Kyle Grant" is also listed as the fictious father on some of Lorie Peterson's other children with Verl Johnson.

322.    It is a common and intentional practice in the Order not to list fathers on their children's birth certificates to cause confusion, avoid criminal prosecution for fathering children in underage, plural or incestuous marriages, and/or for illicit tax and child labor reasons.

323.    Upon information and belief, years after Amanda's birth, the State of Utah located a "Kyle Grant" for purposes of recovering state child support payments only to conclude that he was not the father. This was told as a funny story in Amanda's family.

324.    Amanda's father, Verl Johnson, came to her home about twice a week, but she did not learn that he was her father until he baptized her when she was eight years old.

325.    Growing up, Amanda saw Verl Johnson as an acquaintance even though she was disciplined by him with bare bottom spankings, which practice occurred with some of her siblings into their teens. Other than with respect to discipline and marriage, Amanda and her father seldom conversed.

326.    Amanda considered herself lucky because the physical abuse in her home seemed to be much less than in other Order homes.

327.    Amanda's first memory as a child was at age five. The memory is of being sexually abused by John Paul Johnson, a son of one of her father's plural wives, and some eight years older.

328.    Among other conduct, John Paul Johnson physically penetrated Amanda by placing his hands inside of her, touched her stomach and genitalia, and observed her in the bathroom while she was undressed. Amanda did not consent, nor was she able to as a minor.

329.    Throughout the period in which John Paul Johnson sexually abused Amanda he would give her gifts as a way of "apologizing" for the sexual abuse. On at least one occasion, following an incident of abuse, John Paul Johnson noticed that Amanda was crying and gave her a jar of money.

330.     Amanda was required to engage with John Paul Johnson throughout her childhood. As a child her family would go on family trips, including to Arizona. John Paul Johnson would accompany Amanda on these trips.

331.     Despite telling her parents, Amanda was not protected by those in the Order who knew she was being abused and the abuse continued until she was 15 and John Paul Johnson was 23. Amanda eventually told two outsiders.

332.     The Division of Child and Family Services ("DCFS") came to the Ensign Learning Center, Inc. where Amanda was working. When they arrived, Hyrum Dalton Kingston, the Principal of the Order's school, rushed to tell Amanda that legally she could have a witness in the room, to make sure she honored her father and her mother, and to make sure to protect her family.

333.     Amanda was confused and frightened by how Hyrum Dalton Kingston was acting and by what he was telling her to do. She did not know how to respond to his questions about who she wanted in the room with her as a witness.

334.     Once Amanda learned that DCFS was there to interview her, she did not want a witness from the Order in the room. A witness would prevent her from saying what had been happening to her.

335.     Out of the limited options Amanda had, the only person from the Order there that she thought she could trust was Mary Sommers. Mary Sommers came into the room but was asked to leave by the DCFS workers. When she walked out, she made it obvious that she was leaving a tape recorder in the room.

336.     As a direct result of Hyrum's coaching, Amanda did not disclose her abuse to DCFS out of fear that she would suffer reprisal from Hyrum, her parents, and other members of the Order.

337.    When asked by DCFS whether she was being sexually abused by her "brother," Amanda was able to answer "no," because her abuser was her "half-brother."  When further pressed, she said he was a "cousin" to protect her father's polygamous family. After the interview, DCFS made Mary Sommers erase her recording.

338.    At a follow up interview with DCFS, Amanda continued to protect her abuser because she knew that if her half-brother went to jail, she would ultimately pay the consequence. Fortunately, however, after DCFS got involved, the abuse stopped. Amanda does not think it would have stopped if DCFS had not learned of the abuse and intervened.

339.    The Order, including Amanda's parents, controlled Amanda's access to food, shelter, clothing, money, and other basic necessities. Had Amanda resisted or spoken up against John Paul Johnson's abuses the Order and her parents would have restricted her access to these and other necessities essential to her livelihood.

340.    Like other girls in the Order, Amanda felt intense pressure to marry in the Order and have children at a young age because she had been groomed for that singular purpose throughout her life.

341.    By the time Amanda was 15 and 16, her friends who were also 15 or 16 were already in arranged Order marriages. Any girls who were not married young were seen as not holy or righteous enough and looked down on in the Order.

342.    Amanda told her father the names of two members of the Order she would consider marrying. At age 15, one was a man named Jeremy Sommers, but her father told her that Jeremy Sommers was not her "Number One Choice."  At age 17, the other was a man named Eric, but her father said he smoked weed so she should not want to marry him.

343.     Otherwise, Amanda fought marriage because she knew girls that were betrothed, spiritually married, and got pregnant at 15, some of whom were re-married legally to their husbands when they got older but regretted all that had happened to them.

344.     When Amanda was 16, or maybe as old as 17, her father, Verl Johnson, met with her about the choice for marriage that he wanted her to have, which was her first cousin, Derek Kingston. He informed her that Derek Kingston was on his way to their home to "come forward on her."

345.     Approximately a week before this conversation, Amanda's father took her to a shopping mall and offered to buy her anything that she wanted. Amanda ultimately asked her father to purchase her a t-shirt from the clothing store Hollister. This conduct was highly unusual for Amanda's father who, until this time, rarely interacted with her except in the context of punishment; rather, this conduct was intended as a bribe to make Amanda more amenable to marriage.

346.     In one of her first jobs working for the Order, Amanda was assigned to work for the Order Bank. In this position she worked directly alongside Derek Kingston. Even at a young age, Amanda understood that Derek Kingston had a crush on her and desired to marry her. Within the Order, employment assignments are often used as a way to introduce women to their eventual husbands under the supervision of other Order members.

347.     Amanda resisted her One Above by telling her father that she did not want to marry Derek Kingston because he was her first cousin. Verl Johnson dismissed his daughter's resistance by saying: "Well, he is on his way. He is coming over."  Amanda had no choice.

348.     Derek Kingston arrived at Amanda's home and came forward on her by telling her about his direction from God and that he was supposed to marry her. Amanda responded that she did not believe in polygamy and that he was her first cousin. He laughed at her resistance to the inevitable.

349.    At an Order Dance, Amanda's father gave Derek Kingston permission to dance with her twice. It was unusual for Amanda's father to grant permission more than once. That Amanda's father granted permission twice was an indication that he approved of Derek Kingston as a husband for Amanda and that an engagement would be forthcoming shortly.

350.    As part of her courtship to Derek Kingston, Amanda went on a date with Derek Kingston to Panda Express where he bought her dinner.

351.    Amanda had attended numerous secret Order weddings, including those of many of her friends, and knew that no engagement or marriage in the Order could occur without the direction and approval of Paul Elden Kingston.

352.    Consistent with the requirement of Paul Elden Kingston's approval of all Order marriages, Amanda was tricked by her parents to go to the Order Bank where Paul Elden Kingston had an office. When Paul Elden Kingston appeared, Amanda was frightened because she knew that some of her friends had resisted and even been feisty about having to marry but had gone to meetings with Paul Elden Kingston and come out engaged.

353.    At one point during the meeting, Paul Elden Kingston excused Amanda so that he could speak privately with her parents. When that happened, Amanda seized the chance to flee and literally walked away from the Order Bank, only stopping when it got dark. That meeting, which occurred shortly before she left the Order itself, was her last with Paul Elden Kingston.

354.    The purpose of Amanda's meeting with Paul Elden Kingston was to convince her to marry Derek Kingston and to finalize the plans for her engagement to her first cousin.

355.    By the time Amanda fled the Order it had been determined by her parents, Paul Elden Kingston, and the Order that she would marry Derek Kingston. Had Amanda not fled the Order, she would have become engaged to Derek Kingston within just a few days.

356.     Had Amanda married Derek Kingston, she would have been required to have sex with him without her consent and by force or threats of force if necessary. Amanda was under the age of 18 at this time and, had she become engaged, would have been forced to marry and have sex with Derek Kingston while under the age of 18.

357.     While in elementary school and younger than 12, Amanda received her first work assignment in the Order. Her first jobs were at Fidelity or the Order Bank where she worked at least part-time in the back with other children and paper-routes for the Order. At age 13 or 14, she was reassigned to work at least part-time for the Order at Advance Copy. At 15, she went to work full-time at another Order Business, John's Market Place, where she was a cashier, before being reassigned to work full-time as a teacher's assistant at Ensign Learning Center, Inc.. Finally at 17, Amanda was sent back to the Order Bank this time to work full-time at the front counter. Before she left the Order, she was able to surreptitiously withdraw some $2,000 from her account so that she would have some money when she left. The rest of the money she had earned since starting to work in elementary school had been siphoned out of her account.

358.     Amanda never received a paycheck from any of her Order employers and, thus, has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

359.     If Amanda had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Amanda has not been fairly compensated for her labor at the Order Businesses where she was required to work.

B.     **Jenny Kingston**

360.    As a young child, Jenny was taught to live the standards of the Order, which included being

obedient, receiving direction in marriage, marrying young, and bearing children, but she struggled

with belief, was seen as a problem, and was often punished and ostracized to force her submission

to the Order.

361.    As a child, Jenny experienced sexual abuse and a denial of the help and assistance she

needed to cope with the abuse, so she resisted some of the Order's rules and was considered sinful

and referred to as a "whore."

362.    In the Order, it is known that girls, and especially young girls, like Jenny, that may resist

rules or may not fully believe, need to be married young and impregnated before they can become

more independent and leave.

363.    Jacob Daniel Kingston Jr. "came forward on Jenny," but she was 17 and did not want to

marry him—even if that was God's will, as she was being told by the Ones Above.

364.    Before Jenny was aware that Jacob Daniel Kingston, Jr. would be coming forward on her,

Jenny was required to work directly next to him at Washakie Renewable Energy as part of the

grooming for her marriage.

365.    Washakie Renewable Energy was run by Jacob Daniel Kingston Jr.'s father, Jacob Ortell

Kingston, Sr., and Jenny's employment at Washakie Renewable Energy was intended as a step in

her "courtship" with Jacob Daniel Kingston, Jr.

366.    As part of her employment and "courtship" to Jacob Daniel Kingston, Jr., her future father-

in-law, Jacob Ortell Kingston, Sr., flew Jenny and Jacob Daniel Kingston, Jr. on a private jet to

Las Vegas, Nevada. Indeed, Jenny's employment at Washakie Renewable Energy was used to

assure her Order marriage.

367.     Nevertheless, Jenny resisted when Jacob Daniel Kingston, Jr. came forward on her for many reasons, including the fact that she was interested in someone else.

368.     As a result, her parents conspired with Order members to institutionalize her until they could gain control over her.

369.     Jenny was sent, against her will, to Lifeline for Youth ("Lifeline"), a rehabilitation center for troubled teens.

370.     Jenny was told that she was placed in Lifeline because of alcohol abuse, sex addiction, and self-harm; however, she never used drugs or drank alcohol as a minor and had been sexually active with only one person.

371.     The real reason that Jenny was put in Lifeline and not allowed to leave that facility was because she was not obedient to the Order and needed a "better spirit," meaning she needed to receive the "right direction" to be married.

372.     After some six months at Lifeline, Jenny yielded to the pressures of the Order and was finally allowed to return home.

373.     Thereafter, she attended an engagement meeting with Paul Elden Kingston, her parents, Jacob Daniel Kingston, Jr. and his parents, Sally Kingston and Jacob Ortell Kingston, Sr., as well as the couples' living grandparents, at which Paul Elden Kingston, as the leader of the Order, approved Jenny's marriage.

374.     Accordingly, about a month later, on April 24, 2015, while Jenny was 17 years old, she was trafficked into an unlawful marriage to Jacob Daniel Kingston, Jr., who was an adult and her second cousin.

375.    Jacob Daniel Kingston, Jr.'s grandfather, John Daniel Kingston Sr. directed the wedding in the absence of Paul Elden Kingston, and instructed Jenny's father to officiate by reading the Order's wedding ceremony from an old piece of paper.

376.    Jenny recalls John Daniel Kingston Sr. standing nearby her father, Jeremy Ortell Kingston, Sr., as her father officiated at the couples' marriage by reading the Order's wedding ceremony to the couple.

377.    Jeremy Ortell Kingston, Sr. would not have officiated and John Daniel Kingston, Sr. would not have acted as a witness at the wedding, without the approval of Paul Elden Kingston who approves and directs all marriages in the Order.

378.    Bill Stoddard, a Numbered Man in the Order, now deceased, signed the Utah Marriage License, claiming falsely to have been the "Officiant."  The Marriage License states, in part:

> I hereby certify that on the 24th day of April in the year of two thousand 15 in the city of Sandy in said county of Salt Lake, I, the undersigned, an Elder did join in matrimony according to law M[s]. Jenny LaDonna Kingston and M[r]. Jacob Daniel Kingston, The nature of the ceremony was according to Utah Law and was a present mutual agreement of marriage between the parties.

After this certification, the Marriage License was signed, as follows:

| | |
|---|---|
| /s/ Jacob Kingston<br>Signature of Spouse 1 | **/s/ Bill Stoddard**<br>**Signature of Officiant** |
| /s/ Jenny Kingston<br>Signature of Spouse 2 | **/s/ B.W. Stoddard**<br>**Printed Name of Officiant** |
| /s/ John Daniel Kingston<br>Signature of First Witness | **Elder**<br>**Title** |
| /s/ Joseph Ortell Kingston<br>Signature of Second Witness | |

(Emphasis added.)

379.    The Marriage License issued by the State of Utah was completed by Bill Stoddard to fraudulently conceal the fact that there was no lawful marriage; rather, there was only an unlawful

Order marriage ceremony performed by Jenny's father, which unlawful marriage was the product of sex trafficking.

380.    After the Order wedding, Jacob Daniel Kingston, Jr. immediately began to initiate sexual relations with Jenny against her will.

381.    Although Jenny continuously told Jacob Daniel Kingston, Jr. that she did not want to have sex with him nor engage in any other sexual conduct, he insisted that it was unacceptable for her to deny him.

382.    Through this kind of abuse and torment, Jacob Daniel Kingston, Jr. sometimes forced Jenny to submit to his unwanted and unwelcome sexual desires and advances.

383.    When Jacob Daniel Kingston, Jr. was unable to coerce Jenny into engaging in unwanted sex, he would forcibly rape her.

384.    These rapes were often violent and accomplished through physical force.

385.    Numerous other members of the Order conspired to aid Jacob Daniel Kingston, Jr. to unlawfully marry and commit the sexual battery, abuse, and rape of Jenny.

386.    From a young age, Jenny was taught by members of the Order that forced sexual intercourse and other unwanted sexual intimacies were nonexistent in marriage. The common phrase used was: "It isn't rape if you are married."

387.    Members in the Order, including Jacob Ortell Kingston, Sr., John Daniel Kingston, Sr., Sally Kingston, Benny Kingston, Jeremy Kingston, Paul Elden Kingston, and John Daniel Kingston, Jr. were aware that Jacob Daniel Kingston, Jr. frequently abused Jenny to try to get her pregnant, but failed to stop or report the abuse to law enforcement.

388.    To the contrary, these Defendants actively took steps to keep Jenny in an abusive, unlawful marriage and force her to have sexual relations with Jacob Daniel Kingston, Jr. against her will.

389.    Following her marriage and as her "honeymoon," Jenny traveled with Jacob Daniel Kingston, Jr. and his family on what was actually a Washakie Renewable Energy business trip to Turkey. Jacob Daniel Kingston, Jr. forced Jenny to engage in sexual acts with him against her will during this trip.

390.    Throughout her marriage to Jacob Daniel Kingston, Jr., Jenny was also taken on business trips with Jacob Daniel Kingston, Jr. and his family to, among other locations, California, Oregon, Nevada, and Mexico. Jacob Daniel Kingston, Jr. forced Jenny to engage in sexual acts with him against her will on each of these trips.

391.    Jacob Ortell Kingston, Sr. was allowed by the Order to use money to send Jenny to a fertility doctor. Paul Elden Kingston has ultimate control over the operations of the Order and Jacob Ortell Kingston, Sr. could not have used this money without Paul Elden Kingston's knowledge and approval.

392.    The fertility doctor determined that Jenny was fertile and capable of bearing children, but, upon information and belief, also determined that Jacob Daniel Kingston, Jr. would need surgery to increase his ability to father children.[16]

393.    Jacob Ortell Kingston, Sr., however, informed Jacob Daniel Kingston, Jr. and Jenny that time was of the essence, surgery would take too long, and that they need to just "get her pregnant."

394.    Jacob Ortell Kingston, Sr. then forced Jenny to undergo in vitro fertilization ("IVF"). Jenny underwent the IVF process, as instructed, which entailed surgical procedures, medications, and the removal of eggs from her body for fertilization.

395.    Upon information and belief, the sperm used to fertilize Jenny's eggs belonged to Jacob Daniel Kingston, Jr., and once fertilized, Jenny's eggs were returned to her uterus.

---

[16] Despite this, Jenny was blamed for Jacob Daniel Kingston, Jr.'s infertility.

396.    The IVF treatment resulted in the birth of twins in October of 2017.

397.    Jenny continued to rebel against her Order marriage to Jacob Daniel Kingston, Jr., at one point she kissed another man; and as punishment, Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and Jacob Daniel Kingston, Jr. forced her to undergo a repentance process and recommit to the arranged marriage. During this two-week period, they locked Jenny up and took her children away from her.

398.    In or about August 2018, Jacob Ortell Kingston, Sr., who was the One Above Jenny and Jacob Daniel Kingston, Jr., was arrested, convicted, and sent to jail for money laundering and filing false tax returns. In April 2023, he was sentenced to a prison term of 18 years. Sally Kingston, who also shares legal liability for the sexual assaults on Jenny, was sentenced to six years in prison for her involvement in the fraud.

399.    In Jacob Ortell Kingston, Sr.'s absence, John Daniel Kingston, Jr. was assigned to be the One Above and the man with direct authority over Jenny, Jacob Daniel Kingston, Jr., and their children, and, thus, the man to whom she was required to go on important matters, including those related to her "marriage."

400.    John Daniel Kingston, Jr. is a Numbered Man in the Order, assigned number 69. The One Above him is his father, John Daniel Kingston, Sr., who reports directly to the One Above him— Paul Elden Kingston.

401.    Jenny was required to attend counseling sessions with John Daniel Kingston, Jr. as the One Above her. The intent of these counseling sessions was to help her correct her faults within her unlawful marriage.

402.    Because the Order controls all Order marriages, in or before December 2020, Jenny asked John Daniel Kingston, Jr. whether she could divorce Jacob Daniel Kingston, Jr.

403.     When Jenny asked John Daniel Kingston, Jr. about a divorce, she was informed that the Order does not grant Order divorces, and her request for permission to leave Jacob Daniel Kingston Jr. was denied.

404.     Jenny then scheduled a meeting with Paul Elden Kingston, John Daniel Kingston, Jr., and Jacob Daniel Kingston, Jr. to ask Paul Elden Kingston for a divorce, but Paul Elden Kingston also refused to allow Jenny to end her "marriage" to Jacob Daniel Kingston, Jr.

405.     Jenny would not have been unlawfully married without Paul Elden Kingston's approval, nor could she get out of the unlawful marriage without his approval.

406.     To leave the abusive "marriage," Jenny fled the Order with her two minor children.

407.     Jenny had been required to begin working for the Order part-time as a young child when she was approximately six or seven years old. From age 14 she was required to work for the Order full-time. One of her first jobs was at Advanced Vending. While still 14, she was reassigned to work full-time at Washakie Renewable Energy. Sometime after being assigned to work there, she was also assigned to work for one of the Order's A&W restaurants. Later, Jenny was reassigned to work at A-1 Disposal and for Laura Fuller at the A-1 Disposal office building. Prior to leaving the Order, she was also required to work at other Order Businesses, including Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, the Food Group, United Fuel Supply, the Washakie farm, and the Order's Century office.

408.     Jenny never received a paycheck from her Order employers with the exception of the second time she worked at A-1 disposal, because the Order Bank captured her earnings. Because she never received any other paychecks from her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

409.    If Jenny had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Jenny has not been fairly compensated for her labor at the Order Businesses where she was required to work.

### C.    Jana Nicole Johnson

410.    Jana was in elementary school when the Order first started grooming her for marriage.

411.    Jana was to marry her first cousin, Daniel Charles Kingston, who was the son of Order leader Paul Elden Kingston and his first wife, Patricia Kingston. Paul Elden Kingston is also the half-brother of Jana's father, Kent William Johnson.

412.    Kent William Johnson, Paul Elden Kingston, and Patricia Kingston coordinated with other Order members to ensure that Jana and Daniel Charles Kingston were regularly in contact, starting from the time Jana was in elementary school.

413.    Jana and Daniel Charles Kingston both attended school at Ensign Learning Center Beginning around the age of 14, Jana was forced to spend time with Daniel Charles Kingston and was repeatedly told that Daniel Charles Kingston would be a good husband.

414.    All of Jana's older sisters had married Daniel Charles Kingston's older brothers to preserve the Pure Kingston Blood. Indeed, two of Jana's sisters are currently married to the same man.

415.    Like her sisters, Jana was pressured to meet the expectations of a girl of royal blood and maintain her family's worthy status in the Order by marrying a Kingston.

416.    While the pressure to be married by the Order was mounting, Jana was also required to go to work for the Order. Jana knew that refusing to work for the Order, like refusing to submit to an arranged Order marriage would result in severe punishment.

417.    When Jana was 15 years old, Paul Elden Kingston, Patricia Kingston, Kent William Kingston and others in the Order decided that Jana needed to move forward with the marriage to Daniel Charles Kingston. She was told to seek direction to be engaged to Daniel.

418.    As the leader of the Order, Paul Elden Kingston conducted an engagement meeting during which he, Patricia Kingston, Daniel Charles Kingston, Kent William Johnson, and others were present, along with 15-year-old Jana.

419.    During the meeting, Paul Elden Kingston determined and declared that Jana and Daniel Charles Kingston were engaged and would be wed—put another way, he decided to unlawfully traffic her into an unlawful, unwanted marriage and unwanted sexual relations. At the time of the engagement, Jana was 15.

420.    On or about March 9, 2019, Daniel Charles Kingston and Jana were secretly and unlawfully married at the Order's recreation center.

421.    During the marriage ceremony, Daniel's father, Paul Elden Kingston, gave a speech and Daniel's mother, Patricia Kingston, performed and also spoke. Jana's father, Kent William Johnson, officiated at the ceremony. Kent William Johnson would not have officiated at the illegal marriage without the approval of Paul Elden Kingston.

422.    Jana did not want to marry Daniel Charles Kingston, and, as a minor, she could not consent to marrying him even if she had wanted to—because he was her first cousin by blood, which made the marriage illegal and void under Utah law.[17]

423.    Because the Order requires girls and women to submit sexually to their husbands, even if the sexual submission is against their will, Jana's marriage to Daniel Charles Kingston triggered him to force unwanted sexual relations upon Jana. Moreover, as a minor in an illegal and void

---

[17] *See* Utah Code Ann. § 30-1-1(1)(e). *See Also* Utah Code Ann. § 30-1-9.

marriage to her adult cousin, Jana was not legally capable of ever consenting to sexual marital relations with Daniel Charles Kingston.

424.    Among other reasons, Paul Elden Kingston, Patricia Kingston, Kent William Johnson, and the Order promoted, encouraged, and facilitated Daniel Charles Kingston's unwanted and non-consensual sexual relations upon Jana because having children results in more workers for the benefit of the Order.

425.    The Order also facilitates and forces girls to be impregnated and bear children when they are young so the girls cannot escape, which also benefits the Order.

426.    Accordingly, after the arranged Order wedding, Daniel Charles Kingston began to initiate sexual relations with Jana.

427.    Jana typically did not want to have sex or any other sexual relations with Daniel Charles Kingston and tried to make excuses, avoid, and distract Daniel Charles Kingston so that he would understand by her actions and words that she did not want to have sexual intercourse with him nor engage in any other sexual conduct.

428.    For his part, Daniel Charles Kingston expected her to be a submissive and obedient wife and repeatedly initiated sexual relations despite Jana's repetitive refusals.

429.    Frustrated by her usually successful avoidance and refusals, Daniel Charles Kingston told members of the Order that Jana was not being an obedient wife and was attempting to deny him children. Daniel Charles Kingston frequently informed Jana that the Order did not approve of her disobedience and threatened to continue telling leaders and members of the Order if Jana refused to consent to sex.

430.    The Order's disapproval of Jana's sexual disobedience placed her in a hopeless position throughout her void and illegal marriage, as Daniel Charles Kingston sexually and incestuously abused and raped her.

431.    On one such occasion, Daniel Charles Kingston took Jana to Hawaii and informed her that she was obligated to have sex with him. Jana was menstruating and did not want to have sex with him, so she used that as an excuse, voiced her objection, and tried to avoid his sexual advances, but he ignored her objections and incestuously raped her anyway.

432.    On other occasions, Jana refused Daniel Charles Kingston's sexual advances, but he sexually assaulted her against her will and objections.

433.    In addition to raping Jana, Daniel Charles Kingston frequently forced her to watch pornography with him and listen to his detailed sex fantasies.

434.    Daniel Charles Kingston admitted to Paul Elden Kingston, Patricia Kingston, and other members of the Order that he was insisting on having sex with Jana and asked for advice on how to pressure her more successfully.

435.    During her void and illegal marriage, Jana lived in a state of fear and these sessions left her feeling violated and dirty.

436.    Without Paul Elden Kingston's direction to marry his son, Jana would never have placed in an arranged incestuous marriage with Daniel Charles Kingston, and without Paul Elden Kingston's approval, she could not end the marriage.

437.    Jana felt relieved when Daniel Charles Kingston illegally married additional wives because it reduced the frequency of his sexual advances toward her. Jana was the first of three plural wives, and, upon information and belief, Daniel Charles Kingston's subsequent wives included his second

wife who was both his first cousin and his niece, as well as his third wife who is his niece and was a minor at the time they were illegally married across state lines.

438.    While Daniel Charles Kingston's attention was diverted from Jana, she was able to befriend some people outside the Order and obtain a prescription for birth control. Jana began taking the birth control in hopes that she would not conceive a child and be locked into the illegal marriage and Order.

439.    Daniel Charles Kingston, who regularly searched Jana's belongings, found Jana's birth control, and flew into a rage. Daniel Charles Kingston called Jana's father, Kent William Johnson, and informed him that Jana was taking birth control. They then arranged for Jana to be taken to an Order Business, American Digital Systems, where she was held against her will.

440.    Approximately a year to a year and a half into the illegal marriage, Jana was directed to attend counseling sessions with Paul Elden Kingston to help her correct her "shortcomings" within the marriage. Jana was told that these meetings were necessary because she had failed to become pregnant and was refusing to satisfy Daniel Charles Kingston sexually.

441.    In these sessions, Paul Elden Kingston, asked her various questions about why she was denying and attempting to avoid sex with his son, and, at one point later in the marriage, confronted her about taking birth control, which was considered sinful. Jana informed Paul Elden Kingston that she did not want to be in a marriage to Daniel Charles Kingston, but he told her that she was the problem in her marriage and instructed her to repent and make amends to Daniel Charles Kingston. Paul Elden Kingston informed her that it was her duty to repair her marriage, saying this could only be achieved by conceiving a child.

442.    In addition to these sessions, Jana's electronic communications were monitored, her whereabouts tracked, and she was regularly escorted anytime she left her home.

443.    Jana was forced to sleep on the floor of the office building without access to any of her personal belongings. She was only permitted to leave the room for bathroom breaks. During this confinement, Daniel Charles Kingston, along with others, went through Jana's phone and forced her to send messages to the individuals she had befriended outside of the Order to inform them that she no longer wanted their friendship and that they could not contact her further. She was then forced to block their calls and texts.

444.    Jana's sessions with Paul Elden Kingston had continued, and, due to her birth control disobedience, she was now not even allowed to leave the office until she agreed to begin a repentance process with him. Once she was coerced into this process and allowed to leave the office, Jana was heavily supervised and not allowed to go anywhere alone.

445.    Further, Jana felt betrayed after these sessions when she became aware that Paul Elden Kingston and Daniel Charles Kingston did not keep the sessions private. Paul Elden Kingston shared details from the sessions with various members of the Order shaming, pressuring, and further trafficking Jana into the role of a submissive and sexually obedient "wife" and producer of children for the Order.

446.    Although Paul Elden Kingston shared details from his sessions with Jana, he failed to report the sexual assaults and rapes to law enforcement.

447.    Paul Elden Kingston, Patricia Kingston, and others also gave Jana sex toys and unsolicited sex advice to influence, pressure, and remind her of her responsibility to be a dutiful wife and produce children for the Order.

448.    Having had enough, Jana explicitly informed Daniel Charles Kingston that she had no desire to be married to him, that she did not want to have his children until she loved him, which she did not, and again emphasized that she did not want or like having sex with him.

449.   As Jana fled the Order and her illegal marriage, Daniel Charles Kingston, who had recorded some of their conversations, sent recordings to various members of the Order.

450.   Before she fled, Jana had been required to begin working for the Order at approximately age 15. One of her first Order jobs was at the Order Office, aka, the Order Bank, aka, the Century Office. At the Order Office, she was required to work part-time. A few months later, she was assigned to work at Fidelity Lending. Next, she was required to work part-time at two other Order Business, Arrow Real Estate and Property Compliance. A few months later, she was required to work full-time at Standard Restaurant Supply, also an Order Business. Jana understood how disobedience could lead to punishment and went to work as directed to avoid any punishment.

451.   Despite being required to work for these Order Businesses, Jana never received a paycheck while working in the Order. After Jana left the Order, Jana continued to work at Standard Restaurant Supply which only began providing Jana with paychecks after she left the Order. Prior to leaving the Order, Jana's earnings were sent by her employers to the Order Bank. Because she never received any of those paychecks from any of her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid.  The Order Businesses Jana worked for, however, are obliged to maintain and produce those records.

452.   If Jana had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and to her reputation within the Order. To date, Jana has not been fairly compensated for her labor at the Order Businesses where she was required to work while in the Order.

D.    **Julie Ruth Green**

453.    At age 12, Julie first learned that her Number One Choice and future husband had been identified but she was not told who he was; instead, at 12, she was shown who he was at her grandmother's home in a way that made it clear to her who she would marry.

454.    As part of the manipulation, she was later told that she had already picked her Number One Choice before she was born on Earth, so the choice had actually been hers, but she has no recollection of doing that.

455.    Julie learned that her Number One Choice was her full blood uncle, Paul Elden Kingston, Jr. who is the son of Paul Elden Kingston and Patricia Kingston, some 10 years older, and a man with other wives.

456.    All of Julie's full sisters had been married unlawfully and incestuously in the Order to other sons of Paul Elden Kingston and Patricia Kingston[18] to preserve the Pure Kingston Blood.

457.    On information and belief, this has resulted in babies with birth defects.

458.    It is a common and intentional practice in the Order for illegal marriages to be directed and arranged by Order members, subject to approval by Paul Elden Kingston.

459.    That practice was followed in Julie's case culminating in approximately June 2016, when she met with Paul Elden Kingston, his son, Paul Elden Kingston, Jr., and other close family members in Paul Elden Kingston's home for an engagement meeting at which Paul Elden Kingston authorized the illegal union which would make Julie the fifth and incestuous wife of Paul Elden Kingston, Jr.

460.    Accordingly, on December 15, 2016, Julie was trafficked into an Order marriage to Paul Elden Kingston, Jr. which took place on the Order's property known as John's Market Place.

---

[18] Paul Elden Kingston and Patricia Kingston are Plaintiff Julie Nichol's biological grandparents.

461.   Under Utah law, the marriage was illegal and void.[19]

462.   Growing up, Julie was taught the Order's requirement for girls and women to submit sexually to the will of their husbands to have children for the Order.

463.   Despite this, on most occasions when sexual relations occurred between Julie and Paul Elden Kingston, Jr. she communicated that she did not want to have sexual intercourse with him, and, on several of these occasions, he ignored her lack of consent and forcibly raped her.

464.   In or about October 2018, Julie was thinking of leaving the Order and believed she was being tracked by the Order, so she started to stay away from Paul Elden Kingston, Jr.

465.   At about this time, she met with Paul Elden Kingston and asked for a divorce or "unsealing" from her husband, but her request was refused.

466.   Julie would not have been married without Paul Elden Kingston's approval and she could not get out of it without his approval.

467.   To prevent Julie from leaving the marriage, at the direction of Paul Elden Kingston, she was taken against her will by her grandmother, Patricia Kingston, to Pennsylvania, under the guise of going to the beach in California.

468.   Once there, Patricia Kingston told Julie she had to stay in Pennsylvania in an Order member's home, and her phone was disabled so she could not access the internet, make calls, or send texts.

469.   In Pennsylvania, Patricia Kingston kept Julie at Emily Sessions' house, who is a member of the Order. Emily Sessions lives in Pennsylvania with her husband and his plural wives. After leaving the Order, Julie learned that Order members who say they want to leave are sometimes flown to Emily Sessions' home in Pennsylvania to convince them to remain in the Order.

---

[19] *See* Utah Code Ann. § 30-1-1(1)(d)(i).

470.    Julie was kept against her will in Pennsylvania in a failed effort to get her to stay in her void Order marriage in which she would have been subjected to Paul Elden Kingston, Jr.'s ongoing sexual advances and rapes.

471.    By this time, she had already become pregnant once as a result of rape, suffered a miscarriage, and had been accused of killing the baby by failing to be a worthy wife. She was desperate to get out.

472.    While in the Order, Julie was required to start working part-time for Order Businesses at age 12 or 13.  First, she worked filing Order members' 10% Forms and other papers. She was next required to work part-time at the Order Office during the school year and full-time during summer, which soon became full-time year-round work at the Order Office. Julie also worked full-time for other Order Businesses, including Garco Property Management, Arrow Real Estate, and at Order daycares.

473.    Julie never received a paycheck from any of her Order employers, except the Order daycare businesses. She was told that the earnings she did not receive went directly to the Order Bank. Because she never received those paychecks, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

474.    If Julie had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Julie has not been fairly compensated for her labor at the Order Businesses where she was required to work.

E. **Michelle Ruth Michaels**

475.    Michelle became part of the Order when her mother secretly gave birth to her in her mother's home located in South Salt Lake, not at her grandmother's home as stated on her Utah Birth Certificate.

476.    It is a common practice in the Order to not list fathers on their children's birth certificates to intentionally cause confusion, avoid criminal prosecution for fathering children in underage, plural, or incestuous marriages, and/or for illicit tax reasons.

477.    In Michelle's case, her parents, Jesse Orvil Kingston and Michelle Afton Michaels, were married in the Order even though their marriage involved incest, bigamy, and child marriage (Michelle's mother was only 16).

478.    Michelle's Utah Birth Certificate lists a fictitious father, Stephen James Michaels, with a fictitious birth date.

479.    Michelle learned at age eight that her Order marriage to Paul Elden Kingston's son, Jason Ortell Kingston, had already been arranged.

480.    As she grew up, Michelle watched and learned that in the Order girls are typically placed in arranged marriages, impregnated when they are young, and required to have as many children as possible so that the girl cannot leave the Order. Michelle witnessed her older sisters' experience this.

481.    Michelle did not want to become trapped in an unwanted Order marriage as the mother of children who would be forced to provide labor for Order Businesses and subjected to abuse, nor did she want to be married to Jason Ortell Kingston who already had other wives, including 3 of Michelle's half-sisters.

482.    When Michelle was 17, an engagement meeting was scheduled for her to go with her parents to meet with Paul Elden Kingston to get engaged to Jason Ortell Kingston.

483.    Michelle had seen the destructive cycle that her parents and siblings were stuck in, so she was forced to make a choice.

484.    Marriage or leaving were her only options, so at 17 she fled the Order to avoid becoming engaged, married, and pregnant.

485.    When she refused to be trafficked into marriage and left the Order, she was ostracized by her family, and they severed communication with her.

486.    As set forth previously, Michelle was required to begin working for the Order when she was approximately 4 years old and was forced to work for various Order Businesses until she eventually fled.

487.    She primarily worked for American Digital Systems until she was about seven when she was assigned to work at the Order Bank. After that, she also continued to work for American Digital Systems and other Order Businesses, but her primary Order job was at the Order Bank. She also worked at various Order jobs, including AAA Communications.

488.    Michelle never received a paycheck; all her wages went to the Order Bank which controlled her earnings and gave her periodic statements. Because she never received a paycheck from any of her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

489.    In addition to having to work for Order Businesses as a child, Michelle was often required to engage in what she came to understand were some of the Order's fraudulent and illegal business practices.

490.    In February 2016, the Order feared that the FBI was about to serve a search warrant on American Digital Systems. In response to the tip, Michelle was directed to take payroll and other

records and hide or destroy them so that evidence of the Order's unlawful payment, employment, and child labor practices would not be discovered. Michelle witnessed and assisted as truckloads of records and filing cabinets were taken into hiding.

491.    After assisting at American Digital Systems to prepare for the feared FBI raid, Michelle returned to her normal work at various Order jobs, including the Order Bank where the Order's members' money is controlled as the center of the Order's secretive economy.

492.    At the Order Bank, Michelle reported to Andrea LaDonna Michaels, Deborah Williams, Joleen Andrews, and ultimately to Paul Elden Kingston and was assigned to help with member statements, enter service slips, enter checks, sort paychecks, add Order last names to legal last names, file papers and do statements for Order Businesses, etc.

493.    Under the direction of her mother, Michelle Afton Michaels, Michelle also completed forms with false information and signed other peoples' names on checks from the State of Utah, typically parent's names in relation to fake or fraudulent Order daycares businesses.

494.    An example of a fraudulent daycare was the one run by Michelle's mother which, on information and belief, could not be operated under her mother's name because she had taken the blame for allegedly causing the death of a baby to protect her husband, Jesse Orvil Kingston.

495.    An example of a fake daycare requiring Michelle to sign parents' signatures is the daycare business that only existed on paper because the children were actually kept in another Order daycare business that had already maximized the allowed government subsidy. For these daycares, Michelle would also be required to fill out forms fraudulently stating when parents dropped of and picked up their children at the fake daycare.

496.    Michelle was taught and instructed by her mother to sign other members' names, sometimes alternating her right and left hands to make different members' signatures look different and to complete forms to maximize Bleeding the Beast for the benefit of the Order.

497.    Paul Elden Kingston and his right-hand, John Daniel Kingston, Jr., were aware of and ultimately controlled these fraudulent money earning schemes. No large amounts of money would go into or leave the Order without the approval of at least Paul Elden Kingston and his sister, Rachel Orlean Young.

498.    Michelle never received a paycheck; all of her wages went to the Order Bank which controlled her earnings and gave her periodic statements.

499.    Michelle worked for various Order Businesses for 13 years, and, at one point, had approximately $80,000 in her account statement. Michelle was later informed that $44,000 of that amount was paid on her mother's home and that Michelle would have to work off another $6,000 plus interest. Ultimately, the $50,000 went back to the Order. After Michelle left the Order at 17, she went back to the Order Bank to withdraw her remaining funds, but she was refused her earnings and account statement records for various reasons: because she did not have parental consent, because her statement account was closed, and because she was no longer a member of the Order. She had not closed her Order statement or account.

500.    If Michelle had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Michelle has not been fairly compensated for her labor at the Order Businesses where she was required to work.

F.    **Allison Eames**

501.    Allison was born into the Order in a building located at 765 North 300 West, Salt Lake City, Utah, and known in the Order as the "General Store."

502.    Upon information and belief, the Order marriage of Allison's parents, John Daniel Kingston Sr. and Kelli Collins, was illegal in that her mother was a 15-year-old minor and her father already had 4 of his eventual 14 wives.

503.    Allison's father is not listed on her birth certificate, nor is the address of the General Store where she was born. No father is listed and a false address in Kearns, Utah was used for the location of the birth.

504.    Allison did not have a good relationship with her parents, in part, because her parents were verbally and physically abusive.

505.    Her father is so violent and abusive that he has served time in prison for nearly beating to death one of his many daughters. In fact, John Daniel Kingston Sr. has demonstrated on numerous occasions that he is not afraid to use threats and physical violence to intimate and control members of the Order and his family.

506.    Allison was taught from a young age that her sole purpose was to be a good wife and bear children. Allision was taught that this was the only way a girl could establish her place in the Order. At age 11, she was required to attend the Order's marriage preparation course.

507.    In these classes, Allison was taught the skills and duties of an Order girl and wife. Topics included, for example, learning obedience, learning how to get direction, learning how to properly become betrothed and engaged, learning how to budget for a large family, and how to maximize her fertility window to give birth to as many children as possible.

508.    Material taught in the preparation for marriage classes were used during numerous Order functions, lessons at school, and lessons within the home. Allison also attended numerous Order weddings involving minor girls, incest and/or bigamy.

509.    In 2014, for example, at a wedding Allison attended, her half-sister and half-brother were married. This marriage was both incestuous and plural.

510.    At age 16, Allison witnessed another sister get married, and realized that she was the oldest unwed daughter of her parents. By this time, her father was also regularly meeting with her and informing her that it was her turn to be married.

511.    Allison felt the pressure from her One Above and understood that she had no choice but to leave the Order if she was to avoid being married, so she ran away.

512.    After she fled, Allison's parents tracked her down and forced her to return home, but she ran away again. This time, she was able to initiate an emancipation court proceeding causing her parents to give up all their legal and physical parental rights.

513.    As set forth above, Allison had been coerced and required by her parents to start working for Order businesses when she was approximately 8-years old. Refusing to work for the Order meant more physical punishment at the hands of her parents.

514.    Her first job was at an Order business known as A-1 Disposal. At approximately age 10, she was reassigned to work at the Washakie Farm. At about age 12, she was reassigned to work again in the A-1 Disposal office. At about age 14, she was reassigned to work for April McKay preparing tax filings. Allison was next assigned to work at the Order Bank. Then at approximately 15, she was reassigned to work at John's Market Place. While still 15, she was reassigned to work at Family Stores True Value. She worked there until she left the Order on December 6, 2015.

515.    Despite being forced to work for these various Order businesses from the age of 8, Allison never received a single paycheck. Because she never received a paycheck from any of her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or

the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

516.    In addition to being forced to work underage without compensation, Allison was required to engage in activities that she thought were normal but were against the law. For example, when she worked for April McKay, who handled most of the Order leaders' and members' tax filings, Allison's job responsibilities included assisting the Order with its fraud on the government by assisting April McKay as directed to fill out fraudulent tax forms for the Internal Revenue Service ("IRS").

517.    Under April's instruction, Allison would move "dependents" from one Order member's tax forms to another Order member's tax forms, invent addresses, and otherwise manipulate information to maximize tax deductions for Order members which resulted in tax refunds that were typically recovered by the Order itself.

518.    Allison has come to understand that, as a minor, she witnessed and was instructed by April McKay to assist in systematically defrauding the IRS for the Order.

519.    Despite being forced to work for these various Order businesses from the age of 8, Allison never received a single paycheck.

520.    For years, she was informed and understood that her wages were being paid to the Order Bank and that she could only have access to her earnings through the Order Bank.

521.    The Order claims that all members' earnings are tracked with "statements," and that any wages earned by Order members are accounted for in these statements.

522.    Allison, however, was not permitted to access or use her money without obtaining permission, and she rarely received that permission.

523.    Despite working full time for years, Allison's Order Bank statement never showed more than a $1,000 balance, her earnings were being siphoned away.

524.    In fact, Allison noticed on numerous occasions that her statements' balances systematically decreased even though she did not have access to, nor did she spend much of the money owed to her. When she asked where her money had gone, she was told "room and board."

525.    When Allison successfully fled, the Order took the money from her statement.

526.    If Allison had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Allison has not been fairly compensated for her labor at the Order Businesses where she was required to work.

### G.    Priscilla Tucker

527.    Priscilla successfully left the Order on March 1, 2015, when she was 17-years-old.  Her parents are Alma Tucker and Hannah Tucker. Her mother delivered Priscilla when she was 17 or 18-years-old. Her father died when she was not quite 2-years old. After Alma Tucker's death, Hannah Tucker became the second wife of Lynn Kingston.

528.    Starting when she was a young girl, Priscilla was manipulated into believing she should and would marry Joseph Kingston. Her family often talked about Priscilla's anticipated marriage, and she played along—even once going on a hot air balloon ride with Joseph Kingston—until she was scheduled to have an engagement meeting with Paul Elden Kingston on Labor Day, 2014.

529.    She had just turned 17-year-old and said "no" to the engagement meeting. As a result, she was kicked out of her home, fled to a safe house, and attempted to get emancipated.

530.    About a month later, Priscilla's mother told her that she wanted to meet Priscilla one last time before she disowned her. So, five days before her emancipation hearing, Priscilla went to her

mother's house. At the home, two people who were not in the Order appeared without warning and physically took her to a "rehab" facility known as Lifeline for Youth.

531.    She was there for three months until she apologized for everything the Order determined she had done wrong and took on the mindset that she was the one who was bad, and that her parents were good.

532.    In January 2015, after showing sufficient obedience, Priscilla was released from Lifeline and assigned to work for an Order Business. When Priscilla realized she was being groomed for marriage once again, she decided to run away to Las Vegas to avoid the risk of being forced into an Order marriage.

533.    As a young child, Priscilla was sexually abused by some of Jeremy and Benny Kingston's sons, including the one that she was supposed to marry.

534.    Upon information and belief, Joseph's father,[20] Jeremy Kingston, and her grandfather, Joseph Kingston, were aware of the sexual abuse Priscilla was experiencing because she was told that she would have to marry him if he got her pregnant, apparently having been given permission by his patriarchs.

535.    Priscilla was approximately 8 years old when she started working for the Order. Her first Order job was at Standard Restaurant Supply in Salt Lake City, which is one of several Standard Restaurant Supply stores owned by the Order in various states, including Nevada, Arizona, and Idaho. At Standard Restaurant Supply, Priscilla completed various tasks such as sorting merchandise and putting price tags on items from China. She worked there on and off for about two years until her mother and Lynn Kingston took over another Order Business called Family

---

[20] Who is also the father of Plaintiff Jenny Kingston.

Store True Value. She was told her earnings went to her Order statement; however, Priscilla was not given access to her statements or money.

536.     At approximately age 10 or 11, Priscilla was next assigned to work at a True Value Hardware franchise store called Family Store True Value. She often worked into the evenings. Occasionally, she had to work all night and then go to school the next day. In addition, she worked Saturdays and Sundays after church. She was told she was earning minimum wage, but she never saw any of that money because it went to her Order statement, to which Priscilla was denied access.

537.     She worked at Family Store True Value until about age 13 or 14, at which point she was assigned to be a Teacher's Assistant at Ensign Learning Center, a school run by Order members, including Paul Elden Kingston's wife, Patricia Kingston, and the school principal, Hyrum Kingston. As a Teacher's Assistant, she monitored classes, helped the children, graded papers, and taught the children. While she was working full time, 8 am to 4 pm, at the school, Priscilla was enrolled in the Penn Foster online high school program two mornings a week. She was expected to complete the program and graduate within one year, which she did when she was 15.

538.     Although Priscilla understood that some of her co-workers at the school were getting paid into their Order statements/accounts, Priscilla was informed she would not be paid because the school was paying for her Penn Foster course. While working at Ensign Learning Center, she was also required to work weekends at Family Store True Value. She does not recall being paid on her statement for her weekend work.

539.     After working as a Teacher's Assistant for about a year, Priscilla was sent back to work full time at Family Store True Value as a cashier (taking cash or credit card payments from non-Order customers), merchandiser, and setting up piles of goods or displays of new product sent by True Value Hardware.  This involved her going with her mother to trade shows and conventions a

few times in Las Vegas to meet with vendors and help make decisions about what merchandise to buy, including the school uniforms for charter schools that non-Order customers would buy.

540.    Later, at approximately age 15, she was assigned again to work at Standard Restaurant Supply full time as a manager assistant and was assigned some accounting responsibilities. To maintain a uniform product line, the main store in Salt Lake purchased merchandise from vendors in bulk which it shipped out to its various branch stores. Priscilla never received a paycheck from this Order job. After she started dating a non-Order employee, she was fired and punished by being set to live at her aunt's remote and isolated house in Park Valley, Utah.

541.    Next, at about 16 years of age, Priscilla was assigned to work at the front desk and later as a dispatcher and broker for CTC Trucking, one of the businesses Jacob Kingston ran for the Order. The trucking company had previously been known as Attco Trucking. She worked there for about one year, from approximately the end of 2013 to near the end of 2014. As a dispatcher, Priscilla sent Order-owned trucks with loads all over the country. Typically, drivers would start with loads from Order Businesses in Utah and take them to destinations out of state as far away as New York and Florida. Priscilla's responsibilities included finding loads for the trucks to haul back to Utah. Priscilla never received a paycheck from this Order job.

542.    Shortly after Priscilla was released from Lifeline, she worked for Jacob Ortell Kingston, Sr. at Washakie Renewable Energy. She prepared and filed fraudulent state tax forms based on what she was told and taught to put on the forms. All the state tax forms claimed zero income.[21] Priscilla was not paid while employed at Washakie Renewable Energy.

---

[21] Later, Priscilla provided information and assisted the FBI's investigation of Washakie Renewable Energy which contributed to several criminal convictions.

543.    Priscilla was forced to work these Order jobs. She was given no option. Being beaten for disobedience was routine in Priscilla's family and she complied out of fear.

544.    By this time, nearly every month Priscilla would attempt to look at her statement to see if it was growing, but the amounts were wrong. In addition, her statement balance would usually be zeroed out at the end of each year. At one point there was $16,000, which included social security payments due to the death of her father.

545.    On rare occasions, Priscilla was able to access small amounts of money from her Order account. Withdrawals required her mother's approval, the money had to be used at Order Businesses, and sometimes no funds were available even under those conditions. She was told she could use her money for her wedding. But if she missed church or did something wrong, her statement would be docked. In the year or so before Priscilla left the Order, she was not shown nor given access to her Order statements/account.

546.    After Priscilla was able to get out of Lifeline, she went to work for Jacob Kingston who, as she later learned, was running a fraud known as Washakie Renewable Energy for the Order. At this point, in early 2015 she insisted on receiving actual paychecks and on information and belief was paid out of the same account used to pay non-Order employees. She received about two paychecks but was informed that she owed the Order $40 because her statement was negative.

547.    Priscilla experienced suicidal ideations while in the Order and often attempted to carry out suicide plans. For example, she often went to the train tracks and laid on them in hopes that a freight train would come. But when that did not happen, she would get up and go home so she would not get into trouble for missing work or sneaking out. If a train had come, she would not have gotten up.

548.    Shortly before Priscilla left the Order, Amanda Grant helped Priscilla get some cash out of her Order statement/account. Amanda worked at the Order office. Priscilla (and sometimes her older sister, Hannah) would call the office, pretend to be her own mother, and approve the withdrawal. At first, Priscilla would withdraw perhaps $20 a month, eventually with the help of others, she successfully got $600 out four times. These amounts were insignificant compared to the amount that should have been accumulating in her Order account.

549.    If Priscilla had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Priscilla has not been fairly compensated for her labor at the Order Businesses where she was required to work.

### H.    Brenda Collins

550.    Brenda Collins is the daughter of John Daniel Kingston, Sr. and one of his 14 wives, Kelly Mattingly. She and her full sister, Allison Eames, are two of her mother's 12 living children. One of Brenda's earliest memories is of being beaten by her father after a family prayer. Harsh, physical beatings were normal in her childhood.

551.    Brenda witnessed her oldest sister, Rochelle, being married at about age 16 and knew she was destined for the same fate.

552.    Before Brenda was in the eighth grade, she was sexually assaulted by Order member Nathan Mason. When her parents discovered the sexual abuse, they reacted by telling Brenda that bad things only happen to people who deserve it because God only punishes those who go against him. Her parents blamed and punished her for allowing herself to be sexual abused. Shortly thereafter, one of Brenda's sisters reported the sexual abuse to the police. As a result, Brenda was violently beaten by John Daniel Kingston Sr.

553.    Soon, it seemed to Brenda that everyone in the Order knew about the sexual assaults, but no one was willing to help. Even some children in the Order school began to harass and bully her. Brenda's family also began blaming her for her mother's seizures and her father convinced her that she was possessed by a demon, that she was causing her mother's seizures, and that she was killing her mother. When Brenda was punished, her parents sometimes brought up the "Mason thing"—referring to what Nathan Mason had done to her— to remind her that she was bad.

554.    Brenda's half-sister committed suicide at 14 years old. Brenda was a year younger than her half-sister and the two sisters were very close. In response to her half-sister's death, their father announced that the family would not honor her half-sister's behavior and would not have a funeral. He relented only after some of her sisters and others close to her decided to hold their own funeral. Even so, John Daniel Kingston Sr., continued to hold family meetings where he ridiculed her deceased half-sister, and instructed the family to throw away pictures and memories because people who self-harm are "stupid and just need to pray more."

555.    Brenda could not handle the toxic and abusive environment she was trapped in. In fact, Brenda had experienced suicidal ideations since she was 5 years old. At approximately 13, she ran away. During the next two years, as Brenda tried to avoid being returned to the Order and her family, she stayed at the University of Utah Neuropsychiatric Institute, was under state care and went back and forth between family members both in and out of the Order, as well as "rehab" at Lifeline for Youth, foster care at Utah Youth Village, and foster homes, only to be eventually returned to her mother.

556.    Utah's juvenile court's focus was on improving Brenda's relationship with her family so they could be reunited. She was expected to go to family therapy, solve problems, make compromises, and give them a second chance. By about age 15, the plan was that when she left

Lifeline she could either live with people approved by her parents or go to a foster home. Given these options, Brenda never felt free of the Order.

557.     Growing up, Brenda knew who her father was but did not call him father. Like her siblings, she always called him "Daniel."  At some point, she realized he was married to other women and had many other children. Although he seldom spoke to her, she was taught to worship him.

558.     Once Brenda started getting a little older, her father started to pay more attention to her and involved her in classes and outings to groom her for marriage. Her friends at school would tell stories about him hitting them, like he did her, but everyone was taught that they deserved it and that they were supposed to learn from it. At some point, she started realizing other people didn't like him, wondered why, started to ask questions, heard more stories, and realized he didn't care about any of them.

559.     Late one summer, when Brenda was approximately 13, she promised to babysit for her sister but had not been able to shower. She begged her mother to be able to quickly shower and was told "yes," but as soon as the water warmed, she heard banging on the bathroom door. She turned the water off and heard John Daniel Kingston, Sr.'s loud voice shout "open the door right now."  She wrapped a towel around herself and as she opened the door he bolted in and wrapped his hands around her neck and began slamming her head into the toilet while choking her. Her towel was coming lose and she started screaming at him to get off her. But when she got up and tried to fix the towel, he put his hands back around her throat, slapped her and told her to get dressed.[22]

560.     After she shut the door and started to get dressed, he opened the door again while she was still indecent. After she finished dressing, he and her mother took her into her bedroom and

---

[22] This violent altercation was witnessed by her sister, Allison Eames.

reminded her that "good Order members obey, you're never going to amount to anything if you're disobedient, you're disobedient, and that's why that happened to you."  They reminded her again of the "Mason thing."   Once in the van, Brenda was focused on self-harming and whether she could find something to use when one of her siblings turned around and said, "shut up, Brenda, he does that to everybody" leaving her with the thought "I'll just stop crying until I can go into a bathroom and hurt myself."

561.    Before Brenda ran away at 13, she had been required to start working. By the sixth grade she was expected to babysit for other Order families over extended periods of time, make meals, and clean houses. One summer she was taken to work at A-1 Disposal by her mother where she filed papers, cleaned and mopped the kitchen, prepared lunches for two shifts of workers, and cleaned up after both shifts. After that summer Brenda continued to work at A-1 Disposal when she was told to, where she stapled papers, removed staples from papers, shredded papers, swept the floor, cleaned the office, scanned papers, and occasionally input numbers, and completed basic accounting as instructed. At least once a week she was not permitted to leave work until as late as 10pm.

562.     She knew that refusing to work for the Order as directed would have resulted in more physical punishment and ridicule within her family and the Order.

563.    On one occasion, as punishment, she was required to watch a group of five- to seven-year-olds at their Order school without payment. Before she ran away, Brenda was also required to perform various tasks for the Order without compensation and if she did not agree she was slapped or otherwise punished.

564.    Brenda was told that she was being paid for her work at A-1 Disposal and that the money would go to her Order bank account and be hers when she was older. She had an account in the

Order that showed she had earned roughly $475. She would ask why her statements always looked the same as the last month or had less money and was told "sometimes your parents will go through and take some of it."

565.    Her friend who worked at the Order office told Brenda that she regularly received information about the hours members worked and then reduced the amounts the members' accounts would show based on whether they were in trouble, had been "talked to by [John] Daniel [Kingston, Sr.]," had broken equipment, or whether she had simply been told by John Daniel Kingston, Sr. to cut down their earnings.

566.    After Brenda graduated from Utah Youth Village and was returned to her mother, there was a lot of pressure for her to get an Order job. Her mother had told the therapist that she needed to save money for when she is older and learn to be an adult. The therapist suggested that she should be allowed to keep some of the money she earned. A compromise was reached that allowed Brenda to use some of her earnings to get and take care of her own cat.

567.    To earn this money, Brenda worked at Family Store True Value full time during the summer of 2016 when she was about 15-years old, restocking shelves and putting together birthing kits for Order members to buy.[23]   Despite the therapist's suggestion, however, she didn't have access to any of her money except to initially buy a cat. Thereafter, Brenda had to tell her mother when she needed cat food or cat litter, and her mother would buy it and bring it home and tell her how much it cost.

568.    Brenda was 15 years old, in 2016, when she was finally able to stay away from the Order permanently, even though she continued to feel threatened by her parents. Although she was again

---

[23] During this approximate time, in 2016, Brenda was also assigned to assist Laura Fuller paint the interior of a house and do yard work.

placed in state custody, by then the state had finally realized that putting her back in her mother's care was not a good idea. At this time, the state finally stopped pressuring her to go back.

569.    If Brenda had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Brenda has not been fairly compensated for her labor at the Order Businesses where she was required to work.

## I.    **Alex Martin**

570.    When Alex was 15 years old, her parents, John Daniel Kingston, Sr. and Valarie Martin, Kingston, and other senior members in the Order, including Paul Elden Kingston began making arrangements for her to marry Matthew Ortell Kingston, the son of Paul Elden Kingston.

571.    Matthew Ortell Kingston is the presumptive and rumored heir of Paul Elden Kingston and is considered next in line to lead the Order.

572.    Several of Alex's sisters have married Paul Elden Kingston's children, specifically his first wife, Patricia Kingston's sons, and it was expected from an early age that Alex would marry one of Paul Elden Kingston and Patricia Kingston's sons.

573.    When Paul Elden Kingston and Alex's parents decided that she would marry Matthew Ortell Kingston he was already married to Alex's half-sister and some of her aunts. Alex would have become Matthew Ortell Kingston's twelfth or thirteenth wife. Matthew Ortell Kingston was significantly older than Alex and already had several children that were about Alex's age.

574.    One of Matthew Ortell Kingston's wives who was also one of Alex's aunts gave Alex's parents a piece of paper on which was typed a statement that she claimed was direction from God that Alex would be saved by becoming part of Matthew Ortell Kingston's family. Matthew Ortell Kingston's wife would not have provided that written statement to Alex without approval from Matthew Ortell Kingston, Alex's parents, and ultimately Paul Elden Kingston.

575.     When Alex approached her father, John Daniel Kingston, Sr. and told him that Matthew Ortell Kingston was touching her inappropriately at Order dances and that she did not want to marry him, her father became angry and told her that she had a responsibility to God to marry her Number One Choice—despite the fact that she and Matthew Ortell Kingston were first cousins[24]—making it clear that she would have to marry Matthew Ortell Kingston.

576.     Shortly thereafter Alex fled the Order to avoid being forced to marry Matthew Ortell Kingston, to avoid being forced to work for the Order, and so she could go to school to work toward the career she wanted.

577.     Had she not fled the Order, Alex would have been forced to marry Matthew Ortell Kingston, work for her father's Order Businesses and forego the education she needed. Had Alex married Matthew Ortell Kingston she would also have been required to engage in sexual acts with her cousin and give birth to as many children as biologically possible. And had she stayed in the Order, Alex would have been under the age of 18 when she married Matthew Ortell Kingston.

578.     Alex's ability to leave the Order and work for employers who would pay her was limited by the fact that her parents would not allow her to have access to her own Social Security card, her Social Security number, or her birth certificate. Before fleeing the Order to avoid an illegal Order marriage, Alex had been required to work generally without compensation for Order Businesses.

579.     At approximately age 2, Alex and her family moved to Washakie Ranch. As a young child, Alex began working on the ranch (feeding thousands of chickens, washing eggs, packaging meat and loading farm products to sell at church).

---

[24] John Daniel Kingston Sr. is the biological father of Alex Martin. He is also the biological full brother of Paul Elden Kingston who is the father of Matthew Ortell Kingston.

580.     At approximately age 12 or 13, Alex and her family moved away from the ranch, but she was forced to return on weekdays in the summer to feed crew members and clean the farm under the direction of Lallana Huntington. During this time, Alex continued selling farm products at church on the weekends. Farm crew members were made up of Order members who misbehaved or resisted the Order. They were often children and were required to live in the basement. As punishments employees of the ranch were often beaten, forced to sleep outside, fed rotten food, or denied meals.

581.     At approximately age 13, Alex was forced to miss school for weeks at a time to work at the Order's "Weed Farm" in Oregon. There, she was forced to work over ten hours a day often without food, being permitted to eat as a reward after completing all her work. Whenever the marijuana was harvested, Alex would accompany her father in a truck as they hauled the product to Utah. At one point, Alex witnessed the weed being destroyed shortly before the FBI raids on the Order.

582.     At approximately age 14, Alex was assigned to work full time for an Order owned A&W restaurant, likely operating under the Order's Food Group, where she was a shift lead, responsible for making food and operating the register.

583.     At approximately age 15, Alex was assigned to work full time at another Order Business, American Wellness and Rehab Clinic. There, she took patient vitals, entered patient medical history in records, set up patient appointments, answered phones and did other assigned administrative tasks.

584.     Other than the last three paychecks from American Wellness, which Alex hid and refused to turn over the Order before fleeing, all the money she earned from her work for the Order was sent to her Order statement.

585.    If Alex had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Alex has not been fairly compensated for her labor at the Order Businesses where she was required to work.

J.    **Mary Ann Robinson**

586.    Mary Ann was born to Mary Keaton and Jeremy Kingston. Her father is not listed on her or her siblings' birth certificates.

587.    Starting when she was approximately 8 years old in 2000, Mary Ann was sent to work for the Order at Family Stores True Value and John's Market. Her mother told her it was time she started to pay for her own shampoo, toothpaste, groceries, rent, and later for items such as feminine products. She was never told how much she was earning per hour at this or any other Order jobs and when she asked what she was being paid for her required labor she was told that she was earning "Blessings in Heaven."

588.    Mary Ann does not recall any non-Order members working at Family Stores True Value. Whenever a non-member came into the store, she and the other children working there had to hurry into the back room so that the employment of minors would not be too obvious. She had been taught that if an outsider ever asked if she worked there, she was to lie, say "no," and then walk away.

589.    From 2000 through 2008, Mary Ann was assigned by the Order to work at multiple other Order Business, including summers in Idaho on the Order potato farm. She had many jobs and was sent wherever the Order wanted her to work. These jobs included, for example, Advanced Vending, Family Stores True Value, John's Market Place, the Order's office on Angelo Avenue, Ensign Learning Center, and for Sierra Wholesale.

590.     At about age 11, when her father was serving a prison sentence for incest, she began working an additional job delivering newspapers for the Deseret Morning News. Although she was supposed to assist her mother, who was actually employed by the Desert Morning News, Mary Ann did the actual morning newspaper route. At approximately age 13, her mother made her start driving a car to deliver the newspapers. Mary Ann did this while her mother collected the paychecks and turned them over to the Order.

591.     During these years, she could not get up in the early morning hours each day to deliver papers and still go to school because she became too tired. It was more important in the Order for her to work than go to school, so she was taken out of an Order School in fourth grade. Eventually, her mother was fired by the Deseret Morning News when it was discovered that Mary Ann, not her mother, was delivering the newspapers. Secretly, Mary Ann was glad that her mother was fired because she was able to return to school for the end of sixth grade.

592.     Mary Ann was sent back to work for Advanced Vending, later John's Market, then Ensign Learning Center while completing the Order's online high school course to get a high school diploma so that she could work for the Order full time. Once she graduated from high school in 2008, she was sent to work at the Order Bank in the back room where she and several other children were required to sign the names of Order members on payroll checks, tax returns, social security checks and other documents for actual banks and prepare bank deposits. The children took turns so that the false signatures did not look the same, but for certain signatures they had to practice so the forgery looked spot on. For some elite Order members such as Rachel Orlean Kingston Young, Paul Elden Kingston, David Elden Kingston, Carl Kingston, and others the children were instructed to use signature stamps.

593.     Later, at about 16 or 17 years old, Mary Ann started working directly with Paul Elden Kingston at the Order Office and for Mitchell & Associates, the Order tax company, doing financials and taxes for some 32 Order Businesses, meaning she was directed by Paul Elden Kingston and others to, *inter alia*, create false expenses and invoices. Not only did she work directly for him, but she was also required to meet with him to discuss marriage. Although Mary Ann had been raped by two men when she was younger—and in the eyes of the Order was not a virgin—Paul Elden Kingston said he would deal with one of the perpetrators and directed her not to talk with law enforcement.

594.     She was not allowed to see her pay checks or access her money, however, and she was about 13-years old before she was allowed to see records which showed she had $10,000 in her account. By the time she was 15-years old, her statements showed between $15,000 and $20,000 in her account.

595.     By the time Mary Ann was 15 and had her high school diploma, additional money was being taken from her Order statement to pay for groceries, utilities and occasionally even rent payments for the home she lived in. She also learned from her mother and April McKay, who worked with Mitchell & Associates, that the Order was taking money from her earnings for one of her sibling's "child support" so there would be more of a tax refund for the Order. On information and belief, this money never went into her statement.

596.     On information and belief, Mary Ann was only one of the many Order children for whom April McKay prepared tax returns and falsely claimed a deduction for a "dependent" so that the Order could fraudulently receive an earned income tax credit. Mary Ann understood that this practice was occurring but throughout the years she was forced to work for Order Businesses she was never allowed to see her own tax returns or receive any tax refunds.

597.    Mary Ann obtained her driver license at age 18 but her parents did not allow her to keep it because it "gave a girl too much freedom."  In 2012, at age 19, Mary Ann was again sent to Idaho to work on the potato farm until she agreed to be placed in an arranged Order marriage. After her marriage, she was then assigned to work at A-1 Disposal under John Daniel Kingston, Sr. where she prepared financials and taxes for the Order Bank for many of his companies, including AAA Security, A-Fab Engineering, A-1 Disposal, A-Action Express, and the Washakie Farm.

598.    In March 2013, after Mary Ann had her first child, she started to operate her own daycare business but continued to do financials for John Daniel Kingston, Sr., and, because she did financials, she was also required to continue attending year-end meetings held by Paul Elden Kingston for all Order Businesses. She continued to do financials for A-Action Express through April 2017.

599.    Mary Ann left the Order in 2018 for many reasons, including for getting into trouble again because she had been contacted by law enforcement and needed protection from one of her rapists who was again stalking her. When she left, she was told that she had nothing in her Order account despite not being paid for her forced labor.

600.    If Mary Ann had refused to work as directed, she and likely her husband and children would have been punished severely and suffered serious harm both emotionally and to their reputations within the Order. To date, Mary Ann has not been fairly compensated for her labor at the Order Businesses where she was required to work.

## VIII.    The Order Inflicted Substantial, Intentional Emotional Distress

601.    As detailed above, the Order maintained control over Plaintiffs in countless ways, using various means of intimidation, force and violence.

602.    As children, most Plaintiffs were severely punished or beaten for minor, or even simply suspected, transgressions. Children as young as 6 months would be slapped or physically abused for crying. The more "sinful" the Order deemed a child to be, the harsher the abuse.

603.    Sometimes children, including some Plaintiffs, were tied up or locked in rooms, basements and even garbage cans. Plaintiffs witnessed this, knowing they risked the same abuse. For instance, Michelle Ruth Michaels saw another child in her home forced to wear trash bags as diapers for days on end while restrained in a garbage can and other enclosed spaces.

604.    As children, Plaintiffs also feared sexual abuse and incestual and bigamous marriage.

605.    Girls were taught, from a young age, that their foremost responsibility was to be an obedient wife and have lots of children. Thus, underage, incestual, and bigamous marriages were commonplace and caused Plaintiffs to live in fear of a life controlled by the Order.

606.    Having been taught that to deny a husband sexual intercourse was a "sin," they feared arranged marriages and unwanted sex. Yet, they were pressured to get pregnant, openly shamed if they failed to get pregnant, sometimes required to undergo in vitro fertilization procedures, and punished if they used birth control.

607.    When attempting to leave the Order, Plaintiffs were often physically restrained, denied access to their earnings and other resources, and threatened with the loss of the only family and friends they had ever known.

608.    As a result of the relentless pressure, intimidation, and abuse, alleged in this Complaint, some Plaintiffs engaged in self-harm to inflict punishments that they were taught they deserved. One example is Jenny Kingston who used a knife to carve the words Jacob Daniel Kingston Jr. repeatedly disparaged her with: "YOU DON'T DESERVE SOMEONE TO CARE ABOUT YOU LIKE I DO."

609.    Children, including some Plaintiffs, had suicidal ideations as early as age 5. Some made serious attempts to commit suicide. Those that did commit suicide were spoken of so poorly that Plaintiffs and Order members were unable to mourn their loss.

## IX.    The Order's Core Conspiracies.

610.    For decades, the Order has operated at least two core conspiracies as part of its ongoing unlawful activities and patterns and practices of fraud. As alleged in detail herein, these two core conspiracies focus on the sex and labor trafficking of Order members, especially children, and constitute unlawful conspiracies.

611.    At the center of these related core conspiracies are certain Numbered Men and entities: Defendants Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., and Latter Day Church of Christ.

612.    These Defendants, as the Order's core conspirators, used methods such as the "One Above Another" system as actively aided by other individuals and entities that were part of the Order, including the other Defendants, who, as alleged throughout this Complaint, acted in furtherance of these core conspiracies and their objectives.

613.    As part of the first core conspiracy and its objective, certain other Defendants also conspired with the Order's core conspirators to intentionally, knowingly, or recklessly, solicited, instructed, commanded, encouraged and/or actively took steps to arrange and keep certain Plaintiffs in unlawful Order marriages and/or intentionally, knowingly, or recklessly, solicited, instructed, commanded, encouraged and/or intentionally aided or acted in committing sexual batteries, abuses, and rapes of certain Plaintiffs against their will, including, but not limited to, while they were minors, as alleged in detail in this Complaint. Moreover, despite being aware of the sexual batteries, abuses, and rapes of certain Plaintiffs, as minors, each of these Defendants as

the result of and in furtherance of this conspiracy failed to stop or report the illegal activity to law enforcement.

614.    As part of the second core conspiracy—violations of labor, labor trafficking, and related laws—and its objective certain other Defendants also conspired with the Order's core conspirators to intentionally, knowingly, or recklessly, solicit, instruct, command, encourage, aid and/or act to unlawfully injure certain Plaintiffs, as alleged in detail in this Complaint, by, among other things, unlawfully withholding, reducing, and otherwise using their earnings through various mechanisms such as Order Businesses, Order job placement practices, including Management Business Systems, Inc., and the Order's imposed "accounting services," including the use of "10% forms."

615.    These Defendants, as part of these two core conspiracies and in the context of the Order's overall unlawful activities and patterns and practices of fraud, conspired and combined together for the purpose of causing and aiding each other to commit these core conspiracies, the objects of which were illegal and carried out as the result of calculated plans between these Defendants and the Order as alleged in detail in this Complaint.

616.    Defendants, as part of the Order, also acted in concert together though meetings of their minds, agreed core objectives, approvals, and approved courses of action, including obedience to the will, command and teachings of the Order's core conspirators, all designed to accomplish and commit one or more unlawful and overt acts against each Plaintiff in furtherance of the Order's core conspiracies as demonstrated by the facts alleged herein in support of each Plaintiffs' claims.

## FIRST CAUSE OF ACTION
## LABOR TRAFFICKING IN VIOLATION OF FEDERAL LAW

617.    Plaintiffs, Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson ("First Cause of Action Plaintiffs") incorporate in this First Cause of Action the

allegations contained in the other paragraphs of this Complaint and allege, pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1581, et. al. ("TVPRA"), as follows against the Defendants identified below.

618.    The First Cause of Action Plaintiffs were each trafficked into working for various Order Businesses, all of which are controlled and run, at least, by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("First Cause of Action Defendants"), who individually violated and/or conspired to violate and/or benefit by violations of the TPVRA.

619.    As further detailed in this Complaint, the First Cause of Action Defendants used methods of force, fraud or collusion, including among other things the Order's "One Above Another" structure from the top down to labor traffic the First Cause of Action Plaintiffs to unlawfully withhold, reduce, and otherwise use their earnings.

620.    In addition to the One Above Another system, the First Cause of Action Defendants used various mechanisms of force, fraud and coercion, including Order Businesses, Order job placement practices, including Management Business Systems, Inc., and the Order's imposed "accounting services," including the use of "10% forms" that members were required to sign, and thereby labor trafficked the First Cause of Action Plaintiffs, and as minors made them religious martyrs, all in violation of federal law.

621.    In addition to the First Cause of Action Defendants, Amanda Rae Grant was also labor trafficked by Patricia Kinston and others to work at Fidelity Lending, Order Bank, Advanced Copy, John's Market Place, Ensign learning Center and Vanguard Academy; Jenny Kingston was also labor trafficked by Rachel Orlean Kingston Young, Sally Kingston, and others to work at

Washakie Renewable Energy, Advanced Vending, A&W Restaurants, the Food Group, A-1 Disposal, Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, United Fuel Supply, Washakie Farm, and Century Office; Jana Johnson was also labor trafficked by Patricia Kingston, Daniel Charles Kingston, and others to work at Fidelity Lending, Order Bank, Century Office, Arrow Real Estate, aka Property Compliance, and Standard Restaurant Supply; Julie Ruth Green was trafficked as alleged herein to work at Order Bank, Century Office, Garco Property Management, and Arrow Real Estate, aka Property Compliance; Michelle Ruth Michaels was also trafficked by Deborah Williams, Jolene Andrews, Michelle Afton Michaels and others to work at American Digital Systems, Order Bank, and AAA Communications; Allison Eames was also trafficked by April McKay, Valarie Martin, and others to work at A-1 Disposal, Washakie Farms, Order Bank, John's Market Place, and Family Stores True Value; Priscilla Tucker was also trafficked by Patricia Kingston, Rachel Orlean Kingston Young, Sally Kingston, and others to work at Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, Atco Trucking, aka, CTC Trucking, and Washakie Renewable Energy; Brenda Collins was also trafficked by others to work at A-1 Disposal and Family Stores True Value; Alex Martin was also trafficked by Lallana Huntington and others to work at, Washakie Farm, aka, Washakie Ranch, the Weed Farm, A&W Restaurants, The Food Group, Washakie Farm,  and American Wellness and Rehab; and Mary Ann Robinson was trafficked as alleged herein to work at Family Stores True Value, John's Market Place, the Order Office, Ensign Learning Center, A-1 Disposal, A-Action Express, Mitchell and Associates, and Advanced Vending.  Kent William Johnson, Patricia Kinston, Rachel Orlean Kingston Young, Sally Kingston, Daniel Charles Kingston, Deborah Williams, Jolene Andrews, Michelle Afton Michaels, April McKay, and Valarie Martin are hereinafter included as "First Cause of Action Defendants."

622.     As previously detailed thoughout the Complaint, the First Cause of Action Defendants and others deployed numerous methods to force the First Cause of Action Plaintiffs to work for the Order and the Order Businesses, including force, threats of force, physical restraint, threats of physical restraint, serious harm, threats of serious harm, and schemes, plans, or patterns intended to cause the First Cause of Action Plaintiffs to believe that, if they did not perform labor or services, either they and/or other Order members would suffer serious harm or physical restraint and they themselves, at a minimum, would suffer retribution including serious harm in the form of nonphysical, psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel them to perform or to continue performing labor or services to avoid that retribution.

623.     The First Cause of Action Defendants and certain others in the Order knowingly benefited financially and by receiving items or other things of value from participation in a venture that they knew or should have known would involve a violation of the TVPRA, including by obtaining, providing, and profiting from the forced labor of the First Cause of Action Plaintiffs.

624.     The profits from the labor the First Cause of Action Plaintiffs were required to supply accrued to the benefit of the First Cause of Action Defendants and certain others in the Order who used these profits for their personal enrichment, including to purchase numerous homes, vehicles, and other personal items of value.

625.     The wages of Order employees, including the wages that were earned or should have been earned by the First Cause of Action Plaintiffs were deposited directly into the Order Bank, for the benefit of the First Cause of Acton Defendants and certain others in the Order.

626.     The First Cause of Action Defendants and certain others in the Order knew or should have known that the profits and wages they received were obtained from the forced labor of First Cause of Action Plaintiffs.

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson pray for relief as set forth below.

## SECOND CAUSE OF ACTION
## SEX TRAFFICKING IN VIOLATION OF FEDERAL LAW

627.     Plaintiffs, Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green ("Second Cause of Action Plaintiffs") incorporate in this Second Cause of Action the allegations contained in the other paragraphs of this Complaint and allege, pursuant to the TVPRA, as follows against the defendants identified below.

628.     The Second Cause of Action Plaintiffs were each trafficked for sexual purposes by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Second Cause of Action Defendants"), who conspired to violate and/or benefit by violations of the TPVRA.

629.     The Second Cause of Action Defendants individually used and/or conspired to use methods of force, fraud or collusion, including among other things the Order's "One Above Another" structure to sexually traffic the Second Cause of Action Plaintiffs by controlling who they marry, controlling when they begin having sexual relations with their Order husbands, directing that they get pregnant young when it is difficult to leave the Order, and directing that they get pregnant often making it increasingly difficult to leave the Order.

630. By controlling and directing girls and woman in this manner, the Second Cause of Action Defendants maximize the number of children produced in the Order to increase Order membership, obtain a steady supply of workers and a steady supply of female offspring to continue the Order's unlawful patterns and practices.

631. In addition to the Second Cause of Action Defendants who trafficked the Second Cause of Action Plaintiffs for sexual and reproductive purposes, Jenny Kingston was also sexually trafficked by Sally Kingston, Jacob Daniel Kingston, Jr., and others; Jana Johnson was also sexually trafficked by Kent William Johnson, Patricia Kingston, Daniel Charles Kingston and others; and Julie Ruth Green was sexually trafficked by Jacob Daniel Kingston, Jr., Patricia Kingston and others. Sally Kingston, Jacob Daniel Kingston, Jr., Kent William Johnson, Patricia Kingston, Daniel Charles Kingston, and John Daniel Kingston, Jr. are hereinafter included as "Second Cause of Action Defendants."

632. The Second Cause of Acton Defendants began the grooming and sex trafficking of the Second Cause of Action Plaintiffs when they were minors as generally and separately alleged above for each Second Cause of Action Plaintiffs all in violation of federal law. Indeed, to avoid falling victim to sex trafficking in the Order, young females often have to flee the Order itself as did, for example, Amanda Rae Grant, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, and Alex Martin.

633. The Second Cause of Action Defendants facilitated, engaged in, encouraged, condoned, and supported numerous commercial sexual acts with the Second Cause of Action Plaintiffs as alleged in detail above.

634.    The Second Cause of Action Defendants also recruited, enticed, harbored, provided, obtained, and maintained the Second Cause of Action Plaintiffs and caused them to engage in commercial sexual acts, including through physical force, with adult men in the Order.

635.    The Second Cause of Action Defendants' conduct and actions in support of their sex trafficking endeavors, as well as their commercial sexual acts and attempts to commit commercial sexual acts occurred in and/or affected interstate commerce.

636.    The Second Cause of Action Defendants knowingly benefited financially and by receiving items and/or other things of value from participation in a venture that they knew or should have known would involve a violation of the TVPRA, including by engaging in the sex trafficking of the Second Cause of Action Plaintiffs.

637.    The Second Cause of Action Defendants each directly benefited from the value they extracted from the Second Cause of Action Plaintiffs by trafficking them into Order marriages to keep them in the Order and maximize the value they and the Order could extract from them.

WHEREFORE, Plaintiffs Amanda Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, and Priscilla Tucker pray for relief as set forth below.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT

638.    Jenny Kingston, Janna Nicole Johnson, and Alex Martin ("Third Cause of Action Plaintiffs") incorporate herein the allegations contained in the other paragraphs of this Complaint and allege. Pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 206, 216 ("FLSA"), as follows.

639.    Between July 17, 2020 and the present, the Third Cause of Action Plaintiffs were each required to work for various Order Businesses, all of which are controlled and run, at least, by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative

Society, Inc., Latter Day Church of Christ, and the Order ("Third Cause of Action Defendants"), who individually violated and/or conspired to violate the FLSA.

640.    As further detailed in this Complaint, the Third Cause of Action Defendants used methods of force, fraud or collusion, including among other things, the Order's "One Above Another" structure from the top down to violate the Third Cause of Action Plaintiffs' FLSA rights by, among other things, not paying them the minimum wages and overtime wages to which they were entitled through the Third Cause of Action Defendants' use of various mechanisms such as Order Businesses, Order job placement practices, including Management Business Systems, Inc., and the Order's imposed "accounting services," and the "10% forms" that members were required to sign.

641.    In addition to the Third Cause of Action Defendants, Jenny Kingston's FLSA rights were violated by Rachel Orlean Kingston Young, Sally Kingston, Washakie Renewable Energy, Advanced Vending, A&W Restaurants, the Food Group, A-1 Disposal, Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, United Fuel Supply, Washakie Farm, Century Office, and others; Jana Johnson's FLSA rights were violated by Patty Kingston, Daniel Charles Kingston, Fidelity Lending, Order Bank, Century Office, Arrow Real Estate, aka Property Compliance, Standard Restaurant Supply, and others; Brenda Collins' FLSA rights were also violated by A-1 Disposal, Family Stores True Value, and others; Alex Martin's FLSA rights were also violated by Lallana Huntington, Washakie Farm, aka, Washakie Ranch, the Weed Farm, A&W Restaurants, The Food Group, Washakie Farm, and American Wellness and Rehab, and others. Rachel Orlean Kingston Young, Sally Kingston, Washakie Renewable Energy, Advanced Vending, A&W Restaurants, the Food Group, A-1 Disposal, Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, United Fuel Supply, Washakie Farm, Century Office, Patty Kingston, Daniel Charles Kingston, Fidelity Lending, Order Bank, Arrow Real Estate, aka

Property Compliance, Standard Restaurant Supply, Lallana Huntington, the Weed Farm, and American Wellness and Rehab ("Third Cause of Action Defendants").

642.     On information and belief, the Third Cause of Action Defendant entities each have annual revenues of $500,000 or more.

643.     By failing to pay the Third Cause of Action Plaintiffs any wages, minimum wages and/or overtime wages for the hours that they worked, the Third Cause of Action Defendants failed to comply with the FLSA.

644.     The failure of the Third Cause of Action Defendants to pay the Third Cause of Action Plaintiffs any, minimum and/or overtime wages was willful and intentional. Indeed, as a regular practice of its businesses, the Order routinely fails to pay Order employees their minimum and overtime wages and, in fact, frequently pays Order employees no wages at all.

645.     The Third Cause of Action Defendants were aware of their obligation to comply with the wage and hour requirements of the FLSA.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, Brenda Collins, and Alex Martin pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
## VIOLATION OF RICO 18 U.S.C. § 1962(C)

646.     Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson ("Fourth Cause of Action Plaintiffs") incorporate in this Fourth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege, pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), 18 U.S.C. § 1961 *et seq* ("RICO"), as follows against the Defendants identified below.

647.    By the acts described above, various Order Businesses, all of which are controlled and run, at least, by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Fourth Cause of Action Defendants") have engaged in a pattern of wrongful activity in violation of RICO, 18 U.S.C. § 1961, et. al.   The Fourth Cause of Action Defendants, along with separate and independent entities and individuals associated together in a continuing unit for the common purpose of profiting from their illegal activities.

648.    The Fourth Cause of Action Defendants formed an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

649.    Each of the Fourth Cause of Action Defendants has knowingly conducted and/or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of federal trafficking laws, including 18 U.S.C. § 1581, et. al.

650.    The Fourth Cause of Action Defendants are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.  The Fourth Cause of Action Defendants worked together to accomplish their common purpose of trafficking the Plaintiffs for labor and sexual purposes.

651.    The Fourth Cause of Action Defendants forged symbiotic relationships and each Defendant needed and depended upon the participation of the other members to accomplish their common purpose of forcing the Fourth Cause of Action Plaintiffs to work for the Order and Order

Businesses through force, threats of force, physical restraint, threats of physical restraint, serious harm, threats of serious harm, and schemes, plans, or patterns intended to compel work. The Fourth Cause of Action Defendants, as well as the Order Businesses they operate, control, and/or forced the Fourth Cause of Action Plaintiffs to work at, are legal persons and entities which committed criminal acts in violation of 18 U.S.C. § 1589, by doing the acts and engaging in the conduct described above.

652. The Fourth Cause of Action Defendants forged symbiotic relationships and each Defendant needed and depended upon the participation of the other members to accomplish their common purpose of sexually trafficking the Fourth Cause of Action Plaintiffs through methods of force, fraud or collusion, including, among other things, the Order's "One Above Another" structure to control who Plaintiffs marry, control when they begin having sexual relations with their Order husbands, direct that they get pregnant young when it is difficult to leave the Order, and direct that they get pregnant often to make it increasingly difficult to leave the Order. The Fourth Cause of Action Defendants are legal persons and entities which committed criminal acts in violation of 18 U.S.C. § 1591, by doing the acts and engaging in the conduct described above.

653. The Fourth Cause of Action Plaintiffs have been injured in their property by reason of the above-described conduct, and, therefore, are entitled to damages in an unknown amount to be proven at trial, including treble damages, costs, and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson pray for relief as set forth below.

## FIFTH CAUSE OF ACTION
## VIOLATION OF RICO 18 U.S.C. § 1962(D)

654.    Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson ("Fifth Cause of Action Plaintiffs") incorporate in this Fifth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege, pursuant to RICO, 18 U.S.C. § 1961 *et seq*, as follows against the Defendants identified below.

655.    By the acts described above, various Order Businesses, all of which are controlled and run, at least, by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Fifth Cause of Action Defendants") have engaged in a pattern of wrongful activity in violation of RICO, 18 U.S.C. § 1961, et. al.  The Fifth Cause of Action Defendants, along with separate and independent entities and individuals, associated together in a continuing unit for the common purpose of profiting from their illegal activities.

656.    The Fifth Cause of Action Defendants formed an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

657.    The Fifth Cause of Action Defendants have willfully combined, conspired, and agreed to violate 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of federal labor trafficking laws, including 18 U.S.C. § 1589, and federal sex trafficking laws, including 18 U.S.C. § 1591, by doing the acts and engaging in the conduct described above.

658.    Each Defendant knew of, agreed to, and acted in furtherance of the overall objective of the conspiracy be forcing the Fifth Cause of Action Plaintiffs to engage in labor and/or sexual activity for the benefit of Defendants, Order Businesses, and the Order.

659.    The Fifth Cause of Action Plaintiffs have been injured in their property by reason of the above-described conduct, and, therefore, are entitled to damages in an unknown amount to be proven at trial, including treble damages, costs, and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson pray for relief as set forth below.

## SIXTH CAUSE OF ACTION
## LABOR TRAFFICKING IN VIOLATION OF UTAH LAW

660.    Plaintiffs, Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson ("Sixth Cause of Action Plaintiffs"), incorporate in this Sixth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege as follows, pursuant to Utah's human labor trafficking laws, against the Defendants identified below.

661.    The Sixth Cause of Action Plaintiffs were each trafficked into working for various Order Businesses, all of which are controlled and run, at least, by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Rachel Orlean Kingston Young, Jacob Ortell Kingston, Sr., Mark William Johnson, Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Sixth Cause of Action Defendants"), who conspired to violate and/or benefit by Utah's human labor trafficking laws.

662.    As further detailed in this Complaint, the Sixth Cause of Action Defendants individually used and/or conspired to use the Order's "One Above Another" structure from the top down to labor traffic the Sixth Cause of Action Plaintiffs by, among other things, unlawfully withholding, reducing, and otherwise using their earnings through various mechanisms such as Order Businesses, Order job placement practices, including Management Business Systems, Inc., and the Order's imposed "accounting services," including the use of "10% forms" that members were required to sign, and thereby labor trafficked the Sixth Cause of Action Plaintiffs, and as minors made them religious martyrs, all in violation of Utah human labor trafficking law.

663.    In addition to the Sixth Cause of Action Defendants, Amanda Rae Grant was also labor trafficked by Patricia Kinston and others to work at Fidelity Lending, Order Bank, Advanced Copy, John's Market Place, Ensign learning Center and Vanguard Academy; Jenny Kingston was also labor trafficked by Rachel Orlean Kingston Young, Sally Kingston, and others to work at Washakie Renewable Energy, Advanced Vending, A&W Restaurants, the Food Group, A-1 Disposal, Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, United Fuel Supply, Washakie Farm, and Century Office; Jana Johnson was also labor trafficked by Patty Kingston, Daniel Charles Kingston, Kent William Johnson, and others to work at Fidelity Lending, Order Bank, Century Office, Arrow Real Estate, aka Property Compliance, and Standard Restaurant Supply; Julie Ruth Green was trafficked as alleged herein to work at Order Bank, Century Office, Garco Property Management, and Arrow Real Estate, aka Property Compliance; Michelle Ruth Michaels was also trafficked by Deborah Williams, Jolene Andrews, Michelle Afton Michaels and others to work at American Digital Systems, Order Bank, and AAA Communications; Allison Eames was also trafficked by April McKay, Valarie Martin, and others to work at A-1 Disposal, Washakie Farms, Order Bank, John's Market Place, and Family Stores

True Value; Priscilla Tucker was also trafficked by Patricia Kingston, Rachel Orlean Kingston Young, Sally Kingston, and others to work at Family Stores True Value, Standard Restaurant Supply, Ensign Learning Center, Atco Trucking, aka, CTC Trucking, and Washakie Renewable Energy; Brenda Collins was also trafficked by others to work at A-1 Disposal and Family Stores True Value; Alex Martin was also trafficked by Lallana Huntington, and others to work at, Washakie Farm, aka, Washakie Ranch, the Weed Farm, A&W Restaurants, The Food Group, Washakie Farm,  and American Wellness and Rehab; and Mary Ann Robinson was trafficked as alleged herein to work at Family Stores True Value, John's Market Place, the Order Office, Ensign Learning Center, A-1 Disposal, A-Action Express, Mitchell and Associates, and Advanced Vending. Patricia Kinston, Rachel Orlean Kingston Young, Sally Kingston, Daniel Charles Kingston, Deborah Williams, Jolene Andrews, Michelle Afton Michaels, April McKay, Valarie Martin and Lallana Huntington are hereinafter included as "Sixth Cause of Action Defendants."

664.    As previously detailed though out the Complaint, the Sixth Cause of Action Defendants and others deployed numerous methods of force, fraud or collusion to cause the Sixth Cause of Action Plaintiffs to work for the Order and the Order Businesses, including force, threats of force, physical restraint, threats of physical restraint, serious harm, threats of serious harm, and schemes, plans, or patterns intended to cause the Sixth Cause of Action Plaintiffs to believe that, if they did not perform labor or services, either they and/or other Order members would suffer serious harm or physical restraint and they themselves, at a minimum, would suffer retribution including serious harm in the form of nonphysical, psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel them to perform or to continue performing labor or services to avoid that retribution.

665.    The Sixth Cause of Action Defendants and certain others in the Order knowingly benefited financially and by receiving items or other things of value from participation in a venture that they knew or should have known would involve violations of Utah Code Ann. § 76-5-308 (human trafficking for labor), Utah Code Ann. § 76-5-310 (aggravated human trafficking) [Is this correct for labor trafficking?]; and/or Utah Code Ann. § 76-5-309 (benefitting from human trafficking) by obtaining, providing, and profiting from the forced labor of the Sixth Cause of Action Plaintiffs.

666.    The profits from the labor and services the Sixth Cause of Action Plaintiffs were required to supply accrued to the benefit of the Sixth Cause of Action Defendants and certain others in the Order who intercepted and used these profits for their personal enrichment, including to purchase numerous homes, vehicles, and other personal items of value.

667.    The Sixth Cause of Action Defendants knew or should have known that the profits and wages they received were obtained from the forced labor of the Sixth Cause of Action Plaintiffs.

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Brenda Collins, Alex Martin, and Mary Ann Robinson pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION
## SEX TRAFFICKING IN VIOLATION OF UTAH LAW

668.    Plaintiffs, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, and ("Seventh Cause of Action Plaintiffs") incorporate in this Seventh Cause of Action the allegations contained in the other paragraphs of this Complaint and allege, pursuant to Utah's human sex trafficking laws, as follows against the defendants identified below.

669.    The Seventh Cause of Action Plaintiffs were each trafficked for sexual purposes by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative

Society, Inc., Latter Day Church of Christ, and the Order ("Seventh Cause of Action Defendants"), who conspired to violate and/or benefit by violations of Utah's human sex trafficking laws.

670.    The Seventh Cause of Action Defendants individually used and/or conspired to use, among other things, the Order's "One Above Another" structure to sexually traffic the Seventh Cause of Action Plaintiffs by controlling who they marry, controlling when they begin having sexual relations with their Order husbands, directing that they get pregnant young, when it is difficult to leave the Order, and directing that they get pregnant often making it increasingly difficult to leave the Order.

671.    By controlling and directing girls and woman in this manner, the Seventh Cause of Action Defendants maximize the number of children produced in the Order to increase Order membership, obtain a steady supply of workers and a steady supply of female offspring to continue the Order's unlawful patterns and practices.

672.    In addition to the Seventh Cause of Action Defendants who trafficked the Seventh Cause of Action Plaintiffs for sexual and reproductive purposes, Jenny Kingston was also sexually trafficked by Sally Kingston, Jacob Daniel Kingston, Jr., and others; Jana Johnson was also sexually trafficked by Patricia Kingston, Daniel Charles Kingston, Kent William Johnson, and others; and Julie Ruth Green was sexually trafficked by Paul Elden Kingston, Jr., Patricia Kingston, Jacob Daniel Kingston, Jr., Sally Kingston, John Daniel Kingston, Jr., and others. Sally Kingston, Jacob Daniel Kingston, Jr., Patricia Kingston, Paul Elden Kingston., Jr., Daniel Charles Kingston, and John Daniel Kingston, Jr. are hereinafter included as "Seventh Cause of Action Defendants."

673.    The Seventh Cause of Acton Defendants began the grooming and sex trafficking of the Seventh Cause of Action Plaintiffs when they were minors and used various means of Force, fraud

and coercion as generally and separately alleged above for each Seventh Cause of Action Plaintiffs all in violation of Utah law. Indeed, to avoid falling victim to sex trafficking in the Order, young females often have to flee the Order itself as did, for example, Amanda Rae Grant, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, and Alex Martin.

674.     The Seventh Cause of Action Defendants facilitated, engaged in, encouraged, condoned, and supported numerous sexual acts with certain of the Seventh Cause of Action Plaintiffs as detailed above.

675.     The Seventh Cause of Action Defendants also recruited, enticed, harbored, provided, obtained, and maintained the Seventh Cause of Action Plaintiffs knowing that most of them were under the age of 18 and caused them to engage in sexual acts, including through physical force, with adult men in the Order.

676.     The Seventh Cause of Action Defendants knowingly benefited financially and by receiving items and/or other things of value from participation in a venture that they knew or should have known would involve violations of Utah Code Ann. § 76-5-308.1 (human trafficking for sexual exploitation), Utah Code Ann. § 76-5-308.5 (human trafficking of a child for sexual exploitation); Utah Code Ann. § 76-5-310 (aggravated human trafficking); and/or Utah Code Ann. § 76-5-309 (benefitting from human trafficking) by engaging in the sex trafficking of, the Seventh Cause of Action Plaintiffs.

677.     The Seventh Cause of Action Defendants each directly benefited from the value they extracted from the Seventh Cause of Action Plaintiffs by trafficking them into Order marriages to keep them in the Order and maximize the value they and the Order could extract from them.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green pray for relief as set forth below.

## EIGHTH CAUSE OF ACTION
### SEXUAL BATTERY AND ABUSE OF CHILDREN

678.   Plaintiffs Amanda Rae Grant, Jenny Kingston, and Jana Nicole Johnson ("Eighth Cause of Action Plaintiffs"), incorporate in this Eighth Cause of Action the allegations contained in the above paragraphs of this Complaint and allege as follows against the defendants identified below.

679.   The Eighth Cause of Action Plaintiffs were sexually abused as children as the result of and in furtherance of a conspiracy engaged in by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Eighth Cause of Action Defendants"). For purposes of this Eighth Cause of Action, the individual Eighth Cause of Action Defendants were also perpetrators pursuant to Utah Code Ann. § 78B-2-308 and Utah Code Ann. § 76-2-202.

680.   The Eighth Cause of Action Defendants' conspiracy, which included, among other things, use of the Order's "One Above Another" coercive and controlling authority and structure, as alleged in detail in this Complaint, focused on subjecting two of the female Eighth Cause of Action Plaintiffs (Jenny Kingston and Jana Nicole Johnson) to unwanted sexual intercourse/rape with their Order husbands for the purposes of getting these young female Eighth Cause of Acton Plaintiffs pregnant as minors to make it difficult for them to leave the Order, to cause them to produce children as workers for the Order, to continue obtaining the labor and services of these three female Eighth Cause of Action Plaintiffs, and to reinforce the Order's culture of obedience and subservience for women.

681.   Defendant John Paul Johnson's personal sexual abuse of Eighth Cause of Action Plaintiff Amanda Grant was for his own personal sexual gratification. John Paul Johnson is included herein as an "Eighth Cause of Action Defendant."

682.     In addition to the Eighth Cause of Action Defendants, who conspired and as perpetrators caused the sexual battery and abuse of Jenny and Jana, the sexual abuse and rape of Jenny was perpetrated by Sally Kingston and Jacob Daniel Kingston, Jr. in furtherance of the conspiracy and by Jacob Daniel Kingston, Jr. for his own sexual gratification, and the sexual abuse of Jana was perpetrated by Kent William Johnson, Patricia Kingston and Daniel Charles Kingston in furtherance of the conspiracy and by Daniel Charles Kingston for his own personal sexual gratification. Sally Kingston, Jacob Daniel Kingston, Jr., Kent William Johnson, Patricia Kingston and Daniel Charles Kingston are included herein as "Eighth Cause of Action Defendants."

683.     The Eighth Cause of Action Defendants' misconduct was either violent and accomplished through physical force or accomplished as perpetrators under Utah Code Ann. § 78B-2-308 and Utah Code Ann. § 76-2-202.

684.     The Eighth Cause of Action Defendants, acting with intent, caused sexual contact with the Eighth Cause of Action Plaintiffs that was harmful and offensive, and caused the Eighth Cause of Action Plaintiffs to suffer injuries.

WHEREFORE, Plaintiffs Amanda Grant, Jenny Kingston, and Jana Nicole Johnson pray for relief as set forth below.

### NINTH CAUSE OF ACTION
### SEXUAL BATTERY AND RAPE OF ADULTS

685.     Plaintiffs Jenny Kingston, Jana Nicole Johnson,[25] and Julie Ruth Green ("Ninth Cause of Action Plaintiffs") incorporate in this Ninth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege as follows against the defendants identified below.

---

[25] The sexual battery and rape of Plaintiffs Jenny Kingston, Jana Johnson that occurred after they reached majority were a continuation of the sexual battery and rape Jenny and Jana endured as minors.

686.    The Ninth Cause of Action Plaintiffs were sexually battered and raped as the result of and in furtherance of a conspiracy engaged in by Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Ninth Cause of Action Defendants").

687.    The Ninth Cause of Action Defendants' conspiracy, which included, among other things, use of the Order's "One Above Another" coercive and controlling authority and structure, as alleged in detail in this Complaint, focused on subjecting the Ninth Cause of Action Plaintiffs to unwanted sexual contact and intercourse with their Order husbands for the purposes of getting and keeping the Ninth Cause of Acton Plaintiffs pregnant to make it difficult for them to leave the Order, to cause them to produce children as workers for the Order, to continue obtaining their labor and services, and to reinforce the Order's culture of obedience and subservience for women.

688.    In addition to the Ninth Cause of Action Defendants, who conspired to cause the sexual battery and rape of the Ninth Cause of Action Plaintiffs, Sally Kingston conspired to cause the sexual battery and rape of Jenny Kingston; Kent William Johnson and Patricia Kingston conspired to cause the sexual battery and rape of Jana Johnson, and Patricia Kingston conspired to cause the sexual battery and rape of Julie Ruth Green Julie Ruth Green. Sally Kingston, Kent William Johnson, and Patricia Kingston are included herein as "Ninth Cause of Action Defendants."

689.    In addition to the Ninth Cause of Action Defendants, who conspired to cause the sexual battery and rape of the Ninth Cause of Action Plaintiffs, Jenny Kingston was sexually battered and raped by Jacob Daniel Kingston, Jr.; Jana Johnson was sexually battered and raped by Daniel Charles Kingston; and Julie Ruth Green was sexually battered and raped by Paul Elden Kingston, Jr., who acted both for their own personal sexual gratification and as the result of and in furtherance

of a conspiracy as alleged in detail in this Complaint. Jacob Daniel Kingston, Jr., Daniel Charles Kingston, and Jacob Daniel Kingston, Jr. are included herein as "Ninth Cause of Action Defendants."

690.    The sexual batteries and rapes of the Ninth Cause of Action Plaintiffs were caused by the Ninth Cause of Action Defendants' violence and were accomplished through physical force as alleged in detail in this Complaint and in furtherance of the conspiracy.

691.    The Ninth Cause of Action Defendants, acting with intent, caused the sexual batteries and rapes of the Ninth Cause of Action Plaintiffs which were harmful and offensive, and caused the Ninth Cause of Action Plaintiffs to suffer injuries.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green pray for relief as set forth below.

## TENTH CAUSE OF ACTION
## NEGLIGENT SEXUAL BATTERY AND ABUSE OF A CHILD

692.    Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green ("Tenth Cause of Action Plaintiffs"), incorporate in this Tenth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege as follows against the defendants identified below.

693.    The Tenth Cause of Action Plaintiffs were sexually battered and raped as the result of and in furtherance of the negligence of Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Tenth Cause of Action Defendants").

694.    The Tenth Cause of Action Defendants' negligence subjected the Tenth Cause of Action Plaintiffs to unwanted sexual contact and intercourse with their Order husbands which, in turn, kept the Tenth Cause of Acton Plaintiffs pregnant and made it difficult for them to leave the Order,

caused them to produce children as workers for the Order, caused them to continue providing labor and services, and reinforced the Order's culture of obedience and subservience for women.

695.    In addition to the Tenth Cause of Action Defendants, who negligently caused the sexual battery and rape of the Tenth Cause of Action Plaintiffs, Jenny Kingston was sexually battered and raped by Jacob Daniel Kingston, Jr. as a result of his negligence and the negligence of Jacob Kingston, Sr., Sally Kingston, and John Daniel Kingston, Jr.; Jana Johnson was sexually battered and raped by Daniel Charles Kingston as a result of his negligence and the negligence of Kent William Johnson and Patricia Kingston; and Julie Ruth Green was sexually battered and raped by Paul Elden Kingston, Jr. as a result of his negligence and the negligence of Patricia Kingston. Jacob Daniel Kingston, Jr., Daniel Charles Kingston, and Paul Elden Kingston, Jr., who acted for their own personal sexual gratification, and Jacob Kingston, Sr., Sally Kingston, John Daniel Kingston, Jr., Kent William Johnson, and Patricia Kingston, who acted negligently are included herein as "Tenth Cause of Action Defendants."

696.    The Tenth Cause of Action Defendants negligently interjected themselves into and promoted the unlawful marriages and resulting sexual contacts and pregnancies of the Tenth Cause of Action Plaintiffs.

697.    The Tenth Cause of Action Defendants knew or should have known that their acts and omissions would, in fact, promote the unlawful marriages and resulting sexual contacts and pregnancies of the Tenth Cause of Action Plaintiffs.

698.    Through their conduct, the Tenth Cause of Action Defendants had and assumed duties not to negligently cause or further the sexual abuses and rapes of the Tenth Cause of Action Plaintiffs.

699. The Tenth Cause of Action Defendants breached their duties to the Tenth Cause of Action Plaintiffs causing sexual abuse and rapes that were harmful and offensive to the Tenth Cause of Action Defendants causing them to suffer injuries.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green pray for relief as set forth below.

## ELEVENTH CAUSE OF ACTION
## CONVERSION

700. Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Alex Martin ("Eleventh Cause of Action Plaintiffs") incorporate herein the allegations contained in the other paragraphs of this Complaint and alleges as follows.

701. The conduct of Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Rachel Orlean Kingston Young, Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Eleventh Cause of Action Defendants") individually and/or as conspirators amounted to conversion and a conspiracy to convert the Eleventh Cause of Action Plaintiffs' property in the form of the wages they earned that were not paid directly to them.

702. Throughout their time in the Order, the Order Bank statements and accounts of the Eleventh Cause of Action Plaintiffs should have consisted of funds to which they were legally entitled, including the wages they earned from the work they performed at Order Businesses as alleged in detail in this Complaint.

703. Throughout the time the Eleventh Cause of Action Plaintiffs were in the Order, the Eleventh Cause of Action Defendants, willfully and intentionally interfered with the funds in the Order Bank statements and accounts of the Eleventh Cause of Action Plaintiffs, including by

withdrawing funds from their accounts without the lawful consent or authorization of Eleventh Cause of Action Plaintiffs.

704.    The Eleventh Cause of Action Defendants' actions deprived the Eleventh Cause of Action Plaintiffs of their use and possession of their funds.

705.    Throughout the time that the Eleventh Cause of Action Plaintiffs were in the Order, they were entitled to immediate possession of funds that they had earned.

706.    There was no lawful justification for the Eleventh Cause of Action Defendants' interference with the funds of the Eleventh Cause of Action Plaintiffs.

707.    The Eleventh Cause of Action Defendants engaged in conscious wrongdoing and intended to exercise dominion or control over the Eleventh Cause of Action Plaintiffs' funds. The Eleventh Cause of Action Defendants' actions were inconsistent with the Eleventh Cause of Action Plaintiffs' rights to their own property.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Alex Martin pray for relief as set forth below.

### TWELFTH CAUSE OF ACTION
### INFLICTION OF EMOTIONAL DISTRESS

708.    Plaintiffs Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, and Alex Martin ("Twelfth Cause of Action Plaintiffs") incorporate herein the allegations contained in the other paragraphs of this Complaint and alleges as follows.

709.    The conduct of Paul Elden Kingston, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Sr., Jacob Ortell Kingston, Sr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and the Order ("Twelfth Cause of Action Defendants"), individually and/or through a conspiracy directed at the Twelfth

Cause of Action Plaintiffs was outrageous and intolerable in that it offended society's generally accepted standards of decency and morality.

710.    In addition, the conduct of Jacob Daniel Kingston, Jr., Jacob Kingston, Sr., Sally Kingston, and John Daniel Kingston, Jr. directed at Jenny Kingston; the conduct of Kent William Johnson, Patricia Kingston, and Daniel Charles Kingston directed at Janna Nicole Johnson; and the conduct of Paul Elden Kingston, Jr. and Patricia Kingston directed at Julie Ruth Green was outrageous and intolerable in that it offended society's generally accepted standards of decency and morality. Jacob Daniel Kingston, Jr., Sally Kingston, and John Daniel Kingston, Jr., Kent William Johnson, Patricia Kingston, Daniel Charles Kingston, and Paul Elden Kingston, Jr. are hereinafter included as "Twelfth Cause of Action Defendants."

711.    The Twelfth Cause of Action Defendants intentionally and negligently caused or acted in reckless disregard of the likelihood of causing the Twelfth Cause of Action Plaintiffs severe emotional distress.

712.    As a proximate result of the conduct of the Twelfth Cause of Action Defendants, the Twelfth Cause of Action Plaintiffs suffered severe emotional distress.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, and Alex Martin pray for relief as set forth below.

## PUNITIVE DAMAGES

713.    Plaintiffs incorporate herein each and every allegation contained in this Complaint and alleges as follows.

714.    The conduct of Defendants, as alleged herein, was willful and malicious or intentional conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of each Plaintiff.

715.     The wrongful acts alleged herein were committed or specifically authorized by the Order

and/or managerial agents of the Davis County Cooperative Society, Inc., Latter Day Church of

Christ, and the Order Businesses.

WHEREFORE, Plaintiffs pray for punitive damages as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial and pray for individual judgment as follows:

a.      General damages in an amount to be proven at trial;

b.      Special damages in an amount to be proven at trial;

c.      Punitive damages in an amount to be awarded at trial;

d.      Unpaid minimum wages and overtime wages;

e.      Liquidated damages under 29 U.S.C. § 201, et seq.;

f.      Treble damages under 18 U.S.C. § 1964(c);

g.      Attorney fees and costs, pursuant to 18 U.S.C. § 1595;

h.      Attorney fees and costs, pursuant to 29 U.S.C. § 216(b);

i.      Attorney fees and costs, pursuant to 18 U.S.C. § 1964(c);

j.      Treble damages because these Defendants' acts were willful and malicious; and

k.      Attorney fees and costs, pursuant to Utah Code § 77-38-15(3).

Plaintiffs also seek costs, interest and such other and further relief as the Court deems just

and reasonable.

DATED and SIGNED this 28th day of February 2024.

**HOOLE & KING, L.C.**

*/s/ Roger H. Hoole*, Attorneys for Plaintiffs

**JR LAW GROUP, PLLC**

*/s/ Jaclyn J. Robertson,* Attorneys for Plaintiffs

# EXHIBIT A

**EXHIBIT A**

Partial List of Businesses an Entities Owned by the Order

- A 1 Disposal
- A & W Restaurants
- AAA Communications
- AAA Security
- A-FAB Engineering
- Advance Copy & Printing
- Advance Vending
- American Digital Systems
- American Wellness & Rehab Clinic, LLC
- Arrow Real Estate and Property Compliance
- Best Distributing
- Bountiful Baby
- Collin Media, LLC
- Commercial Agent Services, LLC
- COP Coal Development Company
- Davis County Cooperative Society
- East Side Market
- Ensign Learning Center, Inc.
- Ensign Learning Center Alumni Association, Inc.
- Ensign Shoe
- Factory Outlet Stores
- Family First Medicine
- Family Stores True Value
- Fidelity Funding Corporation
- Fountain of Youth Health and Athletic Club
- Fountain of Youth Spas
- Garco
- Garrard's Heating and Air Conditioning, Inc.
- Hiawatha
- John's Marketplace
- Kingston Corporation of the Church of Jesus Christ of Latter
- Latter Day Church of Christ
- LDCC
- Little Red School House Montessori

- Mitchell & Associates
- Mountain Coin Machines Distributors
- Premier Catering & Food Services, LLC
- Ralph's Milk Farm
- Redwood Grocery & Health Foods
- Shoppers Pawn
- Sportsmans Pawn
- Standard Industries
- Standard Industries, LLC
- Standard Restaurant Supply
- Standard Restaurant Supply, Inc.
- Vanguard Academy
- Washakie Farm
- Washakie Food
- Washakie Renewable Energy
- World Enterprises
- Xtreme Pawn
- Zion Ponderosa Ranch Resort
- ZMPC9

# EXHIBIT B

**EXHIBIT B**

The Law Above Another Diagram

