**HOOLE & KING, L.C**
In Association with the
**Justice and Protection Alliance**,
a Utah Non-Profit Corporation
and Advocates for Plaintiffs

Roger H. Hoole (5089)
**HOOLE & KING, L.C.**
4276 South Highland Drive
Salt Lake City, UT 84124
Telephone: (801) 272-7556
rogerh@hooleking.com

---

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| Amanda Rae Grant; Jenny Kingston; Jana Nicole Johnson; Julie Ruth Green; Michelle Ruth Michaels; Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson, <br><br> Plaintiffs, <br><br> vs. <br><br> Paul Elden Kingston, Sr., John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young, John Paul Johnson, Jacob Daniel Kingston, Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Jr., Daniel Charles Kingston, Patricia Kingston, Paul Elden Kingston, Jr., Michelle Afton Michaels, Deborah Williams, Jolene Andrews, April McKay, Valerie Martin, Kent William Johnson, Individual Does 1 through 50, Davis County Cooperative Society, Paul Elden Kingston, Sr., Trustee in Trust of the Davis County Cooperative Society, Davis County | **SECOND AMENDED COMPLAINT AND JURY DEMAND** <br><br><br><br><br><br><br><br><br><br><br><br><br><br> Case No.2:24-cv-00155 <br><br> District Judge Ann Marie McIff Allen <br><br> Magistrate Judge Jared C. Bennett |

Cooperative Society, Inc. dba Redwood Grocery & Health Foods, John's Market Place, Church of Christ, dba, ZMPC and LDCC, A-1 Disposal, Advanced Copy, Ensign Learning Center, Inc., Advance Vending, LLC, United Fuel Supply, Washakie Ranch, Order Bank aka the "Office" aka the "Century Office," Family Stores True Value, World Enterprises, World Enterprises II, the Order, Standard Restaurant Supply, AAA Communications, Washakie Renewable Energy, LLC, Fidelity Lending a dba of Fidelity Funding Company (Utah), Fidelity Funding Investments (Nevada), Property Compliance, aka Arrow Real Estate, Attco Trucking aka CTC Trucking, American Digital Systems, Garco Industrial Park, aka Garco Property Management, American Wellness & Rehab Clinic, A-Action Express, Mitchell & Associates, A-Fab Engineering, Sierra Wholesale, and Entity Does 1 through 500,

Defendants.

Plaintiffs complain and allege against Defendants as follows:

## INTRODUCTION

This action arises from a conspiracy among Defendants to enrich themselves through a scheme that entailed defrauding, physically and sexually abusing, enslaving, and committing numerous statutory violations and torts against Plaintiffs. Defendants are part of or associated with Defendant Davis County Cooperative Society, an economic cooperative of hundreds of businesses created for the financial benefit of the "Order," a purported religious organization that for decades has engaged in the elaborate illegal conspiracy to exploit children.

## TABLE OF CONTENTS

I.   Jurisdiction and Venue ........................................................................4

II.  The Plaintiffs......................................................................................4

III. The Individual Defendants....................................................................6

Second Amended Complaint and Jury Demand | 2

IV.    The Entity Defendants ............................................................................8

V.    General Allegations Made By Each Plaintiff. ......................................16

    A.    Fraud, Child Labor, And Labor Trafficking .............................17

    B.    Forces Incestuous and Bigamist Marriages .............................21

    C.    Fraud Against State and Local Government ..............................24

    D.    The Infliction of Physical and Sexual Abuse ...........................29

    E.    Methods to Obtain Psychological Control ................................31

VI.   Additional Specific Allegations By Each Plaintiff

    A.    Plaintiff Amanda Grant ...........................................................42

    B.    Plaintiff Jenny Kingston ..........................................................51

    C.    Plaintiff Jana Nicole Johnson ..................................................61

    D.    Plaintiff Julie Ruth Green ........................................................69

    E.    Plaintiff Michelle Ruth Michaels ............................................73

    F.    Plaintiff Allison Eames ............................................................78

    G.    Plaintiff Priscilla Tucker .........................................................82

    H.    Plaintiff Brenda Collins ...........................................................88

    I.    Plaintiff Alex Martin ...............................................................94

    J.    Plaintiff Mary Ann Robinson ...................................................99

VII.   First Cause of Action - Labor Trafficking In Violation of Federal Law ..............103

VIII.  Second Cause of Action - Sex Trafficking In Violation of Federal Law ..............108

IX.    Third Cause of Action - Violation of The Federal Fair Labor Standards Act .....111

X.    Fourth Cause of Action - Involuntary Servitude ................................113

XI.    Fifth Cause of Action - Civil Conspiracy ..............................................................

XII.   Sixth Cause Of Action - Sexual Battery And Abuse Of Children ..........................

XIII.  Seventh Cause of Action - Sexual Battery and Rape of Adults ...............................

XIV.  Eighth Cause of Action - Negligent Sexual Battery and Abuse of a Child ..............

XV.  Punitive Damages ......................................................................................

XVI. Prayer For Relief ........................................................................................

## I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, including under the Federal Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Fair Labor Standards Act ("FLSA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

2.      This Court has personal jurisdiction over each Defendant (i) because each purposefully availed themselves of the privilege of conducting various business and/or personal activities in Utah, including, *inter alia*, by residing in Utah, and/or by owning, managing, or operating businesses in Utah; (ii) because Defendants' contacts within this forum give rise to, or are related to, Plaintiffs' injuries and claims; (iii) because Defendants' activities involving Utah, including their labor and/or sex trafficking of minors, are substantial; and (iv) because, pursuant to Utah Code Ann. § 78B-3-205, Defendants were members of a civil conspiracy aimed at committing torts in Utah which caused harm to Plaintiffs in Utah in furtherance of the conspiracy.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Utah.

## II. PLAINTIFFS

4.      Plaintiff Amanda Rae Grant is a young woman and former member of the Order. Amanda was born into the Order on August 31, 1995. Amanda's mother is Lorie Peterson, and her father

is Verl Johnson and Numbered Man 36.

5.    Plaintiff Jenny Kingston is a young woman and former member of the Order. Jenny was born into the Order on May 10, 1997, in a home in the Salt Lake area. Jenny's mother is Benny Kingston, and her father is Jeremy Ortell Kingston, Sr. and Numbered Man 68.

6.    Plaintiff Jana Nicole Johnson is a young woman and former member of the Order. Jana was born into the Order on January 9, 2003. Jana's mother is Nataleen Johnson, and her father is Kent William Johnson and Numbered Man 26.

7.    Plaintiff Julie Ruth Green, aka Julie Nichols, is a young woman and former member of the Order. Julie was born into the Order on December 6, 1998. Julie's mother is Martha Nichols, and her father is Jason Ortell Kingston, one of the Seven Kingston Brothers and Numbered Man 49.

8.    Plaintiff Michelle Ruth Michaels is a young woman and former member of the Order. Michelle was born into the Order on May 2, 2000. Michelle's mother is Michelle Afton Michaels, also known as Michelle Afton Brown. Michelle's father is Jesse Orvil Kingston, one of the Seven Kingston Brothers and Numbered Man 48.

9.    Plaintiff Allison Eames is a young woman and former member of the Order. Allison was born into the Order on November 6, 1999. Allison's mother is Kelli Collins, aka Kelli Mattingly. Allison's father is John Daniel Kingston Sr., one of the Seven Kingston Brothers and Numbered Man 15.

10.    Plaintiff Priscilla Tucker is a young woman and former member of the Order. Priscilla was born into the Order on April 18, 1997. Priscilla's mother is Hannah Tucker, and her father, Alma Tucker, is deceased. Lynn Kingston became her stepfather.

11.    Plaintiff Brenda Collins is a young woman and former member of the Order. Brenda was born into the Order on March 23, 2001. Brenda's mother is Kelli Collins, aka Kelli Mattingly. Brenda's father is John Daniel Kingston, Sr. and Numbered Man 15.

12. Plaintiff Katie Martin (herein sometimes "Alex" or "Alex Martin") is a young woman and former member of the Order. Alex was born into the Order on January 23, 2002. Alex's mother is Valerie Martin. Alex's father is John Daniel Kingston, Sr. and Numbered Man 15.

13. Mary Ann Robinson is a young woman and former member of the Order. Mary Ann was born on November 13, 1992. Mary Ann's mother is Mary Keaton. Mary Ann's father is Jeremy Ortell Kingston, Sr. and Numbered Man 68.

### III. INDIVIDUAL DEFENDANTS

14. Defendant Paul Elden Kingston, Sr. is an individual believed to be residing in, among other counties, Salt Lake County, State of Utah, and a member of the Order.  He is the Order's ultimate leader. He controls the Order, directs Order members, and approves all Order Marriages. He serves as Trustee for Defendant Davis County Cooperative Society,  a position equivalent to serving as Chief Executive Officer of Davis County Cooperative Society.

15. Defendant John Daniel Kingston Sr. is an individual believed to be residing in, among other counties, Salt Lake County, State of Utah, and a leader of the Order.

16. Defendant Hyrum Dalton Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a leader of the Order.

17. Defendant David Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a leader of the Order.

18. Defendant Jesse Orvil Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a leader of the Order.

19. Defendant Jason Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a leader of the Order.

20. Rachel Orlean Kingston Young is an individual believed to be residing in Salt Lake

County, State of Utah, and a member of the Order.[1]

21. Defendant John Paul Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

22. Defendant Jacob Daniel Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

23. Defendant Jacob Ortell Kingston, Sr. is an individual believed to be residing in a prison in the State of California, and a member of the Order.

24. Defendant Sally Kingston is an individual believed to be residing in a prison in the State of Texas, and a member of the Order.

25. Defendant John Daniel Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

26. Defendant Daniel Charles Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

27. Defendant Patricia Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

28. Defendant Paul Elden Kingston, Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

29. Defendant Michelle Afton Michaels also known as Michelle Afton Brown is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

30. Defendant Deborah Williams is an individual believed to be residing in Salt Lake County,

---

[1] In earlier pleadings, Plaintiffs named Defendant Rachel Orlean Kingston Young and at times confused her with Rachel Ann Kingston. On information and belief, after the Court Ordered Plaintiffs to amend to, *inter alia*, name Rachel Ann Kingston as a Defendant, she was apparently released from prison and died of cancer. In the allegations set forth below, these individual's involvement in the complained of conduct is clarified.

State of Utah, and a member of the Order.

31.     Defendant Jolene Andrews is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

32.     Defendant April McKay is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

33.     Defendant Valerie Martin is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

34.     Defendant Kent William Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

35.     Each of the individual Defendants are tied economically to the Order and report to Paul Elden Kingston, Sr.

36.     Individual Defendant Does 1 through 50 are members and agents of the Order, not yet identified, who hold property and conduct business for the benefit of the Order.

## IV. ENTITY DEFENDANTS

37.     Defendant the Order is an unincorporated association identified herein under Federal Rule of Civil Procedure 17(b)(3)(A) and is sued in its common name to enforce substantive rights existing under the United States Constitution or laws. The Order is the name used by Plaintiffs and other members of the Order to refer to the group into which they were born and raised, and that name encompasses all Defendants and their conspiracy. The Order engages in interstate commerce as a conspirator with the other Defendants and through its Order Businesses.

38.     Davis County Cooperative Society also known as Davis County Cooperative ("DCCS") is an unincorporated association identified herein under Federal Rule of Civil Procedure 17(b)(3)(A) and is sued in its common name to enforce substantive rights existing under the United States Constitution or laws. DCCS holds itself out as an "economic cooperative" on its website and as a

"business" in multiple filings with the Tenth Circuit Court of Appeals in Case No. 19-4019. The DCCS engages in interstate commerce as a participant in the Order and through its internet website, https://www.dccsociety.org, which purports to state the Order's "goals."

39.     Defendant Davis County Cooperative Society, Inc. ("DCCS, Inc") is a corporation and to that extent is distinct from the DCCS. It was established in 1941 and is a corporation registered as a nonprofit entity organized under the laws of Utah with a principal place of business at 1798 South 900 East, Salt Lake City, UT 84106. Among other things, it runs for-profit grocery and health food stores. The DCCS, Inc. engages in interstate commerce as a participant in the Order and through Redwood Grocery & Health Foods and John's Marketplace.

40.     Defendant Redwood Grocery & Health Foods is a registered dba of DCCS, Inc. and a for-profit health food and grocery store with a place of business at 4141 South Redwood Road, Salt Lake City, Utah, 84123. It may also do business in the name of Eastside Market. Redwood Grocery & Health Foods engages in interstate commerce as a participant in the Order as well as by engaging in trade and commerce with venders outside of Utah.

41.     Defendant John's Market Place is a registered dba of DCCS, Inc. and a for-profit grocery store with a place of business at 4141 South Redwood Road, Salt Lake City, Utah, 84123. It may also do business in the name of Eastside Market. This Defendant engages in interstate commerce as a participant in the Order and through its website, https://www.johnsmktplace.com, that advertises a "full service grocery store," as well as by engaging in trade and commerce with vendors outside of Utah.

42.     Defendant Latter Day Church of Christ also known as Latter Day Church of Jesus Christ ("LDCC") holds itself out as a "religion" and is registered as a nonprofit corporation with the State of Utah with a principal place of business at 1860 West Parkway Blvd, Salt Lake City, Utah 84119. It is operated by Paul Elden Kingston, Sr., and other members of the Order. The LDCC has

registered two names with the State of Utah under which it conducts business: ZMPC9 and LDCC. The LDCC engages in interstate commerce as a participant in the Order and through its affiliated entity, Latter Day Church of Christ and its Successors, LLC, a limited liability company, organized and existing under the laws of Nevada.

43.     Defendant Order Bank (aka the "Office" aka the "Century Office") is an unincorporated association identified herein under Federal Rule of Civil Procedure 17(b)(3)(A) and is sued in its common name to enforce substantive rights existing under the United States Constitution or laws. It currently has places of business at 10 West Century Park Way in Salt Lake City and 53 West Angelo Avenue in Salt Lake City. Within these physical locations, the Order Bank accommodates various rooms and desks, some of which represent the place of business for other entity Defendants. For example, on information and belief, within these locations are rooms and desks for Fidelity Lending, Fidelity Funding Investments (Nevada), and Fidelity Funding Company (Utah). This tangle of businesses is integral to the Order's conspiracy and the Order Bank engagement in interstate commerce as a participant in the Order.

44.     Defendant A-1 Disposal is a for-profit business under the laws of Utah with a principal place of business at 610 West 3410 South, Salt Lake City, Utah 84119. A-1 Disposal engages in interstate commerce as a participant in the Order and through its website, https://a1disposal.com.

45.     Defendant Advanced Copy is a for-profit business under the laws of Utah with a principal place of business at 4850 South Redwood Road, Taylorsville, Utah. Advanced Copy engages in interstate commerce as a participant in the Order and through use of the internet to send and receive materials for printing and publications. It also ships Order forms to out of state Order Businesses.

46.     Defendant Ensign Learning Center, Inc. is an Order school existing under the laws of Utah with a principal place of business at 2755 Decker Lake Lane, Salt Lake City, Utah 84119. Ensign Learning Center engages in interstate commerce as a participant in the Order and through its

purchase of an online curriculum from Penn Foster High School, a high school program operated out of Pennsylvania and available through the internet in all fifty states.

47.    Defendant Advance Vending is a for-profit business under the laws of Utah with a principal place of business at 3994 South 300 West, Unit 32, Murray, Utah 84107. Advance Vending engages in interstate commerce as a participant in the Order, and through the conspiracy, and on information and belief, by engaging in trade and commerce with vendors outside of Utah.

48.    Defendant United Fuel Supply is a for-profit business under the laws of Utah with a principal place of business at 7950 West 2400 North, Plymouth, Utah 84330. United Fuel Supply engages in interstate commerce as a participant in the Order and through the conspiracy, and as an affiliate of Washakie Renewable Energy.

49.    Defendant Family Stores True Value is a for-profit business and is believed to be a dba of a World Enterprises II entity under the laws of Utah or Nevada with a principal place of business at 4860 South Redwood Road, Taylorsville, Utah 84123. Family Stores True Value engages in interstate commerce by, *inter alia*, obtaining and selling home improvement products under the global umbrella of True Value Hardware Companies. Family Stores True Value's websites, http://stores.truevalue.com/ut/taylorsville and http://familyschooluniforms.com/pages/about, also claims that "it is the largest school uniform provider in Utah and currently serve[s] customers from Alaska to Connecticut."

50.    Defendant Standard Restaurant Supply, a dba of Standard Industries, Inc., is a for-profit business under the laws of Utah with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115. Standard Restaurant Supply engages in interstate commerce as a participant in the Order, through its stores in various states and through its internet website, https://www.standardrestaurant.com/about-us/, which states:

> Since 1980, when Standard Industries, Inc. first opened its doors in Salt Lake City, Utah, customers all over the United States have been experiencing the benefits of

access to one of America's top 25 food service equipment suppliers. From local restaurants to national chain stores and much more.

51.    Defendant AAA Communications is a for-profit business under the laws of Utah with a principal place of business at 2971 South Richards Street, Salt Lake City, Utah 84115. AAA Communications engages in interstate commerce as a participant in the Order and through an answering service for members of the Order both inside and outside of Utah.

52.    Defendant Washakie Renewable Energy, LLC ("WRE") is a for-profit biofuel company under the laws of Utah with a principal place of business at 3950 South 700 East, Ste. 100, Salt Lake City, Utah 84107. Washakie Renewable Energy engaged in interstate commerce as a participant in the Order and through an international conspiracy to defraud the United States of America of over a billion dollars. Some 35 million dollars of the fraud proceeds went to members of the Order. Defendants Jacob Ortell Kingston, Sr. and Sally Kingston are some of the Order members who have pled guilty to various crimes associated with the conspiracy.

53.    Defendant Fidelity Funding Company ("Fidelity Utah") is a for-profit business under the laws of Utah. Its principal place of business is 10 West Century Park Way in Salt Lake City, Utah and its registered agent is at the Order's law offices, 3212 State Street, Salt Lake City, Utah. Fidelity Utah engages in interstate commerce as a participant in the Order, as a financial institution, and through the conspiracy. Fidelity Lending is a dba of Fidelity Utah. Fidelity Utah engages in interstate commerce as a participant in the Order, as a financial institution engaging in electronic communications and money transfers, and through the conspiracy.

54.    Defendant Fidelity Funding Investments, Inc. ("Fidelity Nevada") is a for-profit business under the laws of Nevada with a principal place of business at 5675 South Valley View Blvd., Las Vegas, Navada and a registered agent at the same address. On Utah's Department of Commerce website, https://businessregistration.utah.gov/EntitySearch/OnlineEntitySearch, it names several Order members as its principals, each with the address of 10 West Century Park Way in Salt Lake

City, Utah. Fidelity Investments engages in interstate commerce as a participant in the Order, as a financial institution engaging in electronic communications and money transfers, and through the conspiracy.

55.     Defendant Property Compliance, aka Arrow Real Estate, is a for-profit business under the laws of Utah with a principal place of business at 635 West 5300 South, Ste. 202, Murray, Utah 84123. This Defendant engages in interstate commerce as a participant in the Order and through its website, https://www.arrowutah.com, which states: "We specialize in buying, leasing, renting and selling property from single family homes, to industrial properties" and also offers the public an online list of the properties it has for sale or lease. On information and belief, it also engages in interstate commerce through its use of the Multiple Listing Service.

56.     Defendant Attco Trucking Company, Inc., aka CTC Trucking, is a for-profit business under the laws of Utah with a principal place of business at 2750 West 900 South, Salt Lake City, Utah. This Defendant engages in interstate commerce as a participant in the Order and through the hauling of freight and coal to and from Utah across the United States.

57.     Defendant American Digital Systems is a for-profit business under the laws of Utah with a principal place of business at 2971 South Richards Street, Salt Lake City, Utah 84115. American Digital Systems engages in interstate commerce as a participant in the Order and through electronic communications and  the sale of services and products to Order Businesses outside of Utah.

58.     Defendant Garco Industrial Park, also known as Garco Property Management is a for-profit business under the laws of Utah with a principal place of business at 3994 South 300 West, Millcreek, Utah 84107. This Defendant engages in interstate commerce as a participant in the Order and through the conspiracy.

59.     Defendant American Wellness & Rehab Clinic is a for-profit medical clinic organized under the laws of Utah with a principal place of business at 677 West 5300 South, Murray, Utah

84123. This Defendant engages in interstate commerce as a participant in the Order and through its website, https://www.wellnessandrehabclinic.com/about, that solicits the public to "get started on your patient journey."

60.    Defendant Washakie Ranch may be a dba of N.W.P. LLP and is a for-profit farm located in or around the town of Washakie, Utah in Box Elder County. Washakie Ranch engages in interstate commerce as a participant in the Order, through the conspiracy, and on information and belief, by transporting and selling meat and eggs inside and outside of Utah.

61.    Defendant A-Action Express is a for-profit business under the laws of Utah with a principal place of business at 624 North 300 West, Salt Lake City, Utah 84103. A-Action Express engages in interstate commerce as a participant in the Order and through the conspiracy.

62.    Defendant Mitchell & Associates is a for-profit business under the laws of Utah with a principal place of business at 670 East 3900 South, Suite 301, Salt Lake City, Utah 84117. It engages in interstate commerce as a participant in the Order and through its internet website, https://www.mitchellpros.com, which states that Mitchell & Associates is "Your Partner in Achieving Tax Efficiency."

63.    Defendant A-Fab Engineering is a for-profit business under the laws of Utah, with a principal place of business at 83 Navajo Street, Salt Lake City, Utah 84104. A-Fab Engineering engages in interstate commerce as a participant in the Order and through the conspiracy.

64.    Defendant Sierra Wholesale is a for-profit business operating within Standard Restaurant Supply with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115. Sierra Wholesale engages in interstate commerce as a participant in the Order and, on information and belief, through the coordinated operation of its stores in Idaho, Arizona, Colorado, New Mexico, and Nevada.

65.     Defendant World Enterprises ("World Enterprises Utah") is, on information and belief, a for-profit business that may be permanently closed. It had or has a principal place of business at 3753 State Street, Salt Lake City, Utah 84115. The Nevada Department of Commerce lists a physical address for this entity at 5675 South Valley View Blvd., Las Vegas, NV 8119. It shares the same principals as World Enterprises II. On information and belief, this entity does business for the Order through numerous Order dba's. It also provides accounting functions and engages in interstate commerce as a participant in the Order and through the conspiracy.

66.     Defendant World Enterprises II is a Nevada corporation ("World Enterprises II Nevada") with no address in Nevada listed with the Nevada Department of Commerce.[2] World Enterprises II Nevada operates from 10 West Century Park Way, Salt Lake City, Utah. Its registered agent is at the Order's law offices at 3212 State Street, Salt Lake City. On information and belief, this entity does business in Nevada and Utah through numerous Order dba's. It also provides accounting functions and engages in interstate commerce as a participant in the Order and through the conspiracy.

67.     Each named entity Defendant is a "Order Business," financially tied to the Order, part of the conspiracy, and reports to Paul Elden Kingston. The Order Businesses are sometimes collectively referred to as the "Order Businesses."

68.     The Order owns and manages numerous other entities and businesses throughout the State of Utah and other states, including, for example, the entities on Exhibit A hereto, which are also part of the Order conspiracy and engage in interstate commerce.

69.     Entity Defendants Does 1 through 500 are also Order Businesses, not yet identified, which are controlled by the Order or hold property for the benefit of the Conspiracy.

---

[2] The Nevada Department of Commerce website lists numerous World Enterprise entities that have been dissolved or permanently revoked. *See* https://esos.nv.gov/EntitySearch/OnlineEntitySearch.

## VI. GENERAL ALLEGATIONS MADE BY ALL PLAINTIFFS

*In 1987, a warning sounded at an Order Board Meeting: "I was shown during the nights a terrible condition of oppression and minor slavery throughout the Order."*

70.    Plaintiffs are 10 young women who, from their earliest memories until their eventual escapes, were victims of economic and sexual crimes perpetrated through the illegal conspiracy of Defendants. Some were forced into underage, bigamous, and/or incestuous "Order Marriages." The other Plaintiffs were forced to flee the Order before it could lock them into similar "Order Marriages."

71.    In essence, the Order has become a sophisticated ongoing criminal conspiracy that feeds off labor and sex trafficking, systemic abuse, and the exploitation of women and children who are born into it and become dependent on it.

72.    Plaintiffs estimate that, at this point, the Order has over 10,000 members and that some 70% of them are under the age of 18. Thus, thousands of children are currently working for Order Businesses and receive little to none of their earnings. They typically work long hours, often in harsh conditions, and always with the threat of retribution if they fail to comply. Some Plaintiffs started working when they were just 4 years old.

73.    The Order's power and authority is centered in the Kingston family, also known as the "Kingston clan." To become a member of the Order, you must be born into it or, on rare occasions, be admitted by unanimous vote of all Order members. All the Plaintiffs and virtually all the individual Defendants in this action are closely related by blood and Order Marriages.

74.    Defendants publicly declare to members of the Order that they are not subject to the laws of society. Over recent decades, this belief has led the Order to commit a host of secondary crimes against children. By intertwining (1) labor trafficking and violations of child labor laws, and (2)

sex trafficking through underage, bigamous and/or incestuous marriages and pregnancies, the Order locks girls in and creates ongoing cycles of labor and sex trafficking for its benefit.

75.     As part of Defendants' scheme to obtain financial and sexual control over Plaintiffs, Defendants engaged in tortious and unlawful acts facilitated through standard techniques of brainwashing of Plaintiffs, including the denial of an ordinary education; inflicting sexual, mental and/or physical abuse; threatening such abuse; teaching them to both fear outsiders and avoid all contact with state and federal governments that could possibly uncover the conspiracy.

76.     Plaintiffs physically escaped the Order after enduring years of physical, sexual, and economic abuse. Gradually, they also escaped much of the indoctrination, brainwashing, and mental abuse which was designed to prevent them from taking action against Defendants.

## A.   FRAUD, CHILD LABOR, AND LABOR TRAFFICKING

77.     Defendants force children, including Plaintiffs, to work for Order Businesses to allow Defendants to obtain large, unlawful financial benefits.  For example, at A-1 Disposal, a 12-year-old girl was responsible for employee payroll under the supervision of John Daniel Kingston, Sr., who directed her to make arbitrary, unjustified payroll reductions.

78.     Defendants often force children, including some Plaintiffs to work after school, into the evenings, and sometimes all night. For example, Michelle worked long, overtime hours at the Order Bank, including overnight shifts, while also trying to attend school during the day. John Daniel Kingston, Sr. forced Alex and her sisters to skip school for weeks at a time so that they could work 10-12 hours per day on the Order's pot farm in Oregon.

79.     To satisfy its labor demands, Defendants systematically prioritize a child's labor over a child's education. At Ensign Learning Center, where children are taught part of the online Penn Foster course, most students, including most Plaintiffs, are expected to complete the online program and graduate high school within a year so they can work full-time when they are 14.

80.    To graduate fast, it was common for Order teachers to give Plaintiffs and other students the answers to the online test questions so they could enter the answers into the school's computers. The Order measures the educational success based on how quickly children finish high school because its survival and economic success depends on their subservience and free work

81.    Plaintiffs work amounted to indentured servitude through which they were required to work for Order Businesses with no financial renumeration. Defendants fraudulently claimed to deposit Plaintiffs' earnings into the "Order Bank." The Order Bank is not a real bank, and no cash or monetary instruments issued to children including Plaintiffs are deposited in the Order Bank or any financial institution. The Order Bank operates from offices at 53 West Angelo Avenue and 10 Century Park Way in Salt Lake City.

82.    In this action, an attorney for Paul Elden Kingston, Sr. has stated in court filings that the Order Bank is no more real than the "Easter Bunny." [ECF 116, p.4] Plaintiffs concur, for the reasons described below, but the "Order Bank" still functions and is operated as part of Defendants' elaborate fraud and conspiracy.

83.    Some Plaintiffs, including Amanda Grant, worked at the Order Bank and saw glimpses of how the "Easter Bunny" operated. For example, while Amanda was assigned to work at the front counter, she was provided $500 each day. That was the total amount of cash she was allowed to disperse on a single day to Order members who had permission to receive actual money.

84.    Defendants have continuously told children, including Plaintiffs, that their earnings are tracked on their Order "Statements" and that their wages are in the Order Bank. This is false.

85.    No money or financial instruments is ever issued in exchange for childrens' work for Defendants. Rather, the children, including Plaintiffs, receive "units" which can only be used to make purchases from Defendants and cannot be used as cash. Children, including Plaintiffs, are never told they are receiving units rather than dollars, a fact that can only be determined through

a close reading of Statements that is beyond the capacity or understanding of children.

86.     Given that the units can only be transferred to Defendants, and cannot be used as real money, these units constitute scrip as defined by the Fair Labor Standards Act of 1938, which made unlawful payments in scrip for work.

87.     The manipulation of Order Statements, their failure to show a child's hourly wage or hours worked, and the hiding that the child is receiving unlawful scrip rather than dollars is intentional to disguise Defendants' illegal use of child labor and labor trafficking.

88.     Defendants and others control when and how much scrip children can access in a given year from the Order Bank. To receive scrip that is represented as belonging to them, children must first get approval from a number of members of the Order.

89.     As they grow older, members of the Order, including Plaintiffs, are paid in cash purportedly held in their accounts at the Order Bank. At the end of the year, "money" in those accounts disappears from Statements. Holders of those accounts, including Plaintiffs, are falsely told that their money is then being held in savings accounts for their individual benefit.

90.     More commonly, purported savings simply disappear from the Order Bank. This happens when earnings are allowed to accrue and become sizable.

91.     For example, at one point, Michelle Ruth Michaels' Statement reflected over $80,000 in earnings. Without her knowledge or consent, the Order took $44,000 and then another $22,059.34

to pay the mortgage on her mother's Order-financed home. The $44,000 payment form was filled

out and initialed by "JK," a deceased wife of her father named Janice Kingston.  The $22,059.34

was taken as shown on this Request for Savings Transfer that was neither filled out nor signed by



Michelle. The earnings were taken from a "back account" into which her earnings had initially

been siphoned.

92.     A few months later, again without Michelle's knowledge or consent, she became obligated

to the Order for a $6,000 loan. The loan was the result of what the Order calls an "add-on." An

add-on occurs when the Order takes more money out of a member's Statement than shown on the

Statement and that difference is thereafter treated as a loan by the Order to the member which the

Member then has to pay back to the Order. In Michelle's case, the Order created an add-on and then systematically paid that "loan" back to itself by deducting payments from the wages Michelle believed she was earning by working for the Order.

93.     While defrauding children, including Plaintiffs, of legally required payments for their work, Defendants also uses children, including Plaintiffs, as instruments to commit fraud against the state and federal governments. For example, children, including Plaintiffs, are compelled to assist in the preparation of false and illegal tax returns and the preparation of fraudulent applications to unlawfully obtain welfare and other government support payments.

## B. FORCES INCESTUOUS AND BIGAMIST MARRIAGES

94.     As part of the conspiracy to obtain financial and sexual benefits for themselves, Defendants did not educate Plaintiffs for the sake of expanding their minds and preparing them for a life of self-determination. Instead, the central goal of Defendants' education system was to train young girls to be obedient wives and mothers.

95.     As part of their conspiracy, Defendants force girls into illegal, incestuous and bigamist marriages. This photograph is of a photo-shopped picture displayed at the wedding of Jeremiah Kingston  and his bigamous wife Rebekah Edwards. The photograph had been photo-shopped to include John Daniel Kingston, Sr. a second time (on the left of the couple) because he is both the biological father of Rebekah Edwards and the biological father of Jeremiah Kingston. The women on the far right and far left of the picture are two of John Daniel Kingston, Sr.'s plural wives, Rachel

Kingston, deceased, and Leanne Edwards. John Daniel Kingston, Sr. is the biological half-brother of his bigamous wife Leanne Edwards. Allison Eames and Mary Ann Robinson witnessed this Order wedding.

96.    Because underage, bigamous, and incestuous Order Marriages are illegal, Defendants hide and deny them as part of their conspiracy. It is a common and intentional practice by Defendants not to list fathers on their children's birth certificates to cause confusion, avoid criminal prosecutions for fathering children in underage, bigamous, or incestuous Order Marriages, and for other illicit and illegal reasons.

97.    As children grow, the Order indoctrinates them against speaking to people not in the Order and trains them to say they do not know who their father is if asked so as to hide the truth about the underage, incestuous, bigamist marriages forced upon girls manipulated by Defendants.

98.    Defendants engage in these, and other systemic and systematic patterns of unlawful activity designed to benefit its leaders at the expense of most members. To grow the Order's membership, it also coerces girls and young women to conceive and bear as many children as possible. This is an overt act of the conspiracy and designed to create a constant swell of workers for the conspiracy.

99.    It was standard practice for girls working for Order Businesses to receive a "raise" when they enter an Order Marriage, and thereafter, receive "raises" each time they give birth. This was the case for each Plaintiff who succumbed to an Order Marriage before fleeing.

100.    The labor trafficking of children is fueled and multiplied by other overt acts such as coercing and forcing girls, including each Plaintiff, to submit to an Order Marriage and give birth to as many children as possible as a source of more and more free labor for its ongoing criminal conspiracy or suffer retribution.

101.    Defendants teach young girls, including Plaintiffs, that they must increase the size of the Order by submitting sexually to their Order husbands, even against their will, to produce children

as workers. In turn, each time they are married, Order men are required to engage in sexual intercourse with their wives to multiply the number of births and increase the size of the Order and to accomplish its essential objective of producing workers for Order Businesses.

102.    Thus, Defendants force most underage girls, as it did with each Plaintiff, to either flee or enter an Order Marriage. By successfully forcing most girls when they are young into Order Marriages and pregnancies, the Order makes it extremely difficult for them to leave, maintains them as child slaves, and constantly grows its ongoing conspiracy. Without constantly repeating this untenable cycle of enslaving Order children, the conspiracy would cease to exist.

103.    Defendants deliberately makes girls and women dependent on its closed economy. It does not allow them to divorce their Order husbands, and it threatens to prevent mothers from seeing their children and loved ones if they try to leave.

104.    Further, to prevent the disclosure of the unlawful marriages, Defendants systematically falsify thousands of birth certificates through the omission of fathers' names, hides underage, bigamous, and/or incestuous Order Marriages.

## C.    FRAUD AGAINST STATE AND LOCAL GOVERNMENTS

105.    As part of their wide-ranging conspiracy, Defendants compelled Plaintiffs to assist in an array of financial frauds against both state and local governments, placing Plaintiffs at risk of criminal prosecution.

106.    When Michelle Ruth Michaels was 7, her parents, Michelle Afton Michaels and Jesse Orvil Kingston, who were in an incestuous Order Marriage, were being investigated by the State of Utah. All of their children, except one, either had a false father listed on their birth certificates or no father at all. The youngest had no birth certificate.

107.    To avoid Utah's investigation, Michelle Ruth Michaels was told by her mother and her aunt, Kelly Brown, that Paul Elden Kingston, Sr. had instructed them to take their children to

California to hide and try to get California to issue birth certificates for the three youngest children. The youngest of the three was born to Kelly Brown in California and delivered by David Ortell Kingston. The mothers and children hid in various places in California and, at one point, hid at the Order Business known as the Sahara Dunes Casino L.P. dba Lake Elsinore Hotel and Casino.

108.    When California suspected the attempted birth certificate fraud, Michelle Ruth Michaels' mother and Kelly Brown ran and hid with their children from both Utah and California. The two adults and 10 children slept in a single minivan for weeks. After Michelle turned 8, they were finally brought back to Utah by the Order hidden in a large vehicle. In Utah, they continued to hide in an Order home for weeks or months, resulting in Michelle Ruth Michaels and the other children missing almost an entire school year.

109.    The Order manipulates its workers' earnings and falsifies records. Indeed, in some cases, it either pays them almost nothing and/or it fabricates a record that a wife can use to falsely claim low household income to qualify her family for government benefits such as Medicaid or for other reasons that benefit the Order.



110.    At the direction of Defendants, mothers of minor children often claim that their children are not working and not receiving wages so can qualify for Medicaid and food stamps. In reality, these children (and their fathers) are typically working.

111.    Defendants has continuously taught members of the Order, including Plaintiffs, that the

laws of God as defined by the Order—not society—govern them. This deeply embeds in Order children who grow up to become adult members a fear of governments, law enforcement, judicial systems, child protective services, and a contempt for the rule of law. This, in turn, justifies any deception, action, or crime deemed necessary by Defendants to advance their conspiracy.

112.    The Order practices willful fraud not only against children, but also against local, state, and federal governments—and it often requires children to be complicit in its crimes.

113.    Children do not recognize that they are advancing the Order's illegal conspiracy. If they are disobedient, fail to comply, or challenge these practices, they are punished. Plaintiffs Allison Eames, Michelle Ruth Michaels, Jenny Kingston, Mary Ann Robinson, and Alex Martin were directed and trained to forge, falsify, and fabricate documents as children to further the conspiracy's interests.

114.    The phrase, "Bleeding the Beast," is used by Defendants to refer to how they systematically and expertly exploits and defrauds governments and taxpayers for vast economic benefit.

115.    For example, through a now-defunct biofuel company, Washakie Renewable Energy ("WRE"), the Order conspired to steal and launder over one billion dollars in federal tax credits.[3] After it was finally caught, four Order members involved in the massive fraud were prosecuted.[4]

116.    In 2016, the FBI and IRS executed search warrants on some Order Businesses and homes in connection with the WRE tax fraud. Because the Order had been tipped off and knew that the FBI and IRS planned on executing warrants and seizing records, Order members feverishly hid

---

[3] *See, e.g.*, United States Department of Justice, Office of Public Affairs, Press Release, *Jury Finds Los Angeles Businessman Guilty in $1 Billion Biodiesel Tax Fraud Scheme*, available at: https://www.justice.gov/opa/pr/jury-finds-los-angeles-businessman-guilty-1-billion-biodiesel-tax-fraud-scheme (noting that "Four Members of Kingston Family, including the CEO and CFO of Washakie Renewable Energy, Previously Pleaded Guilty").

[4] In April 2023, these individuals were sentenced to the following prison terms: Jacob Ortell Kingston, Jr. 18 years; Isaiah Kingston 12 years; Rachel Ann Kingston (now deceased) 7 years; and Sally Kingston 6 years. Two of these individuals, Jacob Ortell Kingston, Jr. and Sally Kingston, are defendants in this civil action.

and removed damning information from computers, replaced hard drives, and falsified electronic information. Much of the paper records were left to the children (including some Plaintiffs) to destroy. Order children were directed to shred papers, destroy evidence, hide boxes of records, and lie to the government.

117.    The Order prepared an A, B, and C list with the Order Businesses most likely to be raided. Examples on the A list were the Order Bank and the Order's law firm at 3212 South State Street.

118.    American Digital Systems was on the B list. Michelle Ruth Michaels and several of Michelle's siblings (one only 4-years old) were assigned to work there, shredding paper and loading truckloads of materials which were taken to the home of Michelle's father's third wife, to an Order storage facility on Redwood Road in Salt Lake City, Utah, and to other locations for hiding. Jenny Kingston assisted with gathering and destroying records at Jacob Ortell Kingston, Sr.'s home and other Order Businesses. Alex helped John Daniel Kingston, Sr. destroy records and marijuana at her mother's home.

119.    Order children were then Ordered not to go to their jobs with Defendants so that law enforcement would not see the Order's extensive use of child labor. At one point, Michelle and other children were driven to a rural area, where those 9 and older were instructed to shoot bullets through hard drives, computers, and other devices.

120.    After the raid, children, including Jenny Kingston were assigned to assist Laura Fuller, an Order attorney, with cleaning, re-filing, and re-organizing evidence that the Order had hidden.

121.    Despite the Order's destruction of literal tons of evidence of fraud with the help of its children, the evidence that was seized resulted in the convictions and imprisonment of several Order Members and a judgment in favor of the United States in excess of $500,000,000 for WRE's illegal activities on behalf of the Order.

122.    Bleeding the Beast also includes the Order's falsification and filing of personal income tax

returns for its members. For example, many Order mothers have so many children that claiming them all for child tax credit deductions results in diminishing deductions and refunds. The Order avoids the diminishing deduction problem by directing the allocation of children to the tax returns of single adults. When Allison Eames was about 14, April McKay trained her to forge signatures and allocate dependents on tax returns to fraudulently maximize deductions. The resulting child tax credits or refunds were later intercepted and captured by the Order.

123.    An example of this tax fraud is shown on this tax return filed by the Order for a single adult male with no children or dependents. The Order caused him to claim three dependents so it could receive the child tax credit payments.



124.    This tax fraud is further shown by the tax returns filed by Michelle Ruth Michaels' mother Michelle Afton Michaels and one of her brothers in 2015 and 2016. In 2015, Michelle Afton Michaels claimed three children on her Form 1040, and Nichelle's brother claimed two children on his Form 1040A. Michelle's brother was only two or three years older than the younger brother he claimed and three or four years older than the younger sister (Plaintiff Michelle Ruth Michaels) he claimed.





125.    On information and belief, in order to Bleed the Beast, children continue to be allocated to non-parent tax returns to maximize income tax credits by April McKay and Grace Mitchell and the Order continues to collect the fraudulently acquired child tax payments.

126.    The Order also falsifies tax documentation on behalf of individual Order Businesses. Order Businesses shuffle employes on paper between themselves and manipulate information about child

labor. For example, while working at WRE at age 17, Priscilla Tucker was directed to fill out forms reporting no activity in certain states even though WRE had operated in those states. She was told that there was no way to prove that they had operated there, so there was no need to pay taxes. To avoid being embroiled in such fraud and to avoid an Order Marriage, she fled.

### D.  THE INFLICTION OF PHYSICAL AND SEXUAL ABUSE

127.    To hide unlawful sexual and physically abusive practices involving children, Defendants ignore many of the normal safeguards that protect children from physical and sexual abuse.  As a consequence, physical and sexual abuse, as measured by the actual rule of law, is both common in the Order and hidden by it.  Indeed, each Plaintiff was seriously harmed by abuse and Defendants' disregard of the rule of law.  This abuse included rape, other forms of sexual assault, stranglings, beatings with hard objects including planks of wood, and other crimes against children.

128.    To facilitate their financial fraud, Defendants engaged in retribution, includes serious harm in the form of nonphysical, psychological, financial, or reputational harm, that is sufficiently serious under all the surrounding circumstances to compel children, including Plaintiffs, to perform and to continue performing labor or services in order to avoid incurring such retribution.

129.    Defendants both threaten to physically punish and physically punish children, as it did many Plaintiffs, for not working or for minor workplace violations, sometimes by beating, starving or denying them shelter.

130.    As children, most Plaintiffs were severely punished or beaten for minor, or even simply suspected, transgressions or disobedience. Children as young as 6 months were slapped and physically abused for crying. The more defiant or sinful the child is considered to be by the Ones Above that child, the harsher and more destructive the punishment.

131.    Sometimes children, including some Plaintiffs, were tied up or locked in rooms, basements and even garbage cans. Plaintiffs witnessed this, knowing they risked the same abuse. For instance,

Michelle Michaels saw another child in her home forced to wear trash bags as diapers for days on end while restrained in enclosed spaces.

 

132.    As a result of the relentless pressure, intimidation, abuse, and violence, some Plaintiffs engaged in self-harm, suicidal ideation and actions, or otherwise inflicted punishments on themselves that they believed they deserved. Other children took their own lives and were spoken of and treated so poorly after they died that Plaintiffs were unable to properly mourn their loss.

133.    Punishment by the Order is often followed by a rigorous repentance process that varies in extremes from members, including some Plaintiffs, being physically restrained or held against their will, to being denied basic human necessities, to physical beatings, to children being taken away from their parents, among many other abuses.

134.    It is also a common practice by Defendants not to report child sexual and physical abuse, despite their legal requirement to do so. For example, David Ortell Kingston was previously convicted and sentenced to prison for 10 years for incest after marrying his 15-year-old niece, Mary Ann Kingston, as his fifteenth "wife." Authorities did not learn of this illegal Order Marriage from any mandatory reporter in the Order. Rather, it was only after his bloodied niece stumbled away from the Washakie Ranch on her second attempt to escape the Order after her first attempt failed and she was beaten into unconsciousness by her father, John Daniel Kingston, Sr., who subsequently went to jail for the beating.

135.    Occasionally, the Utah Division of Child and Family Services ("DCFS") would learn about

abuse taking place in the Order and would investigate. On one occasion when this happened, Hyrum Dalton Kingston, the Principal of the Order's Ensign Learning Center, Inc., pressured and intimidated Amanda Grant to stop her from disclosing information about the abuse and rapes she had been suffering for years. Hyrum Dalton Kingston told her that the Order was entitled to have a witness in the room for the DCFS interview. This was to ensure that she would "honor her mother and father" and "protect her family and the Order" by concealing the truth. When DCFS would not allow an adult Order member in the interview, another adult Order member left a recording device in the room to intimidate Amanda and prevent her from telling the truth.

136.    Laura Fuller addressed Order members in meetings and coached Order children, including Plaintiffs, to withhold information and evidence of self-harm and/or the abuse that they suffered at the hands of Order members. Carl Kingston similarly coached children.

### E.    METHODS TO OBTAIN PSYCHOLOGICAL CONTROL

137.    The Order's indoctrination, brainwashing and threatening of children causes them, as it did the Plaintiffs, great fear and confusion when they interact with mainstream society. This is especially so, when, as teens or young adults, some try to escape the Order. If one physically leaves and gradually becomes aware of the nature and extent of the Order's criminal nature and their participation in it, they, as with many Plaintiffs, often find that it takes years to begin to trust governments, law enforcement, and the judicial system.

138.    The Order is structured in a patriarchal and hierarchical manner. When the Order's former leader, John Ortell Kingston, died, he left seven sons, known as the "Seven Kingston Brothers." Before he died, he assigned each of his sons a number, making them "Numbered Men." Subject to potential succession fights, the living Numbered Man with the lowest number leads the Order.

139.    Paul Elden Kingston, Sr. has the lowest number, and thus, is the leader of the conspiracy which encompasses the LDCC. The six surviving Seven Kingston Brothers, each have higher

numbers. The Numbered Man with the next lowest number, 15, is John Daniel Kingston, Sr. In addition to the Seven Kingston Brothers, other senior men in the Order, including its Governing Board, are assigned numbers, thus becoming Numbered Men. The women and children who "belong" to these Numbered Men are also assigned numbers. For example, Jenny Kingston's father is number 68. Because her mother is the first wife, her mother's number through her father is 681. Jenny is the fourth child of her mother, so her number is 6814. Jenny's father's second wife is 682. This continues for all of his wives and children. Similarly, Michelle's father is number 48 and her mother is his sixth wife, making her number 486 and so on.

140.    A numerical tracking system is needed because of the thousands of children being born into the Order. Plaintiffs estimate that the Seven Kingston Brothers have fathered the following children:

A.    Joseph Ortell Kingston (deceased) approximately 150 children;

B.    John Daniel Kingston, Sr. approximately 165 children;

C.    Hyrum Dalton Kingston approximately 100 children;

D.    Paul Elden Kingston, Sr. approximately 300 children;

E.    David Ortell Kingston, Sr. approximately 250 children;

F.    Jesse Orvil Kingston approximately 200 children; and

G.    Jason Ortell Kingston approximately 150 children.

141.    While the Seven Kingston Brothers have authority over members of the Order and the LDCC, all of them report to Paul Elden Kingston, Sr., aka "The Man on the Watch Tower," who directs them, the Order Businesses, and the Order Bank. In short, he controls the money.

142.    While legal ownership of Order Businesses may change, control over them does not. Proceeds from the conspiracy enriches and benefits the individual Defendants. Each Order Business falls within the jurisdiction of the Seven Kingston Brothers. If an Order member starts a

successful business, one of Paul Elden Kingston, Sr's brothers will claim ownership and oversee it for the Order. This is one way that Order members are prevented from passing on wealth to their descendants. All wealth is ultimately controlled and aggregated under Paul Elden Kingston, Sr., but members who develop enough business may earn the honor of being a "Master Steward."

143.    Paul Elden Kingston, Sr., his brothers, and many other Numbered Men have separate homes for each of their wives. For example, he has at least 27 homes—one for each of his wives. He also owns or controls vast wealth and real estate holdings throughout the country. He and his family enjoy lives of luxury, as do other powerful and favored men in the Order.

144.    Another example is Jacob Ortell Kingston, Sr., who helped manage the WRE fraud for the Order's conspiracy. Before he went to prison, he owned expensive real estate and a silver Lamborghini. He also gave a gold Bugatti to a business partner in the fraud.



145.    By contrast, most Order members, especially less favored wives, live in relative poverty, and, on information and belief, often in small, poorly maintained homes, with multiple other wives and large numbers of children. Some of them have little food for themselves and their children.

 

146.    Public news reports[5] state that Paul Elden Kingston, Sr., his sister, Rachel Orlean Young Kingston, and some of his wives also maintain vast stockpiles of gold and silver bullion that he has accrued from the profits of the conspiracy—all derived from its illegal exploitation of children.

147.    To facilitate Paul Elden Kingston, Sr.'s control, Order members are required to follow "The Law of One Above Another," which teaching originated at a New Years Eve Meeting in 1940. Under this system, children are taught that they must treat the One Above them as the "HIGHEST GOD WE CAN KNOW," creating an indoctrination and system of obedience to force children to become religious martyrs in violation of the First Amendment to the Constitution and the laws of the United States.[6]

148.    The Law of One Above Another is a simple concept. As shown in this diagram, the Seven Kingston Brothers report to their "One Above," who is Paul Elden Kingston, Sr.

Paul Kingston

The Seven Kingston Brothers & Order Board

Numbered Men

Married & Unnumbered Men

Women & Children

---

[5] *See e.g.,* Jesse Hyde, *Inside 'The Order,' One Mormon Cult's Secret Empire*, Rolling Stone (June 15, 2011) https://www.rollingstone.com/culture/culture-news/inside-the-Order-one-mormon-cults-secret-empire-244969/ (describing "America's most twisted crime family").
[6] *Prince v. Massachusetts*, 321 U.S. 158 (1944).

Other Numbered Men report to the "One Above" them, typically one of the Seven Kingston Brothers or a member of the Order Board. Fathers report to the One Above them. When a girl or woman is married, her "One Above" changes from her father to her Order husband. Paul Elden Kingston, Sr., for example, is the One Above his estimated 300 wives some of whom are also his half-sisters, first cousins or nieces. A husband is the "One Above" all his wives and all their unwed children. Any married, but unnumbered, man reports to his assigned "One Above" who is a closely related Numbered Man.

149.    Young girls in the Order are specifically taught to ensure they are "... fitting in with the ones over [them] and pleasing [the One Above] in every way [they] know how."

150.    Order members as a whole are taught to "... [abide] by the Order standards [and] make sure the ones around you are doing the same" by following the Law of One Above Another.

151.    Any failure by a member, especially a child, to follow the One Above typically results in punishment, increased indoctrination and training. Plaintiffs experienced threats and punishment for not following the One Above.

152.    The One Above everyone—Paul Elden Kingston, Sr.—directs everything in a child's life from requiring them to work as slaves to prohibiting them from speaking to outsiders because of the Order's fear they might be helped to escape, or that the outsider might blow the whistle on the Order's rampant child abuses. Alex Martin, for example, was told by her father, John Daniel Kingston, Sr., that God would kill her if she revealed the Order's secrets.

153.    The Order, through its Numbered Men structure and its requirement that children obey The Law of One Above Another, as well as its other controlling practices, indoctrinates young girls to satisfy the object of what has become an institutionalized and illegal conspiracy, by coercing girls to enter underage, bigamous, and/or incestuous Order Marriages, engage in sexual intercourse with their Order husbands, have as many children as possible, increase the size of the Order, and

produce slave workers for Order Businesses.

154.    Failure to abide by the Law of One Above Another is a sin in the Order, punishable not only by God, but also by members of the Order. Defendants maintain strict control over children in countless ways, using various means of coercion, intimidation, and force, but the Numbered Men and Law of One Above Another practices are at the core of this emotional, sexual, and physical violence.

155.    Repentance often includes counseling sessions with Paul Elden Kingston. Sr., completing packets of paperwork, restraint, institutionalization, and other punitive measures—all designed to reinforce the absolute need for the "sinful" child to be obedient. This process is established, enforced, and evaluated by the Ones Above to determine if a child has "repented of their sins."

156.    In addition to the Law of One Above Another and punishments, Defendants utilize a wide range of methods to indoctrinate and control its members—including the involuntary members born into the Order—and to make them dependent on the Order, including, but not limited to:

    A.  Requiring members to live in a closed, insular, secretive society;

    B.  Teaching children to fear, distrust, and not associate with outsiders;

    C.  Controlling the education and indoctrination of children;

    D.  Teaching children to hold in contempt and disobey the laws of society;

    E.  Operating an array of Order Businesses in a largely closed economy;

    F.  Requiring children and most adult members to work Order jobs;

    G.  Operating the Order Bank to restrict or prevent access to earnings;

    H.  Using the Order Bank to misappropriate member earnings;

    I.  Stressing the need to function only within the Order's economy;

    J.  Requiring and directing girls to enter Order Marriages;

    K.  Teaching girls to "marry up" into the Kingston blood line;

    L.  Insisting that girls and women give birth to large numbers of children;

    M.  False imprisonment or restraint to coerce compliance;

    N.  Forced institutionalization to coerce compliance;

    O.  Threatening girls and women with the loss of their children if they leave;

    P.  Threatening the loss of family and friends for leaving; and

    Q.  Cutting those who do leave off from their families and friends.

157.    Once indoctrinated and dependent on the Order, children grow to become Order members and, too often, perpetrators, compelled to submit to, and inflict, these practices on others.

158.    In addition to a patriarchal and numerical hierarchy, the Seven Kingston Brothers govern the Order with a belief in the "Pure Kingston Blood," which is another core object of the Order's conspiracy that requires the orchestration of Kingston Order Marriages within the Kingston blood line to maintain Pure Kingston Blood.

159.    The greater the quantity of "Kingston Blood" in your line, the more worthy you are as an individual, thus the more "freedom" you have. Thus, girls are required to "marry up" through an Order Marriage involving the purest of Kingston blood.

160.    Members of the Order who have Kingston blood are favored over those from families whose blood is impure. The Order teaches members that only those with pure Kingston blood will survive the apocalypse. The Order deems individuals' blood impure if they have any blood in their line stemming from a minority race or if they exhibit LGBTQ+ "tendencies." The Southern Poverty Law Center has designated the Order as a hate group since at least 2017.[7]

161.    Women in the Order are favored to the extent they are obedient, pure of blood, married to a Numbered Man, a first wife, and the mother of numerous children.

---

[7] *See* Stephen Lemons, *Blood Cult*, Southern Poverty Law Center (August 8, 2017), https://www.splcenter.org/fighting-hate/intelligence-report/2017/blood-cult.

162.    Men in the Order are favored and given authority and power to the extent they are obedient, pure of blood, have large families, and can produce a lot of money and workers for the Order. Favored men in the Order are also often "gifted" additional wives to exemplify the status of their favor and worthiness. Thus, the overt cycle of unlawful Order Marriages and the bearing of children to become laborers for the conspiracy continues decade after decade.

163.    With the help of thousands of children—who have no choice but to work for the Order because they were conceived and born to advance its economic interests—the Order provides an economy that is largely closed for its members and meets nearly all of their approved needs. For example, it operates businesses providing birthing, daycare, homes, food, consumer goods and services, home improvement supplies and products, transportation, automotive sales and service, education, engineering, farming, lending, insurance, digital, technical, communication, energy, trucking, disposal, "banking," finance, real estate, accounting, tax, and medical services, etc.

164.    While members are generally required to function in a closed economy, the Order's members do not all reside in Utah, its members live in various states, and it robustly uses its members in and outside of Utah to operate its businesses and engage in interstate and foreign trade, commerce, transportation, and communications. The Order also uses its members to engage in interstate commerce by filing fraudulent federal income tax returns and through other means of Bleeding the Beast as alleged herein.

165.    Numerous Order Businesses are open to the general public. These businesses engage in interstate trade and commerce by purchasing and selling products and services outside of Utah. The Order also engages in interstate commerce by using proceeds from its businesses to purchase products, supplies and other goods necessary for its businesses and to operate an economy for its members. It also owns and/or occupies extensive real estate throughout the United States.

166.    In addition, Plaintiffs worked for Order Businesses engaged in interstate commerce as

alleged in paragraphs 41-73. Most were also taken out of Utah for work and/or for sexual purposes:

A.    Amanda Grant was sexually abused in Arizona ¶ 190.

B.    Jenny Kingston worked in Nevada ¶ 254, Oregon ¶ 254, California ¶ 254, and sexually abused in Nevada ¶ 254, Oregon ¶ 254, California ¶ 254, and Turkey ¶ 253.

C.    Jana Johnson was sexually abused in Hawaii ¶ 304.

D.    Julie Green worked in California ¶ 348 and was taken for sexual purposes to the British Virgin Islands ¶ 322, California ¶ 340 and Pennsylvania ¶¶ 340-3.

E.    Michelle Ruth Michaels worked in Nevada ¶¶ 364, 369 and California ¶¶ 363 and 369.

F.    Priscilla Tucker worked in Nevada ¶ 414.

G.    Katie "Alex" Martin worked in Oregon ¶¶ 165 and 464.

H.    Mary Ann Robinson worked in Nevada and Idaho ¶¶ 493-4.

167.    All of this was required of Plaintiffs to benefit the Order as further alleged and detailed in the "Additional Specific Allegations by Each Plaintiff" at paragraphs ¶¶ 182-502.

168.    Under federal and state law, the Order is required to pay employees a minimum wage and, as applicable, overtime wages. The Order fails to comply with these requirements. With few exceptions, Plaintiffs never personally received paychecks. Michelle once received a paycheck by mistake. Priscilla demanded, and ultimately received, two paychecks while working at WRE shortly before she successfully fled. Jenny received paychecks while working at A-1 Disposal in 2020. And after Jana left her Order Marriage in June 2021, she continued to work at Standard Restaurant Supply[8] and began to receive paychecks.

---

[8] According to news reports, in March 2023, Standard Restaurant Supply was cited and fined by the United States Department of Labor for violating child labor laws. *See* Logan Stefanich, *Utah*

169.    Despite the Order's awareness of its legal obligations, it willfully and systematically fails to comply with labor laws. Children working at Order Businesses are deliberately not given paychecks, time sheets, timecards, or clock-in/clock-out records to reflect the days and hours they work. It conspires to keep them in the dark and prevents them from obtaining records that could eventually be used as evidence.

170.    Defendants in this action, not only continue to deny Plaintiffs' requests for copies of their (and their children's) Statements, but Defendants also continue to deny Plaintiffs' requests to close their Order accounts and pay them the money they earned working for Defendants in the Order.

171.    In large part, Defendants do not even attempt to accurately record the number of hours worked by Order employees—because it has no intention of paying them lawful compensation. It creates fabricated records as needed to Bleed the Beast or to pacify former members who threaten to expose the interworking of Defendants' secret economy.

172.    On information and belief, the Order's various means of Bleeding the Beast, has cost and will continue to cost the State of Utah and the United States hundreds of millions of dollars.

173.    The Order conspires constantly to conceal and mitigate its illegalities. To do so, it attempts to overcome and conceal both legal and biological realities. It attempts to do this in many ways.

174.    First, children are taught obedience. Plaintiffs learned at school, work, home, and at LDCC functions that if they questioned the Ones Above them, they suffered. Even if they are instructed to do something immoral, wrong, or illegal, children must follow the Law of One Above Another. They are taught that they will not be punished for any wrong action they are instructed to take.

175.    Second, girls learn their responsibility to get married and bear many children. Beginning at about age 10, Plaintiffs attended courses and completed assignments ensuring full indoctrination

---

*Restaurant Supply Company with Ties to Polygamous Group Cited for Violating Child Labor Laws*, KSL (Mar. 29, 2023). https://www.ksl.com/article/50610695/utah-restaurant-supply-company-with-ties-to-polygamous-group-cited-for-violating-child-labor-laws.

and retention. They were taught to be obedient wives, submit without objection, utilize their fertility periods and to budget and cook for a large family. They complete child-bearing worksheets to calculate how many children they will have between the ages of 16 and 40. When Allison Eames filled out her worksheet, she scheduled herself to have a child every 18 months. Her teacher responded that she was missing kids because an 18-month gap between births was too long. All of this is designed to make preparing for an Order Marriage a girl's top priority, which is lawful until combined with illegal marriage practices involving underage girls, bigamy and/or incest. As a result of the rampant illegality, secrecy, denial, and concealment are paramount.

176.   Third, the Order teaches girls how to "receive direction" for their Order Marriage. The concept of direction is a ploy used to manipulate children into thinking they are choosing their "Number One Choice" or their "First Choice." The Ones Above "help" the girl find her "direction and choice" by "removing things in her life that do not contribute to success" and by making sure she does not consider "marrying someone that is less." Girls may experience teenage infatuation, but if it is not for their Number One Choice, that infatuation is a trick from Satan disguised as direction. To ensure their direction is not from Satan, all Order Marriages must be approved by the Ones Above, and Paul Elden Kingston, Sr. personally in a formal Engagement Meeting.

177.   Fourth, to try to mitigate biological reality, blood samples are taken from all Order children to check genetic compatibility within the confines of the Pure Kingston Blood line. When an incestuous pregnancy occurs, amniotic fluid is withdrawn and tested.  If the baby is suspected to be defective, the girl is manipulated by Paul Elden Kingston, Sr. into having an abortion. The girl is told that the abortion is proper so long as she goes on to have many children. In contrast, women who miscarry naturally may be labeled a sinner and murderer and often left without support or medical care. After Julie Ruth Green became pregnant as a result of a violent rape, she was blamed for a natural miscarriage and ostracized as a baby killer for failing to fulfill her wifely duties.

178.    Fifth, in an effort to avoid legal realities, legally married first wives get "Happily Divorced" so that a subsequent wife can be "legally" married. Once the minor girl has given birth, cannot leave, and turns 18, the Order will authorize a Happy Divorce allowing the man to obtain another child bride all for the purpose of having more children and workers.

179.    Sixth, in an effort to avoid the reality of labor law, Defendants employ all of their manipulation through tools such as the Law of One Above Another and punishment to keep children working without compensation and in the dark about how much they are actually entitled to be paid. It then willfully deprives them of their earnings, limits their access to any money, and intentionally uses vague and incorrect Order "Statements" to keep them confused. Julie Ruth Green was never even allowed to see her Statements until she was 17 years old—many years after she started working.

180.    Defendants deliberately kept Plaintiffs focused on their Order Statements when in reality their Statements were merely a sham and a means to buffer them from their stolen earnings.

## VII. ADDITIONAL SPECIFIC ALLEGATIONS BY EACH PLAINTIFF

181.    Each Plaintiff incorporates in their individual sections below the General Allegations Made by Each Plaintiff above.

### A.    <u>Amanda Grant</u>

182.    Amanda was born into the Order in an Order apartment in the Salt Lake City area, and, on information and belief, in keeping with the Order's need for secrecy and distrust of modern medicine, was delivered by Paul Elden Kingston, Sr.

183.    Amanda's father is Verl Johnson, and her mother is Lorie Peterson. Lorie Peterson and Verl Johnson entered into an unlawful Order Marriage when Lorie Peterson was a 17-year-old minor. Lorie Peterson gave birth to 10 of Verl Johnson's children.

184.    Verl Johnson is a numbered man in the Order and has been assigned number 36, but he is not listed on Amanda's birth certificate. A fictitious father, named "Kyle Grant," is listed instead. "Kyle Grant" is also listed as the fictious father on some of Lorie Peterson's other children with Verl Johnson.

185.    Upon information and belief, years after Amanda's birth, the State of Utah located a "Kyle Grant" for purposes of recovering state child support payments only to conclude that he was not the father. This was told as a funny story in Amanda's family.

186.    Amanda's father, Verl Johnson, came to her home about twice a week, but she did not learn that he was her father until she was eight years old. Other than for discipline and marriage, Amanda and her father seldom conversed.

187.    Amanda's first memory as a child was at age five. The memory is of being sexually abused by John Paul Johnson, who was some eight years older and a son of one of her father's wives.

188.    Among other conduct, John Paul Johnson physically penetrated Amanda by placing his hands inside of her, touched her stomach and genitalia, and observed her in the bathroom while she was undressed. Amanda did not consent, nor was she able to consent as a minor.

189.    Throughout the period in which John Paul Johnson sexually abused Amanda he would give her gifts as a way of "apologizing" for the sexual abuse. On at least one occasion, following an incident of abuse, John Paul Johnson noticed that Amanda was crying and gave her a jar of money.

190.    Amanda was required to engage with John Paul Johnson throughout her childhood. As a child, her family would go on family trips, including to Arizona. John Paul Johnson would accompany Amanda on these trips, and on information and belief, sexually abused her there.

191.    Despite telling her parents, Amanda was not protected by those in the Order who knew she

was being abused and the abuse continued until she was 15 and John Paul Johnson was 23. Amanda eventually told two outsiders.

192.    The Division of Child and Family Services ("DCFS") came to the Ensign Learning Center, Inc. where Amanda was working. When they arrived, Hyrum Dalton Kingston, the Principal of the Order's school, rushed to tell Amanda that legally she could have a witness in the room, to make sure she honored her father and her mother, and to make sure to protect her family. Amanda had suffered physical abuse at the hands of Hyrum Dalton Kingston because of her failure to comply with the work dress code at the school and she knew what would happen if she disobeyed his instruction.

193.    Amanda was confused and frightened by how Hyrum Dalton Kingston was acting and by what he was telling her to do. She did not know how to respond to his questions about who she wanted in the room with her as a witness.

194.    Once Amanda learned that DCFS wanted to interview her, she did not want a witness from the Order in the room. A witness would prevent her from saying what had been happening to her.

195.    Out of the limited options Amanda had, the only person from the Order there that she thought she could trust was Mary Sommers. Mary Sommers came into the room but was asked to leave by the DCFS workers. When she walked out, she made it obvious that she was leaving a tape recorder in the room.

196.    As a direct result of Hyrum Dalton Kingston's coaching and the tape recorder, Amanda did not disclose her abuse to DCFS out of fear that she would suffer reprisal from Hyrum Dalton Kingston, her parents, and other members of the Order.

197.    When asked by DCFS whether she was being sexually abused by her "brother," Amanda was able to answer "no," because her abuser was her "half-brother."  When further pressed, she said he was a "cousin" to protect her father's family and to avoid retribution. After the interview,

DCFS made Mary Sommers erase her recording.

198. At a follow up interview with DCFS, Amanda continued to protect her abuser because she knew that if her half-brother went to jail, she would ultimately pay the consequence. Fortunately, however, after DCFS got involved, the abuse stopped. Amanda does not think it would have stopped if DCFS had not learned of the abuse and intervened.

199. The Order, through the Ones Above Amanda, controlled not only her access to food, shelter, clothing, money, and other basic necessities, but it also controlled her speech. Had she spoken up against John Paul Johnson's abuses, the Order through the Ones Above Amanda would have punished her for harming it.

200. The Ones Above Amanda never reported the sexual abuse to DCFS or law enforcement and took no mandatory action against her abuser. Instead, when her abuser was in his 30's, he was placed in a second Order Marriage with another minor as shown in this photograph of that wedding celebration with his other Order wives.



201. Because girls are thought of and treated as property and taught to submit to men, some men in the Order feel privileged and empowered to abuse girls sexually. The Order turns a blind eye to this to preserve and keep hidden its own illegal marriages.

202. Like other girls in the Order, Amanda felt intense pressure to marry and have children at a young age. She had been groomed for that singular purpose throughout her childhood. By the time she was 15 and 16, her friends who were also 15 or 16 were already in Order Marriages.

203. Under pressure from the Order and her Ones Above, Amanda told her father the names of two members of the Order she would consider marrying. One was a man named Jeremy Sommers, but her father told her that Jeremy Sommers was not her "Number One Choice."  The other was a man named Eric, but her father said he smoked weed so she should not want to marry him.

204. Otherwise, Amanda fought her Order Marriage because she knew girls that were betrothed, spiritually married, and got pregnant at 15, some of whom were re-married legally to their husbands when they got older but regretted all that had happened to them.

205. When Amanda was 16, or maybe as old as 17, her father, Verl Johnson, met with her about the choice for her Order Marriage that he wanted her to have, which was her first cousin, Derek Kingston. He informed her that Derek Kingston was on his way to their home to "come forward on her."[9]

206. Approximately a week before this conversation, Amanda's father had taken her to a mall and offered to buy her anything that she wanted. Amanda ultimately asked her father to purchase her a t-shirt from the clothing store Hollister. This conduct was highly unusual for Amanda's father who, until this time, rarely interacted with her except in the context of punishment; rather, this conduct was intended as coercion to make Amanda more amenable to an Order Marriage.

207. In one of her first jobs working for the Order, Amanda was assigned to work for the Order Bank. In this position, she worked directly alongside Derek Kingston. Even at a young age, Amanda understood that Derek Kingston had a crush on her and desired to marry her. Within the Order, employment assignments are often used as a way to introduce women to their eventual husbands under the supervision of other Order members.

208. Amanda resisted her One Above by telling her father that she did not want to marry Derek Kingston because he was her first cousin. Verl Johnson dismissed his daughter's resistance by saying: "Well, he is on his way. He is coming over."  Amanda had no choice.

209. Derek Kingston arrived at Amanda's home and "came forward" on her by telling her about

---

[9] To "come forward" on a girl means a man is allowed by the Ones Above him to follow his "marital direction" and initiate courtship with a girl. As a girl raised in the Order, Amanda was then supposed to receive "marital direction" that the man coming forward on her was her "First Choice" or her "Number One Choice."

his marital direction and that he was supposed to marry her. Amanda responded that she did not believe in polygamy and that he was her first cousin. He laughed at her resistance to the inevitable.

210.    At an Order Dance, Amanda's father gave Derek Kingston permission to dance with her twice. It was unusual for Amanda's father to grant dance permission more than once. That Amanda's father granted permission twice was an indication that he approved of Derek Kingston as a husband for Amanda and that an engagement would be forthcoming shortly.

211.    As part of her courtship to Derek Kingston, Amanda went on a date with him to Panda Express where he bought her dinner.

212.    Amanda had attended numerous secret Order weddings, including those of many of her friends, and knew that no engagement or marriage in the Order could occur without the direction and approval of Paul Elden Kingston, Sr.

213.    Consistent with the requirement of Paul Elden Kingston, Sr.'s approval of all Order Marriages, Amanda was tricked by her parents to go to the Order Bank where Paul Elden Kingston, Sr. had an office. When Paul Elden Kingston, Sr. appeared, Amanda was frightened because she knew that some of her friends had resisted and even been feisty about having to marry, but had gone to meetings with Paul Elden Kingston, Sr. and come out engaged.

214.    At one point during the meeting, Paul Elden Kingston, Sr. excused Amanda so that he could speak privately with her parents. When that happened, Amanda seized the chance to flee and literally walked away from the Order Bank, only stopping when it got dark. That meeting, which occurred shortly before she left the Order itself, was her last with Paul Elden Kingston, Sr.

215.    The purpose of Amanda's meeting with Paul Elden Kingston, Sr. was to convince her to marry Derek Kingston and to finalize the plans for her engagement to her first cousin.

216.    By the time Amanda fled the Order, it had been determined by her parents, Paul Elden Kingston, Sr., and the Order that she would marry Derek Kingston. Had Amanda not fled, she

would have become engaged. Had she become engaged, she would have been forced to marry and have sex with Derek Kingston while under the age of 18.

217.    While in elementary school and younger than 12, Amanda received her first work assignment in the Order. She first worked at Fidelity or the Order Bank where she worked part-time in the back room with other children. The work that she and the other children did was supervised by various adult Order members, including Janice Kingston, Derek Kingston, and Rachel Orlean Kingston Young, who reported up the chain of command based on the Law of One Above Another to some of the Seven Kingston Brothers, including David Ortell Kingson and Jason Ortell Kingson who in turn reported to their one above who was Paul Elden Kingston, Sr.

218.    At age 13 or 14, she was reassigned to work at least part-time for the Order at Advanced Copy. At that job she was supervised by adult Order members, including Jan McCarthy, one of Jesse Orvil Kingston's wives, who reported based on the Law of One Above Another to Jesse Orvil Kingson who reported to his brother Paul Elden Kingston, Sr.

219.    At 15, she went to work full-time at another Order Business, John's Market Place, where she was a cashier and reported to adult Order members including Michael Brown, the store manager under Hyrum Dalton Kingston, one of the Seven Kingston Brothers, who she understood reported to Paul Elden Kingston, Sr. through the Law of One Above the Other.

220.    Amanda was then reassigned to work full-time as a teacher's assistant at Ensign Learning Center, Inc., where she was supervised by adults including Karen Bryant. Karen Bryant was one of the wives of Hyrum Dalton Kingston, the school principal, to whom both she and Amanda reported. Hyrum Dalton Kingston not only supervised Amanda as a school employee, but he also disciplined her and directed her not to harm the Order when the DCFS was investigating. He, in turn, reported to Paul Elden Kingson, Sr. under the Law of One Above Another.

221.    While working at Ensign Learning Center, Amanda was also required to pay for and

complete the Penn Foster online high school program.

222.    Finally at 17, Amanda was sent back to the Order Bank to work full-time at the front counter under the supervision of adult Order members, including Deborah Williams and Rachel Kingston Young. All Order Bank workers also worked under the supervision and control of at least two of the Seven Kingston Brothers, David Ortell Kingston and Jason Ortell Kingston. They helped manage that operation for their one above, Paul Elden Kingston, Sr., and reported to him.

223.    Before she left the Order, she was able to surreptitiously and gradually withdraw some $2,000 from her account so that she would have some money when she left. The rest of the money she had earned since starting to work in elementary school had been siphoned out of her account.

224.    Amanda never received a paycheck from any of her Order employers and, thus, has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

225.    The Order Bank, Deborah Williams, Rachel Orlean Kingston Young, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston, Sr. obtained Amanda's uncompensated labor for Defendants at the Order Bank.  Advanced Copy, Jan McCarthy, and Jesse Orvil Kingston obtained Amanda's uncompensated labor for Defendants at Advanced Copy. John's Market Place, Michael Brown, and Hyrum Dalton Kingston obtained Amanda's uncompensated labor for Defendants at John's Marketplace. Ensign Learning Center, Karen Bryant, and Hyrum Dalton Kingston obtained Amanda's uncompensated labor for Defendants at Ensign Learning Center.

226.    If Amanda had refused to work as coerced and directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Amanda has not been fairly compensated for her labor at the Order Businesses where she was required to work.

227.     From the time she was a young girl, Amanda was taught to protect her rapist by those who knew of and should have protected her from that abuse. She was indoctrinated to believe that above all she had to protect the Order and its members. She understood that if she failed, she would suffer severe consequences and be deprived of the necessities of life. This left her obedient, confused and frightened.  To avoid being forced to marry her first cousin, she had to disobediently walk away from a meeting with Paul Elden Kingston, Sr. and into the night taking with her that fear and confusion.

228.     Amanda fled the Order to avoid an incestuous Order Marriage after having suffered years of mental abuse, unreported sexual abuse, and economic exploitation. She continues to suffer damages from the Order's abuses and exploitation.

229.     After she left the Order, Amanda struggled to support herself and tried to go to school but had to drop out because of the difficulty adjusting to life outside the Order, her indoctrination, and poor education. When she was contacted and asked to participate in a television program, *Escaping Polygamy*, she participated but remained confused and fearful about what the Order would do to her if she disclosed her sexual abuse and for a long time refused to discuss it.

230.     Amanda had been taught to disobey the laws of society and to fear law enforcement, courts and government. Her life in the closed and insular Order had indoctrinated her to protect her family and friends by avoiding contact with these authorities. Over the years, however, she eventually realized that she had suffered legal injuries and became a plaintiff in the state court action filed on September 9, 2022. After that case was dismissed, her claims were re-filed, pursuant to Utah's savings statute, as part of this action on February 28, 2024.

B.     **Jenny Kingston**

231.   As a young child, Jenny was taught to live the Order's standards and submit to practices such as the Law of One Above Another, which included being obedient, receiving direction to enter into an Order Marriage with her "Number One Choice" or her "First Choice" when she was young, bearing many children, and working as directed for Order Businesses, but she struggled with belief, was seen as a problem, and was often punished and ostracized to force her submission.



232.   For many years as a child, Jenny was a victim of both sexual abuse and a denial of the help and assistance she needed to stop and cope with the abuse, so she resisted some of the Order's rules and was considered sinful and referred to as "trash" and a "whore."

233.   In the Order, it is known that girls, and especially young girls, like Jenny, that may resist rules or may not fully believe, need to be married young and impregnated before they can become independent and leave. This is addressed with threats, punishments and coercion. As part of coercing Jenny into an Order Marriage, pregnancies, and to work Order jobs, she understood that the Order would give her raises on her Statements for an Order Marriage and the birth of children.

234.   Jacob Daniel Kingston Jr. "came forward" on Jenny, but she was 16 and did not want to marry him—even though that was what she was being told to do by the Ones Above her.

235.   Before Jenny was aware that Jacob Daniel Kingston, Jr. would be coming forward on her, she was required by the Ones Above her to work directly next to him at WRE as part of the grooming for her Order Marriage.

236.   WRE was run for the Order by Jacob Daniel Kingston Jr.'s father, Jacob Ortell Kingston, Sr., and Jenny's employment at WRE was intended by them and the Order as a step in her

"courtship" with Jacob Daniel Kingston, Jr.

237.    As part of her employment and "courtship," Jacob Ortell Kingston, Sr. flew Jenny and his son, Jacob Daniel Kingston, Jr., in a private jet to Las Vegas, Nevada. Indeed, Jenny's employment at WRE and this trip were used to coerce and assure her Order Marriage.

238.    Nevertheless, Jenny resisted when Jacob Daniel Kingston, Jr. came forward on her to initiate courtship. As a young girl raised in the Order, she knew that she was supposed to respond by receiving marital direction that he was her First Choice or her Number One Choice. Jenny, however, did not receive that marital direction.

239.    As a result, the Ones Above her conspired to physically institutionalize her until they could control her. She was sent by her parents, against her will, to Lifeline for Youth ("Lifeline"), a rehabilitation center for "troubled teens," which the Order often used to coerce children. She understood that she was there because she was not obedient to the Ones Above and needed a "better spirit," meaning she needed to receive the "right direction" to marry Jacob Daniel Kingston, Jr.

240.    Her parents were not concerned for their daughter; their only concern was pleasing the Ones Above them. The risk of Jenny self-harming, however, is why Lifeline allowed her to stay in its program. In February 2015, after some six months at Lifeline, Jenny yielded to the pressures of the Order and finally returned home after graduating from the program.

241.    About a month later in March 2015, she had to attend an Engagement Meeting with Paul Elden Kingston, Sr., her parents, Jacob Daniel Kingston, Jr. and his parents, Sally Kingston and Jacob Ortell Kingston, Sr., as well as the couples' living grandparents, at which Paul Elden Kingston, Sr., as the leader of the Order, approved Jenny's Order Marriage to her so called "Number One Choice," Jacob Daniel Kingston, Jr.

242.    Then, about a month later, on April 24, 2015, while Jenny was 17 years old, she was trafficked into an Order Marriage and sexual intercourse with Jacob Daniel Kingston, Jr., who was

an adult and her second cousin.

243.   Jacob Daniel Kingston, Jr.'s grandfather, John Daniel Kingston Sr. directed the wedding and instructed Jenny's father to "officiate" by reading the Order's wedding ceremony from an old piece of paper. Jenny recalls John Daniel Kingston Sr. standing near her father, Jeremy Ortell Kingston Sr., as her father "officiated" at the Order Marriage.

244.   Bill Stoddard, a Numbered Man in the Order, now deceased, signed the Utah Marriage License, claiming falsely to have been the "Officiant."  The Marriage License states, in part:

> I hereby certify that on the 24th day of April in the year of two thousand 15 in the city of Sandy in said county of Salt Lake, I, the undersigned, an Elder did join in matrimony according to law M[s]. Jenny LaDonna Kingston and M[r]. Jacob Daniel Kingston, The nature of the ceremony was according to Utah Law and was a present mutual agreement of marriage between the parties.

After this certification, the Marriage License was fraudulently signed, as follows:

245.   Jenny's Order Marriage was invalid because the Marriage License was signed by Bill Stoddard as the Officiant even though he did not officiate and because Jenny did not want to marry Jacob Daniel Kingston, Jr., and, as a minor, could not have given her consent to marry him.

Second Amended Complaint and Jury Demand | 53

246.   After the invalid Order Marriage, Jacob Daniel Kingston, Jr., immediately began to initiate unlawful sexual relations with Jenny against her will.

247.   Although Jenny continuously told Jacob Daniel Kingston, Jr. that she did not want to have sex with him nor engage in any other sexual conduct, he insisted that it was unacceptable for her to deny him. Through this kind of abuse and torment, Jacob Daniel Kingston, Jr., sometimes made Jenny submit to his unwanted and unwelcome sexual desires and advances.

248.   When Jacob Daniel Kingston, Jr. was unable to coerce Jenny into engaging in unwanted sex, he would forcibly rape her. These rapes were often violent and accomplished through physical force.

249.   Jacob Daniel Kingston, Jr. and the Order through its practices based on the Law of One Above Another conspired to aid Jacob Daniel Kingston, Jr. to commit these rapes.

250.   From a young age, Jenny was taught by members of the Order that forced sexual intercourse, and other unwanted sexual intimacies were nonexistent in Order Marriages. The common phrase used was: "It isn't rape if you are married."

251.   In her Order Marriage, she was abused verbally, emotionally, psychologically, physically and sexually causing her to engage in further self-harm. For example, on one occasion, she used a razor blade to carve the words that her "Number One Choice," repeatedly disparaged her with: "YOU DON'T DESERVE SOMEONE TO CARE ABOUT YOU LIKE I DO."



252.   The Order actively took steps to keep Jenny in an abusive, unlawful marriage and force her to have sexual relations with Jacob Daniel Kingston, Jr. against her will.

253.    Following her Order Marriage and as her "honeymoon," Jenny traveled with Jacob Daniel Kingston, Jr. and his family on a WRE business trip to Turkey. Jacob Daniel Kingston, Jr. forced Jenny to engage in sexual acts with him against her will during that trip.

254.    Throughout her Order Marriage to Jacob Daniel Kingston, Jr., Jenny was also taken on business trips with Jacob Daniel Kingston, Jr. and his family to, among other locations, California, Oregon, Nevada, and Mexico. Jacob Daniel Kingston, Jr. forced Jenny to engage in sexual acts with him against her will on each of these trips.

255.    Jacob Ortell Kingston, Sr. was allowed by the Order to use money to send Jenny to a fertility doctor. Paul Elden Kingston, Sr. has ultimate control over the operations of the Order and Jacob Ortell Kingston, Sr. would and could not have used this money without Paul Elden Kingston, Sr.'s knowledge and approval.

256.    The fertility doctor determined that Jenny was fertile and capable of bearing children, but, upon information and belief, also determined that Jacob Daniel Kingston, Jr. would need surgery to increase his ability to father children.[10]

257.    Jacob Ortell Kingston, Sr., however, informed Jacob Daniel Kingston, Jr. and Jenny that time was of the essence, surgery would take too long, and that they need to just "get her pregnant."

258.    Jacob Ortell Kingston, Sr. then forced Jenny to undergo in vitro fertilization ("IVF"). Jenny underwent the IVF process, as instructed, which entailed surgical procedures, medications, and the removal of eggs from her body for fertilization.

259.    Upon information and belief, the sperm used to fertilize Jenny's eggs belonged to Jacob Daniel Kingston, Jr., and once fertilized, Jenny's eggs were returned to her uterus.

260.    The IVF treatment resulted in the birth of twins in October of 2017.

261.    Jenny continued to rebel against her Order Marriage to Jacob Daniel Kingston, Jr. At one

_____

[10] Despite this, Jenny was blamed for Jacob Daniel Kingston, Jr.'s infertility.

point she kissed another man, and as punishment, Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and Jacob Daniel Kingston, Jr. forced her to undergo a repentance process and recommit to the arranged Order Marriage. During this two-week period, they locked Jenny up and took her children, phone, and car away from her.

262. In or about August 2018, Jacob Ortell Kingston, Sr., who was the One Above Jenny and Jacob Daniel Kingston, Jr., was arrested, convicted, and sent to jail for money laundering and filing false tax returns. In April 2023, he was sentenced to a prison term of 18 years. Sally Kingston, who also shares legal liability for the sexual assaults on Jenny, was sentenced to six years in prison for her involvement in the fraud.

263. In Jacob Ortell Kingston, Sr.'s absence, John Daniel Kingston, Jr. was assigned to be the One Above and the man with direct authority over Jenny, Jacob Daniel Kingston, Jr., and their children, and, thus, the man to whom she was required to go on important matters, including those related to her "marriage."

264. John Daniel Kingston, Jr. is a Numbered Man in the Order, assigned number 69. The One Above him is his father, John Daniel Kingston, Sr., who reports directly to the One Above him— Paul Elden Kingston, Sr.

265. Jenny was required to attend counseling sessions with John Daniel Kingston, Jr. as the One Above her. The intent of these counseling sessions was to help her correct her faults within her unlawful marriage.

266. Because the Order controls all Order Marriages, in or before December 2020, Jenny asked John Daniel Kingston, Jr. if she could divorce Jacob Daniel Kingston, Jr.

267. When Jenny asked John Daniel Kingston, Jr. about a divorce, she was informed that the Order does not grant Order divorces, and her request for permission to leave Jacob Daniel Kingston Jr. was denied.

268.    Jenny then scheduled a meeting with Paul Elden Kingston, Sr., John Daniel Kingston, Jr., and Jacob Daniel Kingston, Jr. to ask Paul Elden Kingston, Sr. for a divorce, but Paul Elden Kingston, Sr. also refused to allow Jenny to end her "marriage" to Jacob Daniel Kingston, Jr.

269.    Jenny would not have been unlawfully married without Paul Elden Kingston, Sr.'s approval, nor could she get out of the unlawful marriage without his approval. To leave her abusive Order Marriage, Jenny fled the Order with her two minor children.

270.    Jacob Daniel Kingston Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., John Daniel Kingston, Jr., Jeremy Ortell Kingston, Sr., Paul Elden Kingston, Sr., and other members of the Order, through the Order and its devices such as the Law of One Above Another, coerced and received value from Jenny's sexual relations with Jacob Daniel Kingston, Jr., including by increasing their standing in the Order and the birth of two children.

271.    When she was around six or seven years old, Jenny was required by her father to start working part-time for the Order. Her first job was at Advance Vending, where she cleaned the warehouse, sorted chips and candy, and counted money. At Advance Vending, she reported to her father and other adult members of the Order. While still in school, she was also required by her Ones Above to work part-time at several Order businesses. At Family Stores True Value, she was supervised by and reported to Hanna Tucker and Lynn Kingston. At the Order Bank aka Century Office, she was supervised by and reported to Rachel Ann Kingston Young, Deborah Williams, and ultimately, Paul Elden Kingston, Sr. At Stowell Insurance she worked under and reported to Tamara Stowell. At Standard Restaurant Supply, she was supervised by several adult members of the Order, including Elery Kingston and his adult sons. Additionally, she spent a summer working at the Kaysville Farm without pay, where she cleaned out the shed that would become her living space, along with performing many other tasks.

272.    Jenny worked for A-1 Disposal twice, the first time from about August 2016 through

December 2016, at some 40 hours a week and the second time in the accounts receivable department from about June 1, 2019 through December 30, 2020, for approximately 30 hours per week. Both times she was supervised by and reported to John Daniel Kingston, Jr. She also worked a second time for Family Stores True Value where she reported to Christine Wellington.

273.    When she reached high school, she was assigned by her Ones Above to become a Teacher's Assistant (TA) at the Order's elementary school, Ensign Learning Center, where she was supervised by adult Order members and reported to Karen Bryant and Hyrum Dalton Kingston. At just 14 years old, after graduating from the online high school used by the Order, she was required by the Order to start working full-time at WRE where she was supervised and reported to Sally Kingston, Rachel Ann Kingston Young, Isaiah Kingston, Jacob Ortell Kingston, Sr. and worked alongside Jacob Daniel Kingston Jr.

274.    Some eight months later, after her "marriage" to Jacob Daniel Kingston Jr., at 17, she was moved between several Order Businesses, including WRE, United Fuel Supply, A-1 Disposal, UFS Management, and one of the Order's A&W restaurants, reporting to Jacob Ortell Kingston, Sr., Rachel Elizabeth Kingston Taylor, Rachel Ann Kingston Young, Isaiah Kingston, and Christine Wellington. At some of these Order Businesses she was required to assist Sally Kingston falsify and fabricate tax documents.

275.    After Jacob Ortell Kingston Sr. was arrested, she was assigned to clean out his offices, collect and organize documents hidden before the 2016 FBI and IRS raid, and assist Laura Fuller with his criminal case. She worked under Laura Fuller and received some cash from Laura Fuller and Sally Kingston for her work.

276.    Before fleeing, Jenny worked at Standard Restaurant Supply under Scott Kingston, Elery Kingston and other of his sons. She also worked at A-1 Disposal under John Daniel Kingston, Jr.  At about the time of Jacob Ortell Kingston, Sr.'s arrest, she set up an account for herself at a

real bank. Still, her wages were first submitted to the Order Bank which then made automatic deposits into her bank account. The funds she received from A-1 Disposal were for less than she had earned.

277. She also set up what she understood to be savings accounts at the Order Bank for her children with initial deposits of $500 each. Later, when she tried to withdraw the money for them, she discovered much of it had been taken.

278. Jenny never received a paycheck from her employers with the exception of the second time she worked at A-1 Disposal and later at Standard Restaurant Supply because the Order Bank captured her earnings. Because she never received any direct paychecks, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

279. Advance Vending and Jeremy Ortell Kingston, Sr. obtained Jenny's uncompensated labor for Defendants at Advance Vending. Family Stores True Value, Hanna Tucker, Lynn Kingston, and Christine Wellington obtained Jenny's uncompensated labor for Defendants at Family Stores True Value. The Order Bank aka Century Office, Rachel Ann Kingston Young, Deborah Williams and Paul Elden Kingston, Sr. obtained Jenny's uncompensated labor for Defendants there. Stowell Insurance and Tamara Stowell obtained uncompensated labor for Defendants at Stowell Insurance. Standard Restaurant Supply, Scott Kingston, Elery Kingston and his adult sons obtained Jenny's uncompensated labor for Defendants at Standard Restaurant Supply. A-1 Disposal, John Daniel Kingston, Sr., and John Daniel Kingston, Jr. obtained Jenny's uncompensated labor for Defendants at A-1 Disposal. Ensign Learning Center, Karen Bryant, and Hyrum Dalton Kingston obtained Jenny's uncompensated labor for Defendants at Ensign Learning Center. WRE, Sally Kingston, Rachel Ann Kingston Young, Isaiah Kingston, and Jacob Ortell Kingston, Sr. obtained Jenny's uncompensated labor for Defendants at WRE. United Fuel Supply, UFS Management, the Order's

A&W restaurant, Jacob Ortell Kingston, Sr., Rachel Elizabeth Kingston Taylor, Rachel Ann Kingston Young, Isaiah Kingston, Christine Wellington, and Sally Kingston obtained Jenny's uncompensated labor for Defendants at these Order Businesses.

280.    Laura Fuller, Jacob Ortell Kingston, Sr., and other members of the Order obtained Jenny's partially uncompensated labor while assisting Laura Fuller with collecting and organizing documents hidden before the 2016 FBI and IRS raid related to Jacob Ortell Kingston, Sr.'s criminal conduct and his defense.

281.    If Jenny had refused to work as directed, she would have been punished severely and suffered serious harm, not only emotionally and physically, but also to her reputation within the Order. To date, Jenny has not been fairly compensated for the work she provided as a child. Almost all of her earnings were withheld by the Order. When she left and attempted to withdraw her funds, the Order Bank informed her that not only was her account empty, but that she owed $1,200.

282.    When Jenny left the Order with her two children sometime after December 2020, she started the difficult and painful process of freeing herself from years of indoctrination, sexual, physical, and emotional abuse and from an unwanted and abusive Order Marriage that her leaders had refused to end. To control her thinking and compel her obedience, she had been confined, institutionalized, forced through a repentance process and required to undergo Order-directed counseling. The process of freeing herself from all of this indoctrination and confusion began after she left and continues, but she gradually recognized her injuries shortly before she became a plaintiff in the original state court action.

## C.    Jana Nicole Johnson

283.    Jana was in elementary school when the Order first started grooming her for an Order Marriage. She was to marry her first cousin, Daniel Charles Kingston, who was the son of Order leader Paul Elden Kingston, Sr. and his first wife, Patricia Kingston. Paul Elden Kingston, Sr. is

also the half-brother of Jana's father, Kent William Johnson.

284.    Kent William Johnson, Paul Elden Kingston, Sr., and Patricia Kingston coordinated with other Order members to ensure that Jana and Daniel Charles Kingston were regularly in contact, starting from the time Jana was in elementary school. For example, Jana and Daniel Charles Kingston were both required to attend school at Ensign Learning Center.

285.    Beginning when Jana was about 14, she was forced to spend more time with Daniel Charles Kingston and was repeatedly told that he would be a good husband.

286.    All of Jana's older sisters had married Daniel Charles Kingston's older brothers to preserve the Pure Kingston Blood. Indeed, two of Jana's sisters are currently married to the same Kingston.



287.    Like her sisters, Jana was pressured to meet the expectations of a girl of royal blood and maintain her family's worthy status in the Order by marrying a Kingston.

288.    While the pressure to be married by the Order was mounting, Jana was also required to go to work for the Order. Jana knew that refusing to work for the Order, like refusing to submit to an arranged Order Marriage would result in severe punishment.

289.    When Jana was 15 years old, Paul Elden Kingston, Sr., Patricia Kingston, Kent William Johnson and others in the Order decided that Jana needed to move forward with the Order Marriage to Daniel Charles Kingston. She was told to seek direction to be engaged to Daniel.

290.    Paul Elden Kingston, Sr. conducted an Engagement Meeting during which he, Patricia Kingston, Daniel Charles Kingston, Kent William Johnson, and others were present.

291.   During the meeting, Paul Elden Kingston, Sr. determined and declared that Jana, at age 15, and Daniel Charles Kingston were engaged and would be wed—put another way, he decided to unlawfully traffic her into an unlawful, unwanted Order Marriage and unwanted sexual relations.

292.   On or about March 9, 2019, Daniel Charles Kingston and Jana were secretly and unlawfully married at the Order's recreation center, where they posed for photographs with the wedding party which included Jana and Daniel Charles Kingston's parents.



293.   During the Order Marriage ceremony, Daniel's father, Paul Elden Kingston, Sr., gave a speech and Daniel's mother, Patricia Kingston, performed and also



spoke. Jana's father, Kent William Johnson, officiated at the ceremony. He would not have officiated at the illegal marriage without the approval of Paul Elden Kingston, Sr.

294.   Jana did not want to marry Daniel Charles Kingston, and, as a minor, she could not consent to marry him even if she had wanted to—because he was her first cousin by blood, which made the marriage illegal and void under Utah law.[11]

295.   As part of coercing her into an Order Marriage, pregnancies, and to continue working Order jobs, the Order gave Jana a raise on her Statement for entering into her Order Marriage.

296.   Because the Order requires girls and women to submit sexually to their husbands, even if the sexual submission is against their will, Jana's Order Marriage to Daniel Charles Kingston triggered him to force unwanted sexual relations upon Jana. Moreover, as a minor in an illegal and void marriage to her adult cousin, Jana was not legally capable of ever consenting to sexual marital relations with Daniel Charles Kingston.

---

[11] *See* Utah Code Ann. § 30-1-1(1)(e). *See Also* Utah Code Ann. § 30-1-9.

297.    Among other reasons, Paul Elden Kingston, Sr., Patricia Kingston, Kent William Johnson, and the Order promoted, encouraged, and facilitated Daniel Charles Kingston's unwanted and non-consensual sexual relations upon Jana because having children results in more workers for the benefit of the Order.

298.    The Order also facilitates and compels young girls to become pregnant and bear children, creating additional burdens and barriers that make escape difficult. This further entrenches their dependency on the Order, which directly benefits the Order and increases its control over them.

299.    Accordingly, after the arranged Order wedding, Daniel Charles Kingston began to initiate sexual relations with Jana.

300.    Jana typically did not want to have sex or any other sexual relations with Daniel Charles Kingston and tried to make excuses, avoid, and distract Daniel Charles Kingston so that he would understand by her actions and words that she did not want to have sexual intercourse with him nor engage in any other sexual conduct.

301.    For his part, Daniel Charles Kingston expected her to be a submissive and obedient wife and repeatedly initiated sexual relations despite Jana's repetitive refusals.

302.    Frustrated by her usually successful avoidance and refusals, Daniel Charles Kingston told members of the Order that Jana was not being an obedient wife and was attempting to deny him children. Daniel Charles Kingston frequently informed Jana that the Order did not approve and threatened to continue telling leaders and members of the Order if Jana refused to consent to sex.

303.    The Order's disapproval of Jana's sexual disobedience placed her in a hopeless position throughout her void and illegal marriage as Daniel Charles Kingston sexually and incestuously abused and raped her.

304.    To reward her for entering into an Order Marriage with Daniel Charles Kingston, Defendants took Jana to Hawaii, where Daniel Charles Kingston informed her that she was

obligated to have sex with him. Jana was menstruating and did not want to have sex with him, so she used that as an excuse, voiced her objection, and tried to avoid his sexual advances, but he ignored her objections and raped her anyway.

305.    On other occasions, Jana refused Daniel Charles Kingston's sexual advances, but he sexually assaulted her against her will and objections.

306.    In addition to raping Jana, Daniel Charles Kingston frequently forced her to watch pornography with him and listen to his detailed sex fantasies.

307.    Daniel Charles Kingston admitted to Paul Elden Kingston, Sr., Patricia Kingston, and other members of the Order that he was insisting on having sex with Jana and asked for advice on how to pressure her more successfully.

308.    Without Paul Elden Kingston, Sr.'s direction to marry his son, Jana would never have been placed in an arranged incestuous marriage with Daniel Charles Kingston, and without Paul Elden Kingston, Sr.'s approval, she could not end the marriage.

309.    Jana felt relieved when Daniel Charles Kingston married additional wives because it reduced the frequency of his sexual advances toward her. Jana was the first of three plural wives. Daniel Charles Kingston's subsequent wives included his second wife who was also his first cousin, as well as his third wife who is his niece and was a minor at the time she was trafficked across state lines between Utah and New Mexico and Utah and Rhode Island.

310.    While Daniel Charles Kingston's attention was diverted from Jana, she was able to befriend people outside the Order and obtain a birth control prescription. Jana began taking the birth control in hopes that she would not conceive a child and be locked into her Order Marriage.

311.    Daniel Charles Kingston, who regularly searched Jana's belongings, found Jana's birth control, and flew into a rage. Daniel Charles Kingston called Jana's father, Kent William Johnson, and informed him that Jana was taking birth control. They then arranged for Jana to be taken to an

Order Business, American Digital Systems, where she was held against her will.

312.    Approximately a year to a year and a half into the Order Marriage, Jana was directed to have counseling with Paul Elden Kingston, Sr. to help correct her "shortcomings." In her confused and indoctrinated state of mind, Jana thought these sessions were necessary because she had failed to become pregnant as required by the Law of One Above Another. She was not only living in a state of fear, but these sessions left her feeling violated and dirty.

313.    In these sessions, Paul Elden Kingston, Sr. asked her various questions about why she was denying and attempting to avoid sex with his son, and, at one point later in the Order Marriage, forcefully confronted her about taking birth control, which was considered sinful. Jana informed Paul Elden Kingston, Sr. that she did not want to be in an Order Marriage to Daniel Charles Kingston, but he told her that she was the problem in her Order Marriage and instructed her to repent and make amends to Daniel Charles Kingston. Paul Elden Kingston, Sr. informed her it was her duty to repair her Order Marriage, saying this could only be achieved by conceiving a child.

314.    In addition to these sessions, Jana's electronic communications were monitored, her whereabouts tracked, and she was regularly escorted anytime she left her home.

315.    Jana was forced to sleep on the floor of the office building without access to any of her personal belongings. She was only permitted to leave the room for bathroom breaks. During this confinement, Kent William Johnson, Daniel Charles Kingston, along with others, went through Jana's phone and forced her to send messages to the individuals she had befriended outside of the Order to inform them that she no longer wanted their friendship and that they could not contact her further. She was then forced to block their calls and texts.

316.    Jana's sessions with Paul Elden Kingston, Sr. had continued, and, due to her birth control disobedience, she was now not even allowed to leave the office until she agreed to begin a repentance process with him. Once she was coerced into this process and allowed to leave the

office, Jana was heavily supervised and not allowed to go anywhere alone.

317.    Further, Jana felt betrayed after these sessions when she became aware that Paul Elden Kingston, Sr. and Daniel Charles Kingston did not keep the sessions private. Paul Elden Kingston, Sr. shared details from the sessions with various members of the Order shaming, pressuring, and further trafficking Jana into the role of a submissive and sexually obedient "wife" and producer of children for the Order.

318.    Although Paul Elden Kingston, Sr. shared details from his sessions with Jana, he failed to report the sexual assaults and rapes to law enforcement.

319.    Paul Elden Kingston, Sr., Patricia Kingston, and others also gave Jana sex toys and unsolicited sex advice to influence, pressure, and remind her of her responsibility to be a dutiful wife and produce children for the Order.

320.    Having had enough, Jana explicitly informed Daniel Charles Kingston that she had no desire to be married to him, that she did not want to have his children until she loved him, which she did not, and again emphasized that she did not want or like having sex with him. In June of 2021, she moved out of the Order apartment that she had shared with him and fled her Order Marriage. After she fled, Daniel Charles Kingston, who had recorded some of their private conversations, sent the recordings to various members of the Order.

321.    Daniel Charles Kingston, Paul Elden Kingston, Sr., Patricia Kingston, and Kent William Johnson coerced Jana's sexual relations with Daniel Charles Kingston, Jr. for Defendants.

322.    Jana had been required to begin working for the Order at about age 15. One of her first Order jobs was at Fidelity Lending where she worked under Cheryl Miller collecting debts on Order loans from Order member's Statements. A few months later, she was assigned to work at the Order Office aka the Order Bank aka the Century Office, under the supervision of Deborah Willians and Paul Elden Kingston, Sr., doing transaction balances. Next, from about March 2020

through June 2020, she was required to work in a building housing two other Order Business, Arrow Real Estate and Property Compliance. At Property Compliance, she helped pre-qualify home sellers and was supervised by Leah Kendall and, in turn, Paul Elden Kingston, Sr. From June 2020 through June 2021, Jana worked part-time at Standard Restaurant Supply, where she was supervised by Andrea Miller and a son of Paul Elden Kingston, Sr., and assisted them with marketing restaurant equipment. She never received paychecks for this work. Instead, her Order employers claimed to send her earnings to the Order Bank to be recorded on her Statement. However, her Statements consistently reflected less income than she actually earned.

323.    Fidelity Lending, Cheryl Miller, and Paul Elden Kingston, Sr. obtained Jana's uncompensated labor for Defendants at Fidelity Lending. The Order Bank, Deborah Willians, and Paul Elden Kingston, Sr. obtained Jana's uncompensated labor for Defendants at the Order Bank. Property Compliance, Leah Kendall, and Paul Elden Kingston, Sr. obtained Jana's uncompensated labor for Defendants at Property Compliance. Standard Restaurant Supply, Andrea Miller, and a son of Paul Elden Kingston, Sr. obtained Jana's uncompensated labor for Defendants at Standard Restaurant Supply.

324.    Jana understood how disobedience or insistence on receiving paychecks could lead to punishment and had gone to work as directed. If she had refused, she would have been punished severely and suffered serious harm both emotionally and to her reputation within the Order.

325.    Jana estimates that she earned at least $27,000 in wages working for Order Businesses, all of which, she was informed, went to her Statement. Despite working for years as a minor, however, her Order Bank Statement never showed more than $2,000 in earnings. Further, her Statements regularly showed withdrawals from her account without her consent and without any explanation. To date, she has still not been fairly compensated for her work at these Order Businesses.

326.    Even after Jana fled her Order Marriage and started to receive paychecks, she did not

recognize the nature and extent of her injuries and continued to work at Standard Restaurant Supply until December 2021 or January 2022. She broke that final tie to the Order as she increasingly overcame the indoctrination and brainwashing.

### D. Julie Ruth Green

327. When Julie was 6 or 7 and in the third grade, she started to learn that she had a "Number One Choice." At 12, she was shown who he was at her grandmother's home in a way that made it clear who she would marry. Throughout her childhood—Julie who is shown here when she was 9 or 10 years old—was manipulated into believing that she was personally receiving marriage direction to marry her Number One Choice. As part of this manipulation, she was told that she had already picked her Number One Choice before she was born, so the choice had actually been hers. She has no recollection of doing that.



328. Julie learned that her Number One Choice was her full blood uncle, Paul Elden Kingston, Jr. who is the son of Paul Elden Kingston, Sr. and Patricia Kingston, some 10 years older than her, and a man with other wives.

329. All of Julie's full sisters had been married incestuously in the Order to other sons of Paul Elden Kingston, Sr. and Patricia Kingston to preserve the Pure Kingston Blood.

330. Incestuous Order Marriages have resulted in babies with birth defects and in secret abortions as directed and encouraged by Paul Elden Kingston, Sr. to prevent the birth of babies with birth defects.

331. The practice of directing and arranging incestuous Order Marriages was followed in Julie's case culminating in approximately June 2016, when she met with Paul Elden Kingston, Sr., his son, Paul Elden Kingston, Jr., and other close family members, including Patricia Kingston, in Paul Elden Kingston, Sr's home for an Engagement Meeting at which he authorized the illegal

union which would make Julie the fifth and incestuous wife of his son Paul Elden Kingston, Jr.[12]

332.    Accordingly, on December 15, 2016, Julie was trafficked into an Order Marriage to Paul Elden Kingston, Jr., which took place on the Order's property known as John's Market Place, and which under Utah law was illegal and void.[13]

333.    Julie resisted but was coerced and forced into sexual relations. Months later, she was flown to the British Virgin Islands for a supposed "honeymoon." Although she wanted to go on the trip, she did not want to have sex with her Order husband. While there, however, he coerced and forced her to have sexual intercourse with him.

334.    Subsequently, Julie became pregnant as a result of a violent rape and miscarried the baby. She was then blamed for the miscarriage and ostracized as a baby killer for failing to fulfill her duties as an obedient and compliant wife.  When a girl is placed in an Order Marriage and works at an Order job, the Order Business typically gives her a raise on her Statement, and on information and belief, Julie received a raise as a reward for her Order Marriage. She did not receive a raise for her miscarriage.

335.    Growing up, Julie was taught the Order's requirement for girls and women to submit sexually to the will of their husbands to have children for the Order.

336.    Despite this, on most occasions when sexual relations occurred between Julie and Paul Elden Kingston, Jr. she communicated that she did not want to have sexual intercourse with him, and, on several of these occasions, he ignored her lack of consent and forcibly raped her.

337.    Julie became desperate to get out of her Order Marriage. In or about November 2018, as she was thinking about how to leave, she started to stay away from her Order husband Paul Elden Kingston, Jr. As a result, she believed she was being tracked by the Order.

---

[12] Paul Elden Kingston, Sr. and Patricia Kingston are Julie's biological grandparents.
[13] *See* Utah Code Ann. § 30-1-1(1)(d)(i).

338.    After she was able to physically leave her Order Marriage, she met with Paul Elden Kingston, Sr. and asked for a divorce or "unsealing" from his son, but her request was refused.

339.    Julie would not have been illegally "married" without Paul Elden Kingston Sr.'s approval, and she could not get out of it without his approval.

340.    In January 2019, to prevent Julie from completely leaving the Order, at the direction of Paul Elden Kingston, Sr, she was taken against her will by her grandmother, Patricia Kingston, to California under the guise of going to the beach, but was then flown to Pennsylvania,.

341.    Once there, Patricia Kingston told Julie that she had to stay in Pennsylvania in an Order member's home. Her phone was disabled so she could not access the internet, make calls, or text.

342.    In Pennsylvania, Patricia Kingston kept Julie at Emily Sessions' house. After leaving the Order, Julie learned that Order members who want to leave are sometimes flown to Emily Sessions' home in Pennsylvania and kept there while being convinced to remain in the Order.

343.    Julie was kept against her will in Pennsylvania in a failed effort to get her to stay in her illegal and void Order marriage in which she would have been subjected to Paul Elden Kingston, Jr.'s ongoing sexual advances and rapes.

344.    When she was able to return to Utah, Julie did not return to her Order Marriage and permanently fled the Order itself.

345.    Paul Elden Kingston, Jr., Paul Elden Kingston, Sr., and Patricia Kingston coerced Julie's sexual relations with Paul Elden Kingston, Jr. for Defendants.

346.    While in the Order, Julie was required to start working part-time for Order Businesses at age 12 or 13. First, she worked filing Order members' 10% Forms and other papers in filing cabinets located in her mother's basement.

347.    She was next required to work part-time at the Order Office aka Century Office during the school year and full-time during summers. This involved using stamps with members' signatures

to stamp their signatures on forms, checks, and paperwork. The job became full-time after Julie graduated from the Penn Foster online course by 14, as expected by copying test question answers. At the Order Office she first worked on the Order Statement side under the supervision of several Order adults, including Janice Kingston, Jolene Andrews, and Andrea Nichols.

348.   Julie later worked full-time for an Order property management business at the Order Office under the direction of Rachel Nichols and other adults doing accounts payable, receivable and collections. She also worked for Order daycare businesses. She worked at Garco Industrial Park, which she understood to be a business called Garco Property Management. There, she detailed cars under the supervision of Paul Elden Kingston, Jr. Last, Julie worked for Arrow Real Estate performing custodial work, data input, and miscellaneous paperwork under the supervision of her mother and Andrea Nichols. Julie also worked for her father, Jason Ortell Kingston, in California standing in lines for hours at Comicon each year to buy toys products that she helped haul back to Utah to sell for the Order.

349.   The Order Office, Janice Kingston, Jolene Andrews, Andrea Nichols, and Rachel Nichols obtained Julie's uncompensated labor for Defendants at the Order Office. Garco  Property Management, Julie's mother, and Andrea Nichols obtained Julie's uncompensated labor for Defendants at Garco. Arrow Real Estate obtained Julie's uncompensated labor for the Defendants. Jason Ortell Kingston obtained Julie's uncompensated labor at Comicon for Defendants.

350.   Julie never received a paycheck from any of her Order employers, except the Order daycare businesses. She was told that the earnings she did not receive went directly to the Order Bank.

351.   If Julie had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Julie has not been fairly compensated for her labor at the Order Businesses where she was required to work.

352.    Julie could not have reasonably discovered her injuries and acted on them before she was able to return to Utah and leave the Order in 2019, and thereafter, gradually free herself of the Order's brainwashing and indoctrination about fearing government, law enforcement, courts, and the law. She recalls first realizing that she had suffered injuries that she could act on in a discussion with Jenny Kingston in 2021. She brought her state claims on September 9, 2022, and re-filed them on February 28, 2024.

### E.    Michelle Ruth Michaels

353.    Michelle became part of the Order when her mother secretly gave birth to her in her mother's home located in South Salt Lake, not at her grandmother's home as stated on her Utah Birth Certificate. Michelle's Utah Birth Certificate lists a fictitious father, "Stephen James Michaels," with fake fictitious birth date.

354.    Michelle's parents, Jesse Orvil Kingston and Michelle Afton Michaels, were married in the Order even though their Order Marriage involved incest, bigamy, and child marriage (Michelle's mother was only about 16).



355.    Michelle learned at age eight that her Order Marriage to Paul Elden Kingston, Sr.'s son, Jason Ortell Kingston, had already been arranged.

356.    As she grew up, Michelle watched and learned that in the Order, girls are typically placed in arranged Order Marriages, impregnated when they are young, and required to have as many children as possible so that the girl cannot leave the Order. Michelle witnessed her older sisters' experience this. When she was 17, an Engagement Meeting was scheduled for her with Paul Elden Kingston, Sr. to get engaged to Jason Ortell Kingston.

357.    Michelle did not want to become trapped in an Order Marriage as the mother of children

who would be forced to provide labor for Order Businesses and subjected to abuse, nor did she want to be married to Jason Ortell Kingston who already had other wives, including 3 of Michelle's half-sisters by the time her Engagement Meeting was scheduled.

358. Michelle had seen the destructive cycle that her parents and siblings were stuck in, so she was forced to make a choice. An Order Marriage or leaving the Order were her only options, so at 17 she fled the Order to avoid becoming engaged, married, and pregnant. When she left the Order, she was ostracized by her family, and they severed communication with her.

359. Michelle was required to begin working for the Order when she was approximately 4 years old and was forced to work for various Order Businesses until she eventually fled.

360. Michelle initially worked for American Digital Systems helping Jesse Orvil Kingston and Michelle Afton Michaels with billing, secretarial tasks, cleaning, and shredding documents. When she was about seven she was also assigned to work at the Order Bank.

361. At the Order Bank, Michelle reported to Andrea LaDonna Michaels, Deborah Williams, Jolene Andrews, and ultimately to Paul Elden Kingston, Sr. and his sister, Rachel Orlean Kingston Young. There, she was assigned to help with Order Statements, enter service slips, enter checks, sort pay records, do journal entries, add Order last names to legal last names, etc.

362. She also continued to work at American Digital Systems fixing computers and doing secretarial work, billing, and answering phones. She eventually also reported to Joshua Kingston and Stephanie Coleman. In addition, she worked at other Order Businesses, including AAA Communications, where she answered phones and handled the card line answering service for Jesse Orvil Kingston, and Michelle Afton Michaels, and Orlean Mathews.

363. While as an employee of America Digital Systems, Michelle was required to travel to California some seven times to attend ComiCon conventions with her father, Jesse Orvil Kingston. In California, she assisted in purchasing large numbers of toy products and hauling them back to

Utah in a trailer or box truck rented by the Order. Toy products were displayed at American Digital systems, kept by Jesse Orvil Kingston, and some were sold for the benefit of the Order. Michelle may have received some payment on her Order Statements for some of these work trips.

364. Similarly, Michelle was also required to assist her mother, Michelle Afton Michaels with two Order businesses, Creative Decor and Flowers Forever, by traveling to Nevada on two or three occasions to purchase flowers for Order weddings and funerals. Order members and outsiders were charged for the flowers, but profits were recovered by the Order Bank via service slips, journal entries or checks. Again, Michelle may have received some payments on her Order Statements.

365. In addition to working as a child, Michelle was often required to engage in what she came to understand were some of the Order's fraudulent and illegal business practices.

366. In February 2016, the Order feared that the FBI was about to serve a search warrant on American Digital Systems. In response to the tip, Michelle was directed to take payroll and other records and hide or destroy them so that evidence of the Order's unlawful payment, employment, and child labor practices would not be discovered. Michelle witnessed and assisted as truckloads of records and filing cabinets were taken into hiding.

367. After assisting at American Digital Systems to prepare for the feared FBI raid, Michelle returned to her normal work at various Order jobs, including at the Order Bank where the Order's members' money is controlled as the center of the Order's secretive economy. At the Order Bank she reset computers settings that had been altered before the raid.

368. Under the direction of Jesse Orvil Kingston and Michelle Afton Michaels, Michelle also completed forms with false information and signed other peoples' names on checks from the State of Utah, typically parent's names in relation to fake or fraudulent Order daycare businesses.

369. Michelle never received a single paycheck. All her wages went to the Order Bank, which controlled her earnings, gave her periodic Order Statements, but has refused several recorded

verbal requests to provide her with all of her Statements. Because she never received a paycheck from any of her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

370.    American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, Joshua Kingston, and Stephanie Coleman obtained Michelle's uncompensated labor for Defendants at American Digital Systems. The Order Bank, Andrea LaDonna Michaels, Deborah Williams, Jolene Andrews, Paul Elden Kingston, Sr., and Rachel Orlean Kingston Young obtained Michelle's uncompensated labor for Defendants at the Order Bank. AAA Communications, Jesse Orvil Kingston, Michelle Afton Michaels, and Orlean Mathews obtained Michelle's uncompensated labor for Defendants at AAA.

371.    A fraudulent daycare was run by Michelle's mother under a sister wife's name which, on information and belief, at the time could not be operated under her mother's name because she had taken the blame for causing the death of a baby to protect her husband, Jesse Orvil Kingston.

372.    An example of a fake daycare requiring Michelle to sign parents' signatures is the daycare business that only existed on paper because the children were actually kept in another Order daycare business that had already maximized the allowed government subsidy. For these daycares, Michelle would also be required to fill out forms fraudulently stating when parents dropped off and picked up their children at the fake daycare.

373.    Michelle was taught and instructed by her mother to sign other members' names, sometimes alternating her right and left hands to make different members' signatures look different and to complete forms to maximize Bleeding the Beast for the benefit of the Order.

374.    Jesse Orvil Kingston, Paul Elden Kingston, Sr., and John Daniel Kingston, Sr., were aware of and ultimately controlled these fraudulent schemes. No large amounts of money would go into

or leave the Order without the approval of the Ones Above, Rachel Orlean Kingston Young and Paul Elden Kingston, Sr.

375.    Before she left the Order, Michelle was contacted by law enforcement and had to provide information and answer questions about the Order's business practices. She had been raised to fear law enforcement and knew she could be punished by the Order for revealing its secrets but cooperated reluctantly. This experience, though frightening, helped her to begin seeing that Bleeding the Beast was wrong.

376.    Michelle never received a paycheck; she had always understood that all of her wages went to the Order Bank, which controlled her earnings and gave her periodic Statements.

377.    Michelle worked for Order Businesses for 13 years, and, at one point, had about $80,000 in her Bank Statement. She was later informed that $44,000 of that amount had been paid on her mother's home and that Michelle would have to work off another $6,000 plus interest. Ultimately, the $50,000 went back to the Order. After Michelle left the Order at 17, she called the Order Bank to get copies of her Statements and withdraw her remaining funds, but she was refused both because she did not have parental consent, because her Statement account was closed, and because she was no longer a member of the Order. She had not personally closed her Statement or account.

378.    If Michelle had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Michelle has not been fairly compensated for her labor at the Order Businesses where she was required to work.

379.    After Michelle left the Order at 17, she struggled to overcome and free herself from the extreme indoctrination and control of the Order and Defendants. She had lived in a secret society where she was constantly taught to not only distrust outsiders and disobey the laws of society, but was also required to obediently work in an Order Businesses. Gradually she understood that some

of her work involved financial fraud, and that the Order was cheating the government. Even after becoming an adult, however, she remained largely brainwashed and still did not recognize that as a child she had suffered legal injuries herself and that there were legal remedies she could act on. Shortly after recognizing this, she became a plaintiff in the state court action filed on September 9, 2022, and later brought this action.

### F.    **Allison Eames**

380.    Allison was born into the Order in a building that was once located at 765 North 300 West, Salt Lake City, Utah, and known in the Order as the "General Store."

381.    The Order Marriage of Allison's parents, John Daniel Kingston Sr. and Kelli Mattingly, whose Order name is Kelli Collins, was illegal in that her mother was a 15-year-old, and her father already had 4 of his eventual 14 wives.



382.    Allison's father, John Daniel Kingston, Sr. is not listed on her birth certificate, nor does it list the address of the General Store where she was born. A false address in Kearns was used.

383.    Allison's parents were verbally and physically abusive. Her father served time in prison for nearly beating to death one of his daughters. He demonstrated on numerous occasions that he is not afraid to use threats and physical violence to intimate and control members of his family.

384.    Allison was taught from a young age that her sole purpose was to be a good wife and bear children. She was taught that this was the only way a girl could establish her place in the Order.

385.    At age 11, Alison was required to attend an Order Marriage preparation course. In these classes, she was taught the skills and duties of an Order girl and wife. Topics included learning obedience, learning how to get direction, learning how to properly become betrothed and engaged, learning how to budget for a large family, and how to maximize her fertility window to give birth

to as many children as possible. Material from classes were used during numerous Order functions, lessons at school, and lessons within the home. Allison also attended numerous Order weddings involving minor girls, incest and/or bigamy.

386.    In 2014, for example, at a wedding Allison attended, her half-sister and half-brother were married. This Order Marriage was both incestuous and bigamous.

387.    In February 2015 when she was 16, Allison witnessed another sister marry in the Order and realized that she was the oldest unwed daughter of her parents. By this time, her father was regularly meeting with her and informing her that it was her turn to be married.

388.    Allison felt the pressure from her Ones Above and understood that she had no choice but to leave the Order if she was to avoid an Order Marriage, so, at age 16 in December 2015, even though her birth certificate and social security card were kept from her, she ran away.

389.    After she fled, Allison's parents tracked her down and forced her to return home, but she ran away again. This time, she was able to initiate an emancipation court proceeding causing her parents to give up all their legal and physical parental rights in September 2016.

390.    Allison had been coerced to start working for Order businesses when she was about 8. Refusing to work for the Order meant more physical punishment at the hands of her Ones Above.

391.    Her first job was at an Order business known as A-1 Disposal, where she filed and scanned papers, and did various kitchen duties as required and supervised by her Ones Above. At approximately age 10, she was reassigned to work at the Washakie Ranch. She was taken there by Valerie Martin, reported to her, and had to work excruciating, long hours. She often worked 10 or 12 hours a day slaughtering and skinning chickens with a dull kitchen knife and doing other farm chores. She was often deprived of meals and prevented from going into the house at the end of the day until she had completed all of her work. This often required her to work late into the night.

392.    At about age 12, Alison was reassigned to work again in the A-1 Disposal office where she

continued working for her Ones Above doing her previous tasks, data entry, and some dispatch work which she was too young to handle. At about age 14, she was reassigned to work for April McKay preparing the tax filings of Order members. April McKay trained her to forge signatures and allocate dependents on tax returns to maximize tax deductions. The resulting child tax credits or refunds were later intercepted by the Order.

393.    Allison was next assigned to work at the Order Bank, where she did more data entry for adult members of the Order, including Karen Bryant and the Ones Above her. Then at approximately 15, she was reassigned to work at John's Market Place, where she worked in the bakery and reported to Nate Gustafson. While still 15, she was reassigned to work at Family Stores True Value under the supervision of Christine Wellington as a cashier until she left the Order on December 6, 2015.

394.    A-1 Disposal, Kelli Mattingly or Kelli Collins, and John Daniel Kingston, Sr. obtained Allison's uncompensated labor for Defendants at A-1 Disposal. Washakie Ranch and Valerie Martin obtained Allison's uncompensated labor for Defendants at the Ranch. April McKay obtained Allision's  uncompensated labor for Defendants. The Order Bank and Karen Bryant obtained Allison's uncompensated labor for Defendants at the Order Bank. John's Market Place and Nate Gustafson obtained Allision's uncompensated labor for Defendants at Johns's Market Place. Family Stores True Value and Christine Wellington obtained Allision's uncompensated labor for Defendants at Family Stores True Value.

395.    Despite being forced to work for these various Order businesses from the age of 8, Allison never received a single paycheck. Because she never received a paycheck from any of her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are obliged to maintain and produce those records.

396.    In addition to being forced to work underage without compensation, Allison was required to engage in activities that she thought were normal but were actually against the law. For example, when she worked for April McKay, who handled most of the Order leaders' and members' tax filings, Allison's job responsibilities included assisting the Order with its fraud on the government by assisting April McKay as directed to fill out fraudulent tax forms for the IRS.

397.    Under April McKay's instruction, Allison would move "dependents" from one Order member's tax forms to another Order member's tax forms, invent addresses, and otherwise manipulate information to maximize tax deductions for Order members which resulted in tax refunds that were typically recovered by the Order itself.

398.    Allison has come to understand that, as a minor, she witnessed and was instructed by April McKay to assist in systematically defrauding the IRS for the Order.

399.    For years, Alison was informed and understood that her wages were being paid to the Order Bank and that she could only have access to her earnings through the Order Bank. Despite being forced to work for Order businesses from the age of 8, she never received a single paycheck.

400.    The Order falsely claims that all members' earnings are tracked with Order Statements, and that any wages earned by Order members are sent to what is called the Order Bank and accounted for in these Statements. Allison was not permitted to access or use any of her money without obtaining permission, and she rarely received that permission.

401.    Despite working full-time for years, Allison's Order Bank Statement never showed more than a $1,000 balance, her earnings were being siphoned away on behalf of the Order.

402.    In fact, Allison noticed on numerous occasions that her Statements' balances systematically decreased even though she did not have access to, nor did she spend much of the money owed to her. When she asked where her money had gone, she was told "room and board."

403.    If Allison had refused to work as directed, she would have been punished severely and

suffered serious harm both emotionally and physically and to her reputation within the Order.

404.    When Allison fled, the Order took the rest of the money from her Order Statement and has refused to give it to her or provide an accounting. To date, Allison has not been fairly compensated for her labor at the Order Businesses where she was required to work.

### G.    Priscilla Tucker

405.    Priscilla successfully left the Order on March 1, 2015, when she was 17 years old. Her parents are Alma Tucker and Hannah Tucker. Her mother delivered Priscilla when she was 17 or 18 years old. Her father died when she was not quite 2-years old. After Alma Tucker's death, Hannah Tucker became the second wife of Lynn Kingston.



406.    When Priscilla was 16, Joseph Kingston informed her that his father, Jeremy Kingston, and his grandfather, Joseph Kingston (after whom he was apparently named), told him that he was supposed to marry Priscilla. Things snowballed quickly from there. Her mother and stepfather often talked about Priscilla's coming Order Marriage to Joseph Kingston, and she played along—once going on a hot air balloon ride with him—because she did not know what else to do.

407.    As a young child, Priscilla had been sexually abused by some of Jeremy and Benny Kingston's sons, including Joseph Kingson. At 16, when Priscilla was told by Joseph Kingston that he, her main abuser as a child, was supposed to marry her, he again started making sexual advances. Pricilla said "no" several times, but she also knew her fate was an Order Marriage to him, so she continued to play along as if she would marry him, and he treated her as a wife. She knew it would do no good to fight.

408.    She also knew that, at least, Joseph's father and grandfather were aware of the sexual activity and were condoning it. The younger Joseph Kingston boasted that his father and

grandfather had emboldened him and made it clear that she would have to marry him if he got her pregnant.

409.    For years, Priscilla had experienced suicidal ideations and often attempted to carry out a plan. She went to the train tracks and laid on them in hopes that a freight train would come. But when that did not happen, she would get up and go home so she would not get into trouble for missing work or sneaking out. If a train had come, she would not have gotten up.

410.    In addition to trying to end her life, she continued to play along with Joseph Kingston as if she was his wife until she was scheduled to have an actual Engagement Meeting with Paul Elden Kingston, Sr. on Labor Day, 2014. She had turned 17 and said "no" to the Engagement Meeting. As a result, she was kicked out of her home, fled to a safe house, and attempted to get emancipated.

411.    About a month later, Priscilla's mother told her that she wanted to meet Priscilla one last time before she disowned her. So, five days before her emancipation hearing, Priscilla went to her mother's house. At the home, two people who were not in the Order appeared without warning and physically took her to a "rehab" facility known as Lifeline for Youth.

412.    She was there for three months. During the first month or two she apologized for everything the Order determined she had done wrong and took on the mindset that she was the one who was bad, and that her parents were good. Her therapist at Lifeline did not think she belonged there and wanted to release her, but her parents objected. They wanted her to stay in Lifeline until she turned 18, at which point they would cut her off if she tried to leave the Order or was not obedient.

413.    A compromise was reached. Priscilla's parents agreed to sign her emancipation papers if her therapist kept her at Lifeline until she hit phase 3 of its program. In January 2015, after that was accomplished, Priscilla was released, returned to the Order, and was assigned to work at WRE. The emancipation papers were not signed. When Priscilla realized she was again being groomed for an Order Marriage to Joseph Kingston, she ran away again, this time to Las Vegas, Nevada.

She was 17.

414.    Priscilla was approximately 8 years old when she started working for the Order. Her first Order job was at Standard Restaurant Supply in Salt Lake City, which is one of several Standard Restaurant Supply stores owned by the Order in various states, including Nevada, Arizona, and Idaho. At Standard Restaurant Supply, Priscilla did various tasks as directed by her stepfather, Lynn Kingston, such as sorting merchandise and putting price tags on items from China. She was told her earnings went to her Order Statement, but she was not given any money. This also involved her going with Lynn Kingston to trade shows and conventions in Las Vegas, Nevada to meet with vendors and help make decisions about what to buy.

415.    At approximately age 10 or 11, Priscilla was next assigned to work at another Order Business, Family Store True Value under Christine Wellington and Janet Grow. She often worked into the evenings. Occasionally, she had to work all night and then go to school the next day. In addition, she worked Saturdays and Sundays. She was told she was earning minimum wage, but she never saw any money because it purportedly went to her Order Statement. The Family Stores True Value managers and supervisors required her to use a time clock or handwrite the hours she worked on a timecard and place it in a box at the end of every day. However, she never saw a Statement that led her to believe that she was being paid correctly.

416.    At 13 or 14, she was assigned to be a Teacher's Assistant at Ensign Learning Center, a school run by Order members, including Hyrum Kingston, Karen Bryant, Patricia Kingston, and Paul Elden Kingston, Sr. As a Teacher's Assistant, she monitored classes, helped other children, graded papers, and taught children. While working full time, 8 am to 4 pm, at the school, Priscilla was enrolled in the Penn Foster online high school program two mornings a week. She was expected to pay for and complete the online program and graduate within one year, which she did.

417.    Although Priscilla understood that some of her co-workers were getting paid through their

Statements, she was not paid because the school was paying for her Penn Foster course. While working at Ensign Learning Center, she was also required to work weekends at Family Store True Value. She does not recall seeing payments on her Statement for her weekend work.

418.    After working as a Teacher's Assistant for about a year, Priscilla was sent back to work full time at Family Store True Value as a cashier (taking cash or credit card payments from non-Order customers), merchandizer, and setting up piles of goods and product displays. This time she worked under the same managers and supervisors.

419.    Later, at approximately age 15, she was assigned again to work at Standard Restaurant Supply fulltime where she initially worked as a cashier and stockgirl. Before she turned 16, she became a manager assistant with accounting responsibilities for front of house sales, the warehouse, and will call. Although she did not have a driver license, each day she was also tasked to drive a car to real banking institutions to make deposits for the store. She was supervised and reported to Hanna Owen, Brian Owen, and June Kingston. Priscilla never received a paycheck from this Order job.

420.    While working there, she tried to get emancipated, but was stopped by her mother before she could file the papers. After that, she started dating a non-Order employee.  She was fired and punished by being sent to live at her aunt's remote and isolated house in Park Valley, Utah.

421.    Next, at about 16, Priscilla was assigned to work CTC Trucking at the front desk and later as a dispatcher and broker. There, she reported to Shane Stoddard, Cyril Jackson, and Jacob Ortell Kingston, Sr. The trucking company had previously been known as Attco Trucking. She worked there for about one year, from approximately the end of 2013 to near the end of 2014 dispatching Order owned trucks and coordinating the trucking of freight from Order Businesses in Utah to states as far away as New York and Florida. Priscilla also found loads for the trucks to haul back to Utah. She never received a paycheck from this Order job.

422.    Priscilla was also assigned to perform various unpaid tasks for the Order by Rachel Ann Kingston. She was required to work these Order jobs and perform these tasks, but did not receive paychecks. She had no option. Being beaten for disobedience was routine in her family and she complied out of fear. By this time, nearly every month Priscilla would attempt to look at her Statement to see if it was growing, but the amounts were wrong. In addition, her Statement balance would periodically be zeroed out. At one point there had been $16,000, which included social security payments due to the death of her father, but that amount also disappeared.

423.    On rare occasions, Priscilla was able to access small amounts of money from her Order account. Withdrawals required approval and the money had to be used at Order Businesses, and sometimes no funds were available even under those conditions. She was told she could use her money for her wedding. But if she did something wrong, her Statement would be docked. In the year or so before Priscilla left the Order, she was not shown nor given access to her Statements.

424.    Shortly after Priscilla was released from Lifeline, she was again assigned to work under Jacob Ortell Kingston, Sr., but at another Order Business, WRE. At this point, in early 2015 she insisted on receiving actual paychecks and, on information and belief, was paid out of the same account used to pay non-Order employees. She received about two paychecks, but was informed that she owed the Order $40 because her Statement was negative.

425.    At WRE she prepared and filed state tax forms based on what she was told and taught to put on the forms. All the state tax forms claimed zero income. At the time she did not realize WRE was committing fraud for the Order.[14]

426.    Before Priscilla left the Order, Amanda Grant helped Priscilla get some cash out of her Statement. Amanda worked at the Order office. Priscilla (and sometimes her older sister, Hannah)

_____

[14] Later, Priscilla provided information and assisted the FBI's investigation of Washakie Renewable Energy which contributed to several criminal convictions.

would call the office, pretend to be her own mother, and approve the withdrawal. At first, Priscilla would withdraw perhaps $20 a month, eventually with the help of others, she successfully got $600 out four times. These amounts were insignificant compared to the amount that should have been accumulating in her Order account.

427.    Standard Restaurant Supply, Lynn Kingston, Hanna Owen, Brian Owen, and June Kingston obtained Priscilla's uncompensated labor for Defendants at Standard. Family Store True Value, Christine Wellington and Janet Grow obtained Priscilla's uncompensated labor for Defendants at the store. Ensign Learning Center, Hyrum Dalton Kingston, Karen Bryant, Patricia Kingston, and Paul Elden Kingston, Sr. obtained Priscilia's uncompensated labor for Defendants at Ensign. CTC Trucking, Shane Stoddard, Cyril Jackson, and Jacob Ortell Kingston, Sr. obtained Priscilia's uncompensated labor for Defendants at CTC. Rachel Ann Kingston obtained Priscilla's uncompensated labor for Defendants.

428.    If Priscilla had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Priscilla has not received her Order Statements, nor has she been fairly compensated for her labor at the Order Businesses where she was required to work.

### H.    Brenda Collins

429.    Brenda Collins is the daughter of John Daniel Kingston, Sr., and one of his 14 wives, Kelli Mattingly. She and her full sister, Allison Eames, are two of her mother's 12 living children. One of Brenda's earliest memories is of being beaten by her father after a family prayer. Harsh, physical parental beatings were normal in her childhood.

430.    Brenda witnessed her oldest sister being married at about 16 as well as many other girls and knew she was destined for the same fate.

431.    Before Brenda was in the eighth grade, she was sexually assaulted by Order member Nathan Mason. When her parents discovered the sexual abuse, they reacted by telling Brenda that bad things only happen to people who deserve it because God only punishes those who go against him. Her parents blamed and  punished her for allowing herself to be sexually abused. Shortly thereafter, one of Brenda's sisters reported the sexual abuse to the police. As a result, Brenda was violently beaten by John Daniel Kingston, Sr.

432.    Soon, it seemed to Brenda that everyone in the Order knew about the sexual assaults, but no one was willing to help. Even some children in the Order school began to harass and bully her. Brenda's family also began blaming her for her mother's seizures and her father convinced her that she was possessed by a demon, that she was causing her mother's seizures, and that she was killing her mother. When Brenda was punished, her parents sometimes brought up the "Mason thing"—referring to what Nathan Mason had done to her— to remind her that she was bad.

433.    Brenda's half-sister committed suicide at 14 years old. Brenda was a year younger than her half-sister and the two sisters were very close. In response to her half-sister's death, their father announced that the family would not honor her half-sister's behavior and would not have a funeral. He relented only after some of her sisters and others close to her decided to hold their own funeral. Even so, John Daniel Kingston, Sr., continued to hold family meetings where he ridiculed her deceased half-sister, and instructed the family to throw away pictures and memories because people who self-harm are "stupid and just need to pray more."

434.    Brenda could not handle the toxic and abusive environment she was trapped in. She had experienced suicidal ideations since she was 5 years old. At approximately 13, she ran away. During the next two years, as Brenda tried to avoid being returned to the Order and her family, she

stayed at the University of Utah Neuropsychiatric Institute, was under state care and went back and forth between family members both in and out of the Order, as well as "rehab" at Lifeline for Youth, foster care at Utah Youth Village, and foster homes.

435.    The mandate of Utah's juvenile court was to return Brenda to her parents by focusing on Brenda's relationship with her parents. To accomplish this, she was expected to go to family therapy, solve problems, make compromises, and give them a second chance.

436.    In the juvenile court proceedings, Brenda's father, John Daniel Kingston, Sr., obtained a court Order preventing her from participating in a television program known as *Escaping Polygamy*. He then submitted a list of the people he claimed were associated with that show and Brenda was Ordered not to have contact with those people. That list included all the people that Brenda knew that had left the Order, including many not involved in *Escaping Polygamy.* The court order effectively isolated Brenda and prevented her from seeking support from the relatives she would have naturally turned to for help.

437.    By about age 15, the plan was that when she left Lifeline she could either live with people approved by her parents or in a foster home. Given the options, Brenda never felt free of the Order.

438.    Growing up, Brenda knew who her father was but did not call him father. Like her siblings, she always called him "Daniel."  At some point, she realized he was married to other women and had many other children. Although he seldom spoke to her, she was taught to worship him.

439.    Once Brenda started getting a little older, her father started to pay more attention to her and involved her in classes and outings to groom her for an Order Marriage. Her friends at school would tell stories about him hitting them, like he did her, but everyone was taught that they deserved it and that they were supposed to learn from it. At some point, she started realizing other people didn't like him, wondered why, started to ask questions, heard more stories, and realized he didn't care about any of them.

440.    Late one summer, when Brenda was approximately 13, she promised to babysit for her sister but had not been able to shower. She begged her mother to be able to quickly shower and was told "yes," but as soon as the water warmed, she heard banging on the bathroom door. She turned the water off and heard John Daniel Kingston, Sr.'s loud voice shout "open the door right now." She wrapped a towel around herself and as she opened the door he bolted in and wrapped his hands around her neck and began slamming her head into the toilet while choking her. Her towel was coming loose and she started screaming at him to get off her. But when she got up and tried to fix the towel, he put his hands back around her throat, slapped her and told her to get dressed.[15]

441.    After she shut the door and started to get dressed, he opened the door again while she was still indecent. After she finished dressing, he and her mother took her into her bedroom and reminded her that "good Order members obey, you're never going to amount to anything if you're disobedient, you're disobedient, and that's why that happened to you." They reminded her again of the "Mason thing." Once in the van, Brenda was focused on self-harming and whether she could find something to use when one of her siblings turned around and said, "shut up, Brenda, he does that to everybody" leaving her with the thought "I'll just stop crying until I can go into a bathroom and hurt myself."

442.    Before Brenda ran away at 13, she had been required to start working. By the sixth grade she was expected by the Ones Above her and other Order members to babysit for Order families over extended periods of time, make meals, and clean houses. One summer she was taken to work at A-1 Disposal by her mother, Kelli Mattingly whose Order Name is Kelli Collins, where she was directed to file papers, clean and mop the kitchen, prepare lunches for two shifts of workers, and clean up after both shifts. After that summer Brenda continued to work at A-1 Disposal whenever

---

[15] This violent altercation was witnessed by her sister, Allison Eames.

she was told to by her Ones Above. At A-1 Disposal, she stapled papers, removed staples from papers, shredded papers, swept the floor, cleaned the office, scanned papers, and occasionally inputted numbers into a computer, and completed basic accounting as instructed. At least once a week she was not permitted to leave work until as late as 10 pm.

443.    On one occasion, as punishment, she was required by a Teacher's Assistant at an Order School to watch a group of five- to seven-year-olds, without payment, while the other teachers and students went on a field trip. Before she ran away, Brenda was also required to perform various tasks for the Order without compensation and, if she did not agree, she was slapped or otherwise punished. One another occasion she helped other children paint a home for Laura Fuller.

444.    She knew that refusing to work for the Order as directed would have resulted in more physical punishment and ridicule within her family and the Order. Brenda suffered physical abuse for slight acts of supposed disobedience, mistakes, and hesitation to work.

445.    Brenda was told that she was being paid for her work at A-1 Disposal and that the money would go to her Order bank account and be hers when she was older. She had an account in the Order that showed she had earned roughly $475. She would ask why her Order Statements always looked the same as the last month or had less money and was told "sometimes your parents will go through and take some of it."

446.    Her friend who worked at the Order office told Brenda that she regularly received information about the hours members worked and then reduced the amounts the members' accounts would show based on whether they were in trouble, had been "talked to by [John] Daniel [Kingston, Sr.]," had broken equipment, or whether she had simply been told by John Daniel Kingston, Sr. to cut down their earnings.

447.    After Brenda graduated from Utah Youth Village and was returned to her mother, there was a lot of pressure for her to get an Order job. Her mother had told the therapist that Brenda

needed to save money for when she is older and learn to be an adult. The therapist suggested that she should be allowed to keep some of the money she earned. A compromise was reached that allowed Brenda to use some of her earnings to get and take care of her own cat.

448.    To earn this money, Brenda worked at Family Store True Value full time during the summer of 2016 when she was about 15-years old, restocking shelves and putting together birthing kits for Order members to buy under the supervision of an adult Order member whose name she does not recall. Despite the therapist's suggestion, however, she didn't have access to any of her money except to initially buy a cat. Thereafter, Brenda had to tell her mother when she needed cat food or cat litter. Her mother would buy the item, bring it home, and tell her how much it cost.

449.    John Daniel Kingston, Sr.,  Kelli Mattingly or Kelli Collins, and the Order families that received babysitting and nanny services over extended periods of time obtained Brenda's uncompensated labor for Defendants. A-1 Disposal, Kelli Mattingly or Kelli Collins, and John Daniel Kingston, Sr. obtained Brenda's uncompensated labor for Defendants at A-1 Disposal. An Order school, Laura Fuller, and other Order members obtained Brenda's uncompensated labor for Defendants. Family Store True Value obtained Brenda's uncompensated labor for Defendants.

450.    Brenda was 15 years old in 2016 when the state finally realized that putting her back in her mother's care was not a good idea. At that point, she was finally able to permanently avoid being sent back to live in the Order. She remained in state custody until her case was closed on October 6, 2019. Until then, she still had to have regular contact with her abusive parents, including at team meetings. For years thereafter, she continued to feel threatened by her parents.

451.    If Brenda refused to work as directed, she would be punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Brenda has not been fairly compensated for her labor at the Order Businesses where she was required to work.

452.    After initially fleeing at 13, Brenda spent her minority in and out of various institutions

and foster homes, trying to free herself from the Order. She had been constantly taught that she deserved physical beatings for disobedience and blame for being sexually assaulted as a child because God only punishes those who go against him. Her father convinced her that she was possessed by a demon. Fear, confusion, and suicidal ideation have dominated much of her life. She continued to feel extremely threatened by the Order and her parents.  For many years after she became an adult, she kept running and hiding, struggled with her mental and psychological injuries, and did her best to push the Order and her childhood out of her mind.  She was not able to discover and act on her legal injuries for years after she turned 18.

### I.    Katie "Alex" Martin

453.    When Alex was 15 years old, her parents, John Daniel Kingston, Sr. and Valerie Martin, along with Paul Elden Kingston, Sr. and other senior members in the Order began making arrangements for her to be married to Matthew Ortell Kingston, the son of Paul Elden Kingston, Sr. and Patricia Kingston.

454.    Matthew Ortell Kingston is the presumptive, or at least, rumored heir of Paul Elden Kingston, Sr. He is considered by some to be next in line to lead the Order.

455.    All of Alex's older full blood sisters married Paul Elden Kingston, Sr. and Patricia Kingston's sons. It was expected from an early age that Alex would also marry one of their sons.



456.    When Paul Elden Kingston, Sr. and Alex's parents decided that she would marry Matthew Ortell Kingston he was already married to Alex's aunt, Evelyn Owen, and her half-sister, Deborah Kingston,  and also some of her other aunts. Alex would have become Matthew Ortell Kingston's twelfth or thirteenth wife. Matthew Ortell Kingston was significantly older than Alex, a minor, and already had several children that were about Alex's age.

457.    One of Matthew Ortell Kingston's wives who was also one of Alex's aunts gave Alex's parents a piece of paper on which was typed a statement that she claimed was Alex's marriage direction from God. The direction held that Alex would be saved by becoming part of Matthew Ortell Kingston's family. Neither Matthew Ortell Kingston's wife nor Alex's mother would have presented the content of that marriage direction to Alex without approval from Matthew Ortell Kingston, Alex's father, John Daniel Kingston, Sr., and ultimately Paul Elden Kingston, Sr.

458.    When Alex approached her father, John Daniel Kingston, Sr. and told him that Matthew Ortell Kingston was touching her inappropriately at Order dances and that she did not want to marry him, her father became angry and told her that she had a responsibility to marry her Number One Choice—despite the fact that she and Matthew Ortell Kingston were first cousins.

459.    Shortly thereafter, Alex initially fled the Order to avoid marrying her cousin, but also to avoid being forced to work, and so she could go to school and follow the career she wanted.

460.    Had she not fled the Order, Alex would have been forced to marry Matthew Ortell Kingston, work for her father's Order Businesses and forego the education she needed. Had Alex married Matthew Ortell Kingston she would also have been required to engage in sexual acts with her cousin and give birth to as many children as biologically possible. Had she stayed in the Order, Alex would have been under the age of 18 when she married Matthew Ortell Kingston.

461.    Alex's ability to leave the Order and work for employers who would pay her was limited by the fact that her parents would not allow her to have access to her own Social Security card, her Social Security number, or her birth certificate. Before fleeing the Order to avoid an illegal Order Marriage, Alex had been required to work almost entirely without compensation for Order Businesses.

462.    At approximately age 2, Alex and her family moved to Washakie Ranch. As a young child, Alex began working on the ranch (feeding thousands of chickens, tending to hundreds of cattle,

washing countless eggs, packaging meat and loading farm products to sell to Order members). Punishments included shaming, beatings, increased work, and being forced to sleep outside, eat rotten food and the denial of meals. The public shamming in front of other children was referred to by them as "bust meetings" and caused shame as intended.

463.    At approximately age 12 or 13, Alex and her family moved away from the ranch, but she was forced to return on weekdays in the summer to feed crew members and clean the farm under the direction of Lallana Huntington. During this time, Alex continued selling farm products at church on the weekends. Farm crew members were made up of Order members who misbehaved or resisted the Order. They were often children and were required to live in the basement.

464.    At approximately age 14, Alex was forced to miss school for weeks at a time to work at the Order's "Weed Farm" in Oregon. There, she was forced to work over ten hours a day, often without food, being permitted to eat as a reward after completing all her work. Whenever the marijuana was harvested, Alex would accompany her father in a truck as they hauled the product to Utah. At one point, Alex witnessed the weed being destroyed shortly before the FBI raids on the Order.

465.    At approximately age 15, Alex was assigned by her Ones Above to work at one of the Order-owned A&W franchises, which was operating under the Order's Food Group. At the A&W, she was responsible for making food and operating the register. She reported to Jennifer Kingston, Elizabeth Kingston, Jacob Ortell Kingston, Sr. Those franchises closed and, on information and belief, any remaining assets were absorbed into the Order.

466.    Alex was directed and trained by Valarie Martin and John Daniel Kingston, Sr. to sell farm products at Order functions. She was also directed to become involved in forging and fabricating documents for a business called Washakie Foods.

467.    At approximately age 16, Alex was assigned by John Daniel Kingston, Sr. to work full

time at another Order Business, American Wellness and Rehab Clinic under Carol Fuller and her father. There, she took patient vitals, entered patient medical history in records, set up patient appointments, answered phones and did other assigned administrative tasks.

468.    Other than the last three paychecks from American Wellness, which Alex hid and refused to turn over to the Order before fleeing, all the money she earned from her work for the Order was sent to her Order Statement.

469.    Washakie Ranch and Lallana Huntington obtained Alex's uncompensated labor for Defendants at the Ranch. The Order's Weed Farm and John Daniel Kingston, Sr. obtained Alex's uncompensated labor for Defendants. A&W, Jennifer Kingston, Elizabeth Kingston, and Jacob Ortell Kingston, Sr. obtained Alex's uncompensated labor for Defendants at the A&W franchise. American Wellness and Rehab Clinic, Carol Fuller, and John Daniel Kingston, Sr. obtained Alex's uncompensated labor for Defendants at the Order's clinic.

470.    If Alex had refused to work as directed, she would have been punished severely and suffered serious harm both emotionally and physically and to her reputation within the Order. To date, Alex has not been fairly compensated for her labor at the Order Businesses where she was required to work.

471.    Alex started to physically leave the Order on March 26, 2019, when she was 17. Later, she met with her mother in a public restaurant to beg for her birth certificate and social security card, but was not given them. Her mother told her that she had been reported as a runaway and that if she was found by the police before she was 21 the police would return her to her parents. This made her more afraid of law enforcement than ever. At the time, Alex did not know that her parents had also withdrawn consent for her to have a Utah driver license as a minor.

472.    Alex first ran to Holding Out Help ("HOH"), a nonprofit that assists individuals leaving polygamous sects, but she did not disclose to HOH her true name or age. After three days, HOH

told her that Order attorney Laura Fuller was looking for a "17-year-old Katie Martin." This further scared her because she knew that as a minor if she was found, the Order would be able to get her back. To avoid that, she ran away from HOH.

473.    Over time, she was unable to adequately care for herself and after about six months was hospitalized for malnutrition. The Division of Child and Family Services was apparently notified by the hospital, and a case worker visited her. The case worker was able to provide her with her social security number, but not her card.

474.    Over the next several years, Alex moved multiple times to stay in hiding. She established a mailing address, but kept it secret from her family and the Order as she continued to hide. Despite efforts to obtain her social security card and birth certificate from her mother, she did not receive them.  After several visits to a social security office, she was finally at age 18 able to obtain a duplicate social security card.

475.    For a time, Alex tried to live both in and out of the Order. She was working at a Wendy's earning about $12.00 an hour, when her brother, John Daniel Kingston, Jr., promised her $14.00 an hour if she worked at an Order Business. Desperate, she ended up working for A-1 Disposal for a few months when she was 18 or 19. During this time, she also wanted to have mental health therapy and was told by her mother that the Order had a therapist who she could see for free. She met with that person, Andy Gustafson, a few times in an attic room that had a bed, while he read to her from the Bible, until he finally admitted to her that he was not a licensed therapist.

476.    In a final effort to bridge both worlds, Alex was talked into living in a trailer that her mother claimed she owned, and said her father did not control, but the heat and water did not work and some of the same Order men who had been grooming her started showing up at the trailer, so she fled again further terrified about being forced into an Order Marriage.

477.    After finding it impossible to live in both worlds, Alex continued to move as she found

people she was able to trust and places to live, always being careful not to disclose her location to anyone in the Order and avoiding being picked up and returned by the police. During this time, she also wanted to understand whether she had legal rights that she could act on, and as part of this process, one of the people she trusted made arrangements for her to meet with an attorney at a large Salt Lake law firm.  A few months later, Alex became a Plaintiff in this action.

### J.        Mary Ann Robinson

478.    Mary Ann was born to Mary Keaton and Jeremy Kingston. Her mother was illegally married to her father soon after her 15th birthday and was taken out of school. Mary Ann's father is not listed on her or her siblings' birth certificates.

479.    Starting when she was approximately 8 years old in 2000, Mary Ann was sent to work for Order Businesses by her mother who told her that it was time she started to pay for her own shampoo, toothpaste, groceries, rent, and later for items such as feminine products. She was never told how much she was earning per hour at any other Order jobs and when she asked what she was being paid  for her required labor she was told that she was earning "Blessings in Heaven."

480.    From 2000 through 2008, Mary Ann was assigned by Ones Above her to work at Order Businesses, including Advance Vending, Family Stores True Value, John's Market Place, the Order Bank, Ensign Learning Center, Sierra Wholesale, etc.

481.    Requiring Mary Ann to work as a child presented problems for the Order and Mary Ann. For example, when she worked at Family Stores True Value whenever a non-member came into the store, she and the other children working there had to hurry into the back room so that the employment of minors would not be too obvious. She had been taught that if an outsider ever asked if she worked there, she was to lie, say "no," and then walk away.

482.    Then after her father went to prison for incest, her mother started her delivering newspapers for the Deseret Morning News. Although she was supposed to merely assist her mother, Mary Ann did the actual morning newspaper delivery (eventually driving herself), while her mother collected the paychecks and turned them over to the Order.

483.    During these years, Mary Ann could not get up in the early morning hours each day to deliver papers and still go to school because she became too tired. It was more important in the Order for her to work than to go to school, however, so she was taken out of the Order School in fifth grade. Mary Ann believes her mother lost the paper route job when it was discovered that she, not her mother, was delivering the papers. Secretly, Mary Ann was glad that her mother was fired because she was able to return to school for the end of sixth grade.

484.    Mary Ann was not allowed to see her Order Statements or access her money, however, and she was about 13-years old before she was allowed to see records which showed she had $10,000 in her Order account. By the time she was 15-years old, her Statements showed between $15,000 and $20,000 in her account.

485.    At about 15 when Mary Ann had her high school diploma, additional money was being taken from her Statement to pay for groceries, utilities and occasionally even rent for the Order home she lived in. She also learned from her mother and April McKay, who worked with Mitchell & Associates, that the Order was taking money from her earnings for one of her sibling's "child support" so there would be more of a tax refund for the Order.

486.    Mary Ann was one of many Order children for whom the Order prepared tax returns and on whose returns it falsely claimed a child tax credit deduction for a "dependent" so that the Order could Bleed the Beast. She understood that this practice was occurring but throughout the years she was forced to work she was never allowed to see her own tax returns or receive any tax refunds.

487.    Back in school after the loss of the paper route, Mary Ann was required by her Ones Above to work for Order Businesses.  She worked for Advance Vending under Cory Jensen and her father, Jeremy Kingston, cleaning the warehouse and vending machines, preparing routes for drivers, keeping the vans clean, and counting money for deposit in a real bank. She worked at Family Stores True Value under Susie Nelson and Lorna Reynolds marking items and stocking store shelves, cleaning back areas, and working as a cashier. She worked at John's Market Place for Karen Anderson as a stocker, janitor, and cashier. She worked at Sierra Wholesale, under her mother, Mary Keaton, doing custodial work and preparing flooring orders for installation.  At Ensign Learning Center, she was required to work for Order Businesses to earn school credit and to pay for her Penn Foster course.

488.    Once Mary Ann graduated from high school in 2008, she was sent to work at the Order Bank. First, she worked with other children in the back room of the Order Bank office on Angelo Avenue.  This was the accounts payable department. Her task was to enter data to create invoices for Order Businesses showing the earnings of the businesses' employees. She would then give these invoices to her supervisor, Carrie Hughes, who would pass them to Dorothy Sanders in the accounts payable department. Dorothy Sanders would use the invoices to create paychecks for the businesses' adult and child employees. Second, at times, Mary Ann also worked in accounts payable where the paychecks were printed. Third, she and other children worked under Lisa Kingston, Jolene Sanders and Crystal Young, in another backroom at the Order Bank's office at 10 Century Park Way. The children's job at this location was to take the paychecks that had been printed on Angelo Avenue and endorse them by forging the Order Businesses' employees' signatures on thousands of paychecks. The paychecks were then deposited into an account in the name of the DCCS at Brighton Bank. Throughout this process, the adult and child employees never saw their paychecks.

489.    At the 10 Century Park Way office, Mary Ann and other children were also required to sign the names of Order members on tax returns, social security checks and other documents, many of which instruments were deposited in real banks. The children took turns so that the false signatures did not look the same, but for certain signatures they had to practice so the forgery looked spot on. For some elite Order members such as Rachel Orlean Kingston Young, David Elden Kingston, Carl Kingston, Paul Elden Kingston, Sr., and others, the children were instructed to use signature stamps.

490.    Around the age of 16 or 17, Mary Ann was instructed by her Ones Above to transfer to the Financials Department at the Order Bank's 10 Century Park Way office, working under Susan Johnson and Colleen Livingston, reporting directly to Paul Elden Kingston Sr. She also worked under Paul Elden Kingston Sr.'s orders, alongside Grace Mitchell and Kyle Kingston, at Mitchell & Associates, an Order accounting company that provides Order members tax and accounting services for the benefit of the Order. Her work for Paul Elden Kingston, Sr. included doing financials and taxes for some 32 Order Businesses, meaning she was directed by Paul Elden Kingston, Sr. and others to, *inter alia*, create false expenses and invoices.

491.    Not only did Mary Ann work directly for Paul Elden Kingston, Sr., but she was also required to meet with him to discuss her expected Order Marriage. Although she had been raped by two men when she was younger—and in the eyes of the Order was not a virgin—Paul Elden Kingston, Sr. said he would deal with one of the perpetrators and directed her not to talk with law enforcement.

492.    Mary Ann obtained her driver license at age 18, but her parents as her direct Ones Above, did not allow her to physically keep it because it "gave a girl too much freedom." She was, however, expected to drive to her Order jobs.

493.    In 2012, at age 19, she was taken against her will to Idaho to be isolated and punished until

she agreed to be placed in the Order Marriage chosen for her. In Idaho, she refused to speak with her grandfather, Dan Brown, about marriage. As a result, she was further punished by having to work on the Order's Idaho potato farm. She was never paid for her work.

494.    Mary Ann did not want to stay in Idaho. When the opportunity came to sneak back to Utah, she climbed into her uncle's truck and refused to get out. When she finally got back to Utah she ran away and stayed with relatives who she thought were safe. While with these relatives, however, she was pressured to stay in the Order. She made it clear that the only way she would not leave is if she could marry John Andrew Robinson. He was not her "First Choice," according to her Ones Above, but to get her back, the Order reluctantly agreed.

495.    Mary Ann understood that she would get raises at her Order job as a financial reward for entering into her Order Marriage and for having each of her children.

496.    After her Order Marriage to Andrew, she was assigned to work at A-1 Disposal under John Daniel Kingston, Sr., where she prepared financials and taxes for the Order Bank and many of his companies, including AAA Security, A-Fab Engineering, A-1 Disposal, A-Action Express, and Washakie Ranch.

497.    In March 2013, after Mary Ann had her first child, she started to operate her own daycare but continued to do financials for John Daniel Kingston, Sr., and, because she did financials, she was required to continue attending year-end meetings held by Paul Elden Kingston, Sr. for all Order Businesses. She did financials for A-Action Express through April 2017.

498.    Advance Vending, Cory Jensen, and Jacob Kingston obtained Mary Ann's uncompensated labor for Defendants at Advance Vending. Family Stores True Value, Susie Nelson and Lorna Reynolds obtained Mary Ann's uncompensated labor for Defendants at that store. John's Market Place and Karen Anderson obtained Mary Ann's uncompensated labor for Defendants at Johns's Market Place. Sierra Wholesale and Mary Keaton obtained Mary Ann's uncompensated labor for

Defendants at Sierra Wholesale. The Order Bank, Carrie Hughes, Dorothy Sanders, Lisa Kingston, Jolene Sanders, and Crystal Young obtained Mary Ann's uncompensated labor for Defendants at the Order Bank. Paul Elden Kingston, Sr. and 32 Order Businesses obtained Mary Ann's uncompensated labor for Defendants. The Order's Idaho potato farm and Dan Brown obtained Mary Ann's uncompensated labor for Defendants at the farm. A-1 Disposal and John Daniel Kingston, Sr. obtained Mary Ann's uncompensated labor for Defendants.

499.    Mary Ann left the Order in 2018 for many reasons, including for getting into trouble again because she had been contacted by law enforcement and needed protection from one of her rapists who was again stalking her. When she left, she was told that she had nothing in her Order account despite not being paid for her forced labor.

500.    If Mary Ann had refused to work as directed, she, and likely her husband and children, would have been punished severely and suffered serious harm both emotionally and to their reputation within the Order. To date, Mary Ann has not been fairly compensated for her labor at the Order Businesses where she was required to work.

501.    From the time Mary Ann started working for Order Businesses as a child, she had been taught to falsify records and fear law enforcement. After she was raped as a child, she was punished and directed not to speak with law enforcement. When she left the Order, she was indoctrinated, frightened for her children, and confused.

502.    In December 2018, she gave birth to her fifth child, a daughter, and was informed that her daughter would not live. The hospital crisis worker visited with her while she believed her daughter was dying. During those discussions, something "clicked" in Mary Ann's mind. She, for the first time, started to see the Order for what it was and resolved to leave with Andrew and her children, including her daughter who survived.

## VIII. FIRST CAUSE OF ACTION
## LABOR TRAFFICKING IN VIOLATION OF FEDERAL LAW

503.    Plaintiffs, Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson ("First Cause of Action Plaintiffs" or "Plaintiffs") incorporate in this First Cause of Action the allegations contained in the other paragraphs of this Complaint and allege labor trafficking, pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589, 1590 and 1595, against the "First Cause of Action Defendants" as follows.[16]

504.    Amanda Grant alleges labor trafficking against Fidelity Lending aka the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston, Sr., and Defendants in paragraphs 217, 222 and 225; Advanced Copy, Jesse Orvil Kingston, Paul Elden Kingston, Sr., and Defendants in paragraphs 218 and 225; John's Market Place, Hyrum Dalton Kingston, and Defendants in paragraph 219 and 225; and Ensign Learning Center, Hyrum Dalton Kingston, and Defendants in paragraphs 220 and 225.

505.    Jenny Kingston alleges labor trafficking against Advance Vending and Defendants in paragraphs 271 and 279; Family Stores True Value and Defendants in paragraphs 271, 272 and 279; the Order Bank aka Century Office, Rachel Ann Kingston Young, Deborah Williams, Paul Elden Kingston, Sr., and Defendants in paragraphs 271 and 279; Standard Restaurant Supply and the Defendants in paragraphs 271, 276 and 279; A-1 Disposal, John Daniel Kingston, Sr., and Defendants in paragraphs 272, 276 and 279; Ensign Learning Center and Hyrum Dalton Kingston, and Defendants in paragraphs 273 and 279; and WRE, United Fuel Supply, UFS Management,

---

[16] Under the TVPRA, a plaintiff does not need to sue her direct supervisors to bring a claim against the entity they worked for. *J.L. v. Best Western International, Inc.*, 521 F.Supp. 3d 1048 (D. Colo. 2021). In this action, Plaintiffs have not named as Defendants all of the individuals who were involved in their trafficking.

Sally Kingston, Rachel Ann Kingston Young, Jacob Ortell Kingston, and Defendants in paragraphs 273-4 and 279.

506.    Jana Johnson alleges labor trafficking at paragraphs 322-3 against Fidelity Lending and Defendants; the Order Bank, Deborah Willians, Paul Elden Kingston, and Defendants; Property Compliance, Paul Elden Kingston, Sr., and Defendants; and Standard Restaurant Supply and Defendants.

507.    Julie Green alleges labor trafficking against the Order and Defendants in paragraph 346; the Order Office aka Century Office and Defendants in paragraphs 347-9; Garco Property Management and Defendants in paragraphs 348-9; Arrow Real Estate and Defendants in paragraphs 348-9; and Jason Ortell Kingston and Defendants in paragraphs 348-9.

508.    Michelle Michaels alleges labor trafficking against American Digital Systems, Jesse Orvil Kingston, and Michelle Afton Michaels and Defendants in paragraphs 359-62, 366-7 and 370; the Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston, Sr., and Rachel Orlean Kingston Young and Defendants in paragraphs 361 and 370; and AAA Communications, Jesse Orvil Kingston, Michelle Afton Michaels and Defendants in paragraphs 362 and 370.

509.    Allison Eames alleges labor trafficking against A-1 Disposal, John Daniel Kingston, Sr. and the Defendants in paragraphs 391, 392 and 394; Washakie Ranch and Valerie Martin and Defendants in paragraphs 391 and 394; April McKay and Defendants in paragraphs 392 and 394; the Order Bank and the Defendants in paragraphs 393-4; John's Market Place and Defendants in paragraphs 393-4; and  Family Stores True Value and Defendants in paragraphs 393-4.

510.    Priscilla Tucker alleges labor trafficking against Standard Restaurant Supply, and Defendants in paragraphs 414, 419 and 427; Family Store True Value and Defendants in paragraphs 415, 417-8 and 427; Ensign Learning Center, Hyrum Dalton Kingston, Patricia Kingston, and Paul Elden Kingston, Sr. and Defendants in paragraphs 416-7 and 427. CTC

Trucking, Jacob Ortell Kingston, Sr., and Defendants in paragraphs 421 and 427; Rachel Ann Kingston and Defendants in paragraphs 422 and 427; and WRE and Defendants in paragraphs 424-5 and 427.

511.    Brenda Collins alleges labor trafficking against John Daniel Kingston, Sr. and Defendants in paragraphs 442 and 449; A-1 Disposal and John Daniel Kingston, Sr. and Defendants in paragraphs 442 and 449; the Order and Defendants as alleged in paragraphs 443 and 449; and Family Store True Value and Defendants in paragraphs 448-9.

512.    Alex Martin alleges labor trafficking against Washakie Ranch and John Daniel Kingston, Sr. and Defendants in paragraphs 462-3, 466 and 469; John Daniel Kingston, Sr. and Defendants in paragraphs 464 and 469; A&W, The Food Group and Jacob Ortell Kintston, Sr. and Defendants in paragraphs 465 and 469; and American Wellness and Rehab Clinic and John Daniel Kingston, Sr. and Defendants in paragraphs 467-9.

513.    Mary Ann Robinson alleges labor trafficking against Advance Vending and Defendants in paragraphs 487 and 498; Family Stores True Value and Defendants in paragraphs 487 and 498; John's Market Place and Defendants in paragraphs 487 and 498; Sierra Wholesale and Defendants in paragraphs 487 and 498; the Order Bank (two locations) and Defendants in paragraphs 488-9 and 498; Paul Elden Kingston, Sr. and Defendants in paragraphs 490, 497-8; the Order and Defendants in paragraphs 493-4 and 498; and A-1 Disposal and John Daniel Kingston, Sr. and Defendants in paragraphs 496-8.

514.    As alleged in the General Allegations Made by Each Plaintiff (paragraphs 74-180) and as further detailed in Additional Specific Allegations by Each Plaintiff (paragraphs 181-502), the "First Cause of Action Defendants" as identified above in this First Cause of Action, knowingly provided or obtained the labor or services of the First Cause of Action Plaintiffs by various unlawful means, including, for example, the Numbered Men scheme, the Law of One Above

Another, the Pure Kingston Blood Line, the First Choice manipulation, Engagement Meetings, Order Marriage, and the requirement to have children---all to lock Plaintiffs into the Order as entrapped laborers.

515.    These unlawful means or methods included force, coercion, fraud, collusion or physical restraint, or threats of force or physical restraint, to make Plaintiffs, as minors, religious martyrs in violation of federal law as specifically alleged, for example at paragraphs 226-7 for Amanda, 239 and 281 for Jenny, 315 and 324 for Jana, 341 and 351 for Julie, 378 for Michelle, 391 and 403 for Allison, 422, 428 and 434 for Priscilla, 434, 451-2 for Brenda,  462 and 470 for Alex, and 493 and 500 for Mary Ann.

516.    The unlawful means or methods also included serious harm or threats of serious harm in the form of devices, schemes, plans, or patterns intended to cause Plaintiffs to believe that, if they did not perform labor or services they would suffer retribution in the form of psychological, financial, or reputational harm, that was sufficiently serious, under the surrounding circumstances, to compel them to perform or to continue performing labor or services to avoid that retribution, as alleged, for example, at paragraphs 226 for Amanda, 281 for Jenny, 324 for Jana, 351 for Julie, 378 for Michelle, 403 for Allison, 428 for Priscilla, 451 for Brenda,  470 for Alex, and 500 for Mary Ann.

517.    The unlawful means or methods also included abuse of process or threatened abuse of process by denying Plaintiffs access to child protective services, access to juvenile courts, and access to the judicial system, by threats which under the surrounding circumstances was sufficient to prevent Plaintiffs from obtaining that processes as alleged, for example, at paragraphs 105, 127, 192-201, 410-13 and 431.

518.    The unlawful means or methods also included abuse of process or threatened abuse of process by indoctrinating Plaintiffs to fear governments, law enforcement, judicial systems, and

child protective services and to have a deep contempt for the rule of law—all through the Order's indoctrination, devices, schemes, plans, or patterns, which under the surrounding circumstances was sufficient to prevent Plaintiffs form obtaining that processes as alleged, for example, at paragraphs 77, 105, 129, 153, 227, 230, 375 and 501.

519. The unlawful means or methods also included abuse of process or threatened abuse of process by involuntarily involving Plaintiffs in criminal conduct, which under the surrounding circumstances was sufficient to prevent Plaintiffs form obtaining that processes---until after they realized that they had been involved in actual criminal conduct as minors and would not be held responsible for that involvement.

520. In this manner, the First Cause of Action Defendants knowingly provided or obtained the labor or services of the First Cause of Action Plaintiffs by various unlawful means or methods.

521. The First Cause of Action Defendants have either direct liability for Plaintiffs' labor trafficking because of their own acts and omissions and because they knew or should have known that their acts and omissions violated the TVPRA, or indirect liability because the acts, omission and state of mind of others, who knew or should have known that their acts and omissions violated the TVPRA, is imputed to them.

522. The First Cause of Action Defendants knowingly benefited financially and by receiving value from their participation in acts or omissions that they knew or should have known would violate the TVPRA, including by obtaining, providing, and profiting from the Plaintiffs' labor and services.

523. The wages that Plaintiffs earned and should have received were denied them and taken to benefit the First Cause of Action Defendants who knew or should have known that the profits and wages they received were obtained from the forced labor of Plaintiffs.

524. The First Cause of Action Defendants' acts and omissions occurred in and/or affected

interstate commerce.

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson pray for relief as set forth below.

## IX. SECOND CAUSE OF ACTION
## SEX TRAFFICKING IN VIOLATION OF FEDERAL LAW

525.    Plaintiffs, Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green ("Second Cause of Action Plaintiffs") incorporate in this Second Cause of Action the allegations contained in the other paragraphs of this Complaint and allege sex trafficking, pursuant to 18 U.S.C. § 1591 of the TVPRA, against the "Second Cause of Action Defendants" as follows. [17]

526.    Jenny Kingston alleges sex trafficking against Jacob Daniel Kingston Jr. and Defendants Order in paragraphs 234-270; Jacob Ortell Kingston, Sr. and the Defendants in paragraphs 236-9, 241-50, 252-61 and 270; Sally Kingston and Defendants in paragraphs 238-9, 241-2, 247-50, 252-4, 261 and 270; John Daniel Kingston, Sr. and Defendants in paragraphs 238-9, 243-50, 261-5 and 270; John Daniel Kingston, Jr. and Defendants in paragraphs 238, 261-7 and 270; Jeremy Ortell Kingston, Sr. and Defendants in paragraphs 234-5, 239-43, 247-50 and 270; and Paul Elden Kingston, Sr. and Defendants in paragraphs 238-242, 246-50, 252, 255, 262-65 and 268-270.

527.    Jana Johnson alleges sex trafficking against Daniel Charles Kingston and Defendants in paragraphs 290-321; Paul Elden Kingston, Sr. and Defendants in paragraphs 284-99, 302-5, 307-8, 312-9 and 321; Patricia Kingston and Defendants in paragraphs 284-93, 295-9, 302-5, 307-8 and 321; and Kent William Johnson and Defendants in paragraphs 284-93, 295-9, 302-5, 307-8 and 321.

---

[17] A plaintiff does not need to sue her supervisors under the TVPRA to bring a sex trafficking claim. *J.L. v. Best Western International, Inc.*, 521 F.Supp. 3d 1048 (D. Colo. 2021). In this action, Plaintiffs have not named as Defendants all of the individuals who were involved in sex trafficking.

528.     Julie Green alleges sex trafficking against Defendants in paragraphs 327-9 and 345; Paul Elden Kingston, Jr. and Defendants in paragraphs 331-45; Paul Elden Kingston, Sr. and Defendants in paragraph 331-6, 338-43 and 345; and Patricia Kingston and Defendants in paragraphs 331-6, 340-3 and 345.

529.     As alleged in the General Allegations Made by Each Plaintiff (paragraphs 74-180) and as further detailed in Additional Specific Allegations by Each Plaintiff (paragraphs 181-502), the Second Cause of Action Defendants used, for example, the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood Line, the Number On Choice or First Choice manipulation, Engagement Meetings, Order Marriage, and the requirement to have children to determine who the Second Cause of Action Plaintiffs marry, coerce when they have sexual relations, require that they get pregnant young and often, and make it increasingly difficult for them to  leave the Order.

530.     In this manner, the Second Cause of Action Defendants knowingly controlled the Second Cause of Action Plaintiffs sexually to maximize the number of children produced in the Order to increase Order membership, and obtain an ongoing supply of workers and female offspring to continue the Order's unlawful labor and sexual practices.

531.     To accomplish this, the Second Cause of Action Defendants recruited, enticed, harbored, provided, obtained, and maintained the Second Cause of Action Plaintiffs and caused them to engage in sexual acts by various unlawful means or methods, including, for example, the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood Line, the First Choice manipulation, Engagement Meetings, underage, bigamous and/or incestuous Order Marriages, and by other unlawful means when applied to Plaintiffs, as minors, entrapped them in the Order for the purpose of providing sex to their Order husbands and having children to benefit Defendants.

532.    Second Cause of Action Defendants caused Jenny, Jana, and Julie to engage in sexual acts with their Order husbands by force, fraud, or coercion, including threats of serious harm, physical restraint, and schemes intended to cause them to believe that failure to engage in sexual intercourse with their Order husbands would result in serious harm. Jenny and Jana were also under 18 years of age when some of the sexual acts occurred.

533.    The Second Cause of Action Defendants' conduct and actions in support of their sex trafficking endeavors occurred in and/or affected interstate commerce. Jenny was taken to Nevada (¶ 254), Oregon (¶ 254), California (¶ 254), and Turkey (¶ 253). Jana was taken to Hawaii (¶ 304). Julie was taken to the British Virgin Islands (¶ 333). In these locations, Jenny, Jana, and Julie had sexual intercourse with their Order husbands. Julie was also taken to California and Pennsylvania and restrained there in an attempt to have her engage in further sexual relations with her Order husband (¶¶ 340-3).

534.    Jenny, Jana, and Julie's sexual acts constituted commercial sex acts for purposes of the TVPRA because value was given and received on account of their sex acts.

535.    The Second Cause of Action Defendants received value within the Order on account of Jenny's Order Marriage, sexual intercourse with her Order husband, the birth of her two children as workers for the Order, and their increased standing in the Order. Jenny was given and received value in the form of raises at her Order jobs for her Order Marriage and the birth of her children, trips to various places, and increased standing in the Order, which, at the time, she considered valuable and necessary for her survival in the Order.

536.    The Second Cause of Action Defendants received value within the Order on account of Jana's Order Marriage, sexual intercourse with her Order husband, and his increased standing in the Order. Jana was given and received value in the form of a raise at her Order job for her Order

Marriage, a trip to Hawaii, and increased standing in the Order, which, at the time, she considered valuable and necessary for her survival in the Order.

537.    The Second Cause of Action Defendants received value within the Order on account of Julie's Order Marriage, sexual intercourse, pregnancy, and their increased standing in the Order. Julie was given and received value in the form of a raise at her Order job for her Order Marriage, a trip to the British Virgin Islands, and increased standing in the Order, which, at the time, she considered valuable and necessary for her survival in the Order.

538.    The Second Cause of Action Defendants knew or should have known their actions would violate the TVPRA and that value was given and received as a result of those violations.

WHEREFORE, Plaintiffs, Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green, pray for relief as set forth below.

## X. THIRD CAUSE OF ACTION
## VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT

539.    Jenny Kingston, Jana Nicole Johnson, and Alex Martin ("Third Cause of Action Plaintiffs") incorporate herein the allegations contained in the other paragraphs of this Complaint and allege, pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 206, 216 ("FLSA"), against the "Third Cause of Action Defendants" as follows.

540.    For purposes of Jenny's FLSA claims, she alleges that she was an employee of Defendants through certain Order Businesses and certain individuals who acted directly or indirectly in the interest of these Order Businesses and Defendants in relation to Jenny's employment.

541.    Specifically, Jenny alleges a direct employee-employer relationship for purposes of the FLSA against Advance Vending in paragraphs 271 and 279; Family Stores True Value in paragraphs 271-2 and 279; the Order Bank aka Century Office, Rachel Ann Kingston Young, Deborah Williams, and Paul Elden Kingston, Sr. in paragraphs 271 and 279; Standard Restaurant Supply in paragraphs 271, 276 and 279; A-1 Disposal and John Daniel Kingston, Sr. in paragraphs

272, 276 and 279; Ensign Learning Center and Hyrum Dalton Kingston in paragraphs 273 and 279; and WRE, United Fuel Supply, Sally Kingston, Rachel Ann Kingston Young and Jacob Ortell Kingston in paragraphs 273-4 and 279.

542.    For purposes of Jana's FLSA claims, she alleges that she was an employee of Defendants through certain Order Businesses and certain individuals who acted directly or indirectly in the interest of these Order Businesses in relation to Jana's employment.

543.    Specifically, at paragraphs 322-3, Jana alleges a direct employee-employer relationship for purposes of the FLSA against Fidelity Lending, the Order Bank, Deborah Williams, Paul Elden Kingston, Property Compliance, Paul Elden Kingston, Sr., and Standard Restaurant Supply.

544.    For purposes of Alex's FLSA claims, she alleges that she was an employee of Defendants through certain Order Businesses and certain individuals who acted directly or indirectly in the interest of these Order Businesses in relation to Alex's employment.

545.    Specifically, Alex alleges a direct employee-employer relationship for purposes of the FLSA against Washakie Ranch and John Daniel Kingston, Sr. in paragraphs 462-3, 466 and 469; John Daniel Kingston, Sr. in paragraphs 464 and 469; A&W, The Food Group, and Jacob Ortell Kingston, Sr. in paragraphs 465 and 469; and American Wellness and Rehab Clinic and John Daniel Kingston, Sr. in paragraphs 467-9.

546.    The surviving six of the Seven Kingston Brothers, John Daniel Kingston, Sr., Hyrum Dalton Kingston, Paul Elden Kingston, Sr., David Ortell Kingston, Sr., Jesse Orvil Kingston, and Jason Ortell Kingston, are included in this claim as Third Cause of Action Defendants because they had substantial control over the terms and conditions of the Third Cause of Action Plaintiffs' employment. They, under Paul Elden Kingston, Sr., had the authority to hire, fire, supervise, and control work schedules, determine conditions of employment, determine rates and methods of payment, and maintain the employment records of the Third Cause of Action Plaintiffs.

547.    The Third Cause of Action Defendants were engaged in commerce or in the production of goods for commerce, or the Third Cause of Action Plaintiffs were engaged in commerce or the production of goods for commerce. On information and belief, the Third Cause of Action Defendant entities each also had annual revenues of $500,000 or more. Defendant entities also had an annual revenues of $500,000 or more.

548.    The Third Cause of Action Defendants did not pay the Third Cause of Action Plaintiffs the required minimum wage nor compensate them for overtime hours at a rate of 1.5 times the normal hourly rate for hours worked over 40 in a week.

549.    By failing to pay the Third Cause of Action Plaintiffs any wages, minimum wages and/or overtime wages for the hours they worked, the Third Cause of Action Defendants failed to comply with the FLSA.

550.    The failure of the Third Cause of Action Defendants to pay the Third Cause of Action Plaintiffs any minimum and/or overtime wages was willful and intentional. Indeed, as a regular practice of its businesses, Defendants routinely fail to pay Order employees their minimum and overtime wages and, in fact, frequently pay Order employees no wages at all.

551.    The Third Cause of Action Defendants were aware of their obligation to comply with the wage and hour requirements of the FLSA.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Alex Martin pray for relief as set forth below.

### XI. FOURTH CAUSE OF ACTION
### INVOLUNTARY SERVTUDE

552.    Plaintiffs, Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson ("Fourth Cause of Action Plaintiffs" or "Plaintiffs") incorporate in this Fourth Cause of Action the allegations contained in the other paragraphs of this Complaint and further

allege claims for involuntary servitude, pursuant to 18 U.S.C. § 1584 of the TVPRA as follows.

553.    Amanda Grant alleges involuntary servitude against Fidelity Lending aka the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston, Sr., and Defendants in paragraphs 217, 222 and 225; Advanced Copy, Jesse Orvil Kingston, Paul Elden Kingston, Sr., and Defendants in paragraphs 218 and 225; John's Market Place, Hyrum Dalton Kingston, and Defendants in paragraph 219 and 225; and Ensign Learning Center, Hyrum Dalton Kingston, and Defendants in paragraphs 220 and 225.

554.    Jenny Kingston alleges involuntary servitude against Advance Vending and Defendants in paragraphs 271 and 279. Family Stores True Value and Defendants in paragraphs 271, 272 and 279; the Order Bank aka Century Office, Rachel Ann Kingston Young, Deborah Williams, Paul Elden Kingston, Sr., and Defendants in paragraphs 271 and 279; Standard Restaurant Supply and Defendants in paragraphs 271, 276 and 279; A-1 Disposal, John Daniel Kingston, Sr., and Defendants in paragraphs 272, 276 and 279; Ensign Learning Center, Hyrum Dalton Kingston, and Defendants in paragraphs 273 and 279; and WRE, United Fuel Supply, UFS Management, Sally Kingston, Rachel Ann Kingston Young, Jacob Ortell Kingston, and Defendants in paragraphs 273-4 and 279.

555.    Jana Johnson alleges involuntary servitude at paragraphs 322-3 against Fidelity Lending and Defendants; the Order Bank, Deborah Willians, Paul Elden Kingston, and Defendants; Property Compliance, Paul Elden Kingston, Sr., and Defendants; and Standard Restaurant Supply and Defendants.

556.    Julie Green alleges involuntary servitude against Defendants in paragraph 346; the Order Office aka Century Office and Defendants in paragraphs 347-9; Garco Property Management and Defendants in paragraphs 348-9; Arrow Real Estate and the Order in paragraphs 348-9; and Jason Ortell Kingston and Defendants in paragraph 348-9.

557.    Michelle Michaels alleges involuntary servitude against American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, the Order Bank and Defendants in paragraphs 359-62, 366-7 and 370; the Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston, Sr., Rachel Orlean Kingston Young and Defendants in paragraphs 361 and 370; AAA Communications, Jesse Orvil Kingston, Michelle Afton Michaels and Defendants in paragraphs 362 and 370.

558.    Allison Eames alleges involuntary servitude against A-1 Disposal, John Daniel Kingston, Sr. and the Order in paragraphs 391, 392 and 394; Washakie Ranch, Valerie Martin and the Order in paragraphs 391 and 394; April McKay and the Order in paragraphs 392 and 394; the Order Bank and the Order in paragraphs 393-4; John's Market Place and the Order in paragraphs 393-4; and Family Stores True Value and the Order in paragraphs 393-4.

559.    Priscilla Tucker alleges involuntary servitude against Standard Restaurant Supply and the Defendants in paragraphs 414, 419 and 427; Family Store True Value and the Order in paragraphs 415, 417-8 and 427; Ensign Learning Center, Hyrum Dalton Kingston, Patricia Kingston, Paul Elden Kingston, Sr., and Order in paragraphs 416-7 and 427. CTC Trucking, Jacob Ortell Kingston, Sr., and the Order in paragraphs 421 and 427; Rachel Ann Kingston and the Order in paragraphs 422 and 427; and WRE and the Order in paragraphs 424-5 and 427.

560.    Brenda Collins alleges involuntary servitude against John Daniel Kingston, Sr. and the Order in paragraphs 442 and 449; A-1 Disposal, John Daniel Kingston, Sr. and the Order in paragraphs 442 and 449; the Order as alleged in paragraphs 443 and 449; and Family Store True Value and the Order in paragraphs 448-9.

561.    Alex Martin alleges involuntary servitude against Washakie Ranch, John Daniel Kingston, Sr. and the Defendants in paragraphs 462-3, 466 and 469; John Daniel Kingston, Sr. and the Order in paragraphs 464 and 469; A&W, The Food Group, Jacob Ortell Kingston, Sr. and the Order in

paragraphs 465 and 469; and American Wellness and Rehab Clinic, John Daniel Kingston, Sr. and the Defendants in paragraphs 467-9.

562.    Mary Ann Robinson alleges involuntary servitude against Advance Vending and the Order in paragraphs 487 and 498; Family Stores True Value and the Order in paragraphs 487 and 498; John's Market, Karen Anderson and the Defendants in paragraphs 487 and 498; Sierra Wholesale and the Defendants in paragraphs 487 and 498; the Order Bank and the Defendants in paragraphs 488-9 and 498; Paul Elden Kingston, Sr. and the Defendants in paragraphs 490, 497-8; the Order's Idaho potato farm and the Defendants in paragraphs 493 and 498; and A-1 Disposal, John Daniel Kingston, Sr., and the Defendants in paragraphs 496-8.

563.    As alleged in the General Allegations Made by Each Plaintiff (paragraphs 74-180) and as further detailed in Additional Specific Allegations by Each Plaintiff (paragraphs 181-502), the First Cause of Action Defendants knowingly provided or obtained the labor or services of the First Cause of Action Plaintiffs by various unlawful means or methods, including, for example, the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood Line, Engagement Meetings, Order Marriage, and the requirement to have children to determine who the Second Cause of Action Plaintiffs marry, coerce when they have sexual relations, require that they get pregnant young and often—all to lock Plaintiffs into the Order and entrap them in involuntary servitudes.

564.    The Fourth Cause of Action Plaintiffs bring this claim against the "Fourth Cause of Action Defendants" identified in this Fourth Cause of Action, for relief under the private cause of action implied by the Thirteenth Amendment to the United States Constitution and under 18 U.S.C. § 1584 both of which prohibit involuntary servitude.

565.    The Fourth Cause of Action Defendants acting individually and in concert through the Order placed Plaintiffs in a condition of involuntary servitude as feared in 1987 when the Order's

Board was warrened of "a terrible condition of oppression and minor slavery throughout the Order."

566.    Specifically, the Fourth Cause of Action Defendants compelled Plaintiffs into involuntary servitude to perform labor or services against their will for the Fourth Cause of Action Defendants and the Order as detailed in  paragraphs 217-22, 224-5 for Amanda, paragraphs 235, 271-6 for Jenny Kingston, paragraphs 323-6 for Jana, paragraphs 328-9, 332-7 and 339-44 for Julie, paragraphs 363-5, 366-7 for Michelle, paragraphs, 391-5 for Allison, paragraphs 414-9, 421-2, 427 for Priscilla, paragraphs 442-3, 448-9 for Brenda, paragraphs 461, 463-7, 469, 471 for Alex, and  paragraphs 487, 490, 493, 496-8 for Mary Ann.

567.    The Fourth Cause of Action Defendants knowingly and willfully used the Order's schemes, plans, or patterns to induce or coerce the Fourth Cause of Action Plaintiffs into involuntary servitude as children. For example, as alleged throughout this pleading, the Fourth Cause of Action Defendants employed the Numbered Men scheme, the Law of One Above the Other, the Pure Kingston Blood Line, the First Choice manipulation, Engagement Meetings, underage, bigamous and/or incestuous Order Marriages, and other Order practices such as its indoctrination of children to fear governments, law enforcement, judicial systems, child protective services, and the development of contempt for the rule of law, and other unlawful means that when applied to Plaintiffs, as minors, entrapped them in the Order and created and perpetuated an ongoing system of involuntary servitude.

568.    These practices, as applied to Plaintiffs as children, indoctrinated and controlled them, which made them highly vulnerable to involuntary servitude when they were most susceptible to coercion and threats, particularly while they were minors and/or as young mothers. As a result, when Plaintiffs grew, they had to either flee the Order or were placed in Order Marriages, had children, and effectively became entrapped and dependent on the Order as generally alleged, for

example in paragraphs 102-3 and 156-7.

569.    The Fourth Cause of Action Defendants intended to and did cause Plaintiffs to believe that, if they did not enter into or continue in their conditions of involuntary servitude, they would suffer serious harm or physical restraint or be threatened with the same as set forth generally in paragraphs 75-6, 129-31, 151, 154-6, 174 and 179.

570.    In addition, the Fourth Cause of Action Defendants intended to cause Plaintiffs to continue their involuntary servitude by abusing and threatening to abuse the legal process. They did so through the Order's indoctrination of Plaintiffs to fear governments, law enforcement, judicial systems, child protective services, and a shared contempt for the rule of law as alleged, for example, in paragraphs 77, 111, 119 and 135-37.

571.    Through their actions, as alleged herein, the Fourth Cause of Action Defendants directed, assisted, conspired, and acted to make Plaintiff's involuntary servants of the Order in violation of the United States Constitution and laws.

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson pray for relief as set forth below.

## XII. FIFTH CAUSE OF ACTION
## PLAINTIFFS CIVIL CONSPIRACY

572.    Plaintiffs, Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson ("Fifth Cause of Action Plaintiffs" or "Plaintiffs") incorporate in this Fifth Cause of Action the allegations contained in the other paragraphs of this Complaint and further allege a civil conspiracy as follows.[18]

---

[18] Plaintiffs do not need to sue all the conspiracy's co-conspirators. The Defendants are jointly and severally liable to Plaintiffs for the conspiracy alleged herein. *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223 (10th Cir. 1988).

Second Amended Complaint and Jury Demand | 118

573.    In Utah a civil conspiracy requires five elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, (5) damages as a proximate result thereof.[19]

574.    First, Defendants are a combination of two or more persons. Plaintiffs, for example, have alleged at paragraph 1 that the DCCS is an unincorporated association holding itself out as an "economic cooperative," that the "Order" is a catchall name for the unincorporated association, and that the Order refers to and encompasses the economic cooperative at the center of this action. Plaintiffs have alleged at paragraph 2 that the individual Defendants are current members and participants in the Order and that the Order controls each individual Defendant and operates each entity Defendant. Paragraphs 18 - 74 specifically identify individuals and entities who operate as a combination of two or more persons as part of the Order.

575.    Second, Defendants had and have an object to be accomplished. Throughout this pleading Plaintiffs have identified two intertwined Order objectives.  The first is to have Plaintiffs and other young girls enter underage, bigamous, and/or incestuous Order Marriages, engage in sexual intercourse with their Order husbands, and have as many children as possible. *See e. g.* ¶¶ 98, 100 and 153. The second object is to obtain free labor from Plaintiffs and their children for Order Businesses. *See e.g.* ¶¶ 100 and 224-5. These two objectives are intertwined and form a cycle whereby the Order accomplishes its core object of entrapping children, multiplying births, and continually increasing the number of unpaid child workers for Order Businesses. *See e. g.* ¶¶ 98, 100 and 153. This core object is now institutionalized in the Order as feared by Arduous Gustafson in 1987.

576.    Third, Defendants had and have an ongoing meeting of the minds on their object or course

---

[19] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944.

of action. Their ongoing meeting of minds is evident through the Order's "Numbered Men" structure and Defendants' adherence to the "Law of One Above Another." These overlapping means of assuring and enforcing agreement and a meeting of minds with Paul Elden Kingston, Sr. are generally set forth at paragraphs 148-9, 241, 242-3, 255, 257-8, 289-3,297, 307, 309, 312-4, 316, 320, 328, 330, 332, 339, 341, 371, 406, 408, 410, 412, 453, 456-8, 486-7, 490, 496 and 497.

577.    Plaintiffs' allegations regarding the conduct of Defendants also support a clear inference that their actions, specifically the unlawful Order Marriages and the unpaid child labor practices, are unlikely to have been undertaken without their agreement. Indeed, Defendants were warned in 1987 of the "terrible condition of oppression and minor slavery" that would expand "throughout the Order" if such a meeting of the minds was not corrected.

578.    Moreover, a meeting of minds can reasonably be drawn from the DCCS's website, https://www.dccsociety.org, which currently states that one of the "goals" of its community is to "[p]rotect parent's rights to teach their families the principles they hold dear." Another goal on the community's website is to "[p]rotect children and vulnerable adults from abuse." Defendants have a meeting of the minds that their underage, bigamous, and incestuous marriage practices and their child labor practices are not child abuse.

579.    Fourth, Defendants engaged and continue to engage in one or more unlawful, overt acts. To satisfy this element, a plaintiff must show that defendants participated in an underlying tort.[20] The underlying tort requirement is satisfied by the alleged violation of federal statutes.[21] For example, labor trafficking is unlawful under the TVPRA, 18 U.S.C. § 1581. Sex trafficking is unlawful under the TVPRA, 18 U.S.C. § 1591. The age at which sexual intercourse can be

---

[20] *Puttuck v. Gendron*, 2008 UT App 362, ¶ 22, 199 P.3d 971.
[21] *Scholzen v. Scholzen Products Company, Inc.*, 2020 WL 7630801 3 (citing *Estrada v. Mendoza*, 275 P.3d 1024, 1029 (Utah Ct. App. 2012) (noting alleged violation of a statute as constituting an underlying tort for civil conspiracy claim)).

consensual in the United States under the TVPRA is 18. Involuntary servitude is unlawful under 18 U.S.C. § 1584 and the Thirteenth Amendment. Plural marriage is "forever prohibited" under Article III of Utah's Constitution, illegal pursuant to Utah Code Ann. § 76-7-101, and void under Utah law. Incestuous marriage is illegal under Utah Code Ann. § 76-7-102 and void under Utah Code Ann. § 30-1-1. Underage marriage is illegal under Utah Code Ann. § 76-7-102 and prohibited and void under Utah Code Ann. § 30-1-2.

580.   As to the fourth element, Plaintiffs allege that Defendants violated these statutes and engaged in the tortious conduct alleged herein—all giving rise to civil conspiracy claims. For example, as applied to Plaintiffs as children, the Numbered Men scheme, the Law of One Above the Other, the Pure Kingston Blood Line, the First Choice manipulation, Engagement Meetings, underage, bigamous and/or incestuous Order Marriages amount to unlawful overt acts as alleged throughout this pleading and particularly in paragraphs 152-62. The application of these practices to children indoctrinates and controls them, and as they grow older, it makes them highly susceptible to abuse, effectively entrapped, and dependent on the Order as detailed in paragraphs 153 and 156.

581.   Additional overt acts in furtherance of the conspiracy, include, for example, teaching children to fear outsiders and embedding in them a fear of governments, law enforcement, judicial systems, child protective services, and a contempt for the rule of law—all to hide and justify the crimes needed to advance the Order (¶¶ 75, 111 and 156); not listing fathers on birth certificates to avoid criminal prosecutions and for other illicit reasons (¶¶ 96 and 104); not reporting child abuse (¶ 134); causing children to lie and withhold information about sexual abuse (¶¶ 127 and 135); using children to insulate the Order from its frauds (¶¶ 77 and 119); directing children to shred papers, destroy evidence, hide records, lie to governments and training them to forge, falsify, and fabricate documents (¶¶ 116 and 118); and involving children in Bleeding the Beast and

falsifying tax records (¶¶ 122-6).

582.    Plaintiffs also generally allege at paragraphs 77-81, 84-93, 169 and 171, for example, that they were forced to work for years during their childhoods with little or no pay, denied an ordinary education, and physically abused, or threatened with abuse and denied food and shelter if they failed to work as required. They allege at paragraphs 89-92 that they did not receive paychecks, were lied to about where their income went, that the Order manipulated their Order Statements, and siphoned away their earnings. They allege at paragraph 100 that this exploitation of them constituted overt acts of the conspiracy fueled by the Order's requirement that girls have as many children as possible to provide ongoing free labor.

583.    Plaintiffs' individual allegations of being targeted and coerced through overt acts to provide their child labor for little or no compensation are detailed in paragraphs 217-22 and 224-5 for Amanda, paragraphs 237, 253-4, 271-6 for Jenny Kingston, paragraphs 323-6 for Jana, paragraphs 328-9, 332-7 and 339-44 for Julie, paragraphs 363-5, 366-7 for Michelle, paragraphs, 391-5 for Allison, paragraphs 414-9, 421-2, 427 for Priscilla, paragraphs 442-3, 448-9 for Brenda, paragraphs 461, 463-7, 469, 471 for Alex, and  paragraphs 487-9, 493, 495, 497 for Mary Ann. Specific Defendants directly involved in the labor trafficking are listed in paragraphs 504-13 in the First Cause of Action.

584.    When Plaintiffs each left the Order, they did not receive all of their Order Statements, an accurate accounting of their earnings, or the income that they had earned while working for Order Businesses. These were deliberate and overt acts in furtherance of the ongoing conspiracy and have caused each Plaintiff ongoing harm.

585.    On March 6, 2025, Defendants DCCS, LDCC, Paul Elden Kingston, Sr., Patricia Kingston, the Order, and the Order Bank, etc. have disregarded Plaintiffs' individual request that their Order Statements be emailed to them and have failed to provide the records needed for an accurate

accounting and accurate payment of their earnings. The failures to provide each Plaintiff with her requested information are overt acts in furtherance of the ongoing conspiracy.

586.    Order attorney Carl Kingston responded jointly to each Plaintiffs' request, stating:

> I received your letter with the letters from each of the Defendants you currently represent, requesting copies of their statements.  I have forwarded these on to Davis County Co-operative Society.  In discussing the requests with them, I am advised that they do not have any record of having ever received from any of these individuals any previous request for copies of the statements, contrary to the claims made in each of the letters.  If you have a copy of any such request, please forward a copy of the same to the undersigned.  If you do not, we will consider this to be the first such request and will deal with it accordingly.

> As I am sure you know, it will be impossible to provide the records you have requested by the deadline you mention.  In addition, the policy of Davis County Co-operative in such cases is to request that it be paid for the time involved in such a request, together with a charge for each page of the documents it is asked to produce. We will begin to research the request and advise you of an estimate of the cost once we determine what records we have available.  For your information, many of the records you have requested will undoubtedly fall outside the time period 10449 [sic] of DCCS's record retention policy and are no longer available.

587.    This response again dismisses the requests for copies of Plaintiffs' Order Statements which many Plaintiffs made orally when they left the Order. Their original requests were made to the Order Bank because Defendants represented and caused Plaintiffs to believe that the Order Bank held their earnings, their earnings would be tracked on their Order Statements, and Defendants would keep records of their earnings.

588.    Although it was always the practice and custom for Plaintiffs' to communicate orally with the Order Bank, the ongoing denial of their oral requests for records, an accounting and their income, together with their increasing knowledge of the nature and extent of the Order's ongoing conspiracy caused  them to renew their requests, make their requests in writing and send them not only to the Order Bank but also to Defendants.

589.    The response that there is no record of Plaintiffs' individual oral requests and the treatment of Plaintiffs' recent individual written requests as "the first such requests" are overt acts by Defendants in furtherance of the conspiracy causing Plaintiffs further harm.

590.    Further, the response that it is impossible to provide copies of the Order Statements by Plaintiffs' requested date and that the Davis County Co-operative will charge Plaintiffs for any time involved and for each page are continued efforts to obstruct Plaintiffs' access to their Order Statements and earnings and, as such, are overt acts by Defendants in furtherance of the conspiracy causing further harm to Plaintiffs.

591.    Moreover, Defendants have known of the illegality of their child labor practices for decades. Accordingly, the response that many of the records "will undoubtedly fall outside the time period 10449 [sic] of DCCS's record retention policy and are no longer available" is evidence of a record destruction policy to hide the Order's illegal child labor practices and the spoliation of evidence in furtherance of Defendants' conspiracy causing further harm to Plaintiffs

592.    On March 17, 2025, Plaintiffs responded to Carl Kingston' letter through counsel stating:

> I am in receipt of your March 6, 2025 letter and provided it to my clients. In light of your clients' response, my clients wish to withdraw all money held in their names in the savings accounts, back accounts, or whichever name that your clients now use to describe the account holding my clients earnings accumulated while working for businesses affiliated with your clients and the Davis County Cooperative Society.
>
> We are currently conducting an accounting of those savings based on documents in my clients' possession, and these payments should be quite substantial. After cutting my client's checks, please close their savings accounts and have their checks for their savings available today.  I will have a runner to your office to pick up these checks at 4:00 p.m.  Thank you.

593.    In response, Carl Kingston emailed: "There will be no checks here to pick up.  I am forwarding your letter to Davis County Cooperative Society and will reply when they get back to me." Plaintiffs' counsel replied: "Please let me know where I should have my runner go to pick up my clients' checks at 4:00."

594.    Although it should be a simple thing to close Plaintiffs' Order accounts and issue them checks for their accumulated earnings, there was no further response from Carl Kingston and Defendants did not make Plaintiffs' checks available to them with any final account statements.

595.    In addition, Plaintiffs' individual allegations of being targeted by Defendants sexually are detailed specifically in paragraphs 203-10 and 211-16 for Amanda, paragraphs 234-7,239, 241-2,246-50, 253-4, 260, 265-8 for Jenny, paragraphs 283, 285, 287, 289-91, 295-7, 299, 301-4, 307, 312-4, and 318-20 for Jana, paragraphs 328-9, 322, 335-44 for Julie. These paragraphs identify the specific Defendants involved in the sex trafficking as further detailed in the Second Cause of Action.

596.    With respect to both labor and sexual trafficking, Defendants used a combination of several overt acts, including Numbered Men system, The Law of One Above the Other, the Pure Kingston Blood Line, the Number One Choice or First Choice manipulation, and the Order's indoctrination of fear and contempt for the rule of law are all practices that separately and in combination amount to unlawful overt acts as alleged throughout this pleading and particularly in paragraphs 77-9, 111-2, 138-9, 147-60, 176-9, 217-22, and throughout the Additional Specific Allegations by Each Plaintiff at paragraphs 182-502. These overt acts resulted in Plaintiffs having to either flee the Order or enter into underage, bigamous, and/or incestuous marriages.

597.    Lastly, Plaintiffs have satisfied the fifth element of a civil conspiracy. They alleged at paragraph 76 that they physically escaped the Order after enduring years of physical, sexual, and economic abuse and that they are gradually escaping the indoctrination, brainwashing, and mental abuse which was designed to prevent them from taking action. They also jointly allege that they suffered and continue to suffer damages proximately caused by Defendants. *See* 75-6, 129-31, 151, 154-6, 174 and 179. Finally, the Additional Specific Allegations by Each Plaintiff at paragraphs 200, 217, 281, 304, 318, 321, 334, 337, 339-44, 351-2, 394, 391, 395, 404, 409, 411, 429, 434, 440, 449, 451-2, 471, 473, 493, 499-500 and 594 summarize how they were each injured and are being injured by this ongoing conspiracy.

WHEREFORE, Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie

Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Alex Martin, and Mary Ann Robinson pray for relief as set forth below.

## XIII. SIXTH CAUSE OF ACTION
## SEXUAL BATTERY AND ABUSE OF CHILDREN

598.    Plaintiffs Amanda Grant, Jenny Kingston, and Jana Nicole Johnson ("Sixth Cause of Action Plaintiffs"), incorporate in this Sixth Cause of Action the allegations contained in the above paragraphs of this Complaint and allege, pursuant to Utah Code Ann. § 78B-2-308, as follows.

599.    Amanda Grant alleges sexual battery and abuse of her as a child against John Paul Johnson in paragraphs 187-216.

600.    Jenny Kingston alleges sexual battery and abuse of her as a child against Jacob Daniel Kingston Jr. in paragraphs 232, 234-54.

601.    Jana Johnson alleges sexual battery and abuse of her as a child against Daniel Charles Kingston in paragraphs 283-305.

602.    The "Sixth Cause of Action Defendants" as identified in this Sixth Cause of Action, intentionally sexually abused Amanda, Jenny, and Jana by committing act of sexual abuse, including sexual intercourse on them.

603.    The Sixth Cause of Action Defendants' sexual misconduct was either violent and accomplished through physical force or accomplished as perpetrators under Utah Code Ann. § 78B-2-308.

604.    The Sixth Cause of Action Defendants' sexual contact with the Sixth Cause of Action Plaintiffs was harmful and offensive, and caused the Sixth Cause of Action Plaintiffs to suffer injuries.

WHEREFORE, Plaintiffs Amanda Grant, Jenny Kingston, and Jana Nicole Johnson pray for relief as set forth below.

## XIV. SEVENTH CAUSE OF ACTION
## SEXUAL BATTERY AND RAPE OF ADULTS

605.    Plaintiffs Jenny Kingston, Jana Nicole Johnson,[22] and Julie Ruth Green ("Seventh Cause of Action Plaintiffs") incorporate in this Seventh Cause of Action the allegations contained in the other paragraphs of this Complaint and allege sexual abuse and rape of adults as follows.

606.    Jenny Kingston alleges sexual battery and abuse of her as an adult against Jacob Daniel Kingston Jr. in paragraphs 246-61.

607.    Jana Johnson alleges sexual battery and abuse of her as an adult against Daniel Charles Kingston in paragraphs 305-18.

608.    Julie Green alleges sexual battery and abuse of her as an adult against Paul Elden Kingston, Jr. in paragraphs 332-44.

609.    The Seventh Cause of Action Defendants' subjected the Seventh Cause of Action Plaintiffs to sexual contact and intercourse against their will for the purposes of impregnating or attempting to impregnate the Seventh Cause of Action Plaintiffs to make it difficult for them to leave the Order and to cause them to produce children as workers for the Order.

610.    The sexual batteries and rapes of the Seventh Cause of Action Plaintiffs were caused by the Seventh Cause of Action Defendants' violence and were accomplished through physical force as alleged in detail in this Complaint.

611.    The Seventh Cause of Action Defendants, acting with intent, caused the sexual batteries and rapes of the Seventh Cause of Action Plaintiffs which were harmful and offensive, and caused the Seventh Cause of Action Plaintiffs to suffer injuries.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green pray

---

[22] The sexual battery and rape of Plaintiffs Jenny Kingston and Jana Johnson that occurred after they reached majority were a continuation of the sexual battery and rape Jenny and Jana endured as minors.

for relief as set forth below.

## XV. EIGHTH CAUSE OF ACTION
### NEGLIGENT SEXUAL BATTERY AND ABUSE OF A CHILD

612.   Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green ("Eighth Cause of Action Plaintiffs"), incorporate in this Eighth Cause of Action the allegations contained in the other paragraphs of this Complaint and allege Negligent Sexual Battery and Abuse of a Child, pursuant to Utah Code Ann. § 78B-2-308, as follows.

613.   Jenny Kingston alleges sexual battery and abuse of her as a child against Jacob Daniel Kingston Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., John Daniel Kingston, Jr., Jeremy Ortell Kingston, Sr. and Paul Elden Kingston, Sr.

614.   Jana Johnson alleges sexual battery and abuse of her as a child against Daniel Charles Kingston, Paul Elden Kingston, Sr., Patricia Kingston, and Kent William Johnson.

615.   Julie Green alleges sexual battery and abuse of her as a child against Paul Elden Kingston, Jr., Paul Elden Kingston, Sr., and Patricia Kingston.

616.   The Eighth Cause of Action Plaintiffs were sexually battered and raped as the result of and in furtherance of the negligence the Eighth Cause of Action Defendants as identified in this Eighth Cause of Action.

617.   The Eighth Cause of Action Defendants failed to prevent the child sexual abuse from occurring and failed to report the child sexual abuse to law enforcement when they knew or reasonably should have known of the child sexual abuse and were in positions of responsibility or authority over Jenny, Jana and Julie.

618.   The Eighth Cause of Action Defendants negligently interjected themselves into and promoted the unlawful Order Marriages and resulting sexual contacts and pregnancies or attempted pregnancies of the Eighth Cause of Action Plaintiffs.

619.   The Eighth Cause of Action Defendants knew or should have known that their acts and

Second Amended Complaint and Jury Demand | 128

omissions would, in fact, promote the unlawful Order Marriages and resulting sexual contacts and pregnancies of the Eighth Cause of Action Plaintiffs.

620.    Through their conduct, the Eighth Cause of Action Defendants had and assumed duties not to negligently cause or further the sexual abuses and rapes of the Eighth Cause of Action Plaintiffs.

621.    The Eighth Cause of Action Defendants breached their duties to the Eighth Cause of Action Plaintiffs causing sexual abuse and rapes that were harmful and offensive to the Eighth Cause of Action Defendants causing them to suffer injuries.

WHEREFORE, Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green pray for relief as set forth below.

## XVI. PUNITIVE DAMAGES

The Conduct of Defendants, as alleged herein, was willful and malicious or intentional conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs for which Defendants are liable in punitive damages.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial and pray for individual judgment as follows:

a.    General damages in an amount to be proven at trial;

b.    Special damages in an amount to be proven at trial;

c.    Punitive damages in an amount to be awarded at trial;

d.    Unpaid minimum wages and overtime wages;

e.    Liquidated damages under 29 U.S.C. § 201, et seq.;

f.    Attorney fees and costs, pursuant to 18 U.S.C. § 1595;

g.    Attorney fees and costs, pursuant to 29 U.S.C. § 216(b); and

h.    Attorney fees and costs, pursuant to Utah Code § 77-38-15(3).

Plaintiffs also seek costs, pre- and post-judgment interest, and such other and further relief

as the Court deems just and reasonable.

DATED this 17th day of March 2025.

**HOOLE & KING, L.C.**

*/s/ Roger H. Hoole*, Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of March 2025, I served a true and correct copy of the foregoing on all parties of record via CM/ECF.

/s/ *Roger H. Hoole*

Second Amended Complaint and Jury Demand | 130

**EXHIBIT A**

Partial List of Businesses

- A 1 Disposal
- A & W Restaurants
- AAA Communications
- AAA Security
- A-FAB Engineering
- Advance Copy & Printing
- Advance Vending
- American Digital Systems
- American Wellness & Rehab Clinic, LLC
- Arrow Real Estate and Property Compliance
- Best Distributing
- Bountiful Baby
- Collin Media, LLC
- Commercial Agent Services, LLC
- COP Coal Development Company
- Davis County Cooperative Society
- East Side Market
- Ensign Learning Center, Inc.
- Ensign Learning Center Alumni Association, Inc.
- Ensign Shoe
- Factory Outlet Stores
- Family First Medicine
- Family Stores True Value
- Fidelity Funding Corporation
- Fountain of Youth Health and Athletic Club
- Fountain of Youth Spas
- Garco Industrial Park, aka Garco Property Management
- Garrard's Heating and Air Conditioning, Inc.
- Hiawatha
- John's Marketplace
- Kingston Corporation of the Church of Jesus Christ of Latter
- Latter Day Church of Christ
- LDCC Little Red School House Montessori
- Mitchell & Associates
- Mountain Coin Machines Distributors
- Premier Catering & Food Services, LLC
- Ralph's Milk Farm
- Redwood Grocery & Health Foods
- Shoppers Pawn
- Sportsmans Pawn
- Standard Industries
- Standard Industries, LLC
- Standard Restaurant Supply
- Standard Restaurant Supply, Inc. Davis County Cooperative
- Washakie Ranch
- Washakie Food
- Washakie Renewable Energy
- World Enterprises
- Xtreme Pawn
- Zion Ponderosa Ranch Resort
- ZMP
- Coal Trucking Company
- Coal Valley, LLC, aka Valley Coal
- Best Distributing Coin Operating, Inc.
- The Master Steward Fund
- Desert Tech Munitions LLC
- Desert Teck LLC
- DU Business
- Sahara Dunes Casino L.P. dba Lake Elsinore Hotel and Casino
- Latter Day Church of Christ and its Successors, LLC
- Washakie Foods