# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMANDA RAE GRANT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PAUL ELDEN KINGSTON, SR., et al. <br><br> Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, DENYING PLAINTIFFS' MOTION TO CONSOLIDATE, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT, AND DENYING AS MOOT DEFENDANTS' MOTIONS TO QUASH** <br><br> Case No. 2:24-cv-00155 <br><br> District Judge Ann Marie McIff Allen <br><br> Magistrate Judge Jared C. Bennett |

## **INTRODUCTION**[1]

Plaintiffs are ten former members of a Utah-based religious organization that they generally refer to as "the Order."[2] Broadly speaking, Plaintiffs allege that certain leaders and members of the Order, along with various related businesses and other entities, have orchestrated a far-reaching scheme to economically and sexually exploit women and children over the course of many years.[3]

---

[1] Unless otherwise noted, citations to items available on the Court's docket refer to filings in case no. 2:24-cv-00155. Citations to specific pages in docket entries refer to the electronic page numbers generated by CM/ECF.

[2] *See* Dkt. No. 303 at 1, 4–6. Plaintiffs are Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie "Alex" Martin, and Mary Ann Robinson. *See id.* at 4–6.

[3] *See id.* at 2, 16. The named individual Defendants are Paul Elden Kingston, Sr., John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvill Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young, John Paul Johnson, Jacob Daniel Kingston, Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Jr., Daniel Charles Kingston, Patricia Kingston, Paul Elden Kingston, Jr., Michelle Afton Michaels, Deborah Williams, Jolene Andrews, April McKay, Valerie Martin, and Kent William Johnson. *Id.* at 6–8. The named entity Defendants

Because the claims are complex and the parties are myriad, the filings in this case have been robust even at the pleading stage. The action began on February 28, 2024, when Plaintiffs filed a 135-page complaint.[4] An equally lengthy first amended complaint followed a few months later.[5] A flood of motions to dismiss ensued.[6] Because the first amended complaint failed to clearly specify which claims were asserted against which Defendants, the Court directed Plaintiffs to amend their pleading again and denied the motions to dismiss as moot.[7]

Plaintiffs' second amended complaint (the "SAC") is now before the Court along with another spate of motions to dismiss.[8] Thanks to a wise scheduling order from the Honorable Jared C. Bennett, however, the current wave of motions to dismiss only deals with the timeliness of Plaintiffs' claims.[9]

Other important matters are ripe for disposition as well. Not long after the first of the pending motions to dismiss was filed, Plaintiffs filed a motion to consolidate this case with *Nichols*

---

are Davis County Cooperative Society (the "Cooperative"), Davis County Cooperative Society, Inc. (the "Corporation"), Redwood Grocery & Health Foods, John's Market Place, Latter Day Church of Christ ("LDCC"), Order Bank (also referred to as the "Office" or "Century Office"), A-1 Disposal, Advanced Copy, Ensign Learning Center, Inc., Advance Vending, United Fuel Supply, Family Stores True Value, Standard Restaurant Supply, AAA Communications, Washakie Renewable Energy, LLC ("WRE"), Fidelity Funding Company ("Fidelity Utah"), Fidelity Funding Investments, Inc. ("Fidelity Nevada"), Property Compliance (also known as Arrow Real Estate), Attco Trucking Company, Inc. (also known as CTC Trucking), American Digital Systems, Garco Industrial Park (also known as Garco Property Management), American Wellness & Rehab Clinic, Washakie Ranch, A-Action Express, Mitchell & Associates, A-Fab Engineering, Sierra Wholesale, World Enterprises, and World Enterprises II. *Id.* at 8–15.

[4] Dkt. No. 1 at 1, 135.

[5] Dkt. No. 141 at 1, 135.

[6] *See* Dkt. Nos. 142, 160, 169, 173, 178, 179, 181, 182, 184, 191, 192, 193, 195, 196, 197, 198, 199, 200, 201, 202, 203, 205, 206, 207, 208, 209, 215, 216, 219.

[7] Dkt. No. 294 at 4–6.

[8] *See* Dkt. Nos. 303, 319, 325, 327, 328, 329, 330, 331, 332, 333.

[9] *See* Dkt. No. 318. The Court will entertain motions to dismiss on other grounds at a later date. *See id.*

*v. Kingston*, which is currently pending before the Honorable Dale A. Kimball.[10] Also pending are motions to quash service on certain of the entity Defendants.[11] Finally, Plaintiffs request leave to file a third amended complaint.[12]

As detailed below, the Court will grant in part and deny in part the motions to dismiss, deny the motion to consolidate, grant in part and deny in part the motion to file a third amended complaint, and deny the motions to quash as moot.

## BACKGROUND

As an initial matter, the Court cautions that the allegations in this case deal with serious subjects that evoke strong emotions, including sexual violence and exploitation. Legally speaking, the allegations at this stage are just that—allegations. This case has not yet progressed to the point where Plaintiffs must prove what they have alleged. At the same time, for purposes of Defendants' motions to dismiss, the Court must assume that the "well-pleaded" allegations in the SAC are true and draw any "reasonable inferences" in Plaintiffs' favor. *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011). The Court will follow this directive below in summarizing the allegations, but the reader should be advised that the Court's statements of fact do not convey judgments regarding the ultimate merits of the allegations.

The Court will now summarize some general allegations about the Order that are common to all Plaintiffs. The Court will then discuss each Plaintiff's individual allegations.

---

[10] *See* Dkt. No. 320 at 1–2. Motions to dismiss were previously filed in *Nichols* as well, but they were denied without prejudice to refiling in light of the motion to consolidate. *See* No. 2:25-cv-00051, Dkt. No. 59 at 1.

[11] *See* Dkt. No. 326 at 1; Dkt. No. 371 at 1.

[12] *See* Dkt. No. 403 at 1.

## I.       General Allegations Regarding the Order.

As an organization, the Order has key religious, social, and economic components.[13] It is a stratified hierarchy where members are numerically ranked by their authority.[14] Paul Elden Kingston, Sr., is currently the highest-ranking member.[15] Higher-ranked members of the Order enjoy an elevated status vis-à-vis lower-ranked members, and disobeying the orders of a higher-ranked member is considered sinful and triggers various punishments, including physical abuse and the deprivation of necessities.[16] Other sources of authority, such as judges, law enforcement officers, and other government officials, are seen as untrustworthy and illegitimate.[17]

For young girls in the Order, obedience involves getting married, as directed by higher-ranking members, to a man who is approved by Paul Elden Kingston, Sr.[18] In these marriages, the bride is often underage and not the groom's first wife.[19] In addition, because the Order is centered around the Kingston family and favored status accompanies "Pure Kingston Blood," these marriages are often incestuous.[20] Once married, a girl becomes subservient to her husband, and it becomes her duty to submit to sex with her husband—even against her wishes— and have as many children as possible.[21]

Though they often live in squalor, the children born from Order marriages fuel the group's economy and generate substantial wealth for its leaders through their work at Order-affiliated

---

[13] *See* Dkt. No. 303 at 16–17, 31–39.
[14] *See id.* at 31–32,
[15] *Id.* at 32, 34–35.
[16] *See id.* at 29–30, 34–36.
[17] *See id.* at 16, 24–25, 31.
[18] *See id.* at 41.
[19] *See id.* at 21–23, 35.
[20] *See id.* at 16, 21–22, 35, 37.
[21] *Id.* at 22–23, 36–37, 40–41.

businesses.[22] These businesses range from grocery stores to financial institutions and are all ultimately controlled by Paul Elden Kingston, Sr., and his brothers John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, and Jason Ortell Kingston.[23] Children begin working for Order businesses at an early age and often labor for long hours.[24]

Children's work for Order businesses often happens at the expense of their education.[25] For instance, when the time comes for high school, it is expected that children will complete an online diploma program within one year so that they can fully devote themselves to work as 14-year-olds.[26] Sometimes children are even fed the answers to test questions so they can complete their online schooling more quickly.[27]

Children working for Order businesses are assured that their earnings go to savings accounts at the "Order Bank."[28] Moreover, girls are told that they will receive "raises" when they get married and each time they give birth to a child.[29] Nevertheless, children rarely receive any actual money in exchange for their work, and substantial withdrawals are often made on their accounts without their knowledge or consent.[30] Meanwhile, extreme punishments loom for children who do not work as instructed.[31]

---

[22] *See id.* at 17, 22–23, 33–34.
[23] *See id.* at 9, 12–13, 32–33.
[24] *See id.* at 17.
[25] *See id.* at 17–18.
[26] *Id.* at 17.
[27] *Id.* at 18.
[28] *See id.* at 18.
[29] *Id.* at 22.
[30] *See id.* at 18–20.
[31] *See id.* at 29–30.

## II.    Allegations of Amanda Rae Grant.

Turning to the individual Plaintiffs, the Court begins with Amanda Rae Grant, who was born on August 31, 1995, to parents who are members of the Order.[32] When Amanda was five years old, John Paul Johnson, then eight years her senior, began sexually abusing her.[33] Amanda told her parents about the abuse, but neither they nor anyone else in the Order intervened.[34] As a result, the abuse continued until Amanda was 15, at which point she disclosed the abuse to two people outside the Order.[35] The Utah Division of Child and Family Services ("DCFS") attempted to interview Amanda at Ensign Learning Center, which was her workplace at the time.[36] Before the interview began, however, Hyrum Dalton Kingston, Amanda's supervisor, admonished her to "honor[] her father and her mother" and "protect her family," and another member of the Order put a tape recorder in the interview room.[37] Because the interview was being recorded and Hyrum Dalton Kingston had physically abused her in the past for disobeying his instructions, Amanda did not tell DCFS that John Paul Johnson had abused her.[38] DCFS later held a second interview with Amanda, but she again declined to reveal any abuse, fearing that she would be deprived of necessities such as food and clothing or otherwise punished if John Paul Johnson faced any legal consequences for his actions.[39]

Amanda began working at Order businesses before she reached the age of 12.[40] She first worked at the Order Bank, where she reported to Rachel Orlean Kingston Young, who then

---

[32] *Id.* at 4–5, 42.
[33] *Id.* at 43.
[34] *Id.* at 43–45.
[35] *Id.* at 43–44.
[36] *Id.* at 44.
[37] *Id.*
[38] *Id.*
[39] *Id.* at 45, 50.
[40] *Id.* at 48.

reported up the chain of command to David Ortell Kingston, Jason Ortell Kingston, and Paul Elden Kingston, Sr.[41] When she was 13 or 14 years old, Amanda started a part-time job at Advanced Copy, where her supervisor reported to Jesse Orvill Kingston, who then reported to Paul Elden Kingston, Sr.[42] At age 15, she began working full-time at John's Market Place, where her supervisor reported to Hyrum Dalton Kingston, who then reported to Paul Elden Kingston, Sr.[43] Subsequently, Amanda began her work at Ensign Learning Center, where Hyrum Daniel Kingston supervised her, reporting to Paul Elden Kingston, Sr.[44] When she was 17, Amanda returned to the Order Bank, where she worked under Deborah Williams, Rachel Orlean Kingston Young, David Ortell Kingston, and Jason Ortell Kingston, the latter two of which reported to Paul Elden Kingston, Sr.[45] Amanda never received a paycheck from any of the businesses where she worked, but if she had refused to work as directed, she would have been physically and emotionally harmed.[46]

When Amanda was about 16 or 17, Derek Kingston told her that "he was supposed to marry her."[47] Amanda told Derek that she did not want to marry him because he was her first cousin and "she did not believe in polygamy."[48] Even still, Amanda's parents pressured her to accept Derek's proposal, including by deceiving her into attending a meeting with Paul Elden Kingston, Sr., to discuss the proposal.[49] Amanda felt that this meeting was an attempt to force her to get married and—by extension—have sex with Derek Kingston while she was still a minor, so when Paul

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.* at 49.
[46] *Id.*
[47] *Id.* at 46–47.
[48] *Id.*
[49] *See id.*

Elden Kingston, Sr., asked to have a private discussion with her parents, Amanda left and, shortly thereafter, fled from the Order altogether.[50] While Amanda was able to withdraw $2,000 before leaving the order, the rest of the money she had earned from all her work had been removed from her account.[51]

After leaving the Order, it took Amanda some time to fully appreciate the injuries that she had suffered in the community.[52] In addition, she was initially hesitant to pursue legal action because she "had been taught to disobey the laws of society and to fear law enforcement, courts and government."[53] Ultimately, however, Amanda joined this action, where she raises the following claims against the following parties:[54]

1.  Labor trafficking, pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), against the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston, Sr., Advanced Copy, Jesse Ortell Kingston, John's Market Place, Hyrum Dalton Kingston, and Ensign Learning Center;[55]

---

[50] *Id.* at 47–48.

[51] *Id.* at 49.

[52] *Id.* at 50.

[53] *Id.*

[54] *Id.* at 50; *see* Dkt. No. 1 at 135.

[55] Dkt. No. 303 at 103. Amanda indicates that she is also asserting this claim against other "Defendants" specified in various parts of the SAC (e.g., Jan McCarthy). *See id.* at 48–49, 103. These other individuals, however, are not named as Defendants in the case caption or the section at the beginning of the SAC delineating the parties. *See id.* at 1–2, 6–8. Accordingly, the Court will not construe the SAC as raising claims against those individuals. This same issue appears in connection with other claims in the SAC, *see, e.g.*, *id.* at 1–2, 6–15, 57–60, 103–04, and in each instance, the Court will take the same approach: the Court will not consider claims asserted against individuals and entities who are mentioned in the SAC but not named as Defendants in the appropriate places. The Court also observes that Plaintiffs' claims are, at times, hard to untangle, as the causes of action contain and incorporate many collective allegations against "Defendants"

2.    Involuntary servitude, pursuant to the TVPRA, against the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston, Sr., Advanced Copy, Jesse Orvil Kingston, John's Market Place, Hyrum Dalton Kingston, and Ensign Learning Center;[56] and

3.    Sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against John Paul Johnson as a perpetrator.[57]

### III.    Allegations of Jenny Kingston.

Jenny Kingston was born on May 10, 1997, to members of the Order.[58] She began working for Order business when she was about six or seven years old.[59] Jenny's work history includes positions at Advance Vending, the Order Bank, Ensign Learning Center, WRE, Standard Restaurant Supply, and United Fuel Supply, along with multiple stints at both Family Stores True Value and A-1 Disposal.[60] While at the Order Bank, Jenny was supervised by Rachel Orlean Kingston Young, Deborah Williams, and—by extension—Paul Elden Kinston, Sr.[61] John Daniel

---

or "the Order," which Plaintiffs say "encompasses all Defendants." *E.g.*, *id.* at 8, 119-22. As the Court has already stated, collective allegations will not be tolerated. *See* Dkt. No. 294 at 3. Accordingly, in construing the causes of action in the SAC, the Court will only recognize claims against specific Defendants who are either identified in the applicable cause of action itself or through cross references to specific paragraphs delineating the applicable Plaintiff's allegations.

[56] Dkt. No. 303 at 114.

[57] *Id.* at 126. Amanda also raised a civil conspiracy claim in the SAC, but she has now dismissed that claim voluntarily. *See* Dkt. No. 321 at 2.

[58] *See* Dkt. No. 303 at 5.

[59] *Id.* at 57.

[60] *Id.* at 57–58

[61] *Id.* at 57. The SAC states that "Rachel Ann Kingston Young" supervised Jenny at the Order Bank, but the Court assumes that this was a mistake because Rachel Orlean Kingston Young is mentioned elsewhere in connection with the Order Bank and Rachel Ann Kingston is apparently deceased. *See id.* at 7 n.1, 48. The Court will take this same approach with other references in the SAC to "Rachel Ann Kingston Young." *See, e.g.*, *id.* at 58.

Kingston, Sr., and John Daniel Kingston, Jr., supervised Jenny at A-1 Disposal, both during her initial stint, from about August 2016 through December 2016, and during her subsequent tenure from about June 1, 2019, through December 30, 2020.[62] Jenny began working at Ensign Learning Center when she started high school and reported to Hyrum Dalton Kingston.[63] Jenny was directed to work full-time at WRE, where she was supervised by Sally Kingston, Rachel Orlean Kingston Young, and Jacob Ortell Kingston, Sr., just after completing high school at age 14.[64] Jenny started working at United Fuel Supply, where she reported to Jacob Ortell Kingston, Sr., Rachel Orlean Kingston Young, and Sally Kingston, as a 17-year-old.[65] Jenny worked for Standard Restaurant Supply just before leaving the Order, at around the same time as her second stint at A-1 Disposal.[66]

By the time Jenny started at Standard Restaurant Supply and had her second stint at A-1 Disposal, she had opened a personal bank account and set up automatic deposits from her account with the Order Bank.[67] Otherwise, Jenny never received payment for any of her work at Order businesses, and even the payments she did receive were insufficient.[68] At the same time, Jenny knew that if she ever refused to work, she would be harmed emotionally and physically.[69]

While at WRE, Jenny worked with Jacob Daniel Kingston, Jr., her second cousin.[70] Jacob Ortell Kingston and Jacob Daniel Kingston, Jr., intended for this placement to facilitate a courtship and marriage between Jenny and Jacob Daniel Kingston, Jr.[71] Jenny knew that she could get pay

---

[62] *See id.* at 57–59.
[63] *Id.* at 58.
[64] *See id.* at 58–59.
[65] *See id.* at 58–60.
[66] *See id.*
[67] *See id.* at 58–59.
[68] *Id.* at 59.
[69] *Id.* at 60.
[70] *Id.* at 51–53, 58.
[71] *Id.* at 51–52.

raises at work if she got married and had children.[72] In addition, Jacob Ortell Kingston, Sr., flew Jenny and Jacob Daniel Kingston, Jr., to Las Vegas on a private jet to entice her into marriage.[73] Nevertheless, when Jacob Daniel Kingston, Jr., expressed his desire to marry her, Jenny, then 16 years old, declined.[74] Because of this decision, Jenny's parents sent her against her will to a rehabilitation center called Lifeline for Youth ("Lifeline").[75] Six months later, in February 2015, Jenny relented and returned home.[76] In March 2015, Paul Elden Kingston, Sr., approved the proposed marriage at a meeting with Jenny, Jacob Daniel Kingston, Jr., Sally Kingston, Jacob Ortell Kingston, Sr., and John Daniel Kingston, Sr., among others.[77] Then, on April 24, 2015, when Jenny was 17 years old, she was married to Jacob Daniel Kingston, Jr., who was then an adult.[78] John Daniel Kingston, Sr., presided over the wedding.[79]

Following their marriage, Jenny repeatedly told Jacob Daniel Kingston, Jr., that she did not want to have sex with him.[80] Undeterred, Jacob Daniel Kingston, Jr., employed physical, verbal, and emotional abuse to force Jenny to have sex with him.[81] This conduct occurred even as Jenny traveled with Jacob Daniel Kingston, Jr., and his family on WRE business trips to Turkey, California, Oregon, Nevada, and Mexico.[82] When Jenny, through no fault of her own, struggled to get pregnant, Jacob Ortell Kingston, Sr., with financial assistance from Paul Elden Kingston, Sr.,

---

[72] *Id.* at 51.
[73] *Id.* at 52.
[74] *Id.* at 51–52.
[75] *Id.* at 52.
[76] *Id.*
[77] *Id.*; *see id.* at 52–53.
[78] *Id.* at 52–53.
[79] *Id.* at 53.
[80] *Id.* at 54.
[81] *Id.*
[82] *Id.* at 55.

11

rushed to force Jenny to undergo in vitro fertilization procedures.[83] As a result, Jenny gave birth to twins in October 2017.[84]

Faced with this untenable situation, Jenny sought opportunities to rebel.[85] When they discovered that Jenny had kissed another man, Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and Jacob Daniel Kingston, Jr., "locked Jenny up and took her children, phone, and car" for two weeks as part of "a repentance process" designed to make her "recommit" to her marriage.[86] "[T]o help correct her faults," Jenny was also required to attend counseling sessions with John Daniel Kingston, Jr., who reported to John Daniel Kingston, Sr., and Paul Elden Kingston, Sr.[87]

In or before December 2020, Jenny asked John Daniel Kingston, Jr., for permission to divorce Jacob Daniel Kingston, Jr.[88] When this request was denied, Jenny went to Paul Elden Kingston, Sr., who also refused to let her get a divorce.[89] Accordingly, in order to escape her abusive relationship with Jacob Daniel Kingston, Jr., Jenny took her two children and fled from the Order sometime after December 2020.[90] When Jenny fled, she attempted to withdraw money from the Order Bank but discovered that her account was overdrawn by $1,200.[91] In addition, the separate savings accounts for her children, which she had previously opened with $500 initial deposits, were empty.[92]

---

[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.* at 55–56.
[87] *Id.* at 56.
[88] *Id.*
[89] *Id.* at 57.
[90] *Id.* at 57, 60.
[91] *Id.* at 60.
[92] *Id.* at 59.

"[G]radually," Jenny "recognized her injuries" and joined this action.[93] She raises the following claims against the following parties:

1.  Labor trafficking, pursuant to the TVPRA, against Advance Vending, Family Stores True Value, the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston, Sr., Standard Restaurant Supply, A-1 Disposal, John Daniel Kingston, Jr., John Daniel Kingston, Sr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, and Jacob Ortell Kingston, Sr.;[94]

2.  Sex trafficking, pursuant to the TVPRA, against Jacob Daniel Kingston, Jr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and Paul Elden Kingston, Sr.;[95]

3.  Willful failure to pay minimum or overtime wages, pursuant to the Fair Labor Standards Act ("FLSA"), against Advance Vending, Family Stores True Value, the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston, Sr., Standard Restaurant Supply, A-1 Disposal, John Daniel Kingston, Sr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, Jacob Ortell Kingston, Sr., David Ortell Kingston, Jesse Orvil Kingston, and Jason Ortell Kingston;[96]

---

[93] *Id.* at 60.
[94] *Id.* at 57–58, 103–04.
[95] *Id.* at 108.
[96] *See id.* at 111–13.

4.  Involuntary Servitude, pursuant to the TVPRA, against Advance Vending, Family Stores True Value, the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston, Sr., Standard Restaurant Supply, A-1 Disposal, John Daniel Kingston, Sr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, and Jacob Ortell Kingston, Sr.;[97]

5.  Civil conspiracy against Paul Elden Kingston, Sr., Jacob Daniel Kingston, Jr., Sally Kingston, Jacob Ortell Kingston, Jr., John Daniel Kingston, Sr., Jacob Ortell Kingston, Sr., WRE, Family Stores True Value, the Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Standard Restaurant Supply, A-1 Disposal, Ensign Learning Center, Hyrum Dalton Kingston, the Cooperative, LDCC, and Patricia Kingston;[98]

6.  Sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against Jacob Daniel Kingston, Jr., as a perpetrator;[99]

7.  Sexual abuse of an adult against Jacob Daniel Kingston, Jr.;[100] and

8.  Negligent sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against Jacob Daniel Kingston, Jr., and against Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., John Daniel Kingston, Jr., and Paul Elden Kingston, Sr., as non-perpetrators.[101]

---

[97] *Id.* at 113–14.
[98] *See id.* at 52–53, 55, 57–59. Jenny has voluntarily dismissed this claim as to some Defendants. *See* Dkt. No. 322 at 2.
[99] Dkt. No. 303 at 126.
[100] *Id.* at 127.
[101] *See id.* at 128.

IV.    Allegations of Jana Nicole Johnson.

Jana Nicole Johnson was born on January 9, 2003, to parents who are members of the Order.[102] Jana began working for Order businesses when she was about 15 years old.[103] Early on, Jana worked for Fidelity Utah, but a few months later, she moved to the Order Bank, where she was supervised by Deborah Wiliams and Paul Elden Kingston, Sr.[104] Next, from about March 2020 through June 2020, Jana worked at Arrow Real Estate, supervised by Paul Elden Kingston, Sr.[105] Then, from June 2020 through about December 2021 or January 2022, Jana worked at Standard Restaurant Supply.[106] For the most part, Jana never received a paycheck for her work, and her statements from the Order Bank consistently indicated that she was being underpaid.[107] Her account at the Order Bank never had more than $2,000, and her statements often reflected unexplained withdrawals to which she did not consent.[108] Even so, Jana generally worked as directed, understanding that she would be "punished severely" if she did not do so.[109]

When Jana was still a young child, it was determined that she would marry Daniel Charles Kingston, her first cousin.[110] To facilitate this union, Jana's father, Kent William Johnson, together with Paul Elden Kingston, Sr., and Patricia Kingston, made sure that Jana and Daniel Charles Kingston "were regularly in contact" by, among other things, sending both to school at Ensign Learning Center.[111] When Jana was 15 years old, Kent William Johnson, Paul Elden Kingston, Sr.,

---

[102] *See id.* at 5.
[103] *Id.* at 66.
[104] *Id.*
[105] *Id.* at 67.
[106] *See id.* at 67–68.
[107] *Id.* at 67.
[108] *Id.*
[109] *Id.*
[110] *Id.* at 60.
[111] *Id.* at 61.

and Patricia Kingston concluded that it was time for her to get married.[112] Around March 9, 2019, Jana was married to Daniel Charles Kingston against her will, knowing that "severe punishment" would be forthcoming if she did not move forward with the wedding.[113] Both Paul Elden Kingston, Sr., and Patricia Kingston spoke at the ceremony, and Kent William Johnson, at the direction of Paul Elden Kingston, Sr., officiated.[114] Because she got married as instructed, Jana received a raise at work.[115]

In general, Jana did not want to have sex with Daniel Charles Kingston.[116] Sometimes Jana was able to successfully avoid sex, but other times Daniel Charles Kingston would force her into sexual relations.[117] For instance, on a trip to Hawaii that was a "reward" to Jana for getting married, Daniel Charles Kingston told Jana that she was "obligated to have sex with him."[118] When Jana still refused him, Daniel Charles Kingston forced Jana to have intercourse.[119] Daniel Charles Kingston also complained to others, including Paul Elden Kingston, Sr., and Patricia Kingston, about Jana's refusals and "asked for advice on how to pressure her more successfully."[120]

Jana feared that she would be stuck in her marriage if she got pregnant, so she secretly began taking birth control.[121] When Daniel Charles Kingston found out, he and Kent William Johnson confined Jana for a time in the office of American Digital Systems, where she was forced to sleep on the floor, deprived of her personal belongings, cut off from friends outside the Order,

---

[112] *Id.* at 61–62.
[113] *Id.*
[114] *Id.* at 62.
[115] *Id.*
[116] *Id.* at 63.
[117] *Id.* at 63–64.
[118] *Id.*
[119] *Id.* at 64.
[120] *Id.* at 63–64.
[121] *Id.* at 64.

and only allowed to leave the room to use the restroom.[122] Jana was also required to have counseling sessions with Paul Elden Kingston, Sr., in which he interrogated her about her use of birth control and questioned why she did not want to have sex with Daniel Charles Kingston.[123] Jana informed Paul Elden Kingston, Sr., that she did not want to be married to Daniel Charles Kingston, but Paul Elden Kingston, Sr., insisted that Jana "was the problem" and needed to "repent," which she could only do by getting pregnant.[124] Jana was only released from confinement when she agreed to undergo a "repentance process" with Paul Elden Kington, Sr.[125] Even after her release, however, Jana was "heavily supervised and not allowed to go anywhere alone."[126]

In June 2021, Jana fled the Order, though for several months she continued working at Standard Restaurant Supply, where she began receiving some paychecks.[127] While Jana did not initially "recognize the nature and extent of her injuries," she ultimately left Standard Restaurant Supply and joined this action.[128] Here, she raises the following claims against the following parties:

1.      Labor trafficking, pursuant to the TVPRA, against Fidelity Utah, the Order Bank, Deborah Williams, Paul Elden Kingston, Sr., Arrow Real Estate, and Standard Restaurant Supply;[129]

2.      Sex trafficking, pursuant to the TVPRA, against Daniel Charles Kingston, Paul Elden Kingston, Sr., Patricia Kingston, and Kent William Johnson;[130]

---

[122] *Id.* at 64–65.
[123] *Id.* at 65.
[124] *Id.*
[125] *Id.*
[126] *Id.* at 65–66.
[127] *Id.* at 66–68.
[128] *Id.* at 67–68.
[129] *Id.* at 104.
[130] *Id.* at 108.

3. Willful failure to pay minimum or overtime wages, pursuant to the FLSA, against Fidelity Utah, the Order Bank, Deborah Williams, Paul Elden Kingston, Sr., Arrow Real Estate, Standard Restaurant Supply, John Daniel Kingston, Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, and Jason Ortell Kingston;[131]

4. Involuntary Servitude, pursuant to the TVPRA, against Fidelity Utah, the Order Bank, Deborah Williams, Paul Elden Kingston, Sr., Arrow Real Estate, and Standard Restaurant Supply;[132]

5. Civil conspiracy against Fidelity Utah, the Order Bank, Deborah Williams, Paul Elden Kingston, Sr., Standard Restaurant Supply, Daniel Charles Kingston, Patricia Kingston, Kent William Johnson, the Cooperative, and LDCC;[133]

6. Sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against Daniel Charels Kingston as a perpetrator;[134]

7. Sexual abuse of an adult against Daniel Charles Kingston;[135] and

8. Negligent sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against Daniel Charles Kingston, and against Paul Elden Kingston, Sr., Patricia Kingston, and Kent William Johnson as non-perpetrators.[136]

---

[131] *Id.* at 111–13.

[132] *Id.* at 114.

[133] *See id.* at 60–68, 118, 120, 122–23, 125. Jana has voluntarily dismissed this claim as to one other Defendant. *See* Dkt. No. 322 at 2.

[134] Dkt. No. 303 at 126.

[135] *Id.* at 127.

[136] *See id.* at 128.

## V.      Allegations of Julie Ruth Green.

Julie Ruth Green was born into the Order on December 6, 1998.[137] Around age 12 or 13, Julie started working at Order businesses, beginning with the Order Bank, where she was supervised by Jolene Andrews, among others.[138] She also worked at Garco Property Management under Paul Elden Kingston, Jr., and at Arrow Real Estate.[139] She also worked for Jason Ortell Kingston by "standing in lines for hours at Comicon each year to buy toys . . . to sell for the Order."[140] Julie never received a paycheck from any Order businesses but also knew that serious emotional and physical harm awaited if she did not work as directed.[141]

When she was 12, Julie learned that she had been chosen to marry Paul Elden Kingston, Jr., her uncle who is ten years her senior.[142] Paul Elden Kingston, Sr., authorized this marriage at a June 2016 meeting with Paul Elden Kingston, Jr., and Patricia Kingston, and the wedding happened on December 15, 2016, at John's Market Place.[143] During the relationship, Julie was often forced to have sexual relations with Paul Elden Kingston, Jr., including while they were on a trip to the British Virgin Islands.[144] Julie got pregnant as a result of one of these encounters but then suffered a miscarriage.[145] Julie received a raise at work for getting married, but due to the miscarriage, she did not receive the customary raise for having a child.[146]

---

[137] *Id.* at 5.
[138] *See id.* at 70–71.
[139] *Id.* at 71.
[140] *Id.*
[141] *Id.*
[142] *Id.* at 68.
[143] *Id.* at 68–69.
[144] *Id.* at 69.
[145] *Id.*
[146] *Id.*

Around November 2018, Julie separated herself physically from Paul Elden Kingston, Jr., and later met with Paul Elden Kingston, Sr., to ask for a divorce.[147] Paul Elden Kingston, Sr., declined this request and, in January 2019, ordered Patricia Kingston to confine Julie to an Order member's home in Pennsylvania.[148] Eventually, Julie was able to return to Utah, and in 2019, she left the Order.[149] It took until 2021 for Julie to "realiz[e] that she had suffered injuries that she could act on."[150] She raises the following claims against the following parties:

1.  Labor trafficking, pursuant to the TVPRA, against the Order Bank, Jolene Andrews, Garco Property Management, Paul Elden Kingston, Jr., Arrow Real Estate, and Jason Ortell Kingston;[151]

2.  Sex trafficking, pursuant to the TVPRA, against Paul Elden Kingston, Jr., Paul Elden Kingston, Sr., and Patricia Kingston;[152]

3.  Involuntary servitude, pursuant to the TVPRA, against the Order Bank, Jolene Andrews, Garco Property Management, Paul Elden Kingston, Jr., Arrow Real Estate, and Jason Ortell Kingston;[153]

4.  Civil conspiracy against the Order Bank, Jolene Andrews, Jason Ortell Kingston, Paul Elden Kingston, Jr., Paul Elden Kingston, Sr., Patricia Kingston, the Cooperative, and LDCC;[154]

---

[147] *Id.* at 69–70.

[148] *Id.* at 70.

[149] *Id.* at 70, 72.

[150] *Id.* at 71.

[151] *Id.* at 104; *see id.* at 70–71.

[152] *Id.* at 109.

[153] *Id.* at 114; *see id.* at 70–71.

[154] *Id.* at 118, 120, 122–23; *see id.* at 68–71. Julie has voluntarily dismissed this claim as to some Defendants. *See* Dkt. No. 322 at 2.

5.      Sexual abuse of an adult against Paul Elden Kingston, Jr.;[155] and

6.      Negligent sexual abuse of a child, pursuant to Utah Code § 78B-2-308, against Paul Elden Kingston, Jr., and against Paul Elden Kingston, Sr., and Patricia Kingston as non-perpetrators.[156]

## VI.      Allegations of Michelle Ruth Michaels.

Michelle Ruth Michaels was born on May 2, 2000, to parents who are members of the Order.[157] She began working for Order businesses when she was just four years old.[158] First, she worked at American Digital Systems under Jesse Orvil Kingston and Michelle Afton Michaels.[159] When she was seven years old, Michelle started a second job at the Order Bank, where she reported to Deborah Williams, Jolene Andrews, Paul Elden Kingston, Sr., and Rachel Orlean Kingston Young.[160] Michelle also performed additional work for Jesse Orvil Kingston and Michelle Afton Michaels. She worked for both of them at AAA Communications and assisted Michelle Afton Michaels with two florist businesses.[161] Michelle never received any paychecks for her work, as all her payments went to the Order Bank.[162] She knew that if she did not work as instructed, she would face serious physical and emotional punishment.[163]

When she was eight years old, Michelle learned that she was to be married to Jason Ortell Kingston.[164] Michelle was scheduled to attend an engagement meeting with Paul Elden Kingston,

---

[155] Dkt. No. 303 at 127.
[156] *See id.* at 128.
[157] *See id.* at 5.
[158] *Id.* at 73.
[159] *Id.*
[160] *Id.*
[161] *Id.* at 73–74.
[162] *Id.* at 74–75.
[163] *Id.* at 76.
[164] *Id.* at 72.

Sr., when she was 17 years old, but wanting to avoid an Order marriage, she fled.[165] While Michelle at one time had about $80,000 in her account at the Order Bank, $50,000 of that sum went back to the Order, and Michelle was not allowed to withdraw the remainder when she left the community.[166] Even after leaving the Order and reaching adulthood, it took Michelle some time to "recognize that as a child she had suffered legal injuries."[167] She raises the following claims against the following parties:

1. Labor trafficking, pursuant to the TVPRA, against American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, the Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston, Sr., Rachel Orlean Kingston Young, and AAA Communications;[168]

2. Involuntary servitude, pursuant to the TVPRA, against American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, the Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston, Sr., Rachel Orlean Kingston Young, and AAA Communications;[169] and

3. Civil conspiracy against American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, the Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston, Sr., Rachel Orlean Kingston Young, the Cooperative, LDCC, and Patricia Kingston.[170]

---

[165] *Id.* at 72–73.
[166] *Id.* at 76.
[167] *Id.* at 77.
[168] *Id.* at 104.
[169] *Id.* at 115.
[170] *Id.* at 118, 120, 122–23; *see id.* at 73–75. Michelle has voluntarily dismissed this claim as to one other Defendant. *See* Dkt. No. 322 at 2.

**VII.   Allegations of Allison Eames.**

Allison Eames was born to members of the Order on November 6, 1999.[171] Allison's first job for an Order business came at age eight, when she worked for A-1 Disposal under the supervision of John Daniel Kingston, Sr.[172] When she was about ten years old, Allison was assigned to Washakie Ranch, where she was supervised by Valerie Martin.[173] Allison returned to A-1 Disposal around age 12 and then, at age 14, began working with April McKay on tax filings for Order members.[174] Later, Allison worked at the Order Bank, John's Market Place, and Family Stores True Value.[175] Allison never received a paycheck for her labor but knew that refusing to work would subject her to emotional and physical harm.[176] Her years of work notwithstanding, Allison never had more than $1,000 in her account at the Order Bank.[177] There were many withdrawals from her account that were cryptically attributed to "room and board."[178] When Allison left the Order on December 6, 2015, because she did not want to be coerced into an Order Marriage, she was not allowed to take any of the money in her account.[179]

Allison raises the following claims against the following parties:

1.   Labor trafficking, pursuant to the TVPRA, against A-1 Disposal, John Daniel Kingston, Sr., Washakie Ranch, Valerie Martin, April McKay, the Order Bank, John's Market Place, and Family Stores True Value;[180]

---

[171] *See* Dkt. No. 303 at 5.
[172] *Id.* at 78–79.
[173] *Id.*
[174] *Id.*
[175] *Id.* at 79.
[176] *Id.* at 79–81; *see also id.* at 77.
[177] *Id.* at 80.
[178] *Id.*
[179] *Id.* at 78–79, 81.
[180] *Id.* at 104.

2.  Involuntary Servitude, pursuant to the TVPRA, against A-1 Disposal, John Daniel Kingston, Sr., Washakie Ranch, Valerie Martin, April McKay, the Order Bank, John's Market Place, and Family Stores True Value;[181] and

3.  Civil conspiracy against A-1 Disposal, John Daniel Kingston, Sr., April McKay, the Order Bank, John's Market Place, Family Stores True Value, the Cooperative, LDCC, Paul Elden Kingston, Sr., and Patricia Kingston.[182]

## VIII.  Allegations of Priscilla Tucker.

Priscilla Tucker was born into the Order on April 18, 1997.[183] Priscilla's work for Order businesses began when she started working for Standard Restaurant Supply around the age of 8.[184] Priscilla returned to this business around age 15.[185] Priscilla also worked on two separate occasions at Family Stores True Value, first at age 10 or 11, and later around age 14 or 15.[186] At 13 or 14, Priscilla began working at Ensign Learning Center under Hyrum Dalton Kingston, Patricia Kingston, and Paul Elden Kingston, Sr.[187] When she was about 16 years old, Priscilla began working for CTC Trucking, where she was supervised by Jacob Ortell Kingston, Sr.[188] She also worked at WRE.[189] There, Priscilla received a few paychecks, but she was ultimately told that she actually owed money because her Order account was overdrawn.[190] Otherwise, Priscilla never

---

[181] *Id.* at 115.
[182] *Id.* at 118, 120, 122–23; *see id.* 78–79, 81. Allison has voluntarily dismissed this claim as to some Defendants. *See* Dkt. No. 322 at 2.
[183] Dkt. No. 303 at 5.
[184] *Id.* at 83.
[185] *Id.* at 84.
[186] *See id.* at 83–84.
[187] *Id.* at 83.
[188] *Id.* at 84.
[189] *Id.* at 85.
[190] *Id.*

received any paychecks for her work with Order businesses.[191] If Priscilla had declined to work as instructed, she would have been harmed physically and emotionally.[192]

At age 16, Priscilla was set to be married to a man who had sexually abused her.[193] When she declined to have an engagement meeting with Paul Elden Kingston, Sr., at 17 years old, Priscilla was kicked out of her home, fled the Order, and initiated emancipation proceedings.[194] Approximately one month later, however, Priscilla went to visit her mother's home and was forcibly taken to Lifeline, where she remained for three months.[195] After she was released, Priscilla went back to the Order and began working at WRE.[196] Eventually, however, she realized that she was again in danger of being coerced into an Order marriage, so on March 15, 2015, she left the community for good.[197]

Priscilla raises the following claims against the following parties:

1.      Labor trafficking, pursuant to the TVPRA, against Standard Restaurant Supply, Family Stores True Value, Ensign Learning Center, Hyrum Dalton Kingston, Patricia Kingston, Paul Elden Kingston, Sr., CTC Trucking, Jacob Ortell Kingston, and WRE;[198] and

2.      Involuntary servitude, pursuant to the TVPRA, against Standard Restaurant Supply, Family Stores True Value, the Order, Ensign Learning Center,

---

[191] *See id.* at 83–85.
[192] *Id.* at 86.
[193] *Id.* at 81–82.
[194] *Id.* at 82.
[195] *Id.*
[196] *Id.*
[197] *Id.* at 81–82.
[198] *Id.* at 104–05; *see id.* at 85.

Hyrum Dalton Kingston, Patricia Kingston, Paul Elden Kingston, Sr., CTC Trucking, Jacob Ortell Kingston, Sr., and WRE.[199]

### IX.    Allegations of Brenda Collins.

Brenda Collins was born on March 23, 2001, to parents who are members of the Order.[200] As a young child, Brenda endured both physical and sexual abuse.[201] To escape this environment, Brenda ran away from home as a 13-year-old and spent the following two years at various locations, including the homes of relatives, foster homes, the Utah Youth Village, and Lifeline.[202] Eventually, however, Brenda returned to her parents.[203]

Before she ran away, Brenda started working for Order businesses, such as A-1 Disposal, where she was supervised by John Daniel Kingston, Sr.[204] After returning to the Order, she worked at Family Stores True Value.[205] Brenda was never properly compensated for her work, but at the same time, she knew that she would have suffered physical and emotional harm if she had refused to work.[206]

When Brenda was 15, she was placed in state custody.[207] She remained there until October 6, 2019, keeping regular contact with her parents.[208] Even after that point, Brenda still felt

---

[199] *Id.* at 115. Priscilla also raised a civil conspiracy claim in the SAC, but she has now dismissed that claim voluntarily. *See* Dkt. No. 321 at 2.
[200] *See* Dkt. No. 303 at 5.
[201] *See id.* at 86–87, 89.
[202] *Id.* at 87–88.
[203] *See id.* at 88.
[204] *See id.* at 89–91.
[205] *Id.* at 90–91.
[206] *Id.* at 91.
[207] *Id.*
[208] *Id.*

"threatened by her parents" as well as the Order.[209] As a result, "[s]he was not able to discover and act on her legal injuries for years after she turned 18."[210]

Brenda raises the following claims against the following parties:

1.    Labor Trafficking, pursuant to the TVPRA, against John Daniel Kingston, Sr., A-1 Disposal, and Family Stores True Value;[211]

2.    Involuntary servitude, pursuant to the TVPRA, against John Daniel Kingston, Sr., A-1 Disposal, and Family Stores True Value;[212] and

3.    Civil conspiracy against John Daniel Kingston, Sr., A-1 Disposal, Family Stores True Value, the Cooperative, LDCC, Paul Elden Kingston, Sr., Patricia Kingston, and the Order Bank.[213]

### X.    Allegations of Katie "Alex" Martin.

Katie "Alex" Martin was born on January 23, 2002, to parents who are members of the Order.[214] When she was about two years old, Alex moved with her family to Washakie Ranch, where she began working as a young child and continued working even after her family moved away when she was 12 or 13.[215] She also performed farm work in Oregon for John Daniel Kingston, Sr., and sold farm products at the direction of John Daniel Kingston, Sr., and Valerie Martin.[216] Around age 15, Alex began working for Jacob Ortell Kingston, Sr., at a now-defunct restaurant.[217] Then, beginning when she was about 16 years old, Alex worked at American

---

[209] *Id.* at 91–92.
[210] *Id.* at 92.
[211] *Id.* at 105; *see id.* at 91.
[212] *Id.* at 115.
[213] *Id.* at 118, 122–23; *see id.* at 89–90, 91.
[214] *See id.* at 6.
[215] *Id.* at 93–94.
[216] *See id.* at 92, 94.
[217] *Id.* at 94.

Wellness and Rehab Clinic at the direction of John Daniel Kingston, Sr.[218] With the exception of a few paychecks from American Wellness and Rehab Clinic, Alex was not properly paid for her work for these businesses.[219] Nevertheless, Alex knew that refusing to work as assigned would expose her to emotional and physical abuse.[220]

Alex initially left the Order when she was 17 to avoid being married to her first cousin as a minor.[221] Over the next few years, Alex was forced to move from place to place to avoid being sent back to the Order.[222] It was challenging to work during this time, as Alex's parents withheld her social security card and birth certificate from her and prevented her from having a driver's license as a minor.[223] Under these circumstances, Alex was unable to take care of herself and ended up in the hospital for malnutrition.[224] When Alex was 18, she was able to get a copy of her social security card.[225]

Eventually, Alex reestablished contact with the Order. John Daniel Kingston, Jr., approached Alex and promised to pay her more than her current job if she worked for an Order business.[226] Alex agreed and went to work for A-1 Disposal.[227] Alex also moved into a trailer purportedly owned by her mother.[228] When it became clear that Alex was again at risk of being

---

[218] *Id.* at 94–95.
[219] *Id.* at 95.
[220] *Id.*
[221] *Id.* at 92–93, 95.
[222] *See id.* at 95–96.
[223] *See id.* at 95–96.
[224] *Id.* at 96.
[225] *Id.*
[226] *Id.*
[227] *Id.*
[228] *Id.*

pushed into an unwanted marriage, she left the Order for good and, in the following months, joined this action.[229]

Alex raises the following claims against the following parties:

1.   Labor trafficking, pursuant to the TVPRA, against Washakie Ranch, John Daniel Kingston, Sr., Valerie Martin, Jacob Ortell Kingston, Sr., and American Wellness and Rehab Clinic;[230]

2.   Involuntary Servitude, pursuant to the TVPRA, against Washakie Ranch, John Daniel Kingston, Sr., Valerie Martin, Jacob Ortell Kingston, Sr., and American Wellness and Rehab Clinic;[231] and

3.   Civil conspiracy against John Daniel Kingston, Sr., Jacob Ortell Kingston, Sr., American Wellness and Rehab Clinic, the Cooperative, LDCC, Paul Elden Kingston, Sr., Patricia Kingston, and the Order Bank.[232]

## XI.   Allegations of Mary Ann Robinson.

Mary Ann Robinson was born on November 13, 1992, to parents who are members of the Order.[233] As a child, Mary Ann worked for various Order businesses, such as Advance Vending, Family Stores True Value, John's Market Place, the Order Bank, Ensign Learning Center, Sierra Wholesale, and Mitchell & Associates.[234] Paul Elden Kingston, Sr., supervised Mary Ann at the Order Bank and Mitchell & Associates.[235]

---

[229] *Id.* at 96–97.
[230] *Id.* at 105; *see id.* at 93–95.
[231] *Id.* at 115–16; *see id.* at 94–95.
[232] *Id.* at 118, 120, 122–23; *see id.* at 92, 94–95. Alex has voluntarily dismissed this claim as to some other Defendants. *See* Dkt. No. 322 at 2. Alex also raised an FLSA claim in the SAC, but she has dismissed that claim voluntarily as well. *See* Dkt. No. 321 at 2.
[233] *See* Dkt. No. 303 at 6.
[234] *Id.* at 97, 100.
[235] *Id.* at 100.

29

While working with him, Mary Ann attended meetings with Paul Elden Kingston, Sr., to discuss marriage.[236] At age 19, when she declined to enter the marriage that was planned for her, Mary Ann was confined to an Order farm in Idaho, where she was to be "isolated and punished" until she agreed to move forward with the arrangement.[237] Eventually, Mary Ann was able to "sneak back to Utah."[238] Under pressure from relatives, Mary Ann agreed to stay in the Order on the condition that she could marry John Andrew Robinson, a different man from the one chosen for her.[239]

After she got married, Mary Ann worked at A-1 Disposal under John Daniel Kingston, Sr., and also prepared financial documents for A-Action Express and Washakie Ranch.[240] Mary Ann was not paid for the work she did for Order businesses, and when she left the Order in 2018, there was no money in her Order account.[241] At the same time, Marry knew that she "would have been punished severely" if she had declined to do her assigned work.[242] She also "understood that she would get raises" for getting married and having children.[243]

Mary Ann raises the following claims against the following parties:

1.      Labor trafficking, pursuant to the TVPRA, against Advance Vending, Family Stores True Value, John's Market Place, Sierra Wholesale, Ensign Learning Center, the Order Bank, Mitchell & Associates, Paul Elden

---

[236] *Id.*
[237] *Id.* at 100–01.
[238] *Id.* at 101.
[239] *Id.*
[240] *Id.*
[241] *See id.* at 97, 99, 101–02.
[242] *Id.* at 102.
[243] *Id.* at 101.

Kingston, Sr., A-1 Disposal, A-Action Express, Washakie Ranch, John Daniel Kingston, Sr.;[244] and

2. Involuntary servitude, pursuant to the TVPRA, against Advance Vending, Family Stores True Value, John's Market Place, Sierra Wholesale, Ensign Learning Center, the Order Bank, Mitchell & Associates, Paul Elden Kingston, Sr., A-1 Disposal, A-Action Express, Washakie Ranch, and John Daniel Kingston, Sr.[245]

## **DISCUSSION**

Having laid out the relevant factual background, the Court will now analyze the pending motions, beginning with the motions to dismiss. Then, the Court will address the motion to consolidate, the motion for leave to amend, and the motions to quash.

### I.     **Motions to Dismiss.**

Dismissal is warranted under Rule 12(b)(6) when a plaintiff "fail[s] to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When assessing a complaint in the context of a Rule 12(b)(6) motion, the Court must assume the truth of the plaintiff's factual allegations, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff has "state[d] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To withstand this scrutiny, a complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by conclusory statements," and "permit the court to infer more than the mere possibility of

---

[244] *Id.* at 105; *see id.* at 99, 100–02.

[245] *Id.* at 116; *see id.* at 99–102. Mary Ann also raised a civil conspiracy claim in the SAC, but she has dismissed that claim voluntarily. *See* Dkt. No. 321 at 2. She has also voluntarily dismissed all claims against A-Fab Engineering. *Id.* at 3.

misconduct." *Id.* at 678–79. As is notable here, a claim is subject to dismissal if the underlying allegations, taken as true, establish that the claim is time-barred. *Chance v. Zinke*, 898 F.3d 1025, 1034 (10th Cir. 2018).

"[S]tatutory time bars can be divided into two categories: statutes of limitations and statutes of repose." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.* (*CalPERS*), 582 U.S. 497, 504 (2017). "Although there is substantial overlap between the policies of the two types of statute, each has a distinct purpose and each is targeted at a different actor." *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1156 (10th Cir. 2023) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014), *superseded on other grounds by statute*, 2014 N.C. Sess. Laws 2014-44).

"Statutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims." *Id.* (quoting *CalPERS*, 582 U.S. at 504). Accordingly, "a statute of limitations," in general, "begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Id.* (quoting *CTS*, 573 U.S. at 7–8). Statutes of repose, on the other hand, "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time." *CalPERS*, 582 U.S. at 505 (quoting *CTS*, 573 U.S. at 9). Thus, "[a] statute of repose 'typically bars the right to bring an action after the lapse of a specified period, unrelated to the time when the claim accrued.'" *Hogan*, 73 F.4th at 1156 (quoting *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1218 n.2 (10th Cir. 1991)).

Statutes of limitations, though stringent, are more malleable than statutes of repose. "[S]tatutes of repose cannot be tolled absent 'a particular indication that the legislature did not intend the statute to provide complete repose but instead anticipated the extension of the statutory period under certain circumstances.'" *Hogan*, 73 F.4th at 1156 (quoting *CalPERS*, 582 U.S. at 507). Indeed, a statute of repose may begin running as soon as the defendant commits the

32

corresponding unlawful act, even if the plaintiff has not yet been injured. *Id.*; *see Alexander*, 952 F.2d at 1218 n.2 (offering "delivery of [a] product to a purchaser" as an event that may trigger a statute of repose).

Statutes of limitations, in contrast, are generally subject to tolling. *See Hogan*, 73 F.4th at 1156. For instance, because minors in Utah "may not bring a cause of action," a "statute of limitations" under Utah law generally "may not run" until the affected individual is 18 years old. Utah Code § 78B-2-108(1)–(2). Additionally, a Utah statute of limitations may, in some circumstances, be tolled under the "discovery rule," whereby a limitations period "does not begin to run until the plaintiff learns of, or in the exercise of reasonable diligence should have learned of, the facts that give rise to the cause of action." *Olsen v. Hooley*, 865 P.2d 1345, 1348 (Utah 1993). The discovery rule "operates either when provided by statute . . . or when required by equity." *Colosimo v. Roman Catholic Bishop*, 156 P.3d 806, 810 (Utah 2007). The equitable version of the discovery rule comes into play "when either exceptional circumstances or the defendant's fraudulent concealment prevents the plaintiff from timely filing suit." *Id.* at 811.

Fraudulent concealment may be the basis for applying the equitable discovery rule in two situations: "First, a plaintiff may successfully toll a statute of limitations by showing that, given the defendant's concealment of the plaintiff's cause of action, the plaintiff neither discovered nor reasonably should have discovered the facts underlying the cause of action before the limitations period expired." *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 748 (Utah 2005). "Second, if a plaintiff either knew or reasonably should have known of the facts underlying his or her cause of action *before* a limitations period expired, the plaintiff may nevertheless invoke the concealment version of the discovery rule" by "show[ing] that, given the defendant's actions, the plaintiff acted reasonably in failing to file suit before the limitations period expired." *Id.* "The question of when

33

a plaintiff reasonably would have discovered the facts underlying a cause of action in light of a defendant's affirmative concealment is a 'highly fact-dependent legal question' that is 'necessarily a matter left to trial courts and finders of fact.'" *Id.* at 750 (alteration adopted) (quoting *Berenda v. Langford*, 914 P.2d 45, 53 (Utah 1996)).

The "exceptional circumstances" aspect of the equitable discovery rule is designed for cases where strictly enforcing a statute of limitations "would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action." *Id.* at 747. Notably, however, application of the exceptional circumstances theory also requires "an initial showing . . . that the plaintiff did not know and could not reasonably have discovered the facts underlying the cause of action in time to commence an action within the limitations period." *Colosimo*, 156 P.3d at 812 (alteration adopted) (quoting *Burkholz v. Joyce*, 972 P.2d 1235, 1237 (Utah 1998)).

In the federal system, the concept of equitable tolling may "pause the running of . . . a statute of limitations when a litigant has diligently pursued his rights" but fails to raise a claim on time due to "some extraordinary circumstance." *Arellano v. McDonough*, 598 U.S. 1, 6 (2023) (quoting *Lozano v. Alvarez*, 572 U.S. 1, 10 (2014)). Courts "presume" that equitable tolling is available for any federal statute of limitations, so long as "tolling is consistent with the [applicable] statute." *Lozano*, 572 U.S. at 11. Equitable tolling may be in order for a federal claim "when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, and likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights." *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1246 (10th Cir. 2012) (per curiam) (quoting *United States v. Clymore*, 245 F.3d 1195,

34

1199 (10th Cir. 2001)). With the foregoing principles in mind, the Court will now assess the contested claims.

### a. *TVPRA Claims.*

The Court will first address the contested claims under the TVPRA. The TVPRA allows victims of certain crimes, including labor trafficking, sex trafficking, and involuntary servitude, to file "a civil action against the perpetrator" and, under some circumstances, others who "benefit" from those crimes. 18 U.S.C. § 1595(a); *see also id.* §§ 1584, 1589–91 (prohibiting involuntary servitude, forced labor, labor trafficking, and sex trafficking). Civil TVPRA claims must be "commenced not later than the later of . . . (1) 10 years after the cause of action arose; or (2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense." 18 U.S.C. § 1595(c).

Here, some Defendants challenge the labor trafficking and involuntary servitude claims from Amanda Rae Grant and Mary Ann Robinson as untimely.[246] For Amanda, these Defendants argue that her claims are untimely under 18 U.S.C. § 1595(c)(2) because the alleged wrongdoing occurred when she was a minor but the initial complaint in this case was not filed for more than ten years after she turned 18. These Defendants make this same argument with respect to some of Mary Ann's claims as well. Additionally, a subset of these Defendants contends that Mary Ann's claims against the Order Bank are time-barred. This same group also challenges Mary Ann's claims against A-1 Disposal, arguing that the limitations period for those claims began running sometime in 2013 when Mary Ann was already an adult.

---

[246] Dkt. No. 319 at 2; Dkt. No. 325 at 2, 4; Dkt. No. 327 at 4–5; Dkt. No. 328 at 2–3; Dkt. No. 329 at 10; Dkt. No. 331 at 3; Dkt. No. 332 at 5–6; Dkt. No. 333 at 2, 4–7.

At the outset, the Court is not convinced that Mary Ann's TVPRA claims against A-1 Disposal are untimely. The Defendants who challenge these claims assert that the limitations period began running in 2013 because that is when Mary Ann left A-1 Disposal. The SAC, however, does not clearly indicate when Mary Ann left A-1 Disposal and could be read as saying that she left as late as 2018. Thus, because the Court must draw all reasonable inferences in Mary Ann's favor, *see Iqbal*, 556 U.S. at 678, it cannot conclude at this stage that her labor trafficking and involuntary servitude claims against A-1 Disposal are untimely.

The timeline around Mary Ann's labor trafficking and involuntary servitude claims against the Order Bank is somewhat clearer. The SAC suggests that Mary Ann stopped working for the Order Bank, at the latest, around 2012 when she was already an adult.[247] This means that the limitations period for these claims would have lapsed sometime in 2022, i.e., before the initial complaint in this action was filed. *See* 18 U.S.C. § 1595(c)(1).

As to any TVPRA claims from when Mary Ann was a minor, the SAC indicates that she turned 18 on November 13, 2010, which means that the initial complaint came more than ten years after her 18th birthday, i.e., outside the limitations period. *See* 18 U.S.C. § 1595(c)(2).

Turning to Amanda, the SAC indicates that her labor trafficking and involuntary servitude claims arose when she was a minor, and that she turned 18 on August 31, 2013, which means that the initial complaint was filed more than ten years after her 18th birthday, i.e., after the end of the limitations period. *See* 18 U.S.C. § 1595(c)(2).

Nevertheless, TVPRA claims filed outside the applicable limitations period may still move forward if equitable tolling is available. At the threshold, several Defendants contend that equitable tolling is not available for claims that arose when Amanda and Mary Ann were minors because

---

[247] *See* Dkt. No. 303 at 99–101.

Congress created a statute of repose when it set the limitations period in § 1595(c)(2) based on the claimant's 18th birthday instead of the accrual of the cause of action.[248] The Court is unconvinced.

As an initial matter, existing caselaw does not seem to support the position of these Defendants. Notably, other district courts have suggested that equitable tolling applies to claims under the TVPRA. *See Doe v. Wyndham Hotels & Resorts, Inc.*, No. 2:24-cv-204, 2025 WL 725268, at *3–4 (E.D. Va. Mar. 26, 2025) (unpublished) (declining to dismiss plaintiff's TVPRA claim because "it [was] not clear from the face of the Complaint that equitable tolling [did] not apply"); *Doe v. Choice Hotels*, No. 6:23-cv-1012, 2024 WL 2955728, at *4 (M.D. Fla. June 12, 2024) (unpublished) (declining to dismiss plaintiff's complaint on timeliness grounds where equitable tolling or the continuing tort doctrine may have applied); *Hongxia Wang v. Enlander*, No. 17 Civ. 4932, 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018) (unpublished) ("Given the possibility of equitable tolling, a TVPRA claim is subject to dismissal based on a statute of limitations defense only if the complaint makes clear that the alleged wrongful conduct arose more than ten years before the claim was filed, and that the plaintiff has not been pursuing her rights diligently, and that no extraordinary circumstances stood in her way."). Meanwhile, the cases cited in support of the contrary position are inapposite. For instance, some Defendants rely on *Hogan*, but that case does not address the TVPRA. *See* 73 F.4th at 1155–56. Likewise, some Defendants cite *Ditullio v. Boehm*, a Ninth Circuit decision, but nowhere does that case suggest that § 1595(c)(2) is a statute of repose. *See* 662 F.3d 1091, 1093–1102 (9th Cir. 2011).

Furthermore, the history of the TVPRA counsels against construing § 1595(c)(2) as a statute of repose. When Congress first imposed a limitations period for civil TVPRA actions, it

---

[248] *See* Dkt. No. 319 at 2; Dkt. No. 327 at 5; Dkt. No. 328 at 2–3; Dkt. No. 329 at 17–18; Dkt. No. 331 at 3; Dkt. No. 333 at 4.

simply required claimants to file "not later than 10 years after the cause of action arose." William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 221, 122 Stat. 5044, 5067; Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (recognizing a private right of action for trafficking victims without establishing a limitations period). When Congress later enacted § 1595(c)(2) to create a special limitations period for minor trafficking victims, the amendment was billed as providing an "expanded statute of limitations for civil actions by child trafficking survivors." Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, § 120, 129 Stat. 227, 247.

The Court draws two important conclusions from this legislative history: First, if Congress truly wanted § 1595(c)(2) to be a statute of repose, it could have called it a statute of repose in the enacting language instead of a statute of limitations. Second, the enacting language shows that Congress intended to *expand* the limitations period for minor trafficking victims with § 1595(c)(2), and removing the possibility of equitable tolling by interpreting the provision as a statute of repose would, in at least some cases, have the opposite effect. Consider, for example, a child trafficking victim who, due to extraordinary circumstances, was unable to bring a TVPRA claim within ten years of turning 18. If § 1595(c)(2) were a statute of repose, that individual would be better off under the statutory regime that existed before § 1595(c)(2), as a global limitations period based around the accrual of the individual's claim would presumably be subject to equitable tolling. *See Lozano*, 572 U.S. at 11; *Hogan*, 73 F.4th at 1156. Thus, interpreting § 1595(c)(2) as a statute of repose that is not subject to equitable tolling would be inconsistent with the intent of the provision.

Nevertheless, even where equitable tolling is available for claims filed outside the applicable limitations period, the Court still must determine whether it is warranted. Here, some

38

Defendants assert that Plaintiffs are not entitled to equitable tolling for any of their claims.[249] For Plaintiffs' federal claims, these Defendants contend that the SAC does not establish the diligence or the specific exceptional circumstances required for equitable tolling. To be sure, diligence and exceptional circumstances are prerequisites to equitable tolling for federal claims, *see Arellano*, 598 U.S. at 6, but demanding specific allegations on these issues at this stage would run contrary to the principle that "[a] plaintiff need not anticipate in the complaint an affirmative defense that may be raised by the defendant," *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).[250] Indeed, because the SAC—with all its allegations of abuse, indoctrination, and deception—does not clearly indicate that equitable tolling is unwarranted for Plaintiffs' TVPRA claims, it would be inappropriate to dismiss those claims on timeliness grounds. *Cf. Fernandez*, 883 F.3d at 1299 ("To be sure, on occasion it is proper to dismiss a claim on the pleadings based on an affirmative defense. But that is only when the complaint itself admits all the elements of the affirmative defense."). Accordingly, the motions to dismiss will be denied to the extent they target TVPRA claims.

---

[249] *See* Dkt. No. 327 at 11–13; Dkt. No. 329 at 16–17; Dkt. No. 331 at 4–5; Dkt. No. 332 at 4, 9; Dkt. No. 333 at 12–14. Some of these arguments were raised for the first time in reply briefs. *See, e.g.*, Dkt. No. 381 at 7. As such, the Court declines to consider those arguments. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003).

[250] None of the authorities that Defendants cite compel a different conclusion. *See Menominee Indian Tribe v. United States*, 577 U.S. 250, 252, 254–55 (2016) (addressing an appeal from a government contracting officer's decision); *United States v. Kwai Fun Wong*, 575 U.S. 402, (2015) (addressing whether the statute of limitations for the Federal Tort Claims Act is a jurisdictional bar that is not subject to equitable tolling); *Holland v. Florida*, 560 U.S. 631, 634 (2010) (addressing a petition for a writ of habeas corpus); *Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005) (same). The strongest case cited by Defendants is *Irwin v. Department of Veterans Affairs*, which dealt with equitable tolling for a claim of employment discrimination. 498 U.S. 89, 91–92, 95–96 (1990). There, the Supreme Court affirmed the dismissal of the plaintiff's complaint because his asserted basis for equitable tolling was "at best a garden variety claim of excusable neglect." *See id.* at 91, 96. Here, in contrast, Plaintiffs' argument for equitable tolling is based on "a lifetime of indoctrination and abuse." Dkt. No. 370 at 5.

b.      *FLSA Claims.*

The Court now turns to the contested FLSA claims. FLSA actions "may be commenced within two years after the cause of action accrued," or "within three years" if the "cause of action aris[es] out of a willful violation." 29 U.S.C. § 255(a). Here, Plaintiffs allege willful FLSA violations, so the three-year limitations period applies.

In the motions to dismiss, several Defendants challenge the FLSA claims of Jenny Kingston and Jana Nicole Johnson.[251] Many of these Defendants argue that the limitations periods for the FLSA claims against them began running, at the latest, when Jenny and Jana turned 18. Meanwhile, some Defendants argue that the limitations periods for the claims against them began running, at the latest, around December 2020 for Jenny and around 2019 for Jana. If these Defendants are correct, then both Jenny and Jana's FLSA claims were filed outside the applicable limitations period, as the initial complaint in this case was filed more than three years after Jenny's 18th birthday (May 10, 2015), Jana's 18th birthday (January 9, 2021), December 2020, and 2019.

Even so, courts in this Circuit have consistently found that FLSA claims are subject to equitable tolling. *Born v. Progrexion Teleservices, Inc.*, No. 2:20-cv-00107, 2020 WL 5803320, at *2 (D. Utah Sept. 29, 2020) (unpublished). Therefore, consistent with the above observations regarding the challenged TVPRA claims, the Court concludes that it would not be appropriate to dismiss Jenny and Jana's FLSA claims as untimely where there is no clear indication in the SAC that equitable tolling is unjustified. Thus, the motions to dismiss will be denied to the extent they challenge FLSA claims.

---

[251] *See* Dkt. No. 319 at 2–3; Dkt. No. 325 at 3; Dkt. No. 327 at 6–8; Dkt. No. 328 at 3; Dkt. No. 329 at 7, 12, 14–15; Dkt. No. 332 at 6; Dkt. No. 333 at 8.

   *c.*  *Civil Conspiracy.*

The Court will now address the challenged civil conspiracy claims, which have a four-year limitations period under Utah law. *See* Utah Code § 78B-2-307(4) ("An action may be brought within four years . . . for relief not otherwise provided by law."); *see also Russell/Packard Dev., Inc. v. Carson*, 78 P.3d 616, 620 (Utah Ct. App. 2003) (stating that civil conspiracy claims are "subject to a four-year statute of limitations" and citing Utah Code § 78-12-25(3) (2002)); Act of January 31, 2008, H.B. 78 § 671, 2008 Utah Laws 48, 394 (renumbering Utah Code § 78-12-25(3) as Utah Code § 78B-2-307(3)); Act of March 2, 2023, H.B. 388 § 5, 2023 Utah Laws 1707, 1715 (renumbering Utah Code § 78B-2-307(3) as Utah Code § 78B-2-307(4)).

The moving Defendants seem to agree that Jana Nicole Johnson's civil conspiracy claims are timely.[252] Additionally, Amanda Rae Grant, Priscilla Tucker, and Mary Ann Robinson have dismissed their civil conspiracy claims. The civil conspiracy claims of all remaining Plaintiffs are challenged as untimely based on when those Plaintiffs turned 18.[253] Given the filing date of the initial complaint and the birth dates listed in the SAC, the four-year limitations period has expired for Jenny Kingston (who turned 18 on May 10, 2015), Julie Ruth Green (who turned 18 on December 6, 2016), Michelle Ruth Michaels (who turned 18 on May 2, 2018), Allison Eames (who turned 18 on November 6, 2017), Brenda Collins (who turned 18 on March 23, 2019), and Alex Martin (who turned 18 on January 23, 2020).

Some Defendants argue that this is the end of the analysis because equitable tolling is unavailable, as the Utah statute that tolls limitations periods for minors is a statute of repose. The

---

[252] *See* Dkt. No. 319 at 3; Dkt. No. 325 at 3; Dkt. No. 327 at 6–8; Dkt. No. 328 at 4; Dkt. No. 329 at 8–15; Dkt. No. 331 at 4; Dkt. No. 332 at 6; Dkt. No. 333 at 11.

[253] *See* Dkt. No. 319 at 3; Dkt. No. 325 at 3–4; Dkt. No. 327 at 8–11; Dkt. No. 328 at 4; Dkt. No. 329 at 8, 10–15; Dkt. No. 332 at 7–8; Dkt. No. 333 at 11.

Court rejects this argument. The statute in question, Utah Code § 78B-2-108(2), does not purport to create an entirely different limitations period for claims accruing when a plaintiff is a minor. *See* Utah Code § 78B-2-108(2). To the contrary, the law simply states that it functions to pause "statute[s] of limitations." *Id.*

Thus, tolling under the discovery rule may be available for Plaintiffs' civil conspiracy claims, but whether tolling is warranted remains to be seen. As with the federal claims analyzed above, some Defendants assert that the SAC does not sufficiently allege circumstances justifying tolling. For instance, some Defendants contend that, at this stage in the proceedings, Utah law requires specific allegations detailing how each Defendant's actions prevented Plaintiffs from filing their claims within the applicable limitations periods.

The Court does not see it that way. Questions of tolling under Utah law can be fact-intensive and, therefore, ill-suited for disposition as a matter of law. *See Carson*, 108 P.3d at 750; *Spears v. Warr*, 44 P.3d 742, 753 (Utah 2002) (observing that the application of tolling can sometimes depend on "a subsidiary factual determination—the point at which a person reasonably should know that he or she has suffered a legal injury"), *overruled in part on other grounds by Tangren Fam. Tr. v. Tangren*, 182 P.3d 326, 331 n.20 (Utah 2008). A determination as to fraudulent concealment, for example, "necessitates the type of factual findings which preclude judgment as a matter of law in all but the clearest of cases." *See Carson*, 108 P.3d at 751 (alteration adopted) (quoting *Berenda*, 914 P.2d at 53). More broadly, and as previously highlighted, "a plaintiff need not anticipate affirmative defenses" in order to "satisfy her pleading burden." *Mathews v. McCown*, 575 P.3d 1114, 1141 (Utah 2025); *see also Fernandez*, 883 F.3d at 1299; *Levin v. Miller*, 763 F.3d 667, 671 (7th Cir. 2014) ("[C]omplaints need not anticipate affirmative defenses; neither *Iqbal* nor *Twombly* suggests otherwise.").

42

Considering these principles, the Court will not dismiss Plaintiffs' remaining civil conspiracy claims at this stage. Each Plaintiff in the SAC alleges, at the very least, that she was deprived of her rightful wages under false pretenses. Given these allegations, the SAC does not clearly establish that Plaintiffs are not entitled to tolling for their civil conspiracy claims based on fraudulent concealment or extraordinary circumstances. *See Colosimo*, 156 P.3d at 812; *Carson*, 108 P.3d at 747–48, 750. Therefore, the motions to dismiss will be denied to the extent they challenge Plaintiffs' remaining civil conspiracy claims.

> **d.** *Sexual Abuse of a Child.*

Next, the Court will discuss the challenged claims for child sexual abuse. Utah law generally provides that a civil action for intentional or negligent sexual abuse of a child may be brought (1) "against a perpetrator . . . at any time" and (2) "against a non-perpetrator . . . within four years after the individual attains the age of 18 years" or "within four years after discovery of the sexual abuse, whichever period expires later." Utah Code § 78B-2-308(3)(a)–(b).

The Court will begin by addressing the motion to dismiss of John Paul Johnson, who is sued as a perpetrator of intentional child sexual abuse by Amanda Rae Grant. He contends that a four-year statute of limitations was in effect at the time of the alleged abuse, which means that Amanda's claim became untimely four years after her 18th birthday, i.e., in 2017. It is true that, child sexual abuse claims against perpetrators used to be subject to a four-year statute of limitations, but that changed in 2015, i.e., before the asserted expiration date for Amanda's claim, when the current law with no statute of limitations was enacted. *See* Statute of Limitations for Civil Actions, H.B. 277, 2015 Utah Laws 290.

John Paul Johnson argues that the current statutory regime cannot be applied retroactively for two reasons. First, he argues that the legislature did not clearly indicate in 2015 that its

amendment was supposed to apply retroactively. Utah law generally provides that statutory provisions apply retroactively only when "expressly declared to be retroactive," Utah Code § 68-3-3, but in applying this principle, Utah courts have carved out an exception for "procedural" amendments such as those affecting statutes of limitations. *State v. Winter*, 554 P.3d 355, 361 (Utah Ct. App. 2024); *see also State v. Clark*, 251 P.3d 829, 833–34 (Utah 2011). Second, John Paul Johnson argues that giving retroactive effect to the current version of the law would violate his constitutional rights. This argument is also unpersuasive. While it is certainly true that lawmakers are "prohibited from retroactively reviving a time-barred claim," *Mitchell v. Roberts*, 469 P.3d 901, 903 (Utah 2020), the Utah Supreme Court has indicated that there is no issue with retroactively applying an expanded statute of limitations when, as here, "the limitations defense ha[d] not accrued to the defendant before the amendment bec[ame] effective," *State v. Lusk*, 37 P.3d 1103, 1110 (Utah 2001). Federal law leads to the same conclusion. *See United States v. Taliaferro*, 979 F.2d 1399, 1402 (10th Cir. 1992) ("[T]he application of an extended statute of limitations to offenses occurring prior to the legislative extension, where the prior and shorter statute of limitations has not run as of the date of such extension, does not violate the ex post facto clause."); *see also Int'l Union of Elec., Radio & Mach. Workers, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 243–44 (1976) ("[C]ertainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment." (quoting *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 316 (1945))). Therefore, John Paul Johnson's motion to dismiss will be denied.[254]

---

[254] Some additional Defendants appear to challenge some of Amanda, Jenny, and Jana's child sex abuse claims, even though these claims are not asserted against them. *See* Dkt. No. 303 at 126; Dkt. No. 325 at 1–3; Dkt. No. 327 at 6–9; Dkt. No. 332 at 7. These Defendants' motions will be denied as to these claims. *See United States v. Weatherly*, No. 3:19-cv-802-J-32JRK, 2020 WL

The only remaining challenged claims for child sexual abuse are Jenny Kingston's non-perpetrator claims against Paul Elden Kingston, Sr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and John Daniel Kingston, Jr.[255] Based on the SAC, Jenny turned 18 in 2015, which means that the four-year limitations period for these claims had expired by the time the initial complaint in this case was filed in 2024. The question remains, however, whether the limitations period may be tolled.

As an initial matter, while the applicable statute here incorporates a delayed discovery rule, Utah Code § 78B-2-308(2)–(3), Jenny's allegations in the SAC indicate that this provision does not apply because she was aware of the alleged abuse and the corresponding injuries as they happened. Indeed, based on the SAC, Jenny was present with Paul Elden Kingston, Sr., Jacob Ortell Kingston, Sr., Sally Kingston, and John Daniel Kingston, Sr., at the meeting where her marriage to her eventual abuser was approved. The SAC further alleges that John Daniel Kingston, Sr., presided at the ensuing wedding, and that John Daniel Kingston, Jr., led counseling sessions with Jenny to keep her in the marriage and declined to grant her a divorce. These allegations also demonstrate that the alleged wrongdoing and the corresponding injuries were not hidden from Jenny such that she could qualify for tolling based on fraudulent concealment. *See Carson*, 108 P.3d at 748. Moreover, while tolling may also be warranted based on exceptional circumstances, even that theory requires a threshold showing of delayed discovery. *See Colosimo*, 156 P.3d at 812.

Like the Utah legislature, the Court recognizes that it can "take[] decades" for victims of child sexual abuse to "find the strength to face what happened to them" and pursue legal remedies.

---

2543091, at *1 (M.D. Fla. May 19, 2020) ("Generally, parties do not have standing to move to dismiss claims not asserted against them.").

[255] *See* Dkt. No. 303 at 128; Dkt. No. 325 at 1, 3; Dkt. No. 329 at 14–15; Dkt. No. 333 at 10–11.

Utah Code § 78B-2-308(1)(b). But the Utah Supreme Court has taken a "narrow" view on when the statute of limitations may be tolled for child sexual abuse claims. *Colosimo*, 156 P.3d at 812. For instance, the court has declined to toll the statute of limitations for child sexual abuse victims who have awareness of their abuse before the end of the limitations period but are "psychologically unable to reveal" the details of their cases in time. *O'Neal v. Div. of Fam. Servs.*, 821 P.2d 1139, 1144–45 (Utah 1991). Even where a plaintiff had endured "a period of psychological repression," the court denied tolling because the plaintiff was aware of the abuse for at least some time during the limitations period. *Burkholz*, 972 P.2d at 1235.

Under these circumstances, the Court cannot see how tolling could apply to Jenny's challenged claims.[256] Accordingly, the Court will grant the motions to dismiss filed by Paul Elden Kingston, Sr., Jacob Ortell Kingston, Sr., Sally Kingston, John Daniel Kingston, Sr., and John Daniel Kingston, Jr., to the extent they challenge Jenny's non-perpetrator child sexual abuse claims.

e.    *Sexual Abuse of an Adult.*

Finally, the Court turns to the challenged claims for adult sexual abuse. Because the Utah Code does not provide a specific limitations period for claims of adult sexual abuse, such claims are subject to a four-year catchall limitations period. *See* Utah Code § 78B-2-307(4) ("An action may be brought within four years . . . for relief not otherwise provided by law.").

---

[256] The authorities cited by Plaintiffs do not justify a different result. Plaintiffs rely heavily on *Bistline v. Parker*, a Tenth Circuit case applying tolling principles from Utah law, but there were no state-law child sexual abuse claims at issue there. *See* 918 F.3d 849, 862 (10th Cir. 2019). The other cases that Plaintiffs cite do not deal with such claims, either. *See Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174, at *1–3 (W.D. Ark. Dec. 24, 2013); *Barba v. Seung Heun Lee*, No. CV 09-1115, 2009 WL 8747368, at *2 (D. Ariz. Nov. 4, 2009).

Here, the only adult sexual abuse claims that are challenged are Julie Ruth Green's claim against Paul Elden Kingston, Jr., and Jenny Kingston's claim against Jacob Daniel Kingston, Jr.[257] Based on the SAC, the limitations period for Julie's claim began running in 2018 when she physically separated herself from Paul Elden Kingston, Jr., or, at the latest, in 2019 when she left the Order. In either scenario, the four-year limitations period expired before the filing of the initial complaint in this case. In addition, the record shows that tolling is not warranted for this claim. Based on the SAC, Julie would have been aware of the alleged abuse and the ensuing injuries as they occurred, so tolling based on fraudulent concealment is not warranted. *See Carson*, 108 P.3d at 748. Tolling based on exceptional circumstances is likewise inapplicable given Julie's contemporaneous awareness of the facts underlying her claim. *See Colosimo*, 156 P.3d at 812. Accordingly, the Court will grant the motion of Paul Elden Kingston, Jr., to the extent he challenges Julie's claim for adult sexual abuse.

Jacob Daniel Kingston, Jr., meanwhile, has not sufficiently established that Jenny's claim against him was filed outside the limitations period. He argues that the limitations period for her claim expired by 2019, but the SAC does not clearly state when the alleged abuse ended. When reasonable inferences are drawn in Jenny's favor, the SAC suggests that the last instance of abuse occurred—and the limitations period began running—when Jenny left the Order "sometime after December 2020."[258] This alleged timeline does not foreclose the possibility of additional abuse after February 2020, i.e., within the limitations period. Accordingly, the Court declines to dismiss Jenny's claim for adult sexual abuse at this stage.

---

[257] *See* Dkt. No. 325 at 1, 3; Dkt. No. 329 at 1, 14. Some Defendants move to dismiss Jenny's claim even though it is not asserted against them. Their motion will be denied as to this claim. *See Weatherly*, 2020 WL 2543091, at *1.

[258] Dkt. No. 303 at 60.

**II.     Motion to Consolidate.**

The Court next turns to Plaintiffs' motion to consolidate. A court may consolidate two cases that "involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2). Even when there is a "common question," however, there are other factors that a court should consider before granting a motion to consolidate. For instance, "the court should weigh the interests of judicial convenience in consolidating the cases against the delay, confusion, and prejudice that consolidation might cause." *Cheney v. Judd*, 429 F. Supp. 3d 931, 936 (D.N.M. 2019). "[T]he burden of demonstrating that consolidation is desirable" falls on the moving party, and a court "has broad discretion in determining whether to consolidate cases." *Cheney*, 429 F. Supp. 3d at 936.

There are common questions of law and fact between this case and *Nichols*. The cases involve some common parties, and both feature allegations of sex trafficking, sexual abuse, and civil conspiracy.[259] At the same time, *Nichols* involves a unique plaintiff who filed a separate action even though she and Plaintiffs in this case share a common attorney.[260]

Moreover, even if it was not feasible for the plaintiff in *Nichols* to join this lawsuit when it was originally filed, the timing of the motion to consolidate is still puzzling. The complaint in *Nichols* was filed in close succession with the Court's order directing Plaintiffs in this case to file a second amended complaint, but rather than moving to consolidate at that point, Plaintiffs pressed forward with the SAC (after receiving four deadline extensions) and then waited until the motions to dismiss started coming in.[261] Simply put, the way Plaintiffs went about asking to consolidate this case with *Nichols* did not promote judicial convenience.

---

[259] *See* Dkt. No. 303 at 6–9, 108, 118, 126–28; Dkt. No. 320 at 1–2; No. 2:25-cv-00051, Dkt. No. 2 at 2–3, 21, 25–28.
[260] *See* Dkt. No. 303 at 1; No. 2:25-cv-00051, Dkt. No. 2 at 1.
[261] *See* Dkt. No. 294 at 6; Dkt. No. 296; Dkt. No. 298; Dkt. No. 300; Dkt. No. 302; Dkt. No. 303 at 130; Dkt. No. 319 at 4; Dkt. No. 320 at 2; No. 2:25-cv-00051, Dkt. No. 2 at 29.

Further, the case history suggests that consolidation would not promote efficiency. Plaintiffs, even with three opportunities to plead, have labored to clearly specify which claims are being asserted against which Defendants. Under these circumstances, it is hard to see how adding an additional party to the mix will make things go more smoothly. Therefore, Plaintiffs' motion to consolidate will be denied.

### III.   Motion for Leave to Amend.

The Court will now turn to Plaintiffs' motion for leave to file a third amended complaint. "A party may amend its pleading once as a matter of course," but any subsequent amendments require "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a). "[W]hen justice so requires," a court should "freely" grant a request to amend a pleading. Fed. R. Civ. P. 15(a)(2). Following this directive ensures that the parties will have "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)).

At the same time, leave to amend is not guaranteed. For example, a court may deny leave to amend where the proposed amendment is based on facts that were "known or reasonably should have been known to the [movant]" when the operative pleading was filed. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1189–90 (10th Cir. 2019); *see also Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987) (noting that "courts have denied leave to amend where the moving party was aware of the facts on which the amendment was based for some time prior to the filing of the motion to amend"). Additionally, a court may deny leave to amend because of "undue delay." *Foman v. Davis*, 371 U.S. 178, 182 (1962). This does not mean that a court may deny leave to amend purely based on a delay, but "denial of leave to amend is appropriate 'when

49

the party filing the motion has no adequate explanation for the delay.'" *Minter*, 451 F.3d at 1205-06 (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365–66 (10th Cir. 1993)).

Here, Plaintiffs wish to file a third amended complaint so they can add an additional claim for child sexual abuse under state law and some claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO").[262] Given the sobering allegations detailed above, basic notions of justice counsel strongly in favor of a resolution on the merits—in fairness to all parties concerned. Accordingly, the Court will grant Plaintiffs' request to file a third amended complaint, though not on the exact terms that Plaintiffs propose.

In particular, the Court will not allow Plaintiffs to include their proposed RICO claims in their third amended complaint. The procedural history of this case demonstrates why. Plaintiffs included the same RICO claims in their original complaint and first amended complaint.[263] In response to the first amended complaint, some Defendants moved to dismiss the RICO claims, in part, on timeliness grounds.[264] Then, when Plaintiffs filed the SAC, they did not include any RICO claims. After that, Judge Bennett bifurcated the motion-to-dismiss phase, directing Defendants to first focus their motions on the timeliness of Plaintiffs' claims. Plaintiffs, however, did not raise the prospect of reviving the RICO claims until all the ensuing motions to dismiss had been filed.[265] Thus, if the Court allows Plaintiffs to reassert their RICO claims now, the case will likely be delayed as the Court entertains another round of motions to dismiss based on timeliness. And, critically, Plaintiffs have not explained why this delay would be justified given that they were clearly aware of the facts underlying the RICO claims when they included them in their original

---

[262] *See* Dkt. No. 403 at 2, 4–5.
[263] *See* Dkt. No. 1 at 117, 120; Dkt. No. 141 at 117, 119.
[264] *See* Dkt. No. 141 at 117, 119; Dkt. No. 193 at 4–6; Dkt. No. 205 at 33–35; Dkt. No. 216 at 9-11.
[265] *See* Dkt. Nos. 401, 402.

complaint and first amended complaint (and when they removed them from the SAC). Based on these circumstances, the Court will not permit Plaintiffs to resurrect their RICO claims.

Plaintiffs' new proposed child sexual abuse claim, however, presents a different matter. This claim, which Priscilla Tucker would like to assert against alleged perpetrator Joseph Kingston, Jr., was not included in any prior pleadings in this case.[266] Moreover, as Defendants seem to acknowledge,[267] this claim would not be subject to any limitations period, *see* Utah Code § 78B-2-308(3)(a), so any motion to dismiss the claim would fit within the second round of motions to dismiss contemplated in Judge Bennett's scheduling order.[268]

Further, contrary to Defendants' arguments,[269] the Court would have subject matter jurisdiction over the new proposed child sexual abuse claim. There are already federal claims in this case, so the Court may exercise supplemental jurisdiction over any state-law claims that are "part of the same case or controversy," 28 U.S.C. § 1367(a), i.e., "state law claims that 'derive from a common nucleus of operative fact,'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). The new proposed child sexual abuse claim fits that bill, as it arises from the same alleged pattern of sexual and economic exploitation underlying Plaintiffs' federal claims.[270] Thus, Plaintiffs will be permitted to include this new proposed child sexual abuse claim in their third amended complaint.

---

[266] *See* Dkt. No. 1 at 127; Dkt. No. 141 at 126; Dkt. No. 303 at 126; Dkt. No. 403 at 4; Dkt. No. 403-2 at 106, 164.

[267] *See* Dkt. No. 407 at 15.

[268] The Court also notes that, based on Priscilla's birthday, the statutory amendment removing the statute of limitations for child sexual abuse claims took effect before Priscilla's proposed claim would have expired under the prior statutory scheme. *See* H.B. 277, 2015 Utah Laws 290; Dkt. No. 403-2 at 11. Thus, the potential retroactivity concerns, discussed above in connection with Amanda Rae Grant's claim against John Paul Johnson, would not seem to apply. *See Lusk*, 37 P.3d at 1110. Federal law leads to the same conclusion. *See Taliaferro*, 979 F.2d at 1402.

[269] *See* Dkt. No. 407 at 15.

[270] *See* Dkt. No. 403-2 at 31–32, 99–101, 164.

Finally, in parting, the Court will make three observations in hopes of facilitating a well-drafted third amended complaint.[271] First, as indicated above, the SAC, like its predecessor, contains some improper collective allegations. This problem stems in part from Plaintiffs' use of the term "the Order." This term may be a useful shorthand for all the entities involved in the alleged wrongdoing, but it is confusing to refer to "the Order" as both a collective encompassing all Defendants *and* an individual Defendant against which specific claims are asserted. In their third amended complaint, Plaintiffs should only use the names of specific Defendants when laying out their individual causes of action and the particular allegations related thereto.

Second, the Court encourages Plaintiffs to exercise care in their use of fictitious names. While it is certainly helpful to know whether a Defendant does business under a name different from its official title, the use of a fictitious name does not create a new entity. Thus, for example, if "Family Stores True Value" is a name under which World Enterprises II does business, then Plaintiffs may note the fictitious name in appropriate places in the third amended complaint, but any claims related to the business should be against World Enterprises II and the fictitious name should not be used as a separate Defendant.[272]

Third, the Court acknowledges that this order is somewhat unusual; typically when the Court grants leave to amend it denies any pending motions to dismiss as moot.[273] But because Plaintiffs in this instance sought to add claims to their pleading rather than substantively alter their existing claims, the Court elected to resolve the motions to dismiss before granting leave to amend

---

[271] The proposed pleading that Plaintiffs submitted with their motion for leave to amend suggests that they are already somewhat aware of the issues that the Court is about to highlight. *See, e.g.*, *id.* at 15–16, 66. Nevertheless, the Court sees fit to put these matters on the record so that Plaintiffs may further improve their pleading to the benefit of the Court and the litigants.

[272] *See* Dkt. No. 303 at 11, 15, 103–105, 111, 114–16.

[273] *See, e.g.*, Dkt. No. 294 at 5–6.

in order to keep this case moving forward. Given this atypical posture, the Court reminds Plaintiffs that any claims that have been dismissed should be omitted from the third amended complaint. Additionally, Plaintiffs should not add claims or factual allegations to the third amended complaint unless doing so is consistent with this order.[274]

In light of the Court's remarks, Plaintiffs may wish to file a third amended complaint that is different from the proposed pleading submitted with their motion for leave to amend. The Court is sensitive to this and will accordingly grant Plaintiffs some additional time to make necessary updates.

Because Plaintiffs will be filing a third amended complaint, the pending motions to quash will be denied as moot.

## CONCLUSION & ORDER

In conclusion, the Court ORDERS as follows:

1. The motion to dismiss filed by Advance Vending and Family Stores True Value (Dkt. No. 319) is DENIED.

2. The motion to dismiss filed by Paul Elden Kingston, Sr., Patricia Kingston, Paul Elden Kingston, Jr., Davis County Cooperative Society, Inc., Latter Day Church of Christ, and Deborah Williams (Dkt. No. 325) is GRANTED to the extent it seeks dismissal of Jenny Kingston's claim for negligent child sexual abuse against Paul Elden Kingston, Sr., and Julie Ruth Green's claim for adult sexual abuse against Paul Elden Kingston, Jr.; otherwise, the motion is DENIED.

---

[274] This is not to say that Plaintiffs are absolutely barred from amending their pleading in the future. The Court will continue to entertain requests for leave to amend and will grant such requests for good cause shown.

3. The motion to dismiss filed by Fidelity Funding Company, Fidelity Funding Investments, Inc., and Rachel Orlean Kingston Young (Dkt. No. 327) is DENIED.

4. The motion to dismiss filed by Jesse Orvil Kingston, Jolene Andrews, Michelle Afton Michaels, Kent William Johnson, American Digital Systems, AAA Communications, Advanced Copy, and Washakie Ranch (Dkt. No. 328) is DENIED.

5. The motion to dismiss filed by Standard Restaurant Supply, Sierra Wholesale, World Enterprises, World Enterprises II, Hyrum Dalton Kingston, April McKay, Jacob Ortell Kingston, Sr., Jacob Daniel Kingston, Jr., and Sally Kingston (Dkt. No. 329) is GRANTED to the extent it seeks dismissal of Jenny Kingston's claims for negligent child sexual abuse against Jacob Ortell Kingston, Sr., and Sally Kingston; otherwise, the motion is DENIED.

6. The motion to dismiss filed by John Paul Johnson (Dkt. No. 330) is DENIED.

7. The motion to dismiss filed by Mitchell & Associates (Dkt. No. 331) is DENIED.

8. The motion to dismiss filed by Arrow Real Estate, CTC Trucking, Ensign Learning Center, Garco Property Management, Jason Ortell Kingston, and David Ortell Kingston (Dkt. No. 332) is DENIED.

9. The motion to dismiss filed by A-Fab Engineering, American Wellness and Rehab Clinic, A-1 Disposal, Valerie Martin, John Daniel Kingston, Sr., John Daniel Kingston, Jr., and Daniel Charles Kingston (Dkt. No. 333) is GRANTED to the extent it seeks dismissal of Jenny Kingston's claims for negligent child sexual abuse against John Daniel Kingston, Sr., and John Daniel Kingston, Jr.; otherwise, the motion is DENIED.

10. Plaintiffs' motion to consolidate (Dkt. No. 320) is DENIED.

54

11. Plaintiffs' motion for leave to file a third amended complaint (Dkt. No. 403) is GRANTED IN PART and DENIED IN PART. Plaintiffs shall file a third amended complaint by no later than June 1, 2026.

12. The motions to quash filed by Paul Elden Kingston, Sr. (Dkt. Nos. 326, 371), are DENIED as moot.

DATED this 30th day of March 2026.

BY THE COURT:

Ann Marie McIff Allen
United States District Judge