Roger H. Hoole (5089)
Ruth Hackford-Peer
**HOOLE & KING, L.C.**
4276 South Highland Drive
Salt Lake City, UT 84124
Telephone: (801) 272-7556
Rogerh@hooleking.com
Ruthhp@hooleking.com


**HOOLE & KING, L.C.**
In Association with the
**Justice and Protection Alliance**,
a Utah Non-Profit Corporation
and Advocates for Plaintiffs

*Attorneys for Plaintiffs*

**SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP**

Lara A. Flath (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Lara.Flath@skadden.com
Michael.Griffin@skadden.com

Lauren N. Rosenello (*pro hac vice*)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3125
Lauren.Rosenello@skadden.com

Marley Ann Brumme (*pro hac vice*)
Elizabeth J. Perkins (*pro hac vice*)
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Marley.Brumme@skadden.com
Elizabeth.Perkins@skadden.com

---

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Priscilla Tucker, Brenda Collins, Katie Martin, and Mary Ann Robinson,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>Paul Elden Kingston, John Daniel Kingston Sr., Hyrum Dalton Kingston, David Ortell Kingston, Jesse Orvil Kingston, Jason Ortell Kingston, Rachel Orlean Kingston Young, John Paul Johnson, Jacob Daniel Kingston Jr., Jacob Ortell | **THIRD AMENDED COMPLAINT AND JURY DEMAND**<br><br>Case No. 2:24-cv-00155<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Jared C. Bennett |

Kingston Sr., Sally Kingston, John Daniel Kingston Jr., Joseph Kingston, Daniel Charles Kingston, Patricia Kingston, Paul Elden Kingston Jr., Michelle Afton Michaels, Deborah Williams, Jolene Andrews, April McKay, Valerie Martin, Kent William Johnson, American Digital Systems, American Wellness & Rehab Clinic LLC, Arrow Real Estate Services, Inc., Attco Trucking Company, Inc., Davis County Cooperative Society, Davis County Cooperative Society, Inc., Elizabeth Smith, Ensign Learning Center, Inc., Fidelity Funding Company, Fidelity Funding Company, Four Corners Precision Mfg. Co., Latter Day Church of Christ, Mitchell & Associates, LLC, N.W.R. Limited Partnership, Order Bank, Standard Industries, Inc., United Fuel Supply L.L.C., U.P.C., Inc., Washakie Renewable Energy, LLC, World Enterprises, and Does 1-500,

*Defendants.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... iii

INTRODUCTION ...........................................................................................................1

JURISDICTION AND VENUE ........................................................................................2

PLAINTIFFS .................................................................................................................3

INDIVIDUAL DEFENDANTS .......................................................................................4

ENTITY DEFENDANTS ................................................................................................6

GENERAL FACTUAL ALLEGATIONS MADE BY ALL PLAINTIFFS ...............................14

     A.     Founding of the Order, DCCS, and the LDCC.......................................14

     B.     The Order Exercises Total Physical, Psychological, and Financial Control Over its Members................................................................................15

ADDITIONAL SPECIFIC FACTUAL ALLEGATIONS BY EACH PLAINTIFF ...................43

     C.     Amanda Grant.......................................................................................43

     D.     Jenny Kingston ......................................................................................53

     E.     Jana Nicole Johnson..............................................................................62

     F.     Julie Ruth Green ...................................................................................69

     G.     Michelle Ruth Michaels ........................................................................74

     H.     Allison Eames........................................................................................81

     I.     Priscilla Tucker.....................................................................................85

     J.     Brenda Collins ......................................................................................92

     K.     Katie "Alex" Martin.............................................................................99

     L.     Mary Ann Robinson............................................................................102

COUNT I  (Labor Trafficking in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, 1590 and 1595) ...........................106

COUNT II  (Involuntary Servitude in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1584, and the Thirteenth Amendment).....................110

COUNT III  (Violation of the Federal Fair Labor Standards Act, 29 U.S.C. § 206 et seq.).......115

COUNT IV (Sex Trafficking in Violation of the Trafficking Victims Protection
Reauthorization Act, 18 U.S.C. § 1591 and § 1595)......................................................117

COUNT V  (Civil Conspiracy).......................................................................................120

COUNT VI  (Sexual Battery and Abuse of Children) ............................................................123

COUNT VII  (Sexual Battery and Rape of Adults)...................................................................125

COUNT VIII  (Negligent Sexual Battery and Abuse of a Child)...............................................126

REQUEST FOR PUNITIVE DAMAGES ..................................................................................127

PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL ................................................127

EXHIBIT A ...............................................................................................................................129

EXHIBIT B.................................................................................................................................130

Plaintiffs, by and through their undersigned counsel, hereby allege, as and for their Third Amended Complaint against Defendants as follows:

**INTRODUCTION**

*In 1987, a warning sounded at an Order Board Meeting: "I was shown during the nights a terrible condition of oppression and minor slavery throughout the Order."* – **Arduous Gustafson**

1. From birth until their eventual escapes, Plaintiffs were raised in an insular community referred to as the "Order."[1] While masquerading as a religious organization, the central purpose of the Order (and its affiliated "economic cooperative," the Davis County Cooperative Society ("DCCS")) is to enrich its leadership and their favored wives—including the Individual Defendants (defined *infra*). As one former member commented, "I could boil down what they're about in three words. Money, sex, and power."

2. A secretive and sprawling conspiracy of individuals, unincorporated associations, and hundreds of for-profit businesses, the Order functions as a business enterprise that illegally profits from underpaid and unpaid child labor. To grow the Order's membership—and ensure a constant swell of cheap laborers for the Order's businesses—young women in the Order are brainwashed, coerced into underage, bigamous, and incestuous "Order Marriages" with Order members, and compelled to give birth to as many children as possible. Any acts that are considered by the Order's leadership to be disobedient or any attempt to leave the Order are severely punished, including with physical, psychological, economic, and sexual abuse, leaving members with no choice but to continue working and bearing children that further perpetuate the cycles of labor and sex trafficking.

---

[1] While this group is generally known by non-members as the "Kingstons" (after the powerful family that leads it), members of the group call it the "Order."

3. The conspiracy has been fruitful: the Order is thought to have amassed hundreds of millions of dollars—if not more—in wealth, all benefitting the Order's leader, Defendant Paul Elden Kingston (herein "Paul Elden Kingston Sr."), and a select group of other high-ranking members.

4. Plaintiffs are ten young women who suffered decades of extensive physical, sexual, and economic abuse at the hands of Defendants, which include the powerful men and their favored wives who abused Plaintiffs, the businesses that exploited them, and the Order itself. By this action, Plaintiffs seek to hold Defendants accountable for the myriad injuries Plaintiffs have suffered.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, including under the Trafficking Victims Protection Reauthorization Act and the Fair Labor Standards Act. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

6. This Court has personal jurisdiction over each Defendant because (i) each purposefully availed themselves of the privilege of conducting various business and/or personal activities in Utah, including, *inter alia*, by residing in Utah, and/or by owning, managing, or operating businesses in Utah; (ii) Defendants' contacts within this forum give rise to, or are related to, Plaintiffs' injuries and claims; (iii) Defendants' activities involving Utah, including their labor and/or sex trafficking of minors, are substantial; and (iv) pursuant to Utah Code Ann. § 78B-3-205, Defendants were members of a civil conspiracy aimed at committing torts in Utah which caused harm to Plaintiffs in Utah in furtherance of the conspiracy.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Utah.

## PLAINTIFFS

8.      Plaintiff Amanda Rae Grant is a young woman and former member of the Order. Amanda was born into the Order on August 31, 1995.

9.      Plaintiff Jenny Kingston is a young woman and former member of the Order. Jenny was born into the Order on May 10, 1997.

10.     Plaintiff Jana Nicole Johnson is a young woman and former member of the Order. Jana was born into the Order on January 9, 2003.

11.     Plaintiff Julie Ruth Green, a/k/a Julie Nichols, is a young woman and former member of the Order.  Julie was born into the Order on December 6, 1998.

12.     Plaintiff Michelle Ruth Michaels is a young woman and former member of the Order.  Michelle was born into the Order on May 2, 2000.

13.     Plaintiff Allison Eames is a young woman and former member of the Order. Allison was born into the Order on November 6, 1999.

14.     Plaintiff Priscilla Tucker is a young woman and former member of the Order. Priscilla was born into the Order on April 18, 1997.

15.     Plaintiff Brenda Collins is a young woman and former member of the Order. Brenda was born into the Order on March 23, 2001.

16.     Plaintiff Katie Martin ("Alex") is a young woman and former member of the Order. Alex was born into the Order on January 23, 2002.

17.     Plaintiff Mary Ann Robinson is a young woman and former member of the Order. Mary Ann was born on November 13, 1992.

## INDIVIDUAL DEFENDANTS

18.    Defendant Paul Elden Kingston Sr. is an individual believed to be residing in, among other counties, Salt Lake County, State of Utah, and a member of the Order.  He is the Order's supreme leader and one of the Seven Kingston Brothers.  He controls the Order, directs Order members, and approves all Order Marriages.  He serves as Trustee for Defendant DCCS, a position equivalent to Chief Executive Officer, and Head of Defendant Latter Day Church of Christ.

19.    Defendant John Daniel Kingston Sr. is an individual believed to be residing in, among other counties, Salt Lake County, State of Utah, one of the Seven Kingston Brothers, and a leader of the Order.

20.    Defendant Hyrum Dalton Kingston is an individual believed to be residing in Salt Lake County, State of Utah, one of the Seven Kingston Brothers, and a leader of the Order.

21.    Defendant David Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, one of the Seven Kingston Brothers, and a leader of the Order.

22.    Defendant Jesse Orvil Kingston is an individual believed to be residing in Salt Lake County, State of Utah, one of the Seven Kingston Brothers, and a leader of the Order.

23.    Defendant Jason Ortell Kingston is an individual believed to be residing in Salt Lake County, State of Utah, one of the Seven Kingston Brothers, and a leader of the Order.

24.    Defendant Rachel Orlean Kingston Young is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

25.    Defendant John Paul Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

26.    Defendant Jacob Daniel Kingston Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

4

27.     Defendant Jacob Ortell Kingston Sr. is an individual believed to be residing in a prison in the State of Arizona, and a member of the Order.

28.     Defendant Sally Kingston is an individual believed to be residing in a prison in the State of Texas, and a member of the Order.

29.     Defendant John Daniel Kingston Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

30.     Defendant Joseph Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

31.     Defendant Daniel Charles Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

32.     Defendant Patricia Kingston is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

33.     Defendant Paul Elden Kingston Jr. is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

34.     Defendant Michelle Afton Michaels, a/k/a Michelle Afton Brown, is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

35.     Defendant Deborah Williams is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

36.     Defendant Jolene Andrews is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

37.     Defendant April McKay is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

5

38.     Defendant Valerie Martin is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

39.     Defendant Kent William Johnson is an individual believed to be residing in Salt Lake County, State of Utah, and a member of the Order.

40.     Each of the Individual Defendants is tied economically to the Order and reports to Paul Elden Kingston Sr.

41.     Individual Defendant Does 1 through 50 are members and agents of the Order, not yet identified, who hold property and conduct business for the benefit of the Order.

**ENTITY DEFENDANTS[2]**

42.     Defendant American Digital Systems ("American Digital Systems") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 2971 South Richards Street, Salt Lake City, Utah 84115.  Defendant American Digital Systems engages in interstate commerce as a participant in the Order, as part of the conspiracy, and through electronic communications and the sale of services and products to Order Businesses outside of Utah.  Defendant American Digital Systems has several registered d/b/a's, including: (i) AAA Communications, a for-profit business with a principal place of business at the same principal place of business at 2971 South Richards Street, Salt Lake City, Utah 84115 ("AAA Communications"); and (ii) Advanced Copy and Photo, a for-profit business with a principal place of business at 4850 South Redwood Road, Taylorsville, Utah 84123 ("Advanced Copy").  As AAA Communications, Defendant American Digital Systems engages in interstate commerce as a participant in the Order and through an answering service for members of the Order both inside

---

[2] Plaintiffs reserve the right to assert claims against the Order itself if discovery shows or Plaintiffs otherwise learn that the Order is an entity that is legally, or otherwise, distinct from the Defendants already named herein.

and outside of Utah.  As Advanced Copy, Defendant American Digital Systems engages in interstate commerce as a participant in the Order and through use of the internet to send and receive materials for printing and publications.  It also ships Order forms to out-of-state Order Businesses.

43.    Defendant American Wellness & Rehab Clinic LLC ("American Wellness & Rehab") is a for-profit medical clinic organized under the laws of the State of Utah with a principal place of business at 677 West 5300 South, Murray, Utah 84123.  Defendant American Wellness & Rehab Clinic engages in interstate commerce as a participant in the Order, through the conspiracy, through its website, https://www.wellnessandrehabclinic.com/about, that solicits the public to "get started on your patient journey."

44.    Defendant Arrow Real Estate Services, Inc. ("Arrow Real Estate") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 635 West 5300 South, Ste. 202, Murray, Utah 84123.  Defendant Arrow Real Estate engages in interstate commerce as a participant in the Order, through the conspiracy, and through its website, https://www.arrowutah.com, which states: "We specialize in buying, leasing, renting, and selling property from single family homes, to industrial properties" and also offers the public an online list of the properties it has for sale or lease.  On information and belief, Defendant Arrow Real Estate also engages in interstate commerce through its use of the Multiple Listing Service.

45.    Defendant Attco Trucking Company, Inc., d/b/a CTC Trucking ("CTC Trucking") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 2750 West 900 South, Salt Lake City, Utah 84104.  Defendant CTC Trucking engages in interstate commerce as a participant in the Order, through the conspiracy, and through the hauling of freight and coal to and from Utah across the United States.

46.     Defendant DCCS is an unincorporated association identified herein under Federal Rule of Civil Procedure 17(b)(3)(A) and is sued in its common name to enforce substantive rights existing under the United States Constitution or laws.  DCCS holds itself out as an "economic cooperative" on its website and as a "business" in multiple filings with the Tenth Circuit Court of Appeals in Case No. 19-4019. DCCS engages in interstate commerce as a participant in the Order and through its website, https://www.dccsociety.org, which purports to state the Order's "goals." DCCS is the economic core of the Order and the conspiracy alleged herein, facilitating financial transactions among members and businesses.[3]

47.     Defendant Davis County Cooperative Society, Inc. ("DCCS, Inc.") is a corporation and, on information and belief, is distinct from Defendant DCCS.  It was established in 1941 and is a corporation registered as a nonprofit entity organized under the laws of Utah with a principal place of business at 1798 South 900 East, Salt Lake City, Utah 84106.  Among other things, it runs for-profit grocery and health food stores.  DCCS, Inc. engages in interstate commerce as a participant in the Order as part of the conspiracy.  DCCS, Inc. has several registered d/b/as, including: (i) Redwood Grocery & Health Foods, a for-profit health food and grocery store with a principal place of business at 4141 South Redwood Road, Salt Lake City, Utah 84123 ("Redwood Grocery"); and (ii) John's Market Place, a for-profit grocery store with a principal place of business at 4141 South Redwood Road, Salt Lake City, Utah, 84123 ("John's Market Place").  Redwood Grocery engages in interstate commerce as a participant in the Order as well as by engaging in

---

[3]   Members of the Kingston family have admitted—under oath—that the Order exists as a purported "religiously affiliated organization in which members provide their income to a central entity [DCCS] that distributes money back to members as needed." *See United States v. Dermen, No. 2:18-cr-00365, 2021 WL 515883, at *2 (D. Utah Feb. 10, 2021)* (unpublished).  Like the Order, members of the Kingston family have testified under oath as to the continued existence of DCCS as an organization. *See* ECF 369-4 at 4-5.

trade and commerce with vendors outside of Utah.  John's Market Place engages in interstate commerce as a participant in the Order and through its website, https://www.johnsmktplace.com, that advertises a "full service grocery store," as well as by engaging in trade and commerce with vendors outside of Utah.[4]

48.    Defendant Elizabeth Smith, d/b/a Sierra Wholesale ("Sierra Wholesale") operates a for-profit business with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115 or 3059 S 700 E, Millcreek, Utah 84106.  As Sierra Wholesale, Defendant Elizabeth Smith engages in interstate commerce as a participant in the Order, as part of the conspiracy, and, on information and belief, through the coordinated operation of its stores in Idaho, Arizona, Colorado, New Mexico, and Nevada.

49.    Defendant Ensign Learning Center, Inc. ("Ensign Learning Center") is an Order school existing as a corporation organized under the laws of the State of Utah with a principal place of business at 2755 Decker Lake Lane, Salt Lake City, Utah 84119.  Ensign Learning Center engages in interstate commerce as a participant in the Order, through the conspiracy and through its purchase of an online curriculum from Penn Foster High School, a high school program operated out of Pennsylvania and available through the internet in all fifty states.

50.    Defendant Fidelity Funding Company ("Fidelity Nevada" or "Fidelity Investments") is a for-profit business organized under the laws of the State of Nevada, registered to do business in the State of Utah under the name Fidelity Funding Investments, Inc., with a principal place of business at 5675 South Valley View Blvd., Las Vegas, Nevada 89118, and a

---

[4]  On information and belief, Defendant DCCS is distinct from Defendant DCCS, Inc.  On information and belief, Defendant DCCS is a cooperative pursuant to which Order members pool economic resources, while Defendant DCCS, Inc. operates specific for-profit businesses.  To the extent that DCCS and DCCS, Inc. are not legally, or otherwise, distinct, Plaintiffs' claims should be construed as against whichever of these Defendants against whom a judgment may be enforced.

registered agent at the same address. On Utah's Department of Commerce website, https://businessregistration.utah.gov/EntitySearch/OnlineEntitySearch, it names several Order members as its principals, each with the address of 10 West Century Park Way, Salt Lake City, Utah 84115. Defendant Fidelity Investments engages in interstate commerce as a participant in the Order, as part of the conspiracy, as a financial institution engaging in electronic communications and money transfers, and through the conspiracy.

51.    Defendant Fidelity Funding Company ("Fidelity Utah") d/b/a Fidelity Lending ("Fidelity Lending") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 10 West Century Park Way, Salt Lake City, Utah 84115, and its registered agent is at the Order's law offices, 3212 State Street, Salt Lake City, Utah 84115. Defendant Fidelity Utah engages in interstate commerce as a participant in the Order, as a financial institution, and through the conspiracy. Fidelity Lending engages in interstate commerce as a participant in the Order, as a financial institution engaging in electronic communications and money transfers, and through the conspiracy.[5]

52.    Defendant Four Corners Precision Mfg. Co. ("Four Corners"), d/b/a A-1 Disposal ("A-1 Disposal") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 610 West 3410 South, Salt Lake City, Utah 84119. Through A-1 Disposal, Defendant Four Corners engages in interstate commerce as a participant in the Order and through its website, https://a1disposal.com.

53.    Defendant Latter Day Church of Christ, a/k/a Latter Day Church of Jesus Christ ("LDCC"), holds itself out as a religion and is a nonprofit corporation organized under the laws of the State of Utah with a principal place of business at 1860 West Parkway Blvd, Salt Lake City,

---

[5] On information and belief, Defendant Fidelity Lending is distinct from Defendant Order Bank.

Utah 84119.  It is operated by Defendant Paul Elden Kingston Sr. and other members of the Order for members of the Order.  The LDCC has registered two names with the State of Utah under which it conducts business: ZMPC9 and LDCC.  Defendant LDCC engages in interstate commerce as a participant in the Order, through the conspiracy, and through its members.

54.     Defendant Mitchell & Associates, LLC ("Mitchell & Associates") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 670 East 3900 South, Suite 301, Salt Lake City, Utah 84117.  It engages in interstate commerce as a participant in the Order, through the conspiracy, and through its internet website, https://www.mitchellpros.com, which states that Mitchell & Associates is "Your Partner in Achieving Tax Efficiency."

55.     Defendant N.W.R. Limited Partnership, d/b/a Washakie Ranch ("Washakie Ranch"), is a Nevada limited partnership that operates a for-profit farm located in or around the town of Washakie, Utah, in Box Elder County.  Defendant Washakie Ranch engages in interstate commerce as a participant in the Order, through the conspiracy, and on information and belief, by transporting and selling meat and eggs inside and outside of Utah.

56.     Defendant Order Bank ("Order Bank") a/k/a the "Office," a/k/a the "Century Office" is an unincorporated association identified herein under Federal Rule of Civil Procedure 17(b)(3)(A) and is sued in its common name to enforce substantive rights existing under the United States Constitution or laws.  Defendant Order Bank may also be referred to as "DCCS Bank."  It currently has places of business at 10 West Century Park Way and 53 West Angelo Avenue in Salt Lake City.  Within these physical locations, Defendant Order Bank accommodates various rooms and desks, some of which represent the place of business for other Entity Defendants.  For example, on information and belief, within these locations are rooms and desks for Defendants

11

Fidelity Nevada, and Fidelity Utah d/b/a Fidelity Lending.  This tangle of businesses is integral to the Order's conspiracy, and Defendant Order Bank engages in interstate commerce as a participant in the Order.

57.    Defendant Standard Industries, Inc. ("Standard Industries") d/b/a Standard Restaurant Supply ("Standard Restaurant Supply") is a for-profit business organized under the laws of the State of Nevada with a principal place of business at 3500 South West Temple, Salt Lake City, Utah 84115.  Defendant Standard Industries d/b/a Standard Restaurant Supply engaged in interstate commerce as a participant in the Order, through the conspiracy, through its stores in various states and through its website, https://www.standardrestaurant.com/about-us/, which acknowledges that it serves customers across the United States.

58.    Defendant United Fuel Supply L.L.C. ("United Fuel Supply") is a for-profit business organized under the laws of the State of Nevada with a principal place of business at 7950 West 2400 North, Plymouth, Utah 84330.  Defendant United Fuel Supply engages in interstate commerce as a participant in the Order and through the conspiracy, and as an affiliate of Defendant Washakie Renewable Energy (described below).

59.    Defendant U.P.C., Inc., d/b/a Garco Industrial Park ("Garco Industrial Park") is a for-profit business organized under the laws of the State of Utah with a principal place of business at 3994 South 300 West, Millcreek, Utah 84107.  Defendant Garco Industrial Park engages in interstate commerce as a participant in the Order and through the conspiracy.

60.    Defendant Washakie Renewable Energy, LLC ("WRE") is a for-profit biofuel company organized under the laws of the State of Utah with a principal place of business at 3950 South 700 East, Ste. 100, Salt Lake City, Utah 84107.  Defendant WRE engaged in interstate commerce as a participant in the Order and through an international conspiracy to defraud the

12

United States of America of more than $1 billion. Some $35 million of the fraud proceeds went to members of the Order.[6]

61.     Defendant World Enterprises is a Nevada corporation, registered to do business in the State of Utah as World Enterprises II ("World Enterprises"), with a principal place of business at 10 West Century Park Way, Salt Lake City, Utah 84115. Defendant World Enterprises' registered agent in Utah is at the Order's law offices at 3212 State Street, Salt Lake City, Utah 84115. Defendant World Enterprises does or did business in at least Nevada and Utah through numerous Order d/b/a's including: (i) Advance Vending, a for-profit business with a principal place of business at 3994 South 300 West, Unit 32, Murray, Utah 84107 ("Advance Vending"); and (ii) Family Stores True Value, a for-profit business with a principal place of business at 4860 South Redwood Road, Taylorsville, Utah 84123 ("Family Stores True Value"). As Advance Vending, Defendant World Enterprises engages in interstate commerce as a participant in the Order, and on information and belief, by engaging in trade and commerce with vendors outside of Utah. At times relevant to this Third Amended Complaint, as Family Stores True Value, Defendant World Enterprises engaged in interstate commerce by, inter alia, obtaining and selling home-improvement products under the global umbrella of True Value Hardware Companies. As Family Stores True Value, Defendant World Enterprises operated websites, http://stores.truevalue.com/ut/taylorsville, and http://familyschooluniforms.com/pages/about, that claim that "it is the largest school uniform provider in Utah and currently serve[s] customers from

---

[6] *See* Press Release, Dep't of Justice, *Los Angeles Businessman, Utah Fuel Plant Operators and Employees Sentenced to Prison for Billion-Dollar Biofuel Tax Fraud Scheme* (Apr. 7, 2023), https://www.justice.gov/archives/opa/pr/los-angeles-businessman-utah-fuel-plant-operators-and-employees-sentenced-prison-billion.

13

Alaska to Connecticut." It also provides accounting functions and engages in interstate commerce as a participant in the Order and through the conspiracy.

62. Each named Entity Defendant is among the many "Order Businesses," financially tied to and controlled by the Order, part of the conspiracy, and reports to Paul Elden Kingston Sr. The Order owns and manages numerous other entities and businesses throughout the State of Utah and other states, including, for example, the entities on Exhibit A hereto, which are also part of the Order conspiracy and engage in interstate commerce.

63. Entity Defendants Does 1 through 500 are also Order Businesses, not yet identified, which are controlled by the Order or hold property for the benefit of the Conspiracy.

## GENERAL FACTUAL ALLEGATIONS MADE BY ALL PLAINTIFFS

**A.    Founding of the Order, DCCS, and the LDCC**

64. The Order is comprised of a complex—but intentionally opaque—web of unincorporated associations, business entities, and individuals.

65. The Order's power and authority is centered in one bloodline: the Kingston family. In 1935, Charles W. Kingston founded Defendant DCCS as an economic cooperative after he was excommunicated from the Church of Jesus Christ of Latter Day Saints ("LDS Church") for teaching doctrines contrary to the beliefs and practices of that church, such as polygamy. Both individual and entity members of the Order are also members of Defendant DCCS.

66. After Charles W. Kingston's death, John Ortell Kingston became the leader of the Order. In 1977, John Ortell Kingston incorporated Defendant LDCC, billed as a fundamentalist offshoot of the LDS Church. The alleged "fundamentalist beliefs" held by the Order today reflect the views of John Ortell Kingston—including illegal polygamous marriages and racial purity. Defendant LDCC is not affiliated with the LDS Church. Individual members of Defendant LDCC are also members of Defendant DCCS.

14

67.     There are currently thousands of members of the Order.  Plaintiffs estimate that there are up to 10,000 members, more than 70% of which are believed to be under the age of 18.

**B.     The Order Exercises Total Physical, Psychological, and Financial Control Over its Members**

68.     Despite the existence of Defendant LDCC, the Order does not operate like a religious organization.  Instead, with Defendant DCCS as its economic engine, the Order is a sophisticated criminal business enterprise that feeds off labor and sex trafficking, systemic abuse, and the exploitation of women and children who are born into it and become dependent on it.  The Order uses a wide range of methods to indoctrinate and control Order members—including members born into the Order and who know no other life—and to make them dependent on the Order.  These methods include, but are not limited to:

  a.  Requiring members to live in a closed, insular, secretive society;

  b.  Teaching children to fear, distrust, and not associate with outsiders;

  c.  Controlling the education and indoctrination of children;

  d.  Teaching children to hold in contempt and disobey the laws of society;

  e.  Operating an array of Order Businesses in a largely closed economy;

  f.  Requiring children and most adult members to work Order jobs;

  g.  Operating the Order Bank to restrict or prevent access to earnings;

  h.  Using the Order Bank to misappropriate member earnings;

  i.  Stressing the need to function only within the Order's economy;

  j.  Requiring and directing girls to enter Order Marriages;

  k.  Teaching girls to "marry up" into the Kingston bloodline;

  l.  Insisting that girls and women give birth to large numbers of children;

  m.  False imprisonment or restraint to coerce compliance;

  n.  Forced institutionalization to coerce compliance;

15

o.  Threatening girls and women with the loss of their children if they leave;

p.  Threatening the loss of family and friends for leaving;

q.  Cutting off those who do leave from their families and friends; and

r.  Threatening those who leave with litigation and attempting to coerce them into signing releases of claims.

69.    These methods are described in further detail herein.

### 1.    The Order's "Numbered Men" System Establishes A Hierarchy

70.    The Order is organized as a strict patriarchal hierarchy.  When the Order's most recent former leader, John Ortell Kingston, died, he left seven sons, known as the "Seven Kingston Brothers."  To prevent potential succession fights, before he died, John Ortell Kingston assigned a number to each of the Seven Kingston Brothers, making them "Numbered Men."  The living Numbered Man with the lowest number leads the Order, DCCS, and the LDCC.

71.    Defendant Paul Elden Kingston Sr. has the lowest number and therefore is the current leader of the Order, DCCS, and the LDCC.  While the remaining Seven Kingston Brothers have authority over members of the Order in their succession line, all of them report to Defendant Paul Elden Kingston Sr. a/k/a "The Man on the Watch Tower."  In short, Defendant Paul Elden Kingston Sr. controls the Order's financial and social structure.

72.    In addition to the Seven Kingston Brothers, other senior men in the Order, including its Governing Board ("Board" or "Order Board"), are assigned numbers.  The women and children who "belong" to these Numbered Men are also assigned numbers.  For example, Plaintiff Jenny Kingston's father is Numbered Man 68.  Because her mother is the first wife, her mother's number through her father is 681.  Jenny is the fourth child of her mother, so her number is 6814. Jenny's father's second wife is 682.  This continues for all of his wives and children.  Similarly, Plaintiff Michelle Ruth Michaels' father is Numbered Man 48, and her mother is his sixth wife, making her

16

number 486.  This numerical tracking system is needed because of the thousands of children born into the Order.  Plaintiffs estimate that the Seven Kingston Brothers alone have fathered more than *1,300* children:

    a.   Joseph Ortell Kingston (deceased) approximately 150 children;

    b.   John Daniel Kingston Sr. approximately 165 children;

    c.   Hyrum Dalton Kingston approximately 100 children;

    d.   Paul Elden Kingston Sr. approximately 300 children;

    e.   David Ortell Kingston approximately 250 children;

    f.   Jesse Orvil Kingston approximately 200 children; and

    g.   Jason Ortell Kingston approximately 150 children.

73.     All wealth within the Order is ultimately controlled and aggregated under Defendant Paul Elden Kingston Sr.  For example, while legal ownership of Order Businesses may change, control over them does not.  Each Order Business falls within the jurisdiction of the six surviving Seven Kingston Brothers.  If an Order member starts a successful business, one of the Seven Kingston Brothers will claim ownership and oversee it for the Order, DCCS, and LDCC.  Proceeds of the Order Business are used to enrich and benefit the Order, DCCS, LDCC, and their leadership.

74.     Proceeds from the conspiracy enrich and benefit the Order's leadership and preferred members (and their preferred wives).  Defendant Paul Elden Kingston Sr., his brothers, and many other Numbered Men have separate homes for each of their wives.  For example, Defendant Paul Elden Kingston Sr. has at least 27 homes—one for each of his wives.  He also owns or controls vast wealth and real estate holdings throughout the country.  He and his family

17

enjoy lives of luxury, as do other powerful and favored men in the Order.  Public news reports[7] state that Defendant Paul Elden Kingston Sr., his sister, Defendant Rachel Orlean Kingston Young, and some of his wives also maintain vast stockpiles of gold and silver bullion that he has accrued from the profits of the conspiracy—all derived from its illegal exploitation of women and children.

75.    As another example, Defendant Jacob Ortell Kingston Sr., who was sentenced to prison for his participation in Defendant WRE's tax fraud for the Order's conspiracy (*see infra* ¶ 139), owned expensive real estate and a silver Lamborghini.  He also gave a gold Bugatti to a business partner in the fraud:



76.    By contrast, most Order members, especially less favored wives, live in relative poverty without financial assistance from their Order husbands, often in small, poorly maintained homes with multiple other wives and large numbers of children.  Some of them have little food for themselves and their children:

---

[7] *See e.g.,* Jesse Hyde, *Inside 'The Order,' One Mormon Cult's Secret Empire*, Rolling Stone (June 15, 2011), https://www.rollingstone.com/culture/culture-news/inside-the-order-one-mormon-cults-secret-empire-244969/ (describing "America's most twisted crime family").



### 2.    The Order Seeks to Proliferate "Pure Kingston Blood"

77.    In addition to a patriarchal and numerical hierarchy, the Seven Kingston Brothers govern the Order with a belief in the "Pure Kingston Blood," which is another core object of the Order's conspiracy.  The Order teaches members that only those with Pure Kingston Blood will survive the apocalypse and, as such, requires the orchestration of Order Marriages within the Kingston bloodline to maintain Pure Kingston Blood.  The Order deems an individual's blood "impure" if they have any blood in their line stemming from a minority race or if they exhibit LGBTQ+ "tendencies."[8]

78.    Order members who have Pure Kingston Blood are favored over those from families whose blood is "impure."  The quantity of Pure Kingston Blood in a member's line directly translates to their worth as a member and the "freedom" they have.  Women and girls with Kingston blood are forced to "marry up" the bloodline, i.e., to marry a man with more Kingston blood.  For example, Plaintiff Amanda Rae Grant is Kingston on her father's side; prior to escaping, the Order attempted to coerce Amanda into marrying her cousin whose parents were

---

[8]  The Southern Poverty Law Center has designated the Order as a hate group since at least 2017. *See* Stephen Lemons, *Blood Cult*, Southern Poverty Law Center (Aug. 8, 2017), https://www.splcenter.org/fighting-hate/intelligence-report/2017/blood-cult.

both Kingstons (and each other's half-siblings, as well as a half-sibling and full sibling of Amanda's father).

### 3. The Order Indoctrinates Members into Obedience Through "The Law of One Above Another"

79. As part of Defendants' scheme to obtain financial and sexual control over Plaintiffs, Defendants employed techniques, such as brainwashing, denial of an ordinary education, and/or infliction of sexual, mental, and/or physical abuse or threats of such abuse. Moreover, to conceal their bad acts, Defendants taught Plaintiffs to fear outsiders and avoid all contact with state and federal officials for fear that these victims might escape or an outsider might blow the whistle on the Order's rampant child abuses.

80. The main tool Defendants use to accomplish its indoctrination is the fabricated concept referred to as "The Law of One Above Another." Under this "law," Order children are taught that they must obey the "One Above" them, pursuant to a structured hierarchy set forth below that ultimately culminates at the "HIGHEST GOD WE CAN KNOW." This system of indoctrination and obedience is utilized by Defendants in furtherance of their conspiracy.

81. The Law of One Above Another can be illustrated using the diagram below. The top of the pyramid shows the One Above everyone else—Paul Elden Kingston Sr.—who directs everything. The Seven Kingston Brothers and the Order Board report to Paul Elden Kingston Sr. as their "One Above," and the other Numbered Men report to one of the Seven Kingston Brothers or one of the members of the Order Board. Any married but unnumbered man reports to his assigned One Above, who is a closely related Numbered Man. Unmarried women and children report to their fathers.

20



82. When a girl or woman is married, the One Above her changes from her father to her Order husband. As one example, Defendant Paul Elden Kingston Sr. is the One Above his estimated 30 wives—some of whom are also his half-sisters, first cousins, and nieces—and all their sons and unmarried daughters.

83. Children are taught obedience above all. Even if they are instructed to do something immoral, wrong, or illegal, children must follow the Law of One Above Another.

84. Young girls in the Order are specifically taught to ensure they are ". . . fitting in with the ones over [them] and pleasing [the One Above] in every way [they] know how." This includes requiring girls and young women to sexually submit to their husbands, against their will, to avoid retribution and punishment from the Order. Additionally, Order members as a whole are taught to ". . . [abide] by the Order standards [and] make sure the ones around [them] are doing the same." This includes the prohibition about speaking to outsiders, for fear that outsiders might expose the Order's rampant child abuses. Plaintiff Alex Martin, for example, was told by her father, Defendant John Daniel Kingston Sr., that God would kill her if she revealed the Order's secrets.

85.     Failure to abide by the Law of One Above Another is a sin in the Order, punishable not only by God, but also by members of the Order.  While the Order and its leadership maintain strict control over children in countless ways, using various means of coercion, increased indoctrination, intimidation, and physical and sexual violence, at its core, the Law of One Above Another provides the mechanism for the Order to groom children for such abuse and punish disobedience.

86.     Any failure by a member, especially a child, to follow the One Above typically results in punishment, increased indoctrination, and training.  Often called "repentance," punishment for not obeying the One Above includes counseling sessions with Defendant Paul Elden Kingston Sr., completing packets of paperwork, physical restraint and abuse, institutionalization, and other punitive measures—all designed to reinforce the absolute need for the "sinful" child to be obedient.  This process is established, enforced, and evaluated by the Ones Above to determine if a child has "repented of their sins."  As described below, Plaintiffs experienced threats and punishment for not following the One Above.

### 4.     The Order Economically and Socially Isolates its Members

87.     The Order indoctrinates and maintains control over its members by isolating them from the outside world, making them wholly dependent on the Order and fearful of outsiders—particularly law enforcement, courts, and government.  This indoctrination and control begins when Order members are children, who, once indoctrinated and dependent on the Order, grow to become Order members and, too often, perpetrators, compelled to submit to and inflict illegal practices and abuses on others.

88.     With the help of thousands of children—who have no choice but to work for the Order because they were conceived and born to advance its economic interests (*see infra* ¶¶ 98-110)—the Order has created an almost entirely closed economy for its members.  This closed

22

economy isolates Order members from the outside world, making Order members wholly dependent on the Order to meet every single one of their basic needs. The Order's financial control and isolation of members is accomplished in several ways.

89. *First*, the Order operates its own banking system—Defendant Order Bank—that members are required to use. Although referred to as the "Order Bank," the Order Bank is not a state or federally registered or chartered bank. On information and belief, while Defendant DCCS and/or Defendant DCCS, Inc. has bank accounts at legitimate banks, only Order leadership has access to any such accounts or funds. Beginning as children, however, ordinary members are only permitted to have "accounts" at Defendant Order Bank. While members are told that the money in their accounts is being held in legitimate savings accounts for their individual benefit, no such legitimate, individual accounts exist.

90. Most Order members do not have autonomy to access their Order Bank accounts. Rather, they are required to request money to pay for basic necessities, such as gas and groceries, and receive approval from the One Above them and ultimately Order leadership. To further exert control over its membership, Defendant Order Bank rations the amount of actual cash that can be dispersed to requesting members on any given day. For example, while Plaintiff Amanda Rae Grant was assigned to work at the front counter of Defendant Order Bank, she was provided with just $500 each day to disperse to Order members who had permission from Order leadership to receive actual cash.

91. Any income received from working at Order Businesses is required to be deposited into Defendant Order Bank. But Order members never receive the total amount of money they actually earn, nor are they allowed to accumulate large balances. Some members are allowed to see a "<u>Statement</u>" of their account, but those statements are purposefully confusing and

23

incomplete.   Statements are also manipulated by the Order and DCCS leadership to steal from members and keep members dependent on the Order.  When earnings were allowed to accrue and become sizeable, a member's purported savings simply disappeared or were siphoned out of their accounts through sham transactions.

92.    As example, at one point, Plaintiff Michelle Ruth Michaels' Statement reflected more than $80,000 in earnings.  Without her knowledge or consent, the Order took $44,000 and then another $22,059.34 to pay the mortgage on her mother's Order-financed home.  The $44,000 payment form was filled out and initialed by "JK," a deceased wife of Michelle's father named Janice Kingston.  The $22,059.34 was taken as shown on this "Request for Savings Transfer" that was neither filled out nor signed by Michelle:

93.    A few months later, again without Michelle's knowledge or consent, she became obligated to the Order for a $6,000 loan.  The Order created this loan and then systematically paid that "loan" back to itself by deducting payments from the wages Michelle believed she was earning by working for the Order:

24



94.     In addition to being required to keep all financial assets in the Order Bank, Order members are also required to prepare an inventory of all of their possessions, with the understanding that all items belong to the Order.

95.     *Second*, to ensure that Order members interact only minimally with the outside world, Order Businesses are created to meet essentially every conceivable need of Order members. Indeed, the Order and DCCS operate hundreds of businesses in a panoply of industries, including: (i) retail (*e.g.*, grocery stores, consumer goods stores, home improvement supplies and products); (ii) transportation (*e.g.*, trucking, automotive sales and services); (iii) real estate; (iv) communications and advertising; (v) farming and mining; (vi) engineering, manufacturing, and

25

construction; (vii) waste disposal; (viii) education and childcare (*e.g.*, schools, daycare facilities); (ix) professional services (*e.g.*, accounting, tax, and legal); (x) medical care (*e.g.*, midwifery, physical therapy, physicians, and, on information and belief, IVF); (xi) financial services (*e.g.*, insurance, "banking," finance); and (xii) education (*e.g.*, private school).

96.     While many of these Order Businesses are open to the general public, their primary purpose is to ensure that Order members have their needs met absent interaction with the outside world.[9]  The Order teaches members that if the Order cannot provide something, *i.e.*, there is not an Order Business providing a good or service, then members do not actually need it.

97.     *Third*, economic isolation of Order members goes hand-in-hand with social isolation.  While most Order members reside in Utah, in the Salt Lake area, members rarely interact with non-members.  Members are taught to fear anyone who might expose the Order's criminal conspiracy, including healthcare providers (who are mandated reporters of abuse), law enforcement, courts, and government.  Children raised in the Order are indoctrinated to consistently lie to non-members to conceal the Order's unlawful activities.

### 5.     The Order Relies On Illegal Child Labor And Labor Trafficking

98.     At its core, the Order is a criminal enterprise for profit.  As part of their conspiracy to financially benefit themselves, the Order and its leadership keep costs down at Order Businesses by relying on unlawful child labor and labor trafficking.

99.     Beginning as young as ***four years old***, Order children are forced to work at Order Businesses.  Children occupy a variety of roles at Order Businesses, from bagging groceries at

---

[9]  These businesses engage in interstate trade and commerce by purchasing and selling products and services outside of Utah.  The Order also engages in interstate commerce by using proceeds from its businesses to purchase products, supplies, and other goods necessary for its businesses and to operate an economy for its members.  It also owns and/or occupies extensive real estate throughout the United States.

Defendant DCCS, Inc., to processing payroll at Defendant Four Corners d/b/a A-1 Disposal, to operating as clerks at Defendant Order Bank, to bagging and sorting coal and operating heavy machinery at the Order's coal mine.

100.    Children are forced to work after school—in some instances transported on the school bus *directly* from their Order-operated school to their jobs—into the evenings, and sometimes all night.  For example, Plaintiff Michelle Ruth Michaels worked long, overtime hours at the Order Bank, including overnight shifts, while also trying to attend school during the day. As another example, Defendant John Daniel Kingston Sr. forced Plaintiff Alex Martin and her sisters to skip school for weeks at a time so that they could work 10-12 hours per day on the Order's marijuana farm in Oregon.

101.    To satisfy their labor demands, the Order and its leadership systematically prioritize a child's labor over a child's education.  The Order measures educational success based on how quickly children finish high school because the Order's survival and economic success depends on the subservience and free labor of these children at the Order Businesses.  For example, at Defendant Ensign Learning Center—the Order-operated school—children are taught part of the online Penn Foster course.  Most students, including most Plaintiffs, are expected to complete the online program and graduate high school within a year so they can work full-time by age fourteen. To graduate quickly, it is common for Order teachers to give students the answers to the online test questions so they can enter the answers into the school's computers.

102.    Children working at Order Businesses, including Plaintiffs, are essentially indentured servants, required to work for Order Businesses for little to no financial remuneration. Order Businesses—including the Entity Defendants—fraudulently claim to deposit earnings into each member's account at Defendant Order Bank.  As described above, Defendant Order Bank is

not a registered or chartered bank, and no cash or monetary instruments issued to children, including Plaintiffs, are actually deposited there.  Instead, children are told that their earnings are tracked on their Order Statements and that their wages for work are held at Defendant Order Bank.  This is false for several reasons.

103.    *First*, the Statements do not actually show a child's hourly wage or hours worked.  Their earnings are thus not "tracked" in any manner in which the children can see them.  As described above (*see supra* ¶¶ 89-94), Order Statements are often manipulated to reduce or nearly zero-out balances.  Oftentimes, children are not given their Statements at all.  For example, Plaintiff Julie Ruth Green was not allowed to see her Statements until she was 17 years old—many years after she started working.

104.    *Second*, in exchange for their work at Order Businesses, Order children are not paid in money or legitimate financial instruments.  Rather, the children, including Plaintiffs, receive "units"—or scrip—which can ***only*** be used to make purchases from Order Businesses or other Order members, and cannot be used as cash.[10]  Children, including Plaintiffs, are never told they are receiving "units" rather than dollars, a fact that can only be determined through a close reading of Statements and which is beyond the capacity or understanding of children.  Moreover, Order members control when and how much scrip children can access in a given year from Defendant Order Bank.  To receive scrip that is represented as belonging to them, children must first get

---

[10]  Given that the units can only be transferred to Defendants (or other Order Businesses or Order members), and cannot be used as real money, they constitute an impermissible private wage substitute—known as "scrip"—in violation of the Fair Labor Standards Act of 1938, which mandates that employers pay wages in actual money or negotiable instruments convertible into cash.  *See* 29 C.F.R. § 531.34.

approval from a number of members of the Order.  As they grow older, members of the Order are sometimes paid in cash—if they are paid at all—but that cash is purportedly held in their accounts at the Order Bank and can be withdrawn only with the permission of Order leadership.

105.    *Third*, oftentimes children are not given *any* remuneration—even scrip—for months of work.  If the child raises questions, Order leadership falsely claims that the work was "training" or otherwise non-compensable.

106.    The Order's manipulation of Order Statements, failure to show hourly wage or hours worked, and concealment of unlawful scrip is intended to disguise the illegal use of child labor and labor trafficking.

107.    Under federal and state law, Order Businesses are required to pay employees a minimum wage and, as applicable, overtime wages at each of the Order Businesses.  The Order fails to comply with these requirements.  With few exceptions, Plaintiffs never personally received paychecks.  Plaintiff Michelle Ruth Michaels once received a paycheck by mistake.  Plaintiff Priscilla Tucker demanded, and ultimately received, two paychecks while working at Defendant WRE shortly before she successfully fled.  Plaintiff Jenny Kingston received paychecks while working at Defendant Four Corners, d/b/a A-1 Disposal, in 2020.  And after Plaintiff Jana Johnson left her Order Marriage in June 2021, she continued to work at Defendant Standard Industries d/b/a Standard Restaurant Supply and began to receive paychecks.

108.    Despite the Order's awareness of its legal obligations, it willfully and systematically fails to comply with labor laws.[11]  Children working at Order Businesses are seldom given paychecks, time sheets, timecards, or clock-in/clock-out records to reflect the days and hours

---

[11]  Standard Restaurant Supply has been cited and fined by the United States Department of Labor for violating child labor laws.

they work.  This, of course, is deliberate.  Defendants conspire to keep its members in the dark to prevent them from obtaining records that could eventually be used as evidence.  Indeed, Defendants not only continue to deny Plaintiffs' requests for copies of their (and their children's) account statements but also continue to deny Plaintiffs' requests to pay them the money they earned working for Defendants.

109.    In large part, Order Businesses do not even attempt to accurately record the number of hours worked by Order employees—because it has no intention of paying them lawful compensation.  It creates fabricated records as needed to "Bleed the Beast" (defined *infra* ¶¶ 134-147) or to pacify former members who threaten to expose the inner workings of the Order's secret economy.

110.    In sum, in an effort to avoid the reality of labor laws, Order members are manipulated through tools such as the Law of One Above Another and punishment to keep children working without compensation and in the dark about how much they are entitled to be paid.  It then willfully deprives them of their earnings, limits their access to any money, and intentionally uses vague and incorrect Order Statements to keep them trapped.

### 6.    Women and Children Are Sexually Abused and Subjected to Forced Underage, Incestuous, and Polygamist Marriages

111.    In order to fuel their child labor and labor trafficking scheme—and obtain sexual benefits for favored Order men—the Order and its leadership coerce girls to enter underage, bigamous, and/or incestuous Order Marriages.

112.    Within the Order, girls are not educated for the sake of expanding their minds and preparing them for a life of self-determination.  Instead, the central goal of the Order's education system is to train young girls to become obedient wives and mothers.  Beginning at about age ten, Order children (including Plaintiffs) attend courses and complete assignments to achieve full

indoctrination and retention.  Girls are taught to be obedient wives, submit without objection, utilize their fertility periods, and budget and cook for a large family.  They complete child-bearing worksheets to calculate how many children they will have between the ages of sixteen and forty. When Plaintiff Allison Eames filled out her worksheet, for example, she scheduled herself to have a child every 18 months.  Her teacher responded that she was missing kids because the 18-month gap between births was too long.

113.    The Order also teaches girls how to "receive direction" for their Order Marriage. The concept of direction is a ploy used to manipulate children into thinking they are choosing their "Number One Choice" or their "First Choice" rather than being forced into marriage.  The Ones Above "help" the girl find her "direction and choice" by "removing things in her life that do not contribute to success" and by making sure she does not consider "marrying someone that is less." Girls may experience teenage infatuation, but if it is not for their Number One Choice, that infatuation is a trick from Satan disguised as direction.  To ensure their direction is not from Satan, all Order Marriages must be approved by the Ones Above and Defendant Paul Elden Kingston Sr. personally in a formal "Engagement Meeting."

114.    Through this system—combined with threats of and actual retribution for failure to comply—underage girls and young women are groomed to accept and/or are forced to illegally marry direct relatives, such as half-siblings, uncles, and first cousins—who oftentimes already have other wives.

115.    For example, the below photo-shopped photograph is from the wedding of Jeremiah Kingston and his bigamous wife Rebekah Edwards.  The photograph was photo-shopped to include Defendant John Daniel Kingston Sr. a second time (on the left of the couple) because he is both the biological father of Rebekah Edwards and the biological father of Jeremiah Kingston.  The

31

women on the far-right and far-left of the picture are two of Defendant John Daniel Kingston Sr.'s plural wives, Rachel Kingston, deceased, and Leanne Edwards.  Defendant John Daniel Kingston Sr. is the biological half-brother of his bigamous wife Leanne Edwards.  Plaintiffs Allison Eames and Mary Ann Robinson witnessed this Order wedding:



116.    In an effort to avoid the legal realities of polygamous Order Marriages, legally married first wives sometimes get "Happily Divorced" so that a subsequent wife can be "legally" married.  Once a minor girl has given birth, cannot leave, and turns eighteen, the Order will authorize a Happy Divorce allowing the man to obtain another child bride all for the purpose of having more children and workers.  Widowed women of childbearing age are forced to quickly remarry in order to not "waste a womb."

117.    In an effort to avoid biological realities of incestuous Order Marriages, blood samples are taken from all Order children to check genetic compatibility within the confines of the Pure Kingston Blood.  When an incestuous pregnancy occurs, amniotic fluid is withdrawn and tested.  If the baby is suspected to be defective, the girl is manipulated by Defendant Paul Elden Kingston Sr. into having an abortion.  The girl is told that the abortion is proper so long as she

goes on to have many other children.  In contrast, women who miscarry naturally may be labeled as sinners and murderers and often left without support or medical care.

118.    By successfully forcing most girls into Order Marriages and pregnancies when they are young, the Order makes it extremely difficult for them to leave because they become even more dependent on the Order's closed economy.  Girls working for Order Businesses commonly receive a "raise" when they enter an Order Marriage, and thereafter, receive "raises" each time they give birth.  This was the case for each Plaintiff who was forced into, or nearly forced into, an Order Marriage before fleeing the Order.  Additionally, once women are married, they are not permitted to formally divorce their Order husbands, unless directed to do so, and they face threats that their children will be taken away from them if they try and leave the Order.

119.    Because underage, bigamous, and incestuous Order Marriages are illegal, Order members are trained to hide and deny them as part of the conspiracy.  Young brides are commonly transported to other states to obtain fraudulent marriage licenses.  Women in the Order who are not their husband's first wife often take random last names, a practice intended to prevent authorities from proving that men in the Order practice polygamy.  Birth certificates for children born in the Order commonly do not list fathers, or provide fictitious names, in order to cause confusion, avoid criminal prosecutions for fathering children in underage, bigamous, or incestuous Order Marriages, and for other illicit and illegal reasons.  Indeed, on information and belief, at the direction of leadership, Order members have systematically falsified thousands of birth certificates through the omission of fathers' names or presenting false information to authorities in Utah and other states.  Similarly, children in the Order are indoctrinated against speaking to people not in the Order and trained to say they do not know who their father is.

33

120.    As an example, when Plaintiff Michelle Ruth Michaels was seven years old, her parents—Defendant Michelle Afton Michaels and Defendant Jesse Orvil Kingston, who were in an incestuous Order Marriage—came under investigation by the State of Utah.  Nearly all of their children had either a false father or no father listed on their birth certificates; the youngest had no birth certificate at all.

121.    On Defendant Paul Elden Kingston Sr.'s instructions, Plaintiff Michelle Ruth Michaels' mother and her aunt, Kelly Brown, fled with their children to California to evade the investigation and obtain fraudulent birth certificates for the three youngest children.  One of those children was born to Kelly Brown in California and delivered by Defendant David Ortell Kingston. The women and children hid throughout California, including at the Order Business known as Sahara Dunes Casino L.P. d/b/a Lake Elsinore Hotel and Casino.

122.    When Californian authorities also grew suspicious of the attempted birth certificate fraud, Defendant Michelle Afton Michaels and Kelly Brown fled with their children from both states, two adults and ten children sleeping in a single minivan for weeks.  After Plaintiff Michelle Ruth Michaels turned eight, the Order secretly returned the children to Utah.  There, they continued to hide in an Order home for weeks or months—causing Plaintiff Michelle Ruth Michaels and the other children to miss nearly an entire school year.

123.    Order Marriages are also breeding grounds for Order-sanctioned sexual abuse. Children and young women are indoctrinated and forced to engage in sexual intercourse with their Order husbands—often against their will—and to have as many children as possible to increase the size of the Order and produce more child slave workers for Order Businesses.

### 7.    Order Members—Especially Women and Children—Are Subjected to Physical, Psychological, and Sexual Abuse

124.    Retribution for failure to comply with the commands of the Order and its leadership is rampant.  Children and young women are subjected to serious physical, psychological, financial, and reputational harm.  This abuse—and the threat of abuse—compels children and young women to perform and continue to perform labor or other services to further the Order's criminal conspiracy.

125.    Retribution is doled out for minor—or simply suspected—transgressions or disobedience, both in the workplace at Order Business and at home.  The more defiant or sinful the child is considered to be by the Ones Above, the harsher and more destructive the punishment.  Punishment includes physical beatings, starvation, denial of shelter, and separation from their families.  Disobedient wives and rebellious children are also sent to perform hard physical labor at Order Businesses like Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch.  Threatening emails and texts are common, including threats of blackmail, physical violence, or sexual violence.

126.    Even ***infants*** and toddlers within the Order are physically abused—slapped or beaten—for crying or other perceived transgressions because Order leadership claims that even newborns have the capacity to obey.  Indeed, in one widely reported incident, a one-year-old died after sustaining injuries to her head.  While Order members claimed that the child accidentally had fallen from a highchair while in the care of a babysitter (who served prison time in connection with the incident), doctors, police, and the medical examiner all reported that the child's injuries were inconsistent with that narrative and instead suggested blunt force trauma.  Former Order members report that the babysitter was likely coerced by Order leadership into taking the blame for the accident narrative to cover up that the child had actually been beaten by another Order member.

127.   Sometimes children, including some Plaintiffs, were tied up or locked in rooms, basements, and even garbage cans.  Plaintiffs witnessed this, knowing they risked the same abuse.  For instance, Plaintiff Michelle Ruth Michaels saw another child in her home forced to wear trash bags as diapers for days on end while restrained in enclosed spaces:



128.   As a result of the relentless pressure, intimidation, abuse, and violence, some children and young women, including some Plaintiffs, engaged in self-harm, suicidal ideation and actions, or otherwise inflicted punishments on themselves that they believed they deserved.  Other children took their own lives and were spoken of and treated so poorly after they died that Plaintiffs were unable to properly mourn their loss.  In one instance, the father of a child who took her own life refused to buy her a headstone or otherwise mark her grave.

129.   Many of the normal safeguards that protect children from physical and sexual abuse are avoided by the Order.  As a consequence, physical and sexual abuse, as defined by law, is both common in the Order and hidden by it.

130.   For example, within the Order, it is common for members *not* to report child sexual and physical abuse, despite legal requirements to do so for certain Defendants and other members who are mandatory reporters.  For example, Defendant David Ortell Kingston was convicted and sentenced to prison for 10 years for incest after marrying his 15-year-old niece, Mary Ann

36

Kingston, as his fifteenth "wife."  Authorities did not learn of this illegal Order Marriage from any mandatory reporter in the Order.  Rather, it was only after his bloodied niece stumbled away from Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch on her second attempt to escape the Order and she was beaten into unconsciousness by her father, Defendant John Daniel Kingston Sr., who subsequently went to jail for the beating.

131.    Occasionally, the Utah Division of Child and Family Services ("DCFS") learns about abuse taking place in the Order and will investigate.  On one occasion, Defendant Hyrum Dalton Kingston, the principal of Defendant Ensign Learning Center, pressured and intimidated Plaintiff Amanda Rae Grant to stop her from disclosing information about the abuse and rapes she had been suffering for years.  Defendant Hyrum Dalton Kingston falsely told her that the Order was entitled to have a witness in the room for the DCFS interview.  This was to ensure that she would "honor her mother and father" and "protect her family and the Order" by concealing the truth.  When DCFS would not allow an adult Order member in the interview, another adult Order member left a recording device in the room to intimidate Amanda and prevent her from telling the truth.

132.    Order attorney Laura Fuller addressed Order members in meetings and coached Order children, including Plaintiffs, to withhold information and evidence of self-harm and/or the abuse that they suffered at the hands of Order members.  Order member and attorney Carl Kingston similarly coached children.

133.    Children and women in the Order are also subjected to sexual abuse, including, but not limited to, wives being forced to have sexual intercourse with their husbands, regardless of consent, to force girls and young women to conceive and bear as many children as possible.

37

**8.    Order Members Are Forced to Participate in the Order's Organized Illicit Activities—Including Defrauding the Government**

134.    As part of the wide-ranging conspiracy, the Order and its leadership compel Order members, including children, to assist in an array of financial and other frauds against the federal, state, and local governments, placing members at risk of criminal prosecution.  If they are disobedient, fail to comply, or challenge these practices, they are punished through the physical, sexual, and emotional abuse methods described herein.

135.    The Order and its leadership teach members that the laws of God as defined by the Order—not society—govern them.  This deeply embeds in Order children a fear of governments, law enforcement, judicial systems, child protective services, and a contempt for the rule of law. This, in turn, justifies any deception, action, or crime deemed necessary by the Order, DCCS, and their leadership to advance their conspiracy.  Most notably, the Order engages in a practice its membership refers to as "Bleed[ing] the Beast," a systematic effort to exploit and defraud governments and taxpayers through falsified employment records, welfare fraud, tax fraud, obstruction of justice, and other serious offenses.

136.    *Falsified employment records.*  As described above, Order Businesses and Order leadership manipulate workers' earnings and falsify records relating to workers' earnings and other financial transactions on their Statements.

137.    *Welfare fraud.*  To enable Order wives to falsely claim low household income to qualify their families for government benefits, such as Medicaid and Supplemental Nutritional Assistance Program benefits, Order Businesses pay child workers almost nothing and/or fabricate records to make it appear as if the children are not working and not receiving wages.  Mothers also report that they do not know who their children's father is, or that the father has left and does not contribute financially to the household.  In reality, these children (and their fathers) typically work.

38

138.    Order members also manipulate existing official records to obtain government benefits.  For example, Defendant David Ortell Kingston, who is reported to have some 250 children, was not listed on a birth certificate for one of his children.  Instead, the mother, one of Defendant David Ortell Kingston's plural wives, listed a false name.  Later, when it became possible to secure governmental benefits by having no father listed at all, a Petition for Change on Birth Certificate was filed to remove the fake father's name and replace it with a blank:



139.    ***Tax fraud.***  Tax fraud is also rampant.  In one notable example, through a now-defunct biofuel company, Defendant WRE, the Order conspired to steal and launder more than ***$1 billion*** in federal tax credits.[12]  After it was caught, four Order members involved in the massive

---

[12]  *See, e.g.*, Press Release, Dep't of Justice, *Jury Finds Los Angeles Businessman Guilty in $1 Billion Biodiesel Tax Fraud Scheme* (Mar. 16, 2020), https://www.justice.gov/opa/pr/jury-finds-los-angeles-businessman-guilty-1-billion-biodiesel-tax-fraud-scheme (noting that "Four Members of Kingston Family, including the CEO and CFO of Washakie Renewable Energy, Previously Pleaded Guilty").

fraud were prosecuted and sentenced to prison,[13] and a judgment was entered in favor of the United States in excess of $500,000,000.

140.    ***Obstruction of justice.***  In 2016, the FBI and IRS executed search warrants to seize records on certain Order Businesses and homes in connection with Defendant WRE's tax fraud. Because the Order had been tipped off, Order members feverishly hid and removed damning information from computers, replaced hard drives, and falsified electronic information.  Much of the paper records were left to the children, including some Plaintiffs, to destroy by shredding, hiding boxes, and lying to the government.

141.    The Order prepared an A, B, and C list with the Order Businesses most likely to be raided.  Examples on list A were the Order Bank and the Order's law firm at 3212 South State Street, Salt Lake City, Utah 84115. Order children were directed not to go to their jobs with Defendants so that law enforcement would not see the Order's extensive use of child labor.

142.    Defendant American Digital Systems was on list B.  At the direction of Order leadership, Plaintiff Michelle Ruth Michaels and several of Michelle's siblings (one of whom was only four years old) were assigned to work there, shredding paper and loading truckloads of materials which were taken first to the home of Michelle's father's third wife, then to an Order storage facility on Redwood Road in Salt Lake City, Utah, and finally to other locations for hiding. At the direction of Order leadership, Plaintiff Jenny Kingston assisted with gathering and destroying records at Defendant Jacob Ortell Kingston Sr.'s home and other Order Businesses.  At the direction of Order leadership, Plaintiff Alex Martin helped Defendant John Daniel Kingston

---

[13]  In April 2023, these individuals were sentenced to the following prison terms: Jacob Ortell Kingston Sr. 18 years; Isaiah Kingston 12 years; Rachel Ann Kingston (now deceased) seven years; and Sally Kingston six years.  Two of these individuals, Jacob Ortell Kingston Sr. and Sally Kingston, are Defendants in this action.

Sr. destroy records and marijuana at her mother's home.  At one point, Plaintiff Michelle Ruth Michaels and other children were driven to a rural area, where those 9 and older were instructed by Order leadership to shoot bullets through hard drives, computers, and other devices.  After the raid, children, including Plaintiff Jenny Kingston, were assigned to assist Laura Fuller, an Order attorney, with cleaning, re-filing, and re-organizing evidence that the Order had hidden.

143.    Bleeding the Beast also includes the falsification and filing of personal income tax returns for Order members.  For example, many Order mothers have so many children that claiming them all for child tax credit deductions results in diminishing deductions and refunds.  The Order avoids this problem by directing the allocation of children to the tax returns of single adults.  When Plaintiff Allison Eames was approximately fourteen, Defendant April McKay trained her to forge signatures and allocate dependents on tax returns to fraudulently maximize deductions.  The resulting child tax credits or refunds were later intercepted and captured by the Order.

144.    As an example, the below tax return was filed by the Order for a single adult male with no children or dependents.  The Order caused him to claim three dependents so it could receive child tax credit payments:



41

145.   In 2015, Defendant Michelle Afton Michaels claimed three children on her Form 1040, submitted to the IRS via the mails or wires in early 2016, and Plaintiff Michelle Ruth Michaels' brother claimed two children on his Form 1040A, submitted to the IRS via the mails or wires in early 2016.  Plaintiff Michelle Ruth Michaels' brother was only two or three years older than the younger brother he claimed and three or four years older than the younger sister (Plaintiff Michelle Ruth Michaels) he claimed:





146.    On information and belief, in order to Bleed the Beast, children continue to be allocated to non-parent tax returns to maximize income tax credits by Defendant April McKay and Order member Grace Mitchell, and the Order continues to collect the fraudulently acquired child tax credits.

147.    The Order also falsifies tax documentation on behalf of individual Order Businesses.  Order Businesses shuffle employees on paper between themselves and manipulate information about child labor.  For example, while working at Defendant WRE at age 17, Plaintiff Priscilla Tucker was directed to fill out forms reporting no activity in certain states even though Defendant WRE had operated in those states.  Plaintiff Priscilla Tucker was told that there was no way to prove that Defendant WRE had operated there, so there was no need to pay taxes.  As described at *infra* ¶¶ 433-437, to avoid being embroiled in such fraud and to avoid an Order Marriage, she fled the Order.

## ADDITIONAL SPECIFIC FACTUAL ALLEGATIONS BY EACH PLAINTIFF

148.    Each Plaintiff incorporates in their individual sections below the allegations set forth above.

### C.    Amanda Grant

***Born And Raised Under The Order's Authority***

149.    Amanda Rae Grant was born into the Order in an Order-owned apartment in the Salt Lake City area.  Her birth was not conducted in a hospital or under lawful medical supervision.  Instead, she was delivered by Defendant Paul Elden Kingston Sr.

150.    Amanda's biological parents are non-parties Verl Johnson and Lorie Peterson.  Amanda's parents entered into an Order Marriage when Lorie Peterson was a seventeen-year-old minor and when Verl

43

Johnson was already married to Lorie Peterson's sister.   Throughout the course of their relationship, Lorie Peterson gave birth to ten children fathered by Verl Johnson.

151.   Verl Johnson is Numbered Man 36 in the Order.   Despite his paternity, Verl Johnson is not listed on Amanda's birth certificate.   Instead, the birth certificate falsely lists a fictitious individual, "Kyle Grant," as Amanda's father.   This same fictitious individual is also listed on the birth certificate of several of Verl Johnson's other children with Amanda's mother.

152.   Upon information and belief, years after Amanda's birth, the State of Utah attempted to identify the individual listed as "Kyle Grant" for purposes of recovering state child support payments.   The state ultimately determined that the purported individual was not Amanda's biological father, and upon further information and belief, may not have existed at all. Within Amanda's family, this incident is treated humorously and recounted as an example of successfully deceiving governmental authorities.

153.   Throughout Amanda's childhood, her biological father, Verl Johnson, visited the home approximately twice per week.  Despite these visits, Amanda did not learn that Verl Johnson was her father until she was eight years old.   Prior to that disclosure, their interactions were minimal, and even after the disclosure, Amanda and her father seldom conversed, except in the context of punishment, discipline, or discussions related to her future Order Marriage.

154.   From earliest childhood, the Order controlled every aspect of Amanda's life, including her access to food, shelter, clothing, money, and other basic necessities.

155.   Amanda was required to follow the Order's so-called "ABC Order Standards"—a code of conduct used to indoctrinate, control, and shape Order children, including Amanda, into compliance with the Order's demands for obedience, submission, and devotion to the men above

44

them.  These standards were drilled into Amanda's daily life and reinforced the Order's expectation that she never question her Ones Above.

156.  The ABC Order Standards included, among others: "I is for Incomings," which provided: "Let all of my incomings and outgoings be in the name of the Lord.  I watch what I spend and avoid extravagance.  I will produce more than I consume and create surplus"; and "O is for Obedience," which provided: "I obey my heavenly and earthly father and mother and those who are over me.  I have a complete desire to please heavenly father and those who are over me."

***Childhood Sexual Abuse***

157.  Amanda's earliest childhood memories—from as early as the age of five—involve being sexually abused by Defendant John Paul Johnson, then approximately thirteen years old and a son of one of her father's plural wives.

158.  Among other conduct, Defendant John Paul Johnson engaged in repeated acts of sexual abuse against Amanda.  Examples include physically penetrating Amanda by placing his hands inside of her, touching her stomach and genitalia, and watching her in the bathroom while she undressed.  Amanda did not consent to these sexual acts, nor was she able to consent, as a minor.

159.  Throughout the period Defendant John Paul Johnson sexually abused Amanda, he would provide her with gifts and money to "apologize" for his conduct and to manipulate Amanda into silence and compliance.  On at least one occasion, following an incident of abuse, Defendant John Paul Johnson noticed that Amanda was crying and gave her a jar of money to placate her and attempt to minimize the harm he had done.

160.  Amanda was required to interact with Defendant John Paul Johnson throughout her childhood.  As a child, Amanda's family would go on family trips together, including to Arizona.

Defendant John Paul Johnson accompanied Amanda on those trips and sexually abused her during those occasions.

161.   Although Amanda reported the abuse to her parents, no one in the Order—including those who knew or reasonably should have known that she was being abused—intervened to protect her.  Instead, the Order's silence enabled the abuse to continue until Amanda was fifteen years old and Defendant John Paul Johnson was approximately 23 years old.

162.   Amanda eventually disclosed the abuse to two individuals outside of the Order, who in turn reported it to Utah DCFS.

163.   Following the report, DCFS personnel came to Defendant Ensign Learning Center, where Amanda was working, to interview her.  Upon their arrival, Defendant Hyrum Dalton Kingston, the principal of the Order-operated school, rushed to Amanda and explained to her that she had a legal right to have a witness present during the questioning.  Defendant Hyrum Dalton Kingston further instructed Amanda that she needed to honor her father and her mother and protect her family.  At the time, Amanda had previously suffered physical abuse at the hands of Defendant Hyrum Dalton Kingston for alleged violations of the work dress code at the school, and she understood there would be negative consequences if she disobeyed his instructions.

164.   Once Amanda understood that DCFS intended to question her regarding the abuse, she did not want a witness from the Order present in the room.  She believed an Order-affiliated witness would prevent her from safely disclosing what had been happening to her.

165.   Given the limited options available to her, Amanda identified non-party Mary Sommers as the only person associated with the Order whom she believed she may be able to trust. Mary Sommers initially entered the interview room with Amanda but was later asked to leave by

the DCFS workers. As she exited the room, however, she left behind a tape recorder, signaling to Amanda that the conversation would be recorded and reviewed.

166. As a direct result of Defendant Hyrum Dalton Kingston's coaching, intimidation, and the tape recorder, Amanda did not disclose her abuse during the DCFS interview out of fear that she would suffer retaliation, punishment, or reprisal from Defendant Hyrum Dalton Kingston, her parents, and other members of the Order.

167. In fact, to avoid lying to DCFS, Amanda focused on the semantics of each question. For instance, when DCFS asked whether she was being sexually abused by her "brother," Amanda was able to answer "no," because her abuser was technically her "half-brother." When pressed further, she described Defendant John Paul Johnson as a "cousin" to protect her father's family and avoid retribution. After the interview, DCFS made Mary Sommers erase her recording.

168. At a follow-up interview with DCFS, Amanda continued to protect Defendant John Paul Johnson because she had been deeply indoctrinated to fear the consequences of exposing abuse. Amanda believed that if her half-brother went to jail, she would ultimately suffer the punishment and isolation that would follow. Fortunately, after DCFS became involved, the abuse stopped. Amanda believes the abuse would have continued absent DCFS' intervention.

169. To date, Defendant John Paul Johnson has not suffered consequences for his abuse against Amanda. Instead, after reaching his thirties, Defendant John Paul Johnson was placed in a second Order Marriage with a minor, as shown in this photograph from the wedding celebration with his other Order wives.

**Forced Child Labor In Order Businesses**

170. From early childhood, Amanda was also coached and exploited for labor through a network of Order-controlled businesses.

47

171.   Her first job assignment came at Defendant Fidelity Utah and Defendant Order Bank, where she worked part-time in the back room alongside other children, supervised by Defendant Rachel Orlean Kingston Young, non-party Janice Kingston, and non-party Derek Kingston, who in turn reported to Defendants David Ortell Kingston and Jason Ortell Kingston, and ultimately to Defendant Paul Elden Kingston Sr.

172.   At approximately thirteen, Amanda was reassigned to work at least part-time for the Order at Defendant American Digital Systems d/b/a Advanced Copy.  There she was supervised by adult Order members, including non-party Jan McCarthy, one of Defendant Jesse Orvil Kingston's wives, who reported to Defendant Jesse Orvil Kingston, who in turn reported to his brother, Defendant Paul Elden Kingston Sr.

173.   At fifteen, Amanda was ordered to work full-time at another Order Business, Defendant DCCS, Inc. d/b/a John's Market Place, as a cashier.  She reported to adult Order members, including store manager Michael Brown, who answered to Defendant Hyrum Dalton Kingston, one of the Seven Kingston Brothers, who in turn reported to Defendant Paul Elden Kingston Sr.

174.   Amanda was then reassigned to work full-time as a teacher's assistant at Defendant Ensign Learning Center, where she was supervised by adults including non-party Karen Bryant—one of the wives of Defendant Hyrum Dalton Kingston, the school's principal, to whom both she and Amanda reported.  Defendant Hyrum Dalton Kingston not only supervised Amanda as a school employee, but also physically disciplined her and later directed her not to harm the Order when DCFS came to investigate.  Defendant Hyrum Dalton Kingston reported to Defendant Paul Elden Kingston Sr. under the Law of One Above Another.

175.    While working at Defendant Ensign Learning Center, Amanda was also required to pay for and complete the Penn Foster online high school program, using money withheld from her earnings.

176.    At age seventeen, Amanda was sent back to Defendant Order Bank to work full-time at the front counter, supervised by Defendant Deborah Williams and Defendant Rachel Orlean Kingston Young.  All Order Bank workers also worked under the supervision and control of at least two of the Seven Kingston Brothers—Defendants David Ortell Kingston and Jason Ortell Kingston—who managed the operation for, and reported to, their One Above, Defendant Paul Elden Kingston Sr.

177.    Amanda was never given any meaningful choice regarding her work assignments. Refusal to work would have been treated as disobedience to the Order and punished accordingly. Throughout her childhood and adolescence, the Order exploited her labor while maintaining control over her earnings.

178.    Before she fled, Amanda was able to secretly and gradually withdraw approximately $2,000 from her Order bank account so she would have at least some money when she escaped.  However, the remainder of the wages she had earned since starting work in elementary school had been siphoned out of her account by the Order.

179.    Amanda never received a paycheck from any of her Order employers and therefore has no pay stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid.  The Order Businesses she worked for, however, are obligated by law to maintain and produce those records.

180.    To this day, Amanda has not been fairly compensated for any of the labor the Order extracted from her as a child and teenager.

49

***Targeted Toward An Incestuous Order Marriage At Sixteen***

181.    Like other girls in the Order, Amanda was indoctrinated from childhood to be married off young and bear children for the Order.

182.    The Order's grooming of Amanda for marriage to her first cousin, non-party Derek Kingston, began long before any formal courtship.  From her earliest work assignment at Defendant Order Bank, Amanda was placed directly alongside Derek Kingston.  Even as a child, Amanda recognized that she would probably be forced to marry Derek Kingston.

183.    In an attempt to avoid a marriage to Derek Kingston, and under relentless pressure within the Order to marry young, Amanda tried, at ages fifteen and sixteen, to exercise at least some autonomy over her future by identifying two men within the Order whom she would consider marrying.  However, her father rejected both choices.  He dismissed the first man, non-party Jeremy Sommers, as not her Number One Choice, and rejected the second, a non-party named Eric, by telling Amanda that he smoked marijuana and was therefore unsuitable.  In reality, Amanda's preferences were irrelevant because the decision regarding whom she would marry ultimately rested with the men in the Order hierarchy.

184.    Approximately a week before Verl Johnson raised the subject of Amanda marrying Derek Kingston, he took Amanda to the mall and offered to buy her anything she wanted.  Amanda ultimately asked for a t-shirt from the clothing store Hollister.  Upon information and belief, the gift was intended as coercion to soften Amanda's resistance to an Order Marriage.

185.    When Verl Johnson met with Amanda to specifically discuss his preference for her Order Marriage, he confirmed it was her first cousin, Derek Kingston.  He also informed her that Derek Kingston was on his way to their home to "come forward on her."[14]

186.    In telling her father that she did not want to marry Derek Kingston because he was her first cousin, Amanda was defying the One Above Her.  Verl Johnson dismissed his daughter's objections, telling her: "Well, he is on his way.  He is coming over."

187.    Shortly thereafter, Derek Kingston arrived at Amanda's home and "came forward" on her by telling her about his marital direction and that he was supposed to marry her.  Amanda objected, telling him she did not believe in polygamy and that he was her first cousin.  He laughed off her resistance.

188.    At a subsequent Order dance, Amanda's father permitted Derek Kingston to dance with her twice—a signal within the Order that he approved of Derek Kingston as a husband for Amanda and that an engagement was imminent.  As part of the courtship process with Derek, Amanda also went on a dinner date with him to Panda Express.

189.    Having attended numerous secret Order weddings involving underage, plural and incestuous marriages, Amanda knew that no engagement or marriage in the Order could occur without the direction and approval of Defendant Paul Elden Kingston Sr.

190.    Consistent with that practice, Amanda was tricked by her parents to go to the Order Bank, where Defendant Paul Elden Kingston Sr. maintained an office, so that he could pressure her into the marriage with Derek Kingston and finalize plans for the engagement.  Amanda was

---

[14]  To "come forward" on a girl means a man is allowed by the Ones Above him to follow his "marital direction" and initiate courtship with a girl.  As a girl raised in the Order, Amanda was then supposed to receive "marital direction" that the man coming forward on her was her First Choice or her Number One Choice.

terrified when Defendant Paul Elden Kingston Sr. appeared because she knew other girls who had resisted arranged marriages had entered similar meetings only to come out engaged.

191.    During the meeting, Defendant Paul Elden Kingston Sr. excused Amanda so that he could speak privately with her parents.  Amanda seized the opportunity to escape.  She fled on foot and kept walking until nightfall.

**Escape From The Order And The Order's Lasting Harm**

192.    Had Amanda not escaped, members of the Order would have forced her into an incestuous engagement, married her off as a minor, and compelled her to submit to sexual relations and childbearing.

193.    And while Amanda did escape, it was only after enduring years of mental abuse, sexual abuse, and economic exploitation.  The injuries inflicted by the Order persist in her life to this day.

194.    After leaving, Amanda struggled to support herself.  She attempted to further her education but was forced to drop out, hampered by her indoctrination, inadequate schooling, and the overwhelming difficulty of adjusting to life outside the Order.  When later contacted to participate in the television program *Escaping Polygamy*, she agreed—but remained too confused and fearful of the Order's retaliation to disclose her sexual abuse, and for a long time refused to discuss it.

195.    Amanda was conditioned to disobey the laws of society and to fear law enforcement, courts, and government.  Her upbringing in the closed, insular Order indoctrinated her to protect her abusers by avoiding all contact with outside authorities.  Over time, however, she came to understand that she had suffered actionable legal injuries and became a plaintiff in a state court action filed on September 7, 2022.  *See Grant et al. v. Corporate Does 21-200 et al.*, No. 220905426 (Utah 3d Dist. Ct., Salt Lake Cnty. Sept. 7, 2022).  After that case was dismissed,

52

her claims were timely re-filed pursuant to Utah's savings statute as part of this action on February 28, 2024.

**D.     Jenny Kingston**

***Childhood Marked by Control and Sexual Abuse***



196.    Jenny Kingston's biological parents are non-parties Benny Kingston and Jeremy Ortell Kingston Sr., Numbered Man 68.

197.    From a young age, Jenny Kingston was forced to live by the Order's standards and submit to its coercive doctrines, including the Law of One Above Another.

198.    She was conditioned to accept that she would be married off as a child to her Number One Choice, to bear as many children as the Order demanded, and to work without pay for Order Businesses.

199.    During her childhood, Jenny was sexually abused by her older brother, Defendant Joseph Kingston, and was denied the help and assistance she needed.  When she dared to resist any of the Order's rules, she was branded as sinful, as "trash" and as a "whore."

***Forced Child Labor and Stolen Wages***

200.    At approximately six years old, Jenny's father forced her to begin working part-time for the Order.

201.    Her first job was at Defendant World Enterprises, d/b/a Advance Vending, where she cleaned the warehouse, sorted chips and candy, and counted money under the supervision of her father and other adult Order members.

202.    From there, she was rotated through a succession of Order Businesses.

203.    At Defendant World Enterprises, d/b/a Family Stores True Value, she was supervised by non-parties Hannah Tucker and Lynn Kingston.  At Defendant Order Bank, she was

53

supervised by Defendant Rachel Orlean Kingston Young, Defendant Deborah Williams, and ultimately Defendant Paul Elden Kingston Sr. At non-party Stowell Insurance, she reported to Tamara Stowell. At Defendant Standard Industries d/b/a Standard Restaurant Supply, she was supervised by several adult Order members, including non-party Elery Kingston and his adult sons. She also spent a summer working performing unpaid labor at Kaysville Farm, where, in addition to farm labor, she was made to clean out the shed that would later become her living quarters.

204.    Jenny also worked for Defendant Four Corners, d/b/a A-1 Disposal, on two separate occasions—first from approximately August 2016 through December 2016 (working roughly 40 hours per week), and again in the accounts receivable department from approximately June 1, 2019 through December 30, 2020 (working roughly 30 hours per week). On both occasions, she reported to Defendant John Daniel Kingston Jr.

205.    She also worked a second time at Defendant World Enterprises, d/b/a Family Stores True Value, where she reported to non-party Christine Wellington.

206.    When Jenny reached high school, she was assigned as a Teacher's Assistant at the Order's elementary school, Defendant Ensign Learning Center, where she reported to Karen Bryant and Defendant Hyrum Dalton Kingston.

207.    At just fourteen years old, after graduating from the Order's designated online high school, she was forced to begin working full-time at Defendant WRE, reporting to Defendants Sally Kingston, Rachel Orlean Kingston Young, Jacob Ortell Kingston Sr. and non-party Isaiah Kingston. There, she was also made to work directly alongside Defendant Jacob Daniel Kingston Jr.—the man the Order had pre-selected as her future husband.

208.    By age seventeen, Jenny rotated through additional Order Businesses, including Defendant WRE, Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch, Defendant

United Fuel Supply, non-party UFS Management, and non-party the Food Group, and one of the Order's A&W restaurants.  At these businesses, she reported to Defendant Jacob Ortell Kingston Sr., non-party Rachel Elizabeth Kingston Taylor, non-party Rachel Ann Kingston, non-party Isaiah Kingston, and Defendant Sally Kingston and was directed to assist Defendant Sally Kingston in falsifying and fabricating tax documents.

209.    After the arrest of Defendant Jacob Ortell Kingston Sr., Jenny was assigned to clean out his offices, collect and organize documents that had been hidden before the 2016 FBI and IRS raid, and assist Laura Fuller with his criminal case.  Jenny received minimal cash payments from Laura Fuller and Defendant Sally Kingston for that work.

210.    Jenny never received a paycheck from her employers—with the limited exception of her second placements at Defendant Standard Industries d/b/a Standard Restaurant Supply and Defendant Four Corners d/b/a A-1 Disposal—because the Order Bank captured her earnings.  Even those later paychecks were first routed through the Order Bank's payroll.

211.    Because she was never paid directly, Jenny has no pay stubs confirming the dates she worked, the hours she worked, or the amounts she should have been paid—records that each Order Business is obligated by law to maintain and produce.

212.    Even though before fleeing the Order Jenny managed to open an account at a legitimate bank, her wages from Order Businesses were still routed first through Defendant Order Bank, which then made automatic deposits into her outside account.  The amounts she ultimately received from Defendant Four Corners d/b/a A-1 Disposal were less than what she believes she had actually earned.

213.    Jenny also established savings accounts at Defendant Order Bank for her two children, depositing $500 each.  When she later attempted to withdraw the funds, she discovered that a significant portion of the money was missing.

214.    Had Jenny refused to work as directed, she would have been punished severely and suffered serious emotional, physical, and reputational harm within the Order.

215.    To this day, she has not been fairly compensated for the work she was forced to perform as a child.  Nearly all of her earnings were withheld by the Order, and when she finally left and tried to withdraw what little remained, the Order Bank told her that her account was empty and she *owed* $1,200.

### *Trafficked into an Unlawful Marriage as a Minor*

216.    When Jenny was just 16, Defendant Jacob Daniel Kingston Jr.—her second cousin—"came forward" on her.  Jenny did not want to marry him and said so.  The Ones Above did not care.

217.    Unbeknownst to her, her work assignment at Defendant WRE was designed as a step in her "courtship" with Defendant Jacob Daniel Kingston Jr., and as part of the grooming for her Order Marriage.

218.    As further "courtship," Defendant Jacob Ortell Kingston Sr. flew Jenny and his son, Defendant Jacob Daniel Kingston Jr., in a private jet to Las Vegas, Nevada, where he informed Jenny of his "direction" that she marry his son.

219.    Nevertheless, Jenny resisted.  As a young girl raised in the Order, she knew she was expected to receive marital direction confirming Defendant Jacob Daniel Kingston Jr. as her "Number One Choice" and had not received that direction.

220.    As a result, the Ones Above her conspired to physically institutionalize her until they could gain psychological control over her.  She was sent by her parents, against her will, to

56

Lifeline for Youth ("Lifeline"), a rehabilitation center for "troubled teens," frequently used by the Order to punish supposedly disobedient children.

221.    Jenny understood that she was at Lifeline because she defied the Ones Above in refusing to marry Defendant Jacob Daniel Kingston Jr.

222.    After approximately six months, in February 2015, Jenny yielded to the Order's pressure and returned home to be married.

223.    About a month later, in March 2015, Jenny attended an Engagement Meeting with Defendant Paul Elden Kingston Sr., her parents, Defendant Jacob Daniel Kingston Jr. and his parents, Sally Kingston and Defendant Jacob Ortell Kingston Sr., as well as the couples' living grandparents.  At the meeting, Defendant Paul Elden Kingston Sr. approved the marriage.

224.    On April 24, 2015, at seventeen years old, Jenny was officially trafficked into an Order Marriage and forced to perform sexual intercourse with Defendant Jacob Daniel Kingston Jr., an adult.

225.    Defendant Jacob Daniel Kingston Jr.'s grandfather, Defendant John Daniel Kingston Sr., directed the wedding and instructed Jenny's father to "officiate" by reading the Order's wedding ceremony from an old piece of paper.

226.    Non-party Bill Stoddard, a Numbered Man in the Order, now deceased, fraudulently signed the Utah Marriage License, falsely claiming to have been the officiant.  The Marriage License states, in part:

I hereby certify that on the 24th day of April in the year of two thousand 15 in the city of Sandy in said county of Salt Lake, I, the undersigned, an Elder did join in matrimony according to law M[s]. Jenny LaDonna Kingston and M[r]. Jacob Daniel Kingston, The nature of the ceremony was according to Utah Law and was a present mutual agreement of marriage between the parties.

227.    The Order Marriage was invalid because the Marriage License was fraudulently signed by someone who did not officiate, and because Jenny—a minor who did not want to marry Defendant Jacob Daniel Kingston Jr.—could not (and did not) give lawful consent.

***Sexual Abuse Within the Order Marriage***

228.    Immediately after the invalid ceremony, Defendant Jacob Daniel Kingston Jr., initiated sexual relations with Jenny against her will.

58

229.    On her so-called "honeymoon," Jenny was taken on a business trip to Turkey for Defendant WRE with Defendant Jacob Daniel Kingston Jr. and his family, during which the sexual abuse continued.[15]

230.    Although Jenny continuously told him that she did not want to have sex or engage in any sexual conduct, Defendant Jacob Daniel Kingston Jr. insisted that it was unacceptable for her to deny him. Through abuse and torment, Defendant Jacob Daniel Kingston Jr., coerced Jenny to submit to his unwanted and unwelcome sexual advances. When coercion failed, he violently raped her.

231.    Defendant Jacob Daniel Kingston Jr. and the Order, through its practices based on the Law of One Above Another and indoctrination of young people, conspired to commit these rapes.

232.    In fact, Jenny had been taught that forced sexual intercourse and other unwanted sexual intimacies did not exist within Order Marriages. The common phrase was: "It isn't rape if you are married."

233.    Within the marriage, Jenny was abused verbally, emotionally, psychologically, physically, and sexually, causing her to engage in self-harm.

---

[15]  Throughout her Order Marriage to Defendant Jacob Daniel Kingston Jr., Jenny was also taken on business trips with Defendant Jacob Daniel Kingston Jr. and his family to, among other locations, California, Oregon, Nevada, and Mexico. Defendant Jacob Daniel Kingston Jr. forced Jenny to engage in sexual acts with him against her will on each of these trips.

59

234.    On one occasion, she used a razor blade to carve the words that Defendant Jacob Daniel Kingston Jr. repeatedly disparaged her with, "YOU DON'T DESERVE SOMEONE TO CARE ABOUT YOU LIKE I DO."



### Forced Fertility Treatment

235.    Defendant Jacob Ortell Kingston Sr. used Order money—which, upon information and belief, could not have been spent without the knowledge and approval of Defendant Paul Elden Kingston Sr.—to send Jenny to a fertility doctor.

236.    The doctor determined that Jenny was capable of bearing children, but, upon information and belief, also determined that Defendant Jacob Daniel Kingston Jr. would need surgery to increase his ability to father children.[16]

237.    Defendant Jacob Ortell Kingston Sr., however, informed Defendant Jacob Daniel Kingston Jr. and Jenny that time was of the essence, surgery would take too long, and that they needed to just "get her pregnant."

238.    Defendant Jacob Ortell Kingston Sr. then forced Jenny to undergo in vitro fertilization, a process which entailed surgical procedures, medications, and the removal of eggs from her body.

239.    Upon information and belief, the sperm used to fertilize Jenny's eggs belonged to Defendant Jacob Daniel Kingston Jr., and once fertilized, Jenny's eggs were returned to her uterus.

240.    The in vitro fertilization resulted in the birth of twins in October 2017.

---

[16]   Despite this, Jenny was blamed for Defendant Jacob Daniel Kingston Jr.'s infertility.

***Continued Captivity and Denied Divorce***

241. Jenny continued to rebel against her Order Marriage. At one point she kissed another man, and as punishment, Defendant Jacob Ortell Kingston Sr., Defendant Sally Kingston, Defendant John Daniel Kingston Sr., and Defendant Jacob Daniel Kingston Jr. forced her to undergo a repentance process and recommit to the arranged Order Marriage. During this two-week period, they locked Jenny up and took her children, phone, and car.

242. In or around August 2018, Defendant Jacob Ortell Kingston Sr., the One Above Jenny and Defendant Jacob Daniel Kingston Jr., was arrested and later convicted of money laundering and filing false tax returns. In April 2023, he was sentenced to eighteen years in prison. Defendant Sally Kingston, who also encouraged the sexual assaults against Jenny, was sentenced to six years in prison for her involvement in the fraud.

243. In Defendant Jacob Ortell Kingston Sr.'s absence, Defendant John Daniel Kingston Jr., Numbered Man 69, was assigned to be the One Above Jenny, her husband Defendant Jacob Daniel Kingston Jr., and their children.

244. Jenny was required to attend counseling sessions with Defendant John Daniel Kingston Jr. intended to help her correct her purported faults within the unlawful marriage.

245. In or around December 2020, Jenny asked Defendant John Daniel Kingston Jr. for permission to divorce Defendant Jacob Daniel Kingston Jr. Her request was subsequently denied.

246. Jenny then scheduled a meeting with Defendant Paul Elden Kingston Sr., Defendant John Daniel Kingston Jr., and Defendant Jacob Daniel Kingston Jr. to appeal directly to the Order's leader. In the same way Jenny would not have been unlawfully married without his approval, she could similarly not escape the marriage without it. Defendant Paul Elden Kingston Sr. also denied her request.

61

*Escape with Her Children*

247.    To leave her abusive Order Marriage, after December 2020, Jenny fled the Order with her two minor children.

248.    She has since begun the difficult and painful process of freeing herself from years of indoctrination, sexual, physical, and emotional abuse, and from an unwanted and abusive Order Marriage that her leaders had refused to end.

249.    To control her thinking and compel obedience, she was confined, institutionalized, forced through a repentance process, and subjected to Order-directed counseling.

250.    The process of freeing herself from all of this indoctrination could only begin after she left the Order and continues, but she gradually began to recognize her legal injuries shortly before becoming a plaintiff in the original state court action.  *See Grant et al. v. Corporate Does 21-200 et al.*, No. 220905426 (Utah 3d Dist. Ct., Salt Lake Cnty. Sept. 7, 2022).

**E.    Jana Nicole Johnson**

***Groomed from Elementary School for an Incestuous Marriage***

251.    Jana Nicole Johnson's mother is non-party Nataleen Johnson, and her father is Defendant Kent William Johnson, Numbered Man 26.

252.    Jana was in elementary school when the Order first began grooming her for an Order Marriage to her first cousin, Defendant Daniel Charles Kingston.

253.    Defendant Daniel Charles Kingston is the son of Order leader Defendant Paul Elden Kingston Sr. and his first wife, Defendant Patricia Kingston.



Defendant Paul Elden Kingston Sr. is also the half-brother of Jana's father, Defendant Kent William Johnson.

254.    Defendant Kent William Johnson, Defendant Paul Elden Kingston Sr. and Defendant Patricia Kingston, coordinated to ensure that Jana and Defendant Daniel Charles Kingston, were in regular contact, including by enrolling both children at Defendant Ensign Learning Center.

255.    By age eight, Jana understood she would marry Defendant Daniel Charles Kingston—especially since all six of her older sisters had married sons of Defendant Paul Elden Kingston Sr. and Defendant Patricia Kingston to preserve the Pure Kingston Blood.  Indeed, two of Jana's sisters are currently married to the same Kingston.

256.    And, although Jana was a year younger than Defendant Daniel Charles Kingston, after skipping a grade she was enrolled in courses alongside him, giving her increasingly more time with him—all while being told he would be a good husband.

***Trafficked into an Unlawful Marriage at Fifteen***

257.    When Jana was fifteen years old, Defendant Paul Elden Kingston Sr., Defendant Patricia Kingston, Defendant Kent William Johnson, and others in the Order decided that Jana needed to move forward with her Order Marriage.  She was told to seek direction to become engaged to Defendant Daniel Charles Kingston.

258.    Defendant Paul Elden Kingston Sr. conducted an Engagement Meeting during which he, Defendant Patricia Kingston, Defendant Daniel Charles Kingston, Defendant Kent William Johnson, and others were present.

259.    At the meeting, Defendant Paul Elden Kingston Sr. declared that Jana, at age fifteen, and Defendant Daniel Charles Kingston were engaged and would be wed.

260.    On or around March 9, 2019, Defendant Daniel Charles Kingston and Jana were unlawfully married at the Order's recreation center where they posed for photographs with the wedding party, including both sets of parents.



261.    During the ceremony, Defendant Paul Elden Kingston Sr. gave a speech, Defendant Patricia Kingston performed and spoke, and Jana's father, Defendant Kent William Johnson, officiated—which he would not have done without the approval of Defendant Paul Elden Kingston Sr.



262.    Jana did not want to marry Defendant Daniel Charles Kingston, and, as a minor, she could not consent to marry him—particularly because he was her first cousin by blood, rendering the marriage illegal and void under Utah law.[17]

***Sexual Abuse Within the Marriage***

263.    Jana's Order Marriage also triggered Defendant Daniel Charles Kingston to force unwanted sexual relations on her.

264.    Although as a minor in an illegal and void marriage to her adult cousin (and therefore legally incapable of ever consenting to sexual relations with Defendant Daniel Charles Kingston), Defendant Paul Elden Kingston Sr., Defendant Patricia Kingston, Defendant Kent William Johnson, and the Order promoted, encouraged, and facilitated Defendant Daniel Charles Kingston's assaults because producing children meant more workers for the Order's benefit.  In

---

[17]    *See* Utah Code Ann. § 30-1-1(1)(e).  *See also* Utah Code Ann. § 30-1-9.

some instances, they even gave Jana sex toys and unsolicited sexual advice to further pressure her into sexual compliance.

265. Jana typically tried to avoid and refuse Defendant Daniel Charles Kingston's sexual advances through words and actions, but he repeatedly initiated sexual relations despite her refusals.

266. For instance, as a reward for entering the marriage, Jana was taken to Hawaii, where despite the fact she was menstruating and voiced her objection to sex, Defendant Daniel Charles Kingston proceeded to rape her.

267. On other occasions as well, Jana refused his sexual advances, but Defendant Daniel Charles Kingston sexually assaulted her against her will. In addition to raping Jana, he frequently forced her to watch pornography and listen to his detailed sexual fantasies.

268. Defendant Daniel Charles Kingston reported to Order members that Jana was denying him children.

269. The Order's disapproval placed Jana in a hopeless position as Defendant Daniel Charles Kingston continued to abuse and rape her.

270. Jana felt relieved when Defendant Daniel Charles Kingston married additional wives because it reduced the frequency of his sexual advances toward her. Jana was the first of three plural wives.[18]

---

[18] Defendant Daniel Charles Kingston's subsequent wives included his second wife, who was also his first cousin, as well as his third wife, who is his niece and was a minor at the time she was trafficked across state lines between Utah and New Mexico and Utah and Rhode Island. *See Nichols v. Kingston, et al.*, pending in the United States District Court for the District of Utah, Case No. 2:25-cv-00051-DAK.

271.    While Defendant Daniel Charles Kingston's attention was diverted, Jana befriended people outside the Order and obtained a birth control prescription, hoping to avoid conceiving a child that would lock her into the marriage.

272.    Ultimately, Defendant Daniel Charles Kingston, who regularly searched Jana's belongings, found Jana's birth control and flew into a rage.

273.    Defendant Daniel Charles Kingston called Defendant Kent William Johnson, and they arranged for Jana to be taken to Defendant American Digital Systems, where she was held against her will, forced to sleep on the floor without access to her personal belongings, and permitted to leave the room only for bathroom breaks.

274.    During this confinement, Defendant Kent William Johnson, Defendant Daniel Charles Kingston, and others went through Jana's phone and forced her to send messages ending her friendships with peers outside of the Order.

### *Forced Counseling and Surveillance*

275.    Approximately a year and a half into the Order Marriage, Jana was directed to attend counseling sessions with Defendant Paul Elden Kingston Sr. to correct her "shortcomings" as a wife.  Jana thought these sessions were necessary because she had failed to become pregnant, as required by the Law of One Above Another.

276.    In fact, during the sessions Defendant Paul Elden Kingston Sr. questioned her about avoiding sex with his son and forcefully confronted her about taking birth control, which the Order considers sinful.

277.    Jana informed Defendant Paul Elden Kingston Sr. that she did not want to be in an Order Marriage to Defendant Daniel Charles Kingston.  He responded that she was the problem in her Order Marriage and instructed her to repent and make amends with Defendant Daniel Charles

Kingston. He also informed her that it was her duty to repair her Order Marriage, which could only be achieved by conceiving a child.

278. In addition to these sessions, Jana's electronic communications were monitored, her whereabouts were tracked, and she was regularly escorted anytime she left her home.

279. Jana later learned that Defendant Paul Elden Kingston Sr. and Defendant Daniel Charles Kingston had not kept the sessions private. Defendant Paul Elden Kingston Sr. shared details with various members of the Order, shaming and pressuring Jana into the role of a submissive and sexually obedient wife and producer of children for the Order—yet he failed to report Defendant Daniel Charles Kingston's sexual assaults and rapes to law enforcement.

280. Having had enough, Jana explicitly informed Defendant Daniel Charles Kingston that she had no desire to be married or have children with him.

281. In June 2021, she moved out of the Order apartment that she shared with him and fled her Order Marriage.

***Coerced Labor for the Order Businesses as a Minor***

282. Jana was required to begin working for the Order at about age fifteen.

283. One of her first Order jobs was at Defendant Order Bank and Defendant Fidelity Utah d/b/a Fidelity Lending, where she worked under non-party Cheryl Miller and the ultimate One Above, Defendant Paul Elden Kingston Sr., collecting debts on Order loans from Order members' statements.

284. A few months later, she was assigned to work at the Order Office, a/k/a Defendant Order Bank, a/k/a the Century Office, under the supervision of Defendant Deborah Williams and Defendant Paul Elden Kingston Sr., doing transaction balances.

285. Next, from about March 2020 through June 2020, she was required to work in a building housing another Order Business, Defendant Arrow Real Estate. At Defendant Arrow

67

Real Estate, she helped pre-qualify home sellers and was supervised by non-party Leah Kendall and, in turn, Defendant Paul Elden Kingston Sr.

286. From June 2020 through June 2021, Jana worked part-time at Defendant Standard Industries d/b/a Standard Restaurant Supply, where she assisted non-party Andrea Miller and a son of Defendant Paul Elden Kingston Sr., under their supervision and the direction of Paul Elden Kingston Sr.

287. Jana never received paychecks for any of this work. Her Order employers claimed to send her earnings to Defendant Order Bank to be recorded on her Statement, but her Statements consistently reflected less income than she actually earned.

288. Jana understood that disobedience or insistence on receiving paychecks would lead to punishment. Had she refused to work as directed, she would have been punished severely and suffered serious emotional and reputational harm within the Order.

289. Jana estimates she earned at least $27,000 in wages working for Order Businesses, yet her Order Bank Statement never reflected more than $2,000 in earnings. Her Statements also regularly showed unauthorized withdrawals without explanation. To date, she has not been fairly compensated for her work.

**Flight from the Order and Continuing Harm**

290. Even after Jana fled her Order Marriage and started to receive paychecks, she did not recognize the nature and extent of her injuries and continued to work at Defendant Standard Industries d/b/a Standard Restaurant Supply until December 2021 or January 2022. She broke that final tie to the Order only as she increasingly overcame the indoctrination and brainwashing that had controlled her throughout her early life.

68

**F.    Julie Ruth Green**

***Groomed From Childhood For An Incestuous Marriage To Her First Cousin and Maternal Uncle***

291.    Julie Ruth Green's biological parents are non-party Martha Elaine Kingston a/k/a Martha Nichols and Defendant Jason Ortell Kingston, one of the Seven Kingston Brothers and Numbered Man 49. Martha Elaine Kingston is a daughter of Defendants Paul Elden Kingston Sr. and Patricia Kingston, making her Defendant Jason Ortell Kingston's niece by blood.  As a result of this incestuous union, Defendants Paul Elden Kingston Sr. and Patricia Kingston are simultaneously Julie's  paternal uncle and aunt by marriage—through her father, Defendant Jason Ortell Kingston, who is Paul Elden Kingston Sr.'s brother—and her maternal grandparents, through her mother, Martha Elaine Kingston.

292.    When Julie was approximately six years old and in the third grade, the Order began indoctrinating her with the concept of a Number One Choice—teaching her that a husband had already been chosen for her.

293.    When Julie was twelve, the Order revealed that her Number One Choice was Defendant Paul Elden Kingston Jr.—a close relative approximately ten years her senior who already had multiple wives.

294.    Defendant Paul Elden Kingston Jr. is the son of Defendants Paul Elden Kingston Sr. and Patricia Kingston.  He is therefore both Julie's first cousin through her father, Defendant Jason Ortell Kingston, and her maternal uncle through her mother, Martha Elaine Kingston—a dual blood relationship resulting from the Order's practice of incestuous marriage to preserve Pure Kingston Blood.

69

295.     Julie was not an exception.     Every one of Julie's full sisters was married incestuously within the Order to sons of Defendants Paul Elden Kingston Sr. and Patricia Kingston, each union engineered to preserve Pure Kingston Blood.

296.     Throughout her childhood, Julie had been taught to believe that she was personally receiving divine marriage direction to marry her uncle and cousin.  As part of this indoctrination, Order leadership told Julie that she herself had chosen Defendant Paul Elden Kingston Jr. as her Number One Choice before she was born—so the arrangement had been her decision all along. The Order reinforced this message repeatedly, ensuring that by the time Julie reached marrying age, resistance would feel like a betrayal of her own supposed will.

297.     In or around June 2016, when Julie was seventeen, the Order moved to finalize the arrangement.  Julie was brought to Defendant Paul Elden Kingston Sr.'s home for an Engagement Meeting with Defendants Paul Elden Kingston Sr. and Patricia Kingston, their son Defendant Paul Elden Kingston Jr., and other close family members.  At this meeting, Defendant Paul Elden Kingston Sr. personally authorized the illegal union that would make his seventeen-year-old niece and granddaughter the fifth wife of his own son.

298.     Following this Engagement Meeting, on December 15, 2016, Julie was forced to enter into an Order Marriage with Defendant Paul Elden Kingston Jr., which took place on Defendant DCCS, Inc.'s property also known as John's Market Place.  Under Utah law, the Order Marriage was incestuous and thus void.[19]

299.     In addition to Defendant Paul Elden Kingston Jr., Defendants Paul Elden Kingston Sr., Patricia Kingston and Jason Ortell Kingston were present at this event.

---

[19]     *See* Utah Code Ann. § 30-1-1(1)(d)(i).

*Trafficked into a Forced Marriage and Repeatedly Raped*

300.    Despite Julie's resistance, Defendant Paul Elden Kingston Jr. repeatedly coerced and forced Julie to engage in sexual relations.  For instance, months after her Order Marriage, Julie was flown to the British Virgin Islands for a supposed "honeymoon."  Julie wanted to go on the trip.  She did not want to have sex with her Order husband.  That distinction did not matter to Defendant Paul Elden Kingston Jr., who forced Julie to have sexual intercourse with him against her will.

301.    Subsequently, as a result of a violent rape committed by Defendant Paul Elden Kingston Jr., Julie became pregnant and then suffered a miscarriage.  The Order blamed Julie for the miscarriage—ostracizing her as a "baby killer" and for failing to fulfill her duties as an obedient and compliant wife.

302.    On information and belief, Julie received a raise as a reward for entering her Order Marriage.  She did not receive a raise for her miscarriage.

303.    Despite a lifetime of this indoctrination that required girls and women to submit sexually to the will of their husbands to produce children for the Order, Julie resisted.  On most occasions when sexual relations occurred between Julie and Defendant Paul Elden Kingston Jr., Julie communicated that she did not want to have sexual intercourse with him.  On several of those occasions, he ignored her refusal and forcibly raped her.

*Denied Divorce And Physically Removed from the State*

304.    By November 2018, Julie was desperate to escape her Order Marriage.  Julie tried to physically separate herself from her Order husband, Defendant Paul Elden Kingston Jr.  As a result of these actions, Julie believed that she was being tracked by the Order.

71

305.    After she was able to physically leave her Order Marriage, Julie met with Defendant Paul Elden Kingston Sr. and asked for a divorce or "unsealing" from his son, but her request was refused.

306.    Julie could not have been illegally "married" without Defendant Paul Elden Kingston Sr.'s approval, and she could not get out of the Order Marriage without his consent.

307.    In January 2019, to prevent Julie from leaving the Order, at the direction of Defendant Paul Elden Kingston Sr., Julie was taken against her will by her grandmother, Defendant Patricia Kingston, to California under the guise of going to the beach.  From there, Julie was flown to Pennsylvania.

308.    Once in Pennsylvania, Defendant Patricia Kingston told Julie that she was required to stay in an Order member's home.  Julie's phone was disabled—she could not access the internet, make calls, or send texts.

309.    When she was able to return to Utah later in 2019, Julie did not return to her Order Marriage and permanently fled the Order.

***Forced To Labor For Order Businesses From Age Twelve With No Access To Her Earnings***

310.    While in the Order, Julie was required to start working for Order Businesses at approximately age twelve.

311.    First, Julie worked part-time filing Order members' "10% Forms"[20] and other papers in filing cabinets located in her mother's basement.

312.    Julie was next required to work at Defendant Order Bank, part-time during the school year and full-time during the summer.  Her work involved using stamps bearing Order

---

[20]  A 10% Form is a form that each Order member is required to fill out each year listing all their assets and pledging to give 10% of such assets to Defendant LDCC.

members' signatures to sign forms, checks, and paperwork on their behalf.  After Julie "graduated" from the Penn Foster online course at age fourteen, she was required to work at the Order Bank full-time.  She was tasked with working on Order Statements under the supervision of several Order adults, including non-party Janice Kingston, Defendant Jolene Andrews, and non-party Andrea Nichols.

313.    Julie later worked full-time for an Order property management business at Defendant Order Bank under the direction of non-party Rachel Nichols and other adults, performing accounts payable, receivable, and collections.  She also worked for Order daycare businesses at this time.

314.    Julie also worked at Defendant U.P.C., Inc. d/b/a Garco Industrial Park, which was also sometimes referred to as Garco Property Management.  There, she detailed cars under the supervision of Defendant Paul Elden Kingston Jr.—the same man who was simultaneously raping her.

315.    Additionally, Julie worked for Defendant Arrow Real Estate performing custodial work, data input, and miscellaneous paperwork under the supervision of her mother and Andrea Nichols.

316.    Finally, Julie worked for her father, Defendant Jason Ortell Kingston, in California, standing in lines for hours at Comic-Con each year to buy toy products that she helped haul back to Utah to sell for the Order.

317.    Julie never received a paycheck from any of her Order employers, except for paychecks received from the Order daycare businesses.  She was told that the earnings she did not receive went directly to her account at Defendant Order Bank.  Julie was not allowed to see any of

her Order Statements until she was seventeen years old and could not withdraw funds without the approval of Order leadership.

318.    If Julie had refused to work as directed, she would have been punished severely and suffered serious emotional and physical harm, as well as harm to her reputation within the Order. To date, Julie has not been fairly compensated for her labor at the Order Businesses where she was required to work.

***Escape from the Order and the Path to Recognizing Her Legal Injuries***

319.    Julie could not have reasonably discovered her injuries and acted on them before she was able to return to Utah, and ultimately leave the Order, in 2019.  Only after leaving the Order was Julie gradually able to free herself of the Order's brainwashing and indoctrination to fear the government, law enforcement, courts, and the law.  Julie recalls first realizing that she had suffered actionable injuries in a discussion with Plaintiff Jenny Kingston in 2021.  She brought her state claims on September 7, 2022 (*Grant et al. v. Corporate Does 21-200 et al.*, No. 220905426 (Utah 3d Dist. Ct., Salt Lake Cnty. Sept. 7, 2022)), and re-filed them on February 28, 2024.

## G.    Michelle Ruth Michaels

***Born into Deception***

320.    Michelle was born into the Order on May 2, 2000.



321.    Michelle's mother is Defendant Michelle Afton Michaels, a/k/a Michelle Afton Brown.  Michelle's father is Defendant Jesse Orvil Kingston, one of the Seven Kingston Brothers and Numbered Man 48.  Michelle's uncle is the Order leader, Defendant Paul Elden Kingston Sr.

322.    The Order began deceiving authorities on the day Michelle was born.  Upon information and belief, Michelle's mother gave birth to Michelle at her home in South Salt Lake—not at her grandmother's home, as falsely recorded on Michelle's Utah birth certificate.

323.    The birth certificate further lists a fictitious father, "Stephen James Michaels," with a fabricated birth date.

324.    Michelle's parents, Defendant Jesse Orvil Kingston and Defendant Michelle Afton Michaels, were themselves married in the Order through an incestuous, bigamous union that constituted child marriage—Michelle's mother was approximately sixteen years old at the time she was married.

### *Forced to Labor for the Order from the Age of Four*

325.    Michelle began working for Order Businesses at approximately four years old, and she was forced to continue laboring for the Order until she finally fled at age seventeen—thirteen years of uncompensated child labor extracted under the direction of Defendants and their agents.

326.    Michelle's first assigned workplace was Defendant American Digital Systems. Under the direction of her parents, Defendants Jesse Orvil Kingston and Michelle Afton Michaels, she performed billing and secretarial tasks, cleaned, and shredded documents.

327.    When Michelle was approximately seven years old, she was also assigned to work at Defendant Order Bank.  There, she reported to non-party Andrea LaDonna Michaels and Defendants Deborah Williams, Jolene Andrews, Paul Elden Kingston Sr., and Rachel Orlean Kingston Young.

328.    Her assigned tasks included preparing Order Statements, entering service slips and checks, sorting pay records, drafting journal entries, and appending falsified Order last names to legal last names.

329.    Michelle's labor obligations were not confined to a single Order employer. Michelle also continued to work at Defendant American Digital Systems, fixing computers and doing secretarial work, billing, and answering phones.

330.    Michelle also worked at Defendant American Digital Systems d/b/a AAA Communications, where she answered phones and handled the card line answering service at the direction of her parents and non-party Orlean Mathews.

331.    The Order further required Michelle to travel out of state on its behalf.

332.    As an employee of Defendant American Digital Systems d/b/a AAA Communications, Michelle was forced to travel to California on seven separate occasions to attend Comic-Con conventions with her father, Jesse Orvil Kingston, where she assisted in purchasing large quantities of toy products to be hauled back to Utah in trailers or box trucks rented by the Order.  These toy products were displayed at Defendant American Digital Systems d/b/a AAA Communications and were kept by Defendant Jesse Orvil Kingston or sold for the benefit of the Order.  Some earnings may have been reflected on Michelle's Order Statements for some of these work trips.

333.    Similarly, Michelle was also required to assist her mother, Defendant Michelle Afton Michaels, with two Order businesses, Creative Decor and Flowers Forever, by traveling to Nevada on two or three occasions to purchase flowers for Order weddings and funerals.  Order members and outsiders were charged for the flowers, but profits were recovered by Defendant Order Bank via service slips, journal entries, or checks.  Some payments for these activities may have been reflected on Michelle's Order Statements.

334.    Except for a single paycheck that Michelle received by mistake, Michelle never received any paychecks from her Order employers.  All her wages went to Defendant Order Bank,

76

which controlled her earnings and gave her periodic Order Statements. Like most Order members, Michelle was unable to withdraw funds from her account without the approval of Order leadership.

335.    Because Michelle did not receive paychecks from her Order employers, she has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid.

336.    The Order Businesses she worked for, however, are required by law to maintain and produce these records.

337.    As discussed above, Michelle worked for Order Businesses for thirteen years, and, at one point, about $80,000 was reflected in Michelle's Order account on her Order Statement. She was later informed that amounts of $44,000 and $22,059.34 had been withdrawn, without Michelle's knowledge or consent, to pay the mortgage on her mother's Order-financed home.

338.    A few months later, again without Michelle's knowledge or consent, she became obligated to the Order for a $6,000 loan. The Order created this "loan" and then systematically paid itself back by deducting payments from the wages Michelle believed she was earning by working for the Order. (*See supra* ¶¶ 92-93.)

339.    After Michelle left the Order at age seventeen, she called Defendant Order Bank to obtain copies of her Order Statements and withdraw her remaining funds, but she was refused because she did not have parental consent, because her Order account was closed, and because she was no longer a member of the Order. Michelle had not personally closed her Order account.

340.    If Michelle had refused to work as directed, she would have been punished severely and suffered serious emotional and physical harm, as well as harm to her reputation within the Order. To date, Michelle has not been fairly compensated for her labor at the Order Businesses where she was required to work.

*Groomed from Childhood for an Incestuous Marriage*

341.    While Michelle was being exploited as a child laborer, the Order was simultaneously grooming her for an arranged marriage.

342.    Michelle learned at age eight that her Order Marriage to Defendant Paul Elden Kingston Sr.'s brother, Defendant Jason Ortell Kingston, had already been arranged.

343.    As she grew up, Michelle watched her older sisters be groomed, trafficked into arranged Order Marriages, and become pregnant at a young age.  She feared she had a similar fate coming to her.

344.    Indeed, when Michelle turned seventeen, Defendant Paul Elden Kingston Sr. scheduled an Engagement Meeting to formalize her planned marriage to Defendant Jason Ortell Kingston.

345.    What she was being asked to accept was staggering: beside her young age, Defendant Jason Ortell Kingston already had other wives—including three of Michelle's half-sisters.

346.    Faced with an impossible choice—submit to the Order Marriage or lose her family entirely—Michelle chose her freedom.  At age seventeen, she fled the Order before the engagement could be finalized.   The price of her escape was total ostracism: her family severed all communication with her.

*Forced to Execute the Order's Financial Frauds*

347.    Beyond the labor the Order extracted from Michelle, Defendants also deliberately used her as an instrument of fraud.

348.    In February 2016, when Michelle was approximately fifteen years old, the Order learned that the FBI was preparing to serve a search warrant on Defendant American Digital Systems.

349.    In response, Michelle was directed to help hide and destroy payroll and other records that would have helped expose the Order's unlawful employment, payment, and child labor practices.

350.    Michelle (with the assistance of her siblings, one of whom was four years old at the time) shredded documents and witnessed and assisted as truckloads of records and filing cabinets were taken into hiding.  (*See supra* ¶¶ 140-142.)

351.    After assisting at Defendant American Digital Systems to prepare for the feared FBI raid, Michelle returned to work at various Order jobs, including at the Order Bank.  At the Order Bank, Michelle reset computer settings that had been altered in anticipation of the raid.

352.    Under the direction of her parents, Defendants Jesse Orvil Kingston and Michelle Afton Michaels, Michelle also completed forms with false information and signed other people's names on checks from the State of Utah.  Typically, these were names in relation to fake or fraudulent Order daycare businesses.

353.    For example, a fraudulent daycare was run by Michelle's mother, Michelle Afton Michaels, under a sister wife's name which, on information and belief, at the time could not be operated under her mother's name because she had taken the blame for causing the death of a baby to protect her husband, Defendant Jesse Orvil Kingston.  (*See supra* ¶ 126.)

354.    An example of a fake daycare requiring Michelle to sign parents' signatures is a daycare business that only existed on paper because the children were actually kept in another Order daycare business that had already maximized the allowed government subsidy.  For these daycares, Michelle was also required to fill out forms fraudulently, stating when parents dropped off and picked up their children.

355.    Michelle was taught and instructed by her mother to sign other Order members' names, sometimes alternating her right and left hands to differentiate signatures, and to complete and falsify forms in order to "Bleed the Beast."

356.    Defendants Jesse Orvil Kingston, Paul Elden Kingston Sr. and John Daniel Kingston Sr. were aware of and ultimately controlled these fraudulent schemes.  No large amounts of money would go into or leave the Order without the approval of the Ones Above, Defendants Rachel Orlean Kingston Young and Paul Elden Kingston Sr.

357.    Before she left the Order, Michelle was contacted by law enforcement and asked to provide information about the Order's business practices.  She had been raised to fear law enforcement and knew she risked being punished by the Order for speaking.

358.    Nevertheless, Michelle reluctantly cooperated.

***Escaping from the Order and Recognizing Her Legal Injuries***

359.    After, at age seventeen, Michelle left the Order.

360.    She had been raised to distrust the outside world and the laws of society, to obey the Order without question, and to treat its practices—however exploitative and illegal—as normal and divinely sanctioned.  Thus, Michelle did not initially understand that the abuse she suffered had legal names—labor trafficking, forced labor, financial exploitation—or that legal remedies existed for the injuries that Defendants had inflicted on her throughout her childhood.

361.    Only gradually, as she obtained distance from the Order, did Michelle come to recognize that she had suffered actionable legal injuries and that Defendants bore legal responsibility for them.  Shortly after reaching that recognition, Michelle became a plaintiff in the state court action filed on September 7, 2022 (*Grant et al. v. Corporate Does 21-200 et al.*, No. 220905426 (Utah 3d Dist. Ct., Salt Lake Cnty. Sept. 7, 2022)), and subsequently joined this action.

80

**H.      Allison Eames**

*Born with a Falsified Birth Certificate to a Violent Father and a Child Bride*



362.     Allison was born into the Order on November 6, 1999.

363.     Allison's mother is non-party Kelli Collins, a/k/a Kelli Mattingly.  Her father is Defendant John Daniel Kingston Sr., one of the Seven Kingston Brothers and Numbered Man 15.   The Order Marriage of Allison's parents was illegal in that her mother was a 15-year-old girl, and her father had already married four of his eventual fourteen wives.

364.     Allison's uncle is the Order leader, Defendant Paul Elden Kingston Sr.  Allison is the full sister of Plaintiff Brenda Collins.

365.     Allison was born in a building that was once located at 765 North 300 West, Salt Lake City, Utah 84103 and known in the Order as the "General Store."

366.     Allison's father, Defendant John Daniel Kingston Sr., is not listed on Allison's Utah Birth Certificate, nor is the address of the General Store where she was born.  A false address in Kearns was used instead.

367.     Allison's parents were verbally and physically abusive.  Her father served time in prison for nearly beating to death one of his other daughters.  (*See supra* ¶ 130.)  He demonstrated on numerous occasions that he was not afraid to use threats and physical violence to intimidate and control members of his family.

*Indoctrinated from Childhood*

368.     From a young age, Allison was taught by her parents and other Order members that her sole purpose was to be a good wife and to bear children.  She was taught that this was the only way a woman could establish her place in the Order.

369.    At age eleven, Allison was required to attend an Order Marriage preparation course. In these classes, she was taught the skills and duties of an Order wife. Topics included learning obedience, learning how to receive direction, learning how to become properly betrothed and engaged, learning how to budget for a large family, and learning how to maximize her fertility window to give birth to as many children as possible. Material from these classes was reinforced at Order functions, at school, and within the home. Allison also attended numerous Order weddings involving minor girls, incest, and/or bigamy.

370.    In 2014, for example, Allison attended the Order Marriage of her half-sister and half-brother. The marriage was both incestuous and bigamous.

371.    In February 2015, when she was sixteen, Allison witnessed another sister marry in the Order and realized that she was now the oldest unwed daughter of her parents. By this time, her father was regularly meeting with her and informing her that it was her turn to be married.

### Ran Away—Twice—And Sought Emancipation of Herself at Sixteen

372.    By sixteen, Allison understood that she had no choice but to leave the Order if she was to avoid an Order Marriage. In December 2015, she ran away. She was unable to bring her birth certificate or social security card because the Order kept these documents from her.

373.    Her parents tracked her down and forced her to return home. Allison ran away again.

374.    This time, she initiated an emancipation court proceeding. In September 2016, when she was still only sixteen, her parents gave up all legal and physical parental rights. Allison eventually secured her freedom through a court-ordered adoption to her aunt who had fled the Order years earlier after being the victim of an incestuous Order marriage.

*Forced to Labor for Order Businesses from the Age of Eight*

375.    Allison was required to start working for Order Businesses when she was about eight years old.  Refusing to work for the Order resulted in more physical punishment at the hands of her Ones Above.

376.    Her first job was at Defendant Four Corners d/b/a A-1 Disposal, where she filed and scanned papers and performed various kitchen duties, as required and supervised by her Ones Above, including her father, Defendant John Daniel Kingston Sr.

377.    At approximately age ten, Allison was reassigned to Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch.  She was taken there by Defendant Valerie Martin, to whom she reported.  Allison was often required to work ten or twelve hours a day—slaughtering and skinning chickens with a dull kitchen knife and performing other farm labor.  She was frequently deprived of meals.  She was prevented from entering the house at the end of the day until she had completed all of her work, often forcing her to labor late into the night.

378.    At approximately twelve years old, Allison was reassigned to Defendant Four Corners d/b/a A-1 Disposal's office, where she resumed her prior tasks and took on data entry and dispatch work she was too young to perform.

379.    At approximately age fourteen, Allison was reassigned to work for Defendant April McKay—who handled most of the Order leaders' and members' tax filings.  Allison's job responsibilities included assisting the Order with its systematic fraud on the United States government by following Defendant April McKay's instruction to complete and file fraudulent tax forms to the IRS.  The Order weaponized a child to execute its financial crimes—and tried to ensure that if anyone bore legal exposure, it would be Allison.

380.    Under Defendant April McKay's direction, Allison moved "dependents" from one Order member's tax forms to another, invented addresses, and otherwise manipulated information

83

to maximize tax deductions for Order members. The resulting tax credits or refunds were typically intercepted and recovered by the Order.

381.    Allison was next assigned to work at Defendant Order Bank under non-party Karen Bryant, who in turn reported to Defendant Hyrum Dalton Kingston, where she performed data entry tasks at the direction of adult members of the Order, including the Ones Above her.

382.    At approximately age fifteen, Allison was reassigned to work at Defendant DCCS, Inc., d/b/a John's Market Place, under the supervision of non-party Andy Gustafson on behalf of the Order, where she worked in the bakery.

383.    Finally, while still fifteen, Allison was reassigned to work at Defendant World Enterprises d/b/a Family Stores True Value as a cashier under the supervision of non-party Christine Wellington and, in turn, Defendant David Ortell Kingston. Allison remained at this job until she left the Order on December 6, 2015.

384.    Despite being forced to work for these various Order Businesses from the age of eight, Allison never received a single paycheck. She also has no paycheck stubs to confirm the dates she worked, the hours she worked, or the amounts she should have been paid. The Order Businesses she worked for, however, are required by law to maintain and produce these records.

385.    Allison was told that her wages were being paid to Defendant Order Bank, and that she could access her earnings only through Defendant Order Bank. In reality, Allison was not permitted to access or use any of her money without obtaining permission, which she rarely received.

386.    Despite working full-time at Order Businesses for years, Allison's Order Statement never showed more than a $1,000 balance.

84

387.    Allison noticed on numerous occasions that her balance systematically decreased even though she was permitted to spend almost nothing.  When she asked where her money had gone, she was told "room and board."

388.    When Allison fled the Order, the Order took the remaining money from her account, refused to return it, or provide any accounting.

389.    If Allison had refused to work as directed, she would have been punished severely and suffered serious emotional and physical harm, as well as harm to her reputation within the Order.

390.    To date, Allison has not been fairly compensated for her labor at the Order Businesses where she was required to work.

## I.    Priscilla Tucker



391.    Priscilla Tucker is the biological daughter of non-parties Alma Tucker and Hannah Tucker.  At the time of Priscilla's birth, her mother was approximately seventeen years old.  Her father, Alma, died before Priscilla turned two years old. Following Alma Tucker's death, Hannah Tucker became the second wife of non-party Lynn Kingston, another member of the Order.

### *Childhood Sexual Abuse by Joseph Kingston*

392.    Priscilla first experienced sexual abuse at approximately six years old at the hands of Defendant Joseph Kingston.  Defendant Joseph Kingston is Priscilla's first cousin, related on both sides: his mother is Priscilla's mother's sister, and Priscilla's biological father is Defendant Joseph Kingston's father's uncle.  Unlike most cousin pairings within the Order, Priscilla and Defendant Joseph Kingston grew up in close, regular contact because their mothers were sisters.

85

393.    The abuse first involved Defendant Joseph Kingston telling Priscilla they needed to "play house"—he would be the dad and she the mom.  Under that pretext, he repeatedly touched her private areas, both above and under her clothing.  This type of sexual abuse continued until Priscilla was approximately eleven or twelve years old.

394.    Defendant Joseph Kingston made clear that the abuse was sanctioned by Order leadership.  He boasted to Priscilla that his father and grandfather knew about the sexual activity and condoned it.  He warned her that if he made her pregnant, she would be required to marry him.

**Forced Child Labor in Order Businesses**

395.    Priscilla began working for Order businesses at approximately age eight.

396.    Her first assignment was at Defendant Standard Industries d/b/a Standard Restaurant Supply in Salt Lake City—one of several Order-owned locations across Nevada, Arizona, and Idaho.

397.    Under her stepfather Lynn Kingston's direction, Priscilla sorted merchandise and price-tagged imported goods.  Her work also required her to travel with Lynn Kingston to trade shows and vendor conventions in Las Vegas, Nevada, where she helped evaluate and select merchandise to purchase.

398.    She never received any money for her work at Defendant Standard Industries d/b/a Standard Restaurant Supply but was told her wages went to her Order Statement.

399.    At approximately age ten or eleven, Priscilla was assigned to Defendant World Enterprises d/b/a Family Stores True Value.  She regularly worked into the evenings.

400.    During her time at Defendant Family Stores True Value, on some occasions, Priscilla was forced to work through the night and go directly to school the next morning.  She also worked Saturdays and Sundays.

401.    Priscilla was told she earned minimum wage at Defendant World Enterprises d/b/a Family Stores True Value.  She also never saw the money—it purportedly went to her Order Statement.  Her supervisors required her to clock in and out each day, or to handwrite her hours on a timecard.

402.    At approximately age thirteen or fourteen, Priscilla was assigned as a Teacher's Assistant at Defendant Ensign Learning Center, under the supervision of Karen Bryant and Defendants Hyrum Dalton Kingston, Patricia Kingston, and Paul Elden Kingston Sr.

403.    She worked full time—from eight in the morning to four in the afternoon—monitoring classes, helping children, grading papers, and teaching.

404.    Simultaneously, the Order enrolled Priscilla in Penn Foster, an online high school program offered two mornings per week.  She was required to pay for the program, complete it, and graduate within one year.

405.    Although some co-workers received wages credited to their Statements from their work at Defendant Ensign Learning Center, Priscilla received nothing.  The school claimed her Penn Foster tuition served as her compensation.

406.    While assigned to Defendant Ensign Learning Center, she was also required to work weekends at Defendant World Enterprises d/b/a Family Stores True Value.  She does not recall any Statement credits for those weekend hours.

407.    After approximately one year, Priscilla was returned full time to Defendant World Enterprises d/b/a Family Stores True Value as a cashier and merchandiser.  As a cashier, she processed cash and credit card transactions from non-Order customers.  As a merchandiser, she set up merchandise piles and product displays.

408.    At approximately age fifteen, Priscilla was reassigned full time to Defendant Standard Industries d/b/a Standard Restaurant Supply, initially as a cashier and stockgirl.  Before she turned sixteen, she was promoted to manager assistant, with accounting responsibilities for front-of-house sales, the warehouse, and will call.  Each day she was also required to drive—without a driver's license—to banking institutions to deposit store funds.  She received no paycheck.

409.    At approximately age sixteen, Priscilla was assigned to Defendant Attco Trucking Company, Inc. d/b/a CTC Trucking first as a front-desk worker, then as a dispatcher and broker. She reported to Defendant Jacob Ortell Kingston Sr., among others.

410.    There, she dispatched Order-owned trucks, coordinated freight shipments from Utah to states as far as New York and Florida, and arranged return loads.  She worked there from approximately the end of 2013 through near the end of 2014.  She received no paycheck.

411.    In addition to her assigned positions, Priscilla was required to perform unpaid tasks for the Order.  Physical beatings for any perceived disobedience were routine throughout Priscilla's upbringing.  She complied with Order directives out of genuine fear.

412.    Throughout this period, she checked her Order statement nearly every month.  Her balance was periodically zeroed out entirely.  At one point, her Statement had held $16,000—including Social Security death benefits from her father's death—but that amount disappeared as well.

413.    Any purported misconduct would also result in earning statement deductions.

414.    On rare occasions, Priscilla could access small amounts from her Order account. Withdrawals required approval and could only be spent at Order Businesses.  Even then, funds were sometimes unavailable.

415.     In the year before she left the Order, she was denied access to her Statements entirely.  She was told the money was being saved for her wedding.

***Targeted for an Incestuous Order Marriage to Defendant Joseph Kingston***

416.     As part of her upbringing in the Order, Priscilla was required to attend Order dances.  Men—including married men and significantly older men—were permitted to ask her to dance while she was still a minor.  These dances functioned as courtship rituals that conditioned Priscilla to submit to male attention and authority.  Through "<u>Dance Cards</u>," similar to the redacted Dance Card below, the Order also directed and tracked each girl's dances in detail.



417.     Around age fifteen, Priscilla was directed to meet with Defendant Paul Elden Kingston Sr.  He told her she should pray about her future Order Marriage.  Given her indoctrination, Priscilla understood this as a command from her One Above to accept the marriage being arranged for her.

418.     When Priscilla was sixteen, Defendant Joseph Kingston, her cousin and the same man who had sexually abused her throughout her childhood, told Priscilla that they were to be married.

419.    Events moved quickly.  Her mother and stepfather spoke often of the coming Order Marriage.  Priscilla played along—once accompanying Defendant Joseph Kingston on a hot air balloon ride—because she did not know what else to do.

420.    Members of both families also openly celebrated the planned union.  His mother told Priscilla: "Oh my gosh I'm so happy because I know that you're going to be so amazing, and I already know you."  Priscilla's grandmother added: "Oh my gosh I'm so happy that my two grandkids are getting married."

421.    Worse yet, this period coincided with Defendant Joseph Kingston resuming his sexual advances.  Priscilla refused repeatedly.  But she understood her fate was an Order Marriage to him, and she continued to play along while he treated her as a wife.

### Refusal of the Engagement, Escape Attempt, and Forced Institutionalization at Lifeline for Youth

422.    Priscilla continued to play along with Defendant Joseph Kingston as if she were his wife until she was scheduled for an Engagement Meeting with Defendant Paul Elden Kingston Sr. on Labor Day, 2014.

423.    At the Engagement Meeting, Priscilla refused to consent to the marriage and walked out of the meeting.

424.    As a result, she was kicked out of her home.  She fled to a safe house where she filed a petition for emancipation in Utah court.

425.    About a month later, Priscilla's mother reached out to her, asking her to lunch under the guise that she wanted to see her one last time before having to disown her.

426.    Five days before her emancipation hearing, Priscilla went to her mother's house. Without warning, strange individuals—not Order members—appeared and physically removed Priscilla from her home and took her to Lifeline for Youth.

90

427.    Priscilla remained at Lifeline for three months.  During the first month or two, she internalized the belief that she was bad and her parents were good, apologizing for everything the Order had deemed wrong.

428.    Her therapist did not believe she belonged there and sought to discharge her.  Her parents objected.  They wanted Priscilla held at Lifeline until she turned eighteen.

429.    While confined at Lifeline, Priscilla was not permitted to wear shoes.  Upon information and belief, this restriction was imposed to prevent escape.

430.    Priscilla and other Lifeline participants were also forbidden to stand without another person's hand on their shoulder—a restriction the program called the "shoulder phase." Residents were required to earn the right to stand without supervision.  These conditions deepened Priscilla's sense of helplessness and reinforced the Order's and her parents' control over her.

431.    Ultimately, a compromise was reached.  Priscilla's parents agreed to sign her emancipation papers if she reached phase three of the Lifeline program.

432.    In January 2015, after reaching that milestone, Priscilla was released and returned to the Order; however, the emancipation papers were never signed.

***Continued Labor at Defendant WRE and Participation in the Order's Tax Fraud***

433.    Shortly after her release from Lifeline, Priscilla was again assigned to work under Defendant Jacob Ortell Kingston Sr., this time at Defendant WRE.

434.    In early 2015, Priscilla demanded actual paychecks.  Upon information and belief, she was paid from the same account used for non-Order employees.  She received approximately two paychecks before being told she owed the Order $40 because her Statement was negative.

435.    At Defendant WRE, Priscilla prepared and filed state tax forms using the figures she was instructed to use.  All forms claimed zero income.[21]

436.    Before leaving the Order, Priscilla and her sister would call the Order Bank, a/k/a Order Office, impersonate her mother, and authorize cash withdrawals.

437.    Over time, she successfully withdrew $600 on four separate occasions.  However, these amounts were insignificant compared to what should have been accumulating in her Order account if she had been properly compensated for her labor.

### Escaping the Order

438.    For years, Priscilla experienced suicidal ideations and repeatedly attempted to act on them.  She walked to train tracks and lay on them, waiting for a freight train.  When no train came, she rose and went home to avoid punishment for missing work or sneaking out.  If a train had come, she would not have gotten up.

439.    Unable to withstand the prospect of marrying her abuser and enduring further physical and sexual abuse, Priscilla escaped a second time once the grooming for an Order Marriage to Defendant Joseph Kingston resumed.

440.    On March 1, 2015, she fled the Order by boarding a bus to Las Vegas, Nevada.  She was seventeen years old.

### J.    Brenda Collins

### Childhood Indoctrination

441.    Brenda's mother is non-party Kelli Collins, a/k/a Kelli Mattingly.  Brenda's father is Defendant John Daniel Kingston Sr., one of the Seven Kingston Brothers and

---

[21]  Later, Priscilla provided information and assisted the FBI's investigation of Defendant WRE which contributed to several criminal convictions.

Numbered Man 15.   Brenda's mother is one of the fourteen women Defendant John Daniel Kingston Sr. claimed as wives.



442.    Brenda is one of twelve living children born to her mother, herself just one household among many in a sprawling patriarchal network.   Brenda is the full sister of Plaintiff Allison Eames.

443.    Growing up, Brenda knew who her father was but did not call him "father"—she referred to him only as "Daniel."   Over time she came to understand he was married to other women and had fathered many other children.

444.    Defendant John Daniel Kingston Sr. rarely spoke directly to Brenda as a child, yet she was taught to worship him without question.   Disobedience, however minor, was met with swift and severe punishment.

445.    One of Brenda's earliest memories is of being beaten by her father following a family prayer.   Harsh physical beatings were not aberrations; they were a fixture of her childhood.

446.    One summer, when Brenda was approximately thirteen years old, she had promised to babysit for her sister but had not yet showered.   She begged her mother for permission to quickly shower and was told yes—a small, ordinary moment that was about to turn violent.

447.    As soon as the water warmed, she heard pounding on the bathroom door, followed by Defendant John Daniel Kingston Sr. shouting, "Open the door right now."   She wrapped a towel around herself and opened the door.   He burst in, wrapped his hands around her neck, and began slamming her head into the toilet while choking her.

448.    Her towel began to come loose.   She screamed at him to get off her.   When she stood to fix the towel, he grabbed her throat again, slapped her, and told her to get dressed.

93

449.    When she shut the door to dress, he opened it again before she was clothed.  After she finished dressing, he and her mother led her into her bedroom.  She recalls that they said: "Good Order members obey.  You're never going to amount to anything if you're disobedient.  That's why that happened to you."  The message was unmistakable—she had brought the harsh punishment onto herself.

450.    These types of incidents and relentless violence and degradation Brenda endured contributed to her developing persistent thoughts of self-harm.

451.    As Brenda grew older, her father's attention shifted in a different and equally disturbing direction.  He began involving her in classes and outings specifically designed to groom her for an arranged Order marriage.  Her friends at school also shared stories of Defendant John Daniel Kingston Sr. hitting them just as he hit Brenda, yet all of them had been conditioned to believe they deserved it.  She had already watched her oldest sister be forced into marriage at approximately sixteen, surrounded by countless other girls who were made to follow the same path—and she lived in constant dread that her turn was coming.

***Forced Child Labor Before Running Away***

452.    Before Brenda ran away at thirteen, she had already been forced to work for the benefit of the Order and Order businesses.

453.    By the sixth grade, she cared for Order children for extended periods of time, made meals, and cleaned homes—domestic servitude dressed up as duty.

454.    On one occasion, as punishment, a teacher's assistant at an Order school required Brenda to supervise a group of five- to seven-year-old children—without compensation—while the other teachers and students attended a field trip.

455.    One summer, her mother brought her to work at Defendant Four Corners d/b/a A-1 Disposal.  There, Brenda filed papers, cleaned and mopped the kitchen, prepared lunches for two shifts of workers, and cleaned up after both.

456.    After that summer, Brenda continued to work at Defendant A-1 Disposal whenever the Ones Above directed it.  She stapled and unstapled documents, shredded papers, swept floors, cleaned the office, scanned files, entered numbers into a computer, and completed basic accounting.  At least once per week, she was prohibited from leaving before 10 p.m.

457.    Brenda was told she was being paid for her work at Defendant Four Corners d/b/a A-1 Disposal and that her earnings would be deposited into an Order account in her name, for when she was older.

458.    At one point, her account statement showed she had earned roughly $475.  But month after month, the balance stayed the same—or shrank—despite her continued work.  When she asked why, she was told: "Sometimes your parents will go through and take some of it."

459.    Before she ran away, Brenda was also required to complete other unpaid tasks for the Order, including helping children paint a home for Laura Fuller.

460.    Refusal typically resulted in physical punishment, public ridicule, or both.

461.    Brenda suffered physical abuse for the slightest supposed disobedience, for honest mistakes, and for any hesitation to report for Order work.  But the consequences of refusal extended beyond beatings.

462.    Disobeying and refusing to work an Order job could also have financial consequences.  A friend who worked at the Order Bank a/k/a Order Office once explained to Brenda that she regularly received data on hours worked by Order members and then reduced the credited amounts based on whether a member was in trouble, had been "talked to by Daniel," had

broken equipment, or had simply been instructed by Defendant John Daniel Kingston Sr. to cut their earnings.

***Sexual Assault by Order Member Nathan Mason***

463.    Before Brenda reached the eighth grade, she was sexually assaulted by non-party Nathan Mason.  When her parents discovered the abuse, rather than offer her comfort or protection, they told Brenda that bad things happen only to people who deserve them—because God punishes those who go against him.  In other words, they blamed their child for her assault and punished her for allowing it to happen.

464.    Shortly thereafter, one of Brenda's sisters reported the abuse to the police, refusing to allow the incident to be ignored.  However, when the abuse became public, rather than punishing Nathan Mason, Defendant John Daniel Kingston Sr. violently beat Brenda.

465.    Thereafter, it seemed to Brenda that everyone in the Order knew about the assault— and no one would help.

466.    Children at the Order school began harassing and bullying her.

467.    Her family blamed her for her mother's seizures.  Her father convinced her she was possessed by a demon, that she was causing those seizures, and that she was killing her mother.

468.    And, whenever she was punished for unrelated incidents, her parents would invoke the "Mason thing"—what Nathan Mason had done to her—as a reminder that, at her core, she was bad.

***Half-Sister's Suicide and the Family's Response***

469.    Brenda's half-sister committed suicide at fourteen years old.  Brenda was a year younger, and the two were very close.  In response, their father first announced the family would not hold a funeral.  He relented only after some of her sisters organized one themselves.

96

470.    Even so, Defendant John Daniel Kingston Sr. continued holding family meetings where he ridiculed the deceased girl and instructed the family to discard her pictures and belongings—because people who self-harm are "stupid and just need to pray more."

### *Flight at Age Thirteen and Years in State and Foster Care*

471.    Brenda had experienced suicidal ideations since the age of five.  By approximately thirteen, she had reached the limits of what she could endure and she attempted to run away.

472.    What followed were two years of desperate instability as she fought to avoid being sent back to the Order.  She cycled through the University of Utah Neuropsychiatric Institute, state care, family placements both inside and outside the Order, Lifeline for Youth, foster care at Utah Youth Village, and foster homes.

473.    Despite her allegations of abuse, Utah's juvenile court focused on reunifying Brenda with her parents.  She was forced to attend family therapy, resolve conflicts, make compromises, and give her parents a second chance.

474.    Meanwhile, Defendant John Daniel Kingston Sr. was working the legal system to tighten his grip on her.  In the juvenile court proceedings, he obtained a court order barring Brenda from participating in a television program called *Escaping Polygamy*—and submitted a list of individuals he claimed were associated with the show, directing that Brenda have no contact with anyone on it.

475.    The list included every person Brenda knew who had left the Order—many having no connection to *Escaping Polygamy*.  The court order effectively isolated Brenda and cut her off from the people she would naturally have turned to for support.

476.    By approximately fifteen, Brenda's only options upon leaving Lifeline were to live with people approved by her parents or to enter a foster home at Utah Youth Village.  Neither option truly freed her from the Order's reach.  Even so, she decided to go to Utah Youth Village.

97

477.    After Brenda graduated from Utah Youth Village and was returned to her mother's care, there was significant pressure on her to secure an Order job.  Her mother told Brenda's therapist that Brenda needed to save money and learn to be an adult.  The therapist suggested she be allowed to keep a portion of her earnings—a compromise that allowed Brenda to use some of her wages to buy and care for a cat.

478.    To earn money, Brenda worked full time at Defendant Family Stores True Value during the summer of 2016, when she was approximately fifteen.  She restocked shelves and assembled birthing kits for Order members to purchase, supervised by an adult Order member whose name she does not recall.  Despite the therapist's recommendation, Brenda had no meaningful access to her earnings—except to initially purchase the cat at the outset.  After that, she had to request cat food or litter from her mother, who would buy the item, bring it home, and tell her the price.

479.    In 2016, when Brenda was fifteen, the state formally determined that returning her to her mother's care was inappropriate.  She remained in state custody until her case was closed on October 6, 2019.

480.    However, even after the state acknowledged her mother's home was not a proper place to stay, she was still forced to remain in regular contact with her abusive parents.

481.    Thus, despite her physical freedom from the Order, for years thereafter, she continued to feel threatened by the Order and her parents.  In fact, fear, confusion, and suicidal ideation have continued to dominate much of Brenda's life.

482.    Even after she reached the legal age of adulthood, she continued running and hiding—struggling with her mental and psychological injuries—and doing her best to push the Order and her childhood out of her mind.

483.    In turn, Brenda was not able to discover and act on her legal injuries for years after she turned 18.

**K.    Katie "Alex" Martin**

*Forced Labor From Early Childhood*



484.    Katie "Alex" Martin was born into the Order on January 23, 2002, and subjected from early childhood to the Order's systems of control and exploitation.

485.    Alex's mother is Defendant Valerie Martin, and her father is Defendant John Daniel Kingston Sr., one of the Seven Kingston Brothers and Numbered Man 15.

486.    Alex moved to Washakie Ranch at approximately age two. There, she performed arduous labor such as feeding thousands of chickens, tending cattle, washing eggs, packaging meat, and loading farm products to sell to other Order members.

487.    The farm crew at Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch was primarily comprised of Order children who "misbehaved." Punishments for perceived disobedience included public shaming known as "bust meetings," beatings, being forced to sleep outside, and denial of food.

488.    At approximately age twelve, Alex and her family moved away from the ranch, but she was forced to return on weekdays in the summer to feed crew members and clean the farm. During this time, Alex continued selling farm products at church on the weekends, as directed by her parents.

489.    As Alex grew older, her forced labor assignments expanded. At approximately fourteen years old, she was compelled to miss weeks of school to work at the Order's marijuana farm in Oregon. She worked over ten hours a day, often without food. She was also required to

99

accompany her father on trips transporting marijuana from Oregon to Utah and, during a period of heightened law enforcement scrutiny, witnessed Order members destroying the crop.

490.     In addition to agricultural labor and drug trafficking, Alex worked at an Order-owned A&W franchise, where she prepared food and operated the register.   Although that franchise is now closed, at the time she reported to non-party Jennifer Kingston, non-party Elizabeth Kingston, and Defendant Jacob Ortell Kingston Sr.

491.     At age sixteen, Defendant Jacob Ortell Kingston Sr. commanded Alex to work full time at Defendant American Wellness & Rehab, where she took patient vitals, entered medical records, and performed administrative duties.  Alex was also trained to forge, falsify, and fabricate documents.

492.     Throughout her years of work, Alex was never directly paid.  She was told her earnings were credited to an account at the Order Bank, but she was never given access to those funds.  The only payment Alex received from years of child labor was her last three paychecks from Defendant American Wellness & Rehab, which she hid and refused to turn over to the Order before fleeing.

### *Targeted for an Incestuous Order Marriage to Her First Cousin*

493.     At age fifteen, Alex's parents and Order leaders, including Defendant Paul Elden Kingston Sr. began arranging her marriage to her first cousin, non-party Matthew Ortell Kingston. Matthew is the son of Defendant Paul Elden Kingston Sr. and Defendant Patricia Kingston.  He is significantly older than Alex.  At the time of the proposed marriage, he already had multiple wives—including multiple of Alex's aunts and her half-sister.  Alex would have been his twelfth or thirteenth wife.

494.     Alex was presented with a written "marriage direction" from one of Matthew's wives—who was also Alex's aunt—which Alex understood had been approved by her parents,

Matthew, and ultimately Defendant Paul Elden Kingston Sr.  Alex was told that the marriage direction was from God, and that Alex would be saved by marrying Matthew.

495.  Alex told her father that Matthew was already touching her inappropriately at Order dances.  Her father's response was to tell her that it was her responsibility to marry her "Number One Choice."

***Fleeing the Order***

496.  Fearing forced marriage, sexual exploitation, and continued servitude, Alex fled the Order before the marriage to her first cousin could take place.  Her escape was fraught with obstacles: her parents reported her as a runaway and withheld her birth certificate and social security number, and revoked their consent for her Utah driver's license—systematically stripping her of the ability to secure lawful employment outside of the Order.

497.  Alex first fled to Holding Out Hope ("HOH"), a nonprofit that assists individuals leaving polygamous sects, but she left after HOH staff informed her that attorney Laura Fuller was searching for her.  She feared that, if she was found, she would be forced to return to the Order. Left without adequate funds, Alex suffered from malnutrition and was hospitalized, at which point a case worker helped her obtain her social security number.

498.  After turning eighteen, Alex briefly attempted to reconnect with her family.  Her brother, Defendant John Daniel Kingston Jr., promised her $14.00 an hour if she worked at an Order Business.  Desperate, Alex agreed to work for Defendant Four Corners d/b/a A-1 Disposal for a few months.  During this time, she lived in a trailer that her mother claimed she owned and Alex's father did not control, but the heat and water did not work.

499.  Alex's mother also referred her to a "therapist," non-party Andy Gustafson, who met with Alex in an attic room to read to her from the Bible.  He eventually admitted he was not a licensed therapist.

101

500.    After Order men began harassing Alex at her trailer, she fled again—terrified about being forced into an Order Marriage.  This time, she did not come back.

501.    After she left the Order for good, Alex became a plaintiff in this action.

**L.    Mary Ann Robinson**

***Born Into The Order And Forced To Work From Childhood***

502.    Mary Ann was born on November 13, 1992 to non-parties Mary Keaton and Jeremy Ortell Kingston Sr., Numbered Man 68.



503.    Mary Keaton and Jeremy Ortell Kingston Sr. were married illegally, soon after Mary turned 15.

504.    Jeremy Ortell Kingston Sr. is not listed on Mary Ann's or her siblings' birth certificates.

505.    Starting in 2000, when Mary Ann was approximately eight years old, she was compelled to work for Order Businesses by her mother—who required Mary Ann to pay for her portion of the rent, groceries, and toiletries.

506.    From 2000 to 2008, Mary Ann was rotated through a series of Order Businesses including Defendant World Enterprises d/b/a Advance Vending, Defendant World Enterprises II d/b/a Family Stores True Value, Defendant DCCS, Inc. d/b/a John's Market Place, Defendant Order Bank, Defendant Ensign Learning Center, and Defendant Elizabeth Smith d/b/a Sierra Wholesale.  When Mary Ann asked about compensation, she was told that she was earning "Blessings in Heaven."

507.    Mary Ann also delivered newspapers for the Deseret Morning News on her mother's behalf.  Mary Ann was not compensated for this work—her mother relinquished the paychecks to the Order.

102

508.     While working at Defendant World Enterprises d/b/a Family Stores True Value, Mary Ann was instructed to hide in a back room when non-members came into the store, and to lie if a non-member asked if she was employed there.  She worked marking items and stocking store shelves, cleaning back areas, and working as a cashier.

509.     At Defendant World Enterprises d/b/a Advance Vending, Mary Ann worked under Cory Jensen and her father, Jeremy Ortell Kingston Sr., cleaning the warehouse and vending machines, preparing routes for drivers, keeping the vans clean, and counting money for deposit. At John's Market Place (a registered d/b/a of Defendant DCCS, Inc.), she worked as a stocker, janitor, and cashier.

510.     At Defendant Elizabeth Smith d/b/a Sierra Wholesale, she worked under her mother, Mary Keaton, performing custodial work and preparing flooring orders for installation.

511.     At Defendant Ensign Learning Center, she was required to work for various Order Businesses to earn school credit and, eventually, to pay for her online high school curriculum.

512.     Mary Ann was not allowed to see her Order Bank Statements until she was about thirteen years old, when records showed that she had $10,000 in her Order account.  By the time she was fifteen, her Statements showed between $15,000 and $20,000.  However, she was not allowed to access this money and funds were regularly taken from her account to pay for groceries, utilities, and rent.  Money was also taken from her earnings to pay "child support" on behalf of one of her siblings.  Mary Ann was also forbidden from preparing her own tax forms—on which the Order falsely claimed a child tax credit deduction for a "dependent"—or receiving the associated refunds.

***Directed to Execute the Order's Financial Crimes as a Teenager***

513.     Once Mary Ann graduated from high school in 2008, she was sent to work at Defendant Order Bank on Angelo Avenue.  First, she worked with other children creating invoices

103

for Order Businesses showing employee earnings.  Non-party Carrie Hughes, Mary Ann's supervisor, and non-party Dorothy Sanders used these invoices to create paychecks for the Order Businesses' adult and child employees.

514.    At times, Mary Ann also worked under non-parties Lisa Kingston, Jolene Sanders, and Crystal Young at Defendant Order Bank's office at 10 Century Park Way, Salt Lake City, Utah 84115.  The children's assignment at this location was to take the paychecks printed on Angelo Avenue and endorse them—by forging the Order Businesses' employees' signatures on thousands of paychecks.  The paychecks were then deposited into an account in the name of Defendant DCCS and/or Defendant DCCS, Inc. at Brighton Bank.  Mary Ann and other children were also required to forge the signatures of Order members on tax returns, social security checks, and other documents, many of which were deposited in real banks.

515.    Mary Ann was next instructed by her Ones Above to transfer to the Financials Department at Defendant Order Bank's office at 10 Century Park Way, working under Susan Johnson and Colleen Livingston and reporting directly to Defendant Paul Elden Kingston Sr.

516.    Under Defendant Paul Elden Kingston Sr.'s orders, Mary Ann later worked for Defendant Mitchell & Associates, an accounting company that provides Order members tax and accounting services for the benefit of the Order.  Her work at Defendant Mitchell & Associates included falsifying financials and taxes for some 32 Order Businesses, at the behest of Defendant Paul Elden Kingston Sr.

*Coerced into an Order Marriage*

517.    While working directly for Defendant Paul Elden Kingston Sr., Mary Ann was required to meet with him to discuss her expected Order Marriage.  Upon information and belief, due to her resistance, in 2012, at age nineteen, she was taken against her will to Idaho—isolated

104

from her community, her work, and everyone she knew—to be punished until she agreed to the Order Marriage chosen for her.

518. In Idaho, Mary Ann refused to speak with her grandfather, non-party Dan Brown, about marriage. As a result, she was further punished by being forced to work on the Order's Idaho potato farm. She was never paid for her work.

519. Mary Ann did not want to stay in Idaho. When the opportunity came, she escaped back to Utah, where she stayed with relatives whom she thought were safe. But even among family, the pressure to remain in the Order was relentless. Mary Ann made it clear that the only way she would stay was if she could marry non-party John Andrew Robinson—a man of her choosing, not the Order's. He was not her "First Choice," according to her Ones Above. But to prevent her from leaving entirely, the Order reluctantly agreed.

***Continued Labor After Her Order Marriage***

520. Mary Ann understood that she would receive raises at her Order job as financial rewards—first for entering into her Order Marriage, and then for each child she bore.

521. After her Order Marriage to John Andrew Robinson, Mary Ann was assigned to work at Defendant Four Corners d/b/a A-1 Disposal under Defendant John Daniel Kingston Sr. She prepared financials and taxes for Defendant Order Bank and many other companies, including non-party AAA Security, Inc., Defendant Four Corners d/b/a A-1 Disposal, non-party A-Action Express, and Defendant N.W.R. Limited Partnership d/b/a Washakie Ranch.

522. If Mary Ann had refused to work as directed, she, and likely her husband and children, would have been punished severely. To date, Mary Ann has not been appropriately compensated for her labor at the Order Businesses where she was required to work.

*Fleeing the Order*

523.    In 2018, Mary Ann fled the Order—indoctrinated, confused, and frightened. When she left, she was told she had nothing in her Order account.

## COUNT I[22]
### (Labor Trafficking in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1589, 1590 and 1595)

524.    Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589, 1590 and 1595 as follows:[23]

a.    **Plaintiff Amanda Rae Grant:** Based on the allegations in ¶¶ 149-195, Plaintiff Amanda Rae Grant alleges labor trafficking against Defendants Order Bank, Fidelity Utah d/b/a Fidelity Lending, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston Sr., American Digital Systems d/b/a Advanced Copy, Jesse Orvil Kingston, DCCS, Inc. d/b/a John's Market Place, Hyrum Dalton Kingston, Ensign Learning Center, and DCCS.

b.    **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges labor trafficking against Defendants World Enterprises d/b/a Advance Vending, World Enterprises d/b/a Family Stores True Value, Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston Sr.,

---

[22]  For the Court's convenience, Exhibit B summarizes the causes of action brought by each Plaintiff against each Defendant.

[23]  Under the TVPRA, a plaintiff does not need to sue her direct supervisors to bring a claim against the entity they worked for.  *J.L. v. Best Western Int'l, Inc*., 521 F. Supp. 3d 1048 (D. Colo. 2021). In this action, Plaintiffs have not named as Defendants all of the individuals who were involved in their trafficking.

106

Standard Industries d/b/a Standard Restaurant Supply, Four Corners d/b/a A-1 Disposal, John Daniel Kingston Sr., John Daniel Kingston Jr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, Jacob Ortell Kingston Sr., and DCCS.

c. **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges labor trafficking against Defendants Order Bank, Fidelity Utah d/b/a Fidelity Lending, Deborah Williams, Paul Elden Kingston Sr., Arrow Real Estate, Standard Industries d/b/a Standard Restaurant Supply, and DCCS.

d. **Plaintiff Julie Ruth Green:** Based on the allegations in ¶¶ 291-319, Plaintiff Julie Ruth Green alleges labor trafficking against Defendants Order Bank, Jolene Andrews, U.P.C., Inc. d/b/a Garco Industrial Park, Paul Elden Kingston Jr., Arrow Real Estate, Jason Ortell Kingston, and DCCS.

e. **Plaintiff Michelle Ruth Michaels:** Based on the allegations in ¶¶ 320-361, Plaintiff Michelle Ruth Michaels alleges labor trafficking against Defendants American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston Sr., Rachel Orlean Kingston Young, American Digital Systems d/b/a AAA Communications, and DCCS.

f. **Plaintiff Allison Eames:** Based on the allegations in ¶¶ 362-390, Plaintiff Allison Eames alleges labor trafficking against Defendants Four Corners d/b/a A-1 Disposal, John Daniel Kingston Sr., N.W.R. Limited Partnership d/b/a Washakie Ranch, Valerie Martin, April McKay, Order Bank, DCCS, Inc. d/b/a John's Market

107

Place, Hyrum Dalton Kingston, Defendant World Enterprises d/b/a Family Stores True Value, David Ortell Kingston, and DCCS.

g. **Plaintiff Priscilla Tucker:** Based on the allegations in ¶¶ 391-440, Plaintiff Priscilla Tucker alleges labor trafficking against Defendants Standard Industries d/b/a Standard Restaurant Supply, World Enterprises d/b/a Family Stores True Value, Ensign Learning Center, Hyrum Dalton Kingston, Patricia Kingston, Paul Elden Kingston Sr., Attco Trucking Company, Inc. d/b/a CTC Trucking, Jacob Ortell Kingston Sr., WRE, and DCCS.

h. **Plaintiff Brenda Collins:** Based on the allegations in ¶¶ 441-483, Plaintiff Brenda Collins alleges labor trafficking against Defendants John Daniel Kingston Sr., Four Corners d/b/a A-1 Disposal, World Enterprises d/b/a Family Stores True Value, and DCCS.

i. **Plaintiff Katie "Alex" Martin:** Based on the allegations in ¶¶ 484-501, Plaintiff Katie "Alex" Martin alleges labor trafficking against Defendants N.W.R. Limited Partnership d/b/a Washakie Ranch, John Daniel Kingston Sr., Jacob Ortell Kingston Sr., American Wellness & Rehab, and DCCS.

j. **Plaintiff Mary Ann Robinson:** Based on the allegations in ¶¶ 502-523, Plaintiff Mary Ann Robinson alleges labor trafficking against Defendants World Enterprises d/b/a Advance Vending, World Enterprises d/b/a Family Stores True Value, DCCS, Inc. d/b/a John's Market Place, Elizabeth Smith d/b/a Sierra Wholesale, Ensign Learning Center, Order Bank, Mitchell & Associates, Paul Elden Kingston Sr., Four Corners d/b/a A-1 Disposal, N.W.R. Limited Partnership d/b/a Washakie Ranch, John Daniel Kingston Sr., and DCCS.

525.    The Order is a trafficking "venture" as defined by the TVPRA designed to indoctrinate Plaintiffs to provide underpaid or unpaid labor and services to the members of the venture for the benefit of the members of the venture.  All Defendants participated in the venture, led by Defendant Paul Elden Kingston Sr.

526.    As to each Plaintiff identified in ¶ 524, the enumerated Defendants knowingly provided or obtained her labor or services by means of various schemes, plans, or patterns which, in the totality of the circumstances, was intended to (and did) coerce and did coerce each Plaintiff to believe she would suffer serious physical, psychological or reputational harm if she did not comply.  As alleged, these schemes, plans, or patterns included: (i) threats of or actual physical harm, physical restraint, economic coercion, or fraud; (ii) abuse of process or threatened abuse of process by indoctrinating each Plaintiff to fear governments, law enforcement, judicial systems, and child protective services and preventing each Plaintiff from seeking assistance under the laws of the United States and State of Utah for wrongful conduct perpetrated upon her; (iii) abuse of process or threatened abuse of process by involuntarily involving each Plaintiff in criminal conduct and indoctrinating her into believing that she could be liable for such conduct.

527.    As to each Plaintiff identified in ¶ 524, the enumerated Defendants have either direct liability for each Plaintiff's labor trafficking because of their own acts and omissions and because they knew or should have known that their acts and omissions violated the TVPRA, or indirect liability because the acts, omissions, and state of mind of others, who knew or should have known that their acts and omissions violated the TVPRA, is imputed to them.

528.    As to each Plaintiff identified in ¶ 524, the enumerated Defendants knowingly benefitted financially and by receiving value from their participation in acts or omissions that they

knew or should have known would violate the TVPRA, including by obtaining, providing, and profiting from each Plaintiff's labor and services.

529.    As to each Plaintiff identified in ¶ 524, the wages that each Plaintiff earned and should have received were denied her and taken to benefit the enumerated Defendants who knew or should have known that the profits and wages they received were obtained from each Plaintiff's forced labor.

530.    As to each Plaintiff identified in ¶ 524, the enumerated Defendants' acts and omissions occurred in and/or affected interstate commerce.

531.    As to each Plaintiff identified in ¶ 524, the enumerated Defendants proximately caused her financial injury for which she prays for relief as set forth below.

## <u>COUNT II</u>
**(Involuntary Servitude in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1584, and the Thirteenth Amendment)**

532.    Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege claims for involuntary servitude, pursuant to 18 U.S.C. § 1584 of the TVPRA and the private cause of action implied by the Thirteenth Amendment to the United States Constitution as follows:

    a.    **Plaintiff Amanda Rae Grant:** Based on the allegations in ¶¶ 149-195, Plaintiff Amanda Rae Grant alleges involuntary servitude against Defendants Order Bank, Fidelity Utah d/b/a Fidelity Lending, Rachel Orlean Kingston Young, Deborah Williams, David Ortell Kingston, Jason Ortell Kingston, Paul Elden Kingston Sr., American Digital Systems d/b/a Advanced Copy, Jesse Orvil Kingston, DCCS, Inc. d/b/a John's Market Place, Hyrum Dalton Kingston, Ensign Learning Center, and DCCS.

b. **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges involuntary servitude against Defendants World Enterprises d/b/a Advance Vending, World Enterprises d/b/a Family Stores True Value, Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston Sr., Standard Industries d/b/a Standard Restaurant Supply, Four Corners d/b/a A-1 Disposal, John Daniel Kingston Sr., John Daniel Kingston Jr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, Jacob Ortell Kingston Sr., and DCCS.

c. **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges involuntary servitude against Defendants Order Bank, Fidelity Utah d/b/a Fidelity Lending, Deborah Williams, Paul Elden Kingston Sr., Arrow Real Estate, Standard Industries d/b/a Standard Restaurant Supply, and DCCS.

d. **Plaintiff Julie Ruth Green:** Based on the allegations in ¶¶ 291-319, Plaintiff Julie Ruth Green alleges involuntary servitude against Defendants Order Bank, Jolene Andrews, U.P.C., Inc. d/b/a Garco Industrial Park, Paul Elden Kingston Jr., Arrow Real Estate, Jason Ortell Kingston, and DCCS.

e. **Plaintiff Michelle Ruth Michaels:** Based on the allegations in ¶¶ 320-361, Plaintiff Michelle Ruth Michaels alleges involuntary servitude against Defendants American Digital Systems, Jesse Orvil Kingston, Michelle Afton Michaels, Order Bank, Jolene Andrews, Deborah Williams, Paul Elden Kingston Sr., Rachel Orlean Kingston Young, American Digital Systems d/b/a AAA Communications, and DCCS.

111

f. **Plaintiff Allison Eames:** Based on the allegations in ¶¶ 362-390, Plaintiff Allison Eames alleges involuntary servitude against Defendants Four Corners d/b/a A-1 Disposal, John Daniel Kingston Sr., N.W.R. Limited Partnership d/b/a Washakie Ranch, Valerie Martin, April McKay, Order Bank, DCCS, Inc. d/b/a John's Market Place, Hyrum Dalton Kingston, World Enterprises d/b/a Family Stores True Value, David Ortell Kingston, and DCCS.

g. **Plaintiff Priscilla Tucker:** Based on the allegations in ¶¶ 391-440, Plaintiff Priscilla Tucker alleges involuntary servitude against Defendants Standard Industries d/b/a Standard Restaurant Supply, World Enterprises d/b/a Family Stores True Value, Ensign Learning Center, Hyrum Dalton Kingston, Patricia Kingston, Paul Elden Kingston Sr., Attco Trucking Company, Inc. d/b/a CTC Trucking, Jacob Ortell Kingston Sr., WRE, and DCCS.

h. **Plaintiff Brenda Collins:** Based on the allegations in ¶¶ 441-483, Plaintiff Brenda Collins alleges involuntary servitude against Defendants John Daniel Kingston Sr., Four Corners d/b/a A-1 Disposal, World Enterprises d/b/a Family Stores True Value, and DCCS.

i. **Plaintiff Katie "Alex" Martin:** Based on the allegations in ¶¶ 484-501, Plaintiff Katie "Alex" Martin alleges involuntary servitude against Defendants  N.W.R. Limited Partnership d/b/a Washakie Ranch, John Daniel Kingston Sr., Jacob Ortell Kingston Sr., American Wellness & Rehab, and DCCS.

j. **Plaintiff Mary Ann Robinson:** Based on the allegations in ¶¶ 502-523, Plaintiff Mary Ann Robinson alleges involuntary servitude against Defendants World Enterprises d/b/a Advance Vending, World Enterprises d/b/a Family Stores True

Value, DCCS, Inc. d/b/a John's Market Place, Elizabeth Smith d/b/a Sierra Wholesale, Ensign Learning Center, Order Bank, Mitchell & Associates, Paul Elden Kingston Sr., Four Corners d/b/a A-1 Disposal, N.W.R. Limited Partnership d/b/a Washakie Ranch, John Daniel Kingston Sr., and DCCS.

533.    The Order is a trafficking "venture" as defined by the TVPRA designed to indoctrinate Plaintiffs to provide underpaid or unpaid labor and services to the members of the venture for the benefit of the members of the venture.  All Defendants participated in the venture, led by Defendant Paul Elden Kingston Sr.

534.    As to each Plaintiff identified in ¶ 532, the enumerated Defendants knowingly provided or obtained her labor or services by various unlawful means or methods, including, for example, the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood, Engagement Meetings, Order Marriage, and the requirement to have children to determine who Plaintiff would marry, coerce when she had sexual relations, require that she get pregnant young and often—all to lock Plaintiff into the Order and entrap her in involuntary servitude.

535.    As to each Plaintiff identified in ¶ 532, the enumerated Defendants, acting individually and in concert through the Order, placed Plaintiff in a condition of involuntary servitude, compelling her into involuntary servitude to perform labor or services against her will for these Defendants and the Order as detailed herein.

536.    As to each Plaintiff identified in ¶ 532, the enumerated Defendants knowingly and willfully used the Order's schemes, plans, or patterns to induce or coerce Plaintiff into involuntary servitude as a child.  For example, as alleged throughout this pleading, as to each Plaintiff identified in ¶ 532, the enumerated Defendants employed the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood, the First Choice manipulation, Engagement

113

Meetings, underage, bigamous, and/or incestuous Order Marriages, and other Order practices such as its indoctrination of children to fear governments, law enforcement, judicial systems, child protective services, and the development of contempt for the rule of law, and other unlawful means that when applied to Plaintiff, as a minor, entrapped her in the Order and created and perpetuated an ongoing system of involuntary servitude.

537.    These practices, as applied to each Plaintiff identified in ¶ 532 as a child, indoctrinated and controlled her, which made her highly vulnerable to involuntary servitude when she was most susceptible to coercion and threats, particularly while she was a minor.  As a result, when they grew older, each Plaintiff identified in ¶ 532 was forced to flee the Order.

538.    As to each Plaintiff identified in ¶ 532, the enumerated Defendants intended to and did cause her to believe that, if she did not enter into or continue in her conditions of involuntary servitude, she would suffer serious harm or physical restraint or be threatened with the same.

539.    In addition, as to each Plaintiff identified in ¶ 532, the enumerated Defendants intended to cause her to continue her involuntary servitude by abusing and threatening to abuse the legal process.  They did so through the Order's indoctrination of each Plaintiff to fear governments, law enforcement, judicial systems, child protective services, and a shared contempt for federal and state authorities.

540.    Through their actions, as alleged herein, as to each Plaintiff identified in ¶ 532, the enumerated Defendants directed, assisted, conspired, and acted to make Plaintiff an involuntary servant in violation of the United States Constitution and federal law.

541.    As to each Plaintiff identified in ¶ 532, the enumerated Defendants proximately caused her financial injury for which she prays for relief as set forth below.

114

<u>**COUNT III**</u>
**(Violation of the Federal Fair Labor Standards Act, 29 U.S.C. § 206 et seq.)**

542.     Plaintiffs Jenny Kingston and Jana Nicole Johnson reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 206, 216 ("<u>FLSA</u>") as follows:

a.  **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges that she was an employee of certain Defendants through certain Order Businesses and certain individuals who acted directly or indirectly in the interest of these Order Businesses in relation to Jenny's employment.  Jenny alleges a direct employee-employer relationship for purposes of the FLSA against Defendants World Enterprises d/b/a Advance Vending, World Enterprises d/b/a Family Stores True Value, Order Bank, Rachel Orlean Kingston Young, Deborah Williams, Paul Elden Kingston Sr., Standard Industries d/b/a Standard Restaurant Supply, Four Corners d/b/a A-1 Disposal, John Daniel Kingston Sr., John Daniel Kingston Jr., Ensign Learning Center, Hyrum Dalton Kingston, WRE, United Fuel Supply, Sally Kingston, and Jacob Ortell Kingston Sr. Jenny also alleges claims pursuant to the FLSA against Defendants John Daniel Kingston Sr., Hyrum Dalton Kingston, Paul Elden Kingston Sr., David Ortell Kingston, Jesse Orvil Kingston, and Jason Ortell Kingston because they had substantial control over the terms and conditions of Jenny's employment.  They, under Defendant Paul Elden Kingston Sr., had the authority to hire, fire, supervise, and control work schedules, determine conditions of employment, determine rates and methods of payment, and maintain the employment records of Jenny.

b. **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges that she was an employee of certain Defendants through certain Order Businesses and certain individuals who acted directly or indirectly in the interest of these Order Businesses in relation to Jana's employment. Jana alleges a direct employee-employer relationship for purposes of the FLSA against Defendants Fidelity Utah d/b/a Fidelity Lending, Order Bank, Deborah Williams, Paul Elden Kingston Sr., Arrow Real Estate, and Standard Industries d/b/a Standard Restaurant Supply. Jana also alleges claims pursuant to the FLSA against Defendants John Daniel Kingston Sr., Hyrum Dalton Kingston, Paul Elden Kingston Sr., David Ortell Kingston, Jesse Orvil Kingston, and Jason Ortell Kingston because they had substantial control over the terms and conditions of Jana's employment. They, under Defendant Paul Elden Kingston Sr., had the authority to hire, fire, supervise, and control work schedules, determine conditions of employment, determine rates and methods of payment, and maintain the employment records of Jana.

543.    As to each Plaintiff identified in ¶ 542, the enumerated Defendants were engaged in commerce or in the production of goods for commerce, or Plaintiff was engaged in commerce or the production of goods for commerce. On information and belief, the entities among these Defendants each also had annual revenues of $500,000 or more.

544.    As to each Plaintiff identified in ¶ 542, the enumerated Defendants did not pay her the required minimum wage nor compensate her for overtime hours at a rate of 1.5 times the normal hourly rate for hours worked over 40 in a week. By failing to pay her any wages, minimum wages,

116

and/or overtime wages for the hours she worked, the enumerated Defendants failed to comply with the FLSA.

545.    As to each Plaintiff identified in ¶ 542, the failure of the enumerated Defendants to pay her any minimum and/or overtime wages was willful and intentional.  Indeed, as a regular practice of its businesses, the enumerated Defendants, like all Order Businesses, routinely fail to pay Order employees their minimum and overtime wages and, in fact, frequently pay Order employees no wages at all.

546.    As to each Plaintiff identified in ¶ 542, the enumerated Defendants were aware of their obligation to comply with the wage and hour requirements of the FLSA.

547.    As to each Plaintiff identified in ¶ 542, the enumerated Defendants proximately caused her financial injury for which she prays for relief as set forth below.

## COUNT IV
**(Sex Trafficking in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591 and § 1595)**

548.    Plaintiffs Jenny Kingston, Jana Nicole Johnson, and Julie Ruth Green reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege pursuant to 18 U.S.C. § 1591 of the TVPRA as follows:[24]

   a.  **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges sex trafficking against Defendants Jacob Daniel Kingston Jr., Jacob Ortell Kingston Sr., Sally Kingston, John Daniel Kingston Sr., Paul Elden Kingston Sr., and DCCS.

---

[24]  A plaintiff does not need to sue her supervisors under the TVPRA to bring a sex trafficking claim.  *J.L. v. Best Western International, Inc.*, 521 F. Supp. 3d 1048 (D. Colo. 2021).  In this action, Plaintiffs have not named as Defendants all of the individuals who were involved in sex trafficking.

b. **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges sex trafficking against Defendants Daniel Charles Kingston, Paul Elden Kingston Sr., Patricia Kingston, Kent William Johnson, and DCCS.

c. **Plaintiff Julie Ruth Green:** Based on the allegations in ¶¶ 291-319, Julie Ruth Green alleges sex trafficking against Defendants Paul Elden Kingston Jr., Paul Elden Kingston Sr., Patricia Kingston, and DCCS.

549. The Order is a trafficking "venture" as defined by the TVPRA designed to indoctrinate Plaintiffs to provide sexual and other benefits to preferred members of the venture for the benefit of those members. All Defendants participated in the venture, led by Defendant Paul Elden Kingston Sr.

550. As to each Plaintiff identified in ¶ 548, the enumerated Defendants used for example, the Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood, the Number One Choice or First Choice manipulation, Engagement Meetings, Order Marriage, and the requirement to have children to determine who Plaintiff would marry, coerce when she had sexual relations, require that she get pregnant young and often, and make it increasingly difficult for her to leave the Order.

551. As to each Plaintiff identified in ¶ 548, the enumerated Defendants knowingly controlled her sexually to maximize the number of children produced in the Order to increase Order membership and obtain an ongoing supply of workers and female offspring to continue the Order's unlawful labor and sexual practices. To accomplish this, the enumerated Defendants recruited, enticed, harbored, provided, obtained, and maintained each Plaintiff and caused her to engage in sexual acts by various unlawful means or methods, including, for example, the

118

Numbered Men scheme, the Law of One Above Another, the Pure Kingston Blood, the First Choice manipulation, Engagement Meetings, underage, bigamous, and/or incestuous Order Marriages, and by other unlawful means when applied to Plaintiff, entrapped her, in the Order for the purpose of providing sex to her Order husbands and having children to benefit the enumerated Defendants.

552.   As to each Plaintiff identified in ¶ 548, the enumerated Defendants caused her to engage in sexual acts with her Order husband by force, fraud, or coercion, including threats of serious harm, physical restraint, and schemes intended to cause her to believe that failure to engage in sexual intercourse with her Order husband would result in serious harm.  Plaintiffs Jenny and Jana were under 18 years of age when some of the sexual acts occurred.

553.   As to each Plaintiff identified in ¶ 548, the enumerated Defendants' conduct and actions in support of their sex trafficking endeavors occurred in and/or affected interstate commerce.  As alleged herein, Jenny was taken to Nevada, Oregon, California, and Turkey, and forced to engage in sexual intercourse with her Order husband; Jana was taken to Hawaii, and forced to engage in sexual intercourse with her Order husband; and Julie was taken to the British Virgin Islands and forced to engage in sexual intercourse with her Order husband, as well as taken to California and Pennsylvania, where she was restrained in an attempt to have her engage in further sexual relations with her Order husband.

554.   As to each Plaintiff identified in ¶ 548, her sexual acts constituted commercial sex acts for purposes of the TVPRA because value was given and received on account of her sex acts. As to each Plaintiff identified in ¶ 548, the enumerated Defendants received value within the Order on account of her Order Marriage, sexual intercourse with her Order husband, the birth of her two children as workers for the Order, and their increased standing in the Order.  Plaintiff was given

119

and received value in the form of raises at her Order jobs for her Order Marriage and the birth of her children, trips to various places, and increased standing in the Order, which, at the time, she considered valuable and necessary for her survival in the Order.  As to each Plaintiff identified in ¶ 548, the enumerated Defendant knew or should have known their actions would violate the TVPRA and that value was given and received as a result of those violations.

555.    As to each Plaintiff identified in ¶ 548, the enumerated Defendants' conduct resulted in physical, emotional, sexual, financial, and other injuries for which she prays for relief as set forth below.

## COUNT V
### (Civil Conspiracy)

556.    Plaintiffs Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Brenda Collins, and Katie "Alex" Martin reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege a civil conspiracy against all Defendants as follows.

557.    Defendants are a combination of two or more persons.  Plaintiffs, for example, allege that DCCS is an unincorporated association holding itself out as an "economic cooperative" and that the Order is an unincorporated association affiliated with DCCS.  These Plaintiffs further allege that the Individual Defendants are current members and participants in the Order and that the Order controls or is controlled by the Individual Defendants and operates each Entity Defendant.

558.    Defendants had and have an objective to be accomplished.  The core objective is to entrap children, multiply births, and continually increase the number of unpaid child workers for Order Businesses for the enrichment of Defendant the Order, Defendant DCCS, and their leadership.  To do so, there are two intertwined objectives.  *First*, these Defendants seek to have

120

young girls, including Jenny, enter into underage, bigamous, and/or incestuous Order Marriages, engage in sexual intercourse with their Order husbands, and have as many children as possible. *Second*, these Defendants seek to obtain free labor from young girls, as well as from their children for Order Businesses.

559.   Defendants had and have an ongoing meeting of the minds on their object or course of action.  Their ongoing meeting of minds is evident through, among other things, the Order's Numbered Men structure and these Defendants' adherence to the Law of One Above Another.

560.   Additionally, the unlawful underage, bigamous, and/or incestuous Order Marriages and the unpaid child labor practices, are unlikely to have been undertaken without a meeting of the minds of Defendants.  A meeting of the minds can also reasonably be inferred from the statements on Defendant DCCS's website, which currently list several "goals" that evidence the Defendants' agreed-upon objectives.  For example, Defendant DCCS lists as "goals" to "[e]ducate plural families on their rights and give them a voice to affect change" and "[s]top the persecution of plural families."

561.   Defendants engaged and continue to engage in unlawful, overt acts in furtherance of the conspiracy.  As alleged herein, Defendants engaged in numerous unlawful acts, including violations of federal statutes and the federal and state Constitutions, including: (i) labor trafficking in violation of the TVPRA, 18 U.S.C. §§ 1589, 1590; (ii) sex trafficking in violation of the TVPRA, 18 U.S.C. § 1591; (iii) involuntary servitude in violation of 18 U.S.C. § 1584 and the Thirteenth Amendment; (iv) unlawful plural marriage in violation of Article III of Utah's Constitution, and Utah Code Ann. § 76-7-101; (v) unlawful incestuous marriage in violation of Utah Code Ann. § 76-7-102 and Utah Code Ann. § 30-1-1; and (vi) underage marriage in violation of Utah Code Ann. § 76-7-102 and prohibited and void under Utah Code Ann. § 30-1-2.

121

562.    Numerous overt acts are alleged against these Defendants throughout this Third Amended Complaint by each Plaintiff asserting this Count V against Defendants, including in the Additional Specific Allegations by Each Plaintiff.  Overt acts include: (i) forcing girls to work for Order Business for little to no pay; (ii) manipulating Order Statements to prevent girls, including Plaintiffs, from having an accurate accounting of their earnings or income; (iii) siphoning away girls' earnings; (iv) forcing girls into underage, bigamous, and/or incestuous marriages; (v) indoctrinating girls through the Numbered Men scheme, the Law of One Above Another, and the Pure Kingston Blood to obey; (vi) indoctrinating girls to fear outsiders and embedding in them a fear of governments, law enforcement, judicial systems, child protective services, and a contempt for the rule of law; (vii) causing girls and other children to conceal physical and sexual abuse, including to lie to DCFS; (viii) falsifying or forging records to deliberately Bleed the Beast, and involving children in those efforts; (ix) physically and psychologically abusing, and threatening to abuse, children; and (x) sexual abuse and forced childbearing.

563.    The overt acts in furtherance of the conspiracy have continued since this action was filed.  Since March 6, 2025, Defendants DCCS, LDCC, Paul Elden Kingston Sr., Defendant Patricia Kingston, the Order, and Order Bank have disregarded Plaintiffs' most-recent requests that their Order Statements be emailed to them and have failed to provide the records needed for an accurate accounting and accurate payment of their earnings.  Order attorney Carl Kingston, on behalf of certain Defendants, has disregarded the Plaintiffs' requests for their Order Statements, falsely claiming that Plaintiffs had not made prior requests, it was impossible to provide copies, and that Plaintiffs would need to pay for time involved and per page copied to obtain their Order Statements.

564.    Plaintiffs are aware of other recent overt acts taken in furtherance of the conspiracy, including making false and inconsistent statements—including sworn statements—to this Court in this proceeding by Defendants, including in a declaration filed by Defendant Paul Elden Kingston Sr. (*See, e.g.*, ECF Nos. 136, 374.)

565.    As a result of Defendants' conduct, Plaintiffs Jenny Kingston, Jana Nicole Johnson, Julie Ruth Green, Michelle Ruth Michaels, Allison Eames, Brenda Collins, and Katie "Alex" Martin have suffered severe physical, emotional, sexual, financial, and other injuries for which they pray for relief as set forth below.

**<u>COUNT VI</u>**
**(Sexual Battery and Abuse of Children)**

566.    Plaintiffs Amanda Rae Grant, Jenny Kingston, Jana Nicole Johnson, and Priscilla Tucker reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege pursuant to Utah Code Ann. § 78B-2-308 as follows.

567.    **Plaintiff Amanda Rae Grant:** Based on the allegations in ¶¶ 149-195, Plaintiff Amanda Rae Grant alleges sexual battery and abuse of her as a child against Defendant John Paul Johnson.  Defendant John Paul Johnson intentionally sexually abused Amanda by committing sexual abuse, including sexual intercourse, on her.  Defendant John Paul Johnson's sexual misconduct was either violent and accomplished through physical force or accomplished as a perpetrator under Utah Code Ann. § 78B-2-308. Defendant John Paul Johnson's sexual contact with Amanda was harmful and offensive and caused Amanda to suffer severe sexual, physical, emotional and other injuries for which she prays for relief as set forth below.

568.    **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges sexual battery and abuse of her as a child against Defendant Jacob Daniel Kingston Jr.  Defendant Jacob Daniel Kingston Jr. intentionally sexually abused Jenny by

123

committing sexual abuse, including sexual intercourse, on her. Defendant Jacob Daniel Kingston Jr.'s sexual misconduct was either violent and accomplished through physical force or accomplished as a perpetrator under Utah Code Ann. § 78B-2-308. Defendant Jacob Daniel Kingston Jr.'s sexual contact with Jenny was harmful and offensive and caused Jenny to suffer severe sexual, physical, emotional and other injuries for which she prays for relief as set forth below.

569.    **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges sexual battery and abuse of her as a child against Defendant Daniel Charles Kingston. Defendant Daniel Charles Kingston intentionally sexually abused Jana by committing acts of sexual abuse, including sexual intercourse, on her. Defendant Daniel Charles Kingston's sexual misconduct was either violent and accomplished through physical force or accomplished as a perpetrator under Utah Code Ann. § 78B-2-308. Defendant Daniel Charles Kingston's sexual contact with Jana was harmful and offensive and caused Jana to suffer severe sexual, physical, emotional and other injuries for which she prays for relief as set forth below.

570.    **Plaintiff Priscilla Tucker:** Based on the allegations in ¶¶ 391-440, Plaintiff Priscilla Tucker alleges sexual battery and abuse of her as a child against Defendant Joseph Kingston. Defendant Joseph Kingston intentionally sexually abused Priscilla by committing acts of sexual abuse, including sexual intercourse, on her. Defendant Joseph Kingston's sexual misconduct was either violent and accomplished through physical force or accomplished as a perpetrator under Utah Code Ann. § 78B-2-308. Defendant Joseph Kingston's sexual contact with Priscilla was harmful and offensive and caused Priscilla to suffer severe sexual, physical, emotional and other injuries for which she prays for relief as set forth below.

## COUNT VII
### (Sexual Battery and Rape of Adults)

571.    Plaintiffs Jenny Kingston and Jana Nicole Johnson reallege and incorporate by reference the allegations contained in ¶¶ 1-523 and further allege sexual abuse and rape of adults as follows.[25]

572.    **Plaintiff Jenny Kingston:** Based on the allegations in ¶¶ 196-250, Plaintiff Jenny Kingston alleges sexual battery and abuse of her as an adult against Defendant Jacob Daniel Kingston Jr.  Defendant Jacob Daniel Kingston Jr. subjected Jenny to sexual contact and intercourse against her will for the purpose of impregnating or attempting to impregnate Plaintiff Jenny Kingston to make it difficult for Jenny to leave the Order and to cause Jenny to produce more children to serve as underpaid or unpaid workers for Order Businesses.  The sexual battery and rape of Jenny by Defendant Jacob Daniel Kingston Jr. was accomplished through violence and physical force.  Defendant Jacob Daniel Kingston Jr., acting with intent, caused the sexual battery and rape of Jenny, which were harmful and offensive, and caused Jenny to suffer severe sexual, physical, emotional, and other injuries for which she prays for relief as set forth below.

573.    **Plaintiff Jana Nicole Johnson:** Based on the allegations in ¶¶ 251-290, Plaintiff Jana Nicole Johnson alleges sexual battery and abuse of her as an adult against Defendant Daniel Charles Kingston.  Defendant Daniel Charles Kingston subjected Jana to sexual contact and intercourse against her will for the purpose of impregnating or attempting to impregnate Jana to make it difficult for Jana to leave the Order and to cause Jana to produce more children to serve as underpaid or unpaid workers for Order Businesses.  The sexual battery and rape of Jana by

---

[25]  The sexual battery and rape of Plaintiffs Jenny Kingston and Jana Nicole Johnson that occurred after they reached majority were a continuation of the sexual battery and rape Jenny and Jana endured as minors.

Defendant Daniel Charles Kingston was accomplished through violence and physical force. Defendant Daniel Charles Kingston, acting with intent, caused the sexual battery and rape of Jana, which were harmful and offensive, and caused Jana to suffer severe sexual, physical, emotional, and other injuries for which she prays for relief as set forth below.

## COUNT VIII
### (Negligent Sexual Battery and Abuse of a Child)

574.    Plaintiff Jana Nicole Johnson realleges and incorporates by reference the allegations contained in ¶¶ 1-523 and, based on the allegations contained in ¶¶ 251-290, further alleges Negligent Sexual Battery and Abuse of a Child against Defendants Daniel Charles Kingston, Paul Elden Kingston Sr., Patricia Kingston, and Kent William Johnson, pursuant to Utah Code Ann. § 78B-2-308.

575.    Plaintiff Jana Nicole Johnson was sexually battered and raped as the result of, and in furtherance of the acts of the Defendants enumerated in ¶ 574.

576.    As to Plaintiff Jana Nicole Johnson, the Defendants enumerated in ¶ 574 failed to prevent the child sexual abuse from occurring and failed to report the child sexual abuse to law enforcement when they knew or reasonably should have known of the child sexual abuse and were in positions of responsibility or authority over Plaintiff.

577.    As to Plaintiff Jana Nicole Johnson, the Defendants enumerated in ¶ 574 negligently interjected themselves into and promoted the unlawful Order Marriages and resulting sexual contacts and pregnancies or attempted pregnancies of Plaintiff.

578.    As to Plaintiff Jana Nicole Johnson, the Defendants enumerated in ¶ 574 knew or should have known that their acts and omissions would, in fact, promote the unlawful Order Marriages and resulting sexual contacts and pregnancies of Plaintiff.

126

579.    As to Plaintiff Jana Nicole Johnson, the Defendants enumerated in ¶ 574, through their conduct, had and assumed duties not to negligently cause or further the sexual abuses and rapes of Plaintiff.

580.    As to Plaintiff Jana Nicole Johnson, the Defendants enumerated in ¶ 574, breached those duties to Plaintiff causing sexual abuse and rapes that were harmful and offensive to her, causing her to suffer severe sexual, physical, emotional, and other injuries for which she prays for relief as set forth below.

## REQUEST FOR PUNITIVE DAMAGES

The Individual Defendants' conduct, as alleged herein, was willful and malicious or intentional conduct, intentionally fraudulent, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiffs for which the Individual Defendants are liable in punitive damages.  The wrongful acts alleged herein by the Entity Defendants were committed or specifically authorized by Individual Defendants as managerial agents of the Entity Defendants, including by Defendant Paul Elden Kingston Sr. as the One Above and the managerial agent of the Order.

## PRAYER FOR RELIEF AND DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiffs demand a jury trial on all issues so triable and pray for individual judgment as follows:

a.  General damages in an amount to be proven at trial;

b.  Special damages in an amount to be proven at trial;

c.  Punitive damages in an amount to be awarded at trial;

d.  Unpaid minimum wages and overtime wages;

e.  Liquidated damages under 29 U.S.C. § 201 *et seq.*;

f.  Attorney fees and costs pursuant to 18 U.S.C. § 1595;

127

g.  Attorney fees and costs pursuant to 29 U.S.C. § 216(b);

h.  Attorney fees and costs pursuant to Utah Code § 77-38-15(3);

i.  Costs;

j.  Pre- and post- judgment interest; and

k.  Such other and further relief as the Court deems just and proper.

DATED: June 1, 2026                              Respectfully submitted,

Roger H. Hoole (5089)                            By: *Lara A. Flath*
Ruth Hackford-Peer
**HOOLE & KING, L.C.**                           **SKADDEN, ARPS, SLATE,**
4276 South Highland Drive                        **MEAGHER & FLOM LLP**
Salt Lake City, UT 84124
Telephone: (801) 272-7556                        Lara A. Flath (*pro hac vice*)
Rogerh@hooleking.com                             Michael C. Griffin (*pro hac vice*)
Ruthhp@hooleking.com                             One Manhattan West
                                                 New York, New York 10001
                                                 Telephone: (212) 735-3000
In Association with the                          Lara.Flath@skadden.com
**Justice and Protection Alliance**,             Michael.Griffin@skadden.com
a Utah Non-Profit Corporation
and Advocates for Plaintiffs                     Lauren N. Rosenello (*pro hac vice*)
                                                 One Rodney Square
                                                 920 N. King Street
                                                 Wilmington, Delaware 19801
                                                 Telephone: (302) 651-3125
                                                 Lauren.Rosenello@skadden.com

                                                 Marley Ann Brumme (*pro hac vice*)
                                                 Elizabeth J. Perkins (*pro hac vice*)
                                                 500 Boylston Street
                                                 Boston, Massachusetts 02116
                                                 Telephone: (617) 573-4800
                                                 Marley.Brumme@skadden.com
                                                 Elizabeth.Perkins@skadden.com

                                                 *Attorneys for Plaintiffs*

128

## EXHIBIT A

### Partial List of Order Businesses

- A-1 Disposal
- A & W Restaurants
- AAA Communications
- AAA Security
- A-FAB Engineering
- Advanced Copy and Photo
- Advance Vending
- American Digital Systems
- American Wellness & Rehab Clinic, LLC
- Arrow Real Estate and Property Compliance
- Best Distributing
- Bountiful Baby
- Collin Media, LLC
- Commercial Agent Services, LLC
- COP Coal Development Company
- Davis County Cooperative Society
- East Side Market
- Ensign Learning Center, Inc.
- Ensign Learning Center Alumni Association, Inc.
- Ensign Shoe
- Factory Outlet Stores
- Family First Medicine
- Family Stores True Value
- Fidelity Funding Company
- Fountain of Youth Health and Athletic Club
- Fountain of Youth Spas
- Garco Industrial Park, aka Garco Property Management
- Garrard's Heating and Air Conditioning, Inc.
- Hiawatha
- John's Market Place
- Latter Day Church of Christ
- LDCC Little Red School House Montessori
- Mitchell & Associates LLC
- Mountain Coin Machines Distributors
- Premier Catering & Food Services, LLC
- Ralph's Milk Farm
- Redwood Grocery & Health Foods
- Shoppers Pawn
- Sportsmans Pawn
- Standard Industries
- Standard Restaurant Supply
- Washakie Foods
- Washakie Ranch
- Washakie Renewable Energy
- World Enterprises
- Xtreme Pawn
- Zion Ponderosa Ranch Resort
- ZMPC9
- Coal Trucking Company
- Coal Valley, LLC, aka Valley Coal
- Best Distributing Coin Operating, Inc.
- The Master Steward Fund
- Desert Tech Munitions LLC
- Desert Tech LLC
- DU Business
- Sahara Dunes Casino L.P. d/b/a Lake Elsinore Hotel and Casino
- Latter Day Church of Christ and its Successors, LLC

129

**EXHIBIT B**

**Amanda Rae Grant**

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | Order Bank; Fidelity Utah d/b/a Fidelity Lending; Rachel Orlean Kingston Young; Deborah Williams; David Ortell Kingston; Jason Ortell Kingston; Paul Elden Kingston Sr.; American Digital Systems d/b/a Advanced Copy; Jesse Orvil Kingston; DCCS, Inc. d/b/a John's Market Place; Hyrum Dalton Kingston; Ensign Learning Center; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | Order Bank; Fidelity Utah d/b/a Fidelity Lending; Rachel Orlean Kingston Young; Deborah Williams; David Ortell Kingston; Jason Ortell Kingston; Paul Elden Kingston Sr.; American Digital Systems d/b/a Advanced Copy; Jesse Orvil Kingston; DCCS, Inc. d/b/a John's Market Place; Hyrum Dalton Kingston; Ensign Learning Center; DCCS |
| VI (Sexual Battery and Abuse of Children under Utah Code Ann. § 78B-2-308) | John Paul Johnson |

**Jenny Kingston**

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | World Enterprises d/b/a Advance Vending; World Enterprises d/b/a Family Stores True Value; Order Bank; Rachel Orlean Kingston Young; Deborah Williams; Paul Elden Kingston Sr.; Standard Industries d/b/a Standard Restaurant Supply; Four Corners d/b/a A-1 Disposal; John Daniel Kingston Sr.; John Daniel Kingston Jr.; Ensign Learning Center; Hyrum Dalton Kingston; WRE; United Fuel Supply; Sally Kingston; Jacob Ortell Kingston Sr.; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | World Enterprises d/b/a Advance Vending; World Enterprises d/b/a Family Stores True Value; Order Bank; Rachel Orlean Kingston Young; Deborah Williams; Paul Elden Kingston Sr.; Standard Industries d/b/a Standard Restaurant Supply; Four Corners d/b/a A-1 Disposal; John Daniel Kingston Sr.; John Daniel Kingston Jr.; Ensign Learning Center; Hyrum Dalton Kingston; WRE; United Fuel Supply; Sally Kingston; Jacob Ortell Kingston Sr.;  DCCS |
| III (Fair Labor Standards Act, 29 U.S.C. § 206 et seq.) | Direct employers: World Enterprises d/b/a Advance Vending; World Enterprises d/b/a Family Stores True Value; Order Bank; Rachel Orlean Kingston Young; Deborah Williams; Paul Elden Kingston Sr.; Standard Industries d/b/a Standard Restaurant Supply; Four Corners d/b/a A-1 Disposal; John Daniel Kingston Sr.; John Daniel Kingston |

130

| Count | Defendants Named |
|---|---|
| | Jr.; Ensign Learning Center; Hyrum Dalton Kingston; WRE; United Fuel Supply; Sally Kingston; Jacob Ortell Kingston Sr. Substantial-control defendants: John Daniel Kingston Sr.; Hyrum Dalton Kingston; Paul Elden Kingston Sr.; David Ortell Kingston; Jesse Orvil Kingston; Jason Ortell Kingston |
| IV (Sex Trafficking under TVPRA, 18 U.S.C. §§ 1591, 1595) | Jacob Daniel Kingston Jr.; Jacob Ortell Kingston Sr.; Sally Kingston; John Daniel Kingston Sr.; Paul Elden Kingston Sr.; DCCS |
| V (Civil Conspiracy) | All Defendants |
| VI (Sexual Battery and Abuse of Children under Utah Code Ann. § 78B-2-308) | Jacob Daniel Kingston Jr. |
| VII (Sexual Battery and Rape of Adults) | Jacob Daniel Kingston Jr. |

## Jana Nicole Johnson

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | Order Bank; Fidelity Utah d/b/a Fidelity Lending; Deborah Williams; Paul Elden Kingston Sr.; Arrow Real Estate; Standard Industries d/b/a Standard Restaurant Supply; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | Order Bank; Fidelity Utah d/b/a Fidelity Lending; Deborah Williams; Paul Elden Kingston Sr.; Arrow Real Estate; Standard Industries d/b/a Standard Restaurant Supply; DCCS |
| III (Fair Labor Standards Act, 29 U.S.C. § 206 et seq.) | Direct employers: Fidelity Utah d/b/a Fidelity Lending; Order Bank; Deborah Williams; Paul Elden Kingston Sr.; Arrow Real Estate; Standard Industries d/b/a Standard Restaurant Supply. Substantial-control defendants: John Daniel Kingston Sr.; Hyrum Dalton Kingston; Paul Elden Kingston Sr.; David Ortell Kingston; Jesse Orvil Kingston; Jason Ortell Kingston |
| IV (Sex Trafficking under TVPRA, 18 U.S.C. §§ 1591, 1595) | Daniel Charles Kingston; Paul Elden Kingston Sr.; Patricia Kingston; Kent William Johnson; DCCS |
| V (Civil Conspiracy) | All Defendants |
| VI (Sexual Battery and Abuse of Children under Utah Code Ann. § 78B-2-308) | Daniel Charles Kingston |
| VII (Sexual Battery and Rape of Adults) | Daniel Charles Kingston |

131

| Count | Defendants Named |
|---|---|
| VIII (Negligent Sexual Battery and Abuse of a Child under Utah Code Ann. § 78B-2-308) | Daniel Charles Kingston; Paul Elden Kingston Sr.; Patricia Kingston; Kent William Johnson |

### Julie Ruth Green

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | Order Bank; Jolene Andrews; U.P.C., Inc. d/b/a Garco Industrial Park; Paul Elden Kingston Jr.; Arrow Real Estate; Jason Ortell Kingston; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | Order Bank; Jolene Andrews; U.P.C., Inc. d/b/a Garco Industrial Park; Paul Elden Kingston Jr.; Arrow Real Estate; Jason Ortell Kingston; DCCS |
| IV (Sex Trafficking under TVPRA, 18 U.S.C. §§ 1591, 1595) | Paul Elden Kingston Jr.; Paul Elden Kingston Sr.; Patricia Kingston; DCCS |
| V (Civil Conspiracy) | All Defendants |

### Michelle Ruth Michaels

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | American Digital Systems; Jesse Orvil Kingston; Michelle Afton Michaels; Order Bank; Jolene Andrews; Deborah Williams; Paul Elden Kingston Sr.; Rachel Orlean Kingston Young; American Digital Systems d/b/a AAA Communications; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | American Digital Systems; Jesse Orvil Kingston; Michelle Afton Michaels; Order Bank; Jolene Andrews; Deborah Williams; Paul Elden Kingston Sr.; Rachel Orlean Kingston Young; American Digital Systems d/b/a AAA Communications; DCCS |
| V (Civil Conspiracy) | All Defendants |

### Allison Eames

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | Four Corners d/b/a A-1 Disposal; John Daniel Kingston Sr.; N.W.R. Limited Partnership d/b/a Washakie Ranch; Valerie Martin; April McKay; Order Bank; DCCS, Inc. d/b/a John's Market Place; Hyrum Dalton Kingston; World Enterprises d/b/a Family Stores True Value; David Ortell Kingston; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § | Four Corners d/b/a A-1 Disposal; John Daniel Kingston Sr.; N.W.R. Limited Partnership d/b/a Washakie Ranch; Valerie Martin; April |

| 1584 & Thirteenth Amendment) | McKay; Order Bank; DCCS, Inc. d/b/a John's Market Place; Hyrum Dalton Kingston; World Enterprises d/b/a Family Stores True Value; David Ortell Kingston; DCCS |
|---|---|
| V (Civil Conspiracy) | All Defendants |

### Priscilla Tucker

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | Standard Industries d/b/a Standard Restaurant Supply; World Enterprises d/b/a Family Stores True Value; Ensign Learning Center; Hyrum Dalton Kingston; Patricia Kingston; Paul Elden Kingston Sr.; Attco Trucking Company, Inc. d/b/a CTC Trucking; Jacob Ortell Kingston Sr.; WRE; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | Standard Industries d/b/a Standard Restaurant Supply; World Enterprises d/b/a Family Stores True Value; Ensign Learning Center; Hyrum Dalton Kingston; Patricia Kingston; Paul Elden Kingston Sr.; Attco Trucking Company, Inc. d/b/a CTC Trucking; Jacob Ortell Kingston Sr.; WRE; DCCS |
| VI (Sexual Battery and Abuse of Children under Utah Code Ann. § 78B-2-308) | Joseph Kingston |

### Brenda Collins

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | John Daniel Kingston Sr.; Four Corners d/b/a A-1 Disposal; World Enterprises d/b/a Family Stores True Value; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | John Daniel Kingston Sr.; Four Corners d/b/a A-1 Disposal; World Enterprises d/b/a Family Stores True Value; DCCS |
| V (Civil Conspiracy) | All Defendants |

### Katie "Alex" Martin

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | N.W.R. Limited Partnership d/b/a Washakie Ranch; John Daniel Kingston Sr.; Jacob Ortell Kingston Sr.; American Wellness & Rehab; DCCS |

133

| Count | Defendants Named |
|---|---|
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | N.W.R. Limited Partnership d/b/a Washakie Ranch; John Daniel Kingston Sr.; Jacob Ortell Kingston Sr.; American Wellness & Rehab; DCCS |
| V (Civil Conspiracy) | All Defendants |

**Mary Ann Robinson**

| Count | Defendants Named |
|---|---|
| I (Labor Trafficking under TVPRA, 18 U.S.C. §§ 1589, 1590, 1595) | World Enterprises d/b/a Advance Vending; World Enterprises d/b/a Family Stores True Value; DCCS, Inc. d/b/a John's Market Place; Elizabeth Smith d/b/a Sierra Wholesale; Ensign Learning Center; Order Bank; Mitchell & Associates; Paul Elden Kingston Sr.; Four Corners d/b/a A-1 Disposal; N.W.R. Limited Partnership d/b/a Washakie Ranch; John Daniel Kingston Sr.; DCCS |
| II (Involuntary Servitude under TVPRA, 18 U.S.C. § 1584 & Thirteenth Amendment) | World Enterprises d/b/a Advance Vending; World Enterprises d/b/a Family Stores True Value; DCCS, Inc. d/b/a John's Market Place; Elizabeth Smith d/b/a Sierra Wholesale; Ensign Learning Center; Order Bank; Mitchell & Associates; Paul Elden Kingston Sr.; Four Corners d/b/a A-1 Disposal; N.W.R. Limited Partnership d/b/a Washakie Ranch; John Daniel Kingston Sr.; DCCS |

134